# Exhibit A

Redacted in its entirety

# Exhibit B

Redacted in its entirety

# Exhibit C

Redacted:  Pages 41 - 511
Public:  Pages 512 - 518
Redacted:  Pages 519 - 549

# CONSULTING AGREEMENT

This Agreement is made and entered into as of July xx, 2020 ("Effective Date") by and between James Alexander. ("Company"), having a principal place of business at 13535 Ventura Blvd., Suite C, PMB 405, Sherman Oaks, CA 91423 and Meghan Gardler ("Consultant") having a principal place of business at 2203 Webster St, St 2, San Francisco CA 94115.

1. <u>Engagement of Services</u>. Company may issue Project Assignments to Consultant in the form attached to this Agreement as <u>Exhibit A</u> (Project Assignment). A Project Assignment will become binding when both parties have signed it and once signed, Consultant will be obligated to provide the services and to deliver the materials and deliverables as specified in each Project Assignment. The terms of this Agreement will govern all Project Assignments and services undertaken by Consultant for Company. Consultant represents, warrants and covenants that Consultant will perform the services under this Agreement in a timely, professional and workmanlike manner and that all materials and deliverables provided to Company will comply with (i) the requirements set forth in the Project Assignment, (ii) the documentation and specifications for those materials and deliverables, (iii) any samples or documents provided by Consultant to Company.

2. <u>Compensation; Timing</u>. Company will pay Consultant the fee set forth in each Project Assignment for the services provided as specified in that Project Assignment. The Company will reimburse Consultant's documented, out-of-pocket expenses no later than thirty (10) days after Company's receipt of Consultant's invoice, per the Company's expense policy in place at the time any such expense is incurred. Upon termination of this Agreement for any reason, Consultant will be (a) paid fees on the basis stated in the Project Assignment(s) and (b) reimbursed only for expenses that are properly incurred prior to termination of this Agreement and which are either expressly identified in a Project Assignment or approved in advance in writing by an authorized Company manager.

3. <u>Independent Contractor Relationship</u>. Consultant's relationship with Company is that of an independent contractor, and nothing in this Agreement is intended to, or shall be construed to, create a partnership, agency, joint venture, employment or similar relationship. Consultant shall refer to relationship with Company as encompassing "Consulting or Advisory". Consultant will not be entitled to any of the benefits that Company may make available to its employees, including, but not limited to, group health or life insurance, profit sharing or retirement benefits. Consultant is not authorized to make any representation, contract or commitment on behalf of Company unless specifically requested or authorized in writing to do so by a Company manager. Consultant is solely responsible for, and will file, on a timely basis, all tax returns and payments required to be filed with, or made to, any federal, state or local tax authority with respect to the performance of services and receipt of fees under this Agreement. Consultant is solely responsible for, and must maintain adequate records of, expenses incurred in the course of performing services under this Agreement. No part of Consultant's compensation will be subject to withholding by Company for the payment of any social security, federal, state or any other employee payroll taxes. Company will regularly report amounts paid to Consultant by filing Form 1099MISC with the Internal Revenue Service as required by law.

4. <u>Disclosure and Assignment of Work Resulting from Project Assignments</u>.

    4.1. <u>"Innovations" and "Company Innovations" Definitions</u>. In this Agreement, "Innovations" means all discoveries, designs, developments, improvements, inventions (whether or not protectable under patent laws), works of authorship, information fixed in any tangible medium of expression (whether or not protectable under copyright laws), trade secrets, know-how, ideas (whether or not protectable under trade secret laws), mask works, trademarks, service marks, trade names and trade

dress. "Company Innovations" means Innovations that Consultant, solely or jointly with others, creates, derives, conceives, develops, makes or reduces to practice under a Project Assignment.

4.2.    Disclosure and Assignment of Company Innovations. Consultant agrees to maintain adequate and current records of all Company Innovations, which records shall be and remain the property of Company. Consultant agrees to promptly disclose and describe to Company all Company Innovations. Consultant represents, warrants and covenants that all Company Innovations shall be free and clear of any liens and encumbrances. Consultant hereby does and will irrevocably assign to Company or Company's designee all of Consultant's right, title and interest in and to any and all Company Innovations and all associated records, such assignment to occur with respect to each Company Innovation at the time the Company Innovation is first conceived, made, derived, developed, written or created, and regardless of when the Company Innovation is first conceived, made, derived, developed, written or created. To the extent any of the rights, title and interest in and to Company Innovations cannot be assigned by Consultant to Company, Consultant hereby grants to Company an exclusive, royalty-free, transferable, irrevocable, worldwide, fully paid-up license (with rights to sublicense through multiple tiers of sublicensees) to fully use, practice and exploit those non-assignable rights, title and interest, including, but not limited to, the right to make, use, sell, offer for sale, import, have made, and have sold, the Company Innovations. Tothe extent any of the rights, title and interest in and to the Company Innovations can neither be assigned nor licensed by Consultant to Company, Consultant hereby irrevocably waives and agrees never to assert the non-assignable and non-licensable rights, title and interest against Company, any of Company's successors in interest, or any of Company's customers. If any Company Innovations include any work of authorship that qualifies as a "work made for hire" as defined in subclause (2) under Section 101 of the Copyright Law of the United States (Title 17 of the United States Code, as may be amended from time to time), Company and Consultant agree that Company owns such work of authorship as a work made for hire under such section.

4.3.    Assistance. Consultant agrees to perform, during and after the term of this Agreement, all acts that Company deems necessary or desirable to permit and assist Company, at its expense, in obtaining, perfecting and enforcing the full benefits, enjoyment, rights and title throughout the world in the Company Innovations as provided to Company under this Agreement. If Company is unable for any reason to secure Consultant's signature to any document required to file, prosecute, register or memorialize the assignment of any rights under any Company Innovations as provided under this Agreement, Consultant hereby irrevocably designates and appoints Company and Company's duly authorized officers and agents as Consultant's agents and attorneys-in-fact to act for and on Consultant's behalf and instead of Consultant to take all lawfully permitted acts to further the filing, prosecution, registration, memorialization of assignment, issuance and enforcement of rights in, to and under the Company Innovations, all with the same legal force and effect as if executed by Consultant. Theforegoing is deemed a power coupled with an interest and is irrevocable.

4.4.    Consultant Out-of-Scope Innovations. If Consultant incorporates or permits to be incorporated any Innovations relating in any way, at the time of conception, reduction to practice, creation, derivation, development or making of the Innovation, to Company's business or actual or demonstrably anticipated research or development but which were conceived, reduced to practice, created, derived, developed or made by Consultant (solely or jointly) either unrelated to Consultant's work for Company under this Agreement or prior to the Effective Date (collectively, the "Out-of-Scope Innovations") into any of the Company Innovations, then Consultant hereby grants to Company and Company's designees a royalty-free, transferable, irrevocable, worldwide, fully paid-up license (with rights to sublicense through multiple tiers of sublicensees) to fully use, practice and exploit all patent, copyright, moral right, mask work, trade secret and other intellectual property rights relating to the Out-of-Scope Innovations. Notwithstanding the foregoing, Consultant agrees that Consultant shall not incorporate, or permit to be

incorporated, any Innovations conceived, reduced to practice, created, derived, developed or made by others or any Out-of-Scope Innovations into any Company Innovations without Company's prior written consent.

      4.5.   <u>Assignment by Employees of Consultant</u>. Consultant covenants, represents and warrants that each of Consultant's employees who perform services under this Agreement has or will have a written agreement with Consultant that provides Consultant with all necessary rights to fulfill its obligations under this Agreement, including but not limited to the obligations of this Section 4.

     5.   <u>Confidentiality</u>.

      5.1.   <u>Definition of Confidential Information</u>. "Confidential Information" means (a) any technical and non-technical information related to the Company's business and current, future and proposed products and services of Company, including for example and without limitation, Company Innovations, Company Property (as defined in Section 6 (Ownership and Return of Confidential Information and Company Property)), and Company's information concerning research, development, design details and specifications, financial information, procurement requirements, engineering and manufacturing information, customer lists, business forecasts, sales information, marketing plans and business plans, in each case whether or not marked as "confidential" or "proprietary" and (b) any information that Company has received from others that may be made known to Consultant and that Company is obligated to treat as confidential or proprietary, whether or not marked as "confidential" or "proprietary".

      5.2.   <u>Nondisclosure and Nonuse Obligations</u>. Except as permitted in this Section, Consultant will not (i) use any Confidential Information or (ii) disseminate or in any way disclose the Confidential Information to any person, firm, business or governmental agency or department. Consultant may use the Confidential Information solely to perform Project Assignment(s) for the benefit of Company. Consultant shall treat all Confidential Information with the same degree of care as Consultant accords to Consultant's own confidential information, but in no case shall Consultant use less than reasonable care. If Consultant is not an individual, Consultant shall disclose Confidential Information only to those of Consultant's employees who have a need to know the information as necessary for Consultant to perform this Agreement. Consultant certifies that each of its employees will have agreed, either as a condition of employment or in order to obtain the Confidential Information, to be bound by terms and conditions at least as protective as those terms and conditions applicable to Consultant under this Agreement. Consultant shall immediately give notice to Company of any unauthorized use or disclosure of the Confidential Information. Consultant shall assist Company in remedying any the unauthorized use or disclosure of the Confidential Information. Consultant agrees not to communicate any information to Company in violation of the proprietary rights of any third party.

      5.3.   <u>Exclusions from Nondisclosure and Nonuse Obligations</u>. Consultant's obligations under Section 5.2 do not apply to any Confidential Information that Consultant can demonstrate (a) was in the public domain at or subsequent to the time the Confidential Information was communicated to Consultant by Company through no fault of Consultant; (b) was rightfully in Consultant's possession free of any obligation of confidence at or subsequent to the time the Confidential Information was communicated to Consultant by Company; or (c) was independently developed by employees of Consultant without use of, or reference to, any Confidential Information communicated to Consultant by Company. A disclosure of any Confidential Information by Consultant (a) in response to a valid order by a court or other governmental body or (b) as otherwise required by law will not be considered to be a breach of this Agreement or a waiver of confidentiality for other purposes; provided, however, that Consultant provides prompt prior written notice thereof to Company to enable Company to seek a protective order or otherwise prevent the disclosure.

6.     <u>Ownership and Return of Confidential Information and Company Property</u>. All Confidential Information and any materials and items (including, without limitation, software, equipment, tools, artwork, documents, drawings, papers, diskettes, tapes, models, apparatus, sketches, designs and lists) that Company furnishes to Consultant by Company, whether delivered to Consultant by Company or made by Consultant in the performance of services under this Agreement and whether or not they contain or disclose Confidential Information (collectively, the "Company Property"), are the sole and exclusive property of Company or Company's suppliers or customers. Consultant agrees to keep all Company Property at Consultant's premises unless otherwise permitted in writing by Company. Within five (5) days after any request by Company, Consultant shall destroy or delete electronic records of, (a) all Company Property and (b) all materials and items in Consultant's possession or control that contain or disclose any Confidential Information. Consultant will provide Company a written certification of Consultant's compliance with Consultant's obligations under this Section.

7.     <u>Indemnification</u>. Consultant will indemnify and hold harmless Company from and against any and all third party claims, suits, actions, demands and proceedings against Company and all losses, costs and liabilities related thereto arising out of or related to (i) an allegation that any item, material and other deliverable delivered by Consultant under this Agreement infringes any intellectual property rights or publicity rights of a third party or (ii) any negligence by Consultant or any other act or omission of Consultant, including without limitation any breach of this Agreement by Consultant.

8.     <u>Observance of Company Rules</u>. At all times while on Company's premises, Consultant will observe Company's rules and regulations with respect to conduct, health, safety and protection of persons and property.

9.     <u>No Conflict of Interest</u>. During the term of this Agreement, Consultant will not accept work, enter into a contract or accept an obligation inconsistent or incompatible with Consultant's obligations, or the scope of services to be rendered for Company, under this Agreement. Consultant warrants that, to the best of Consultant's knowledge, there is no other existing contract or duty on Consultant's part that conflicts with or is inconsistent with this Agreement. Consultant agrees to indemnify and hold harmless Company from any and all losses and liabilities incurred or suffered by Company by reason of the alleged breach by Consultant of any services agreement between Consultant and any third party.

10.    <u>Term and Termination</u>.

10.1.   <u>Term</u>. This Agreement is effective as of the Effective Date set forth above and will terminate on December 31, 2020 unless renewed or terminated earlier. Any renewal will be effective for 90 days, subject to earlier termination as set forth below. A renewal by Company or Consultant must be received in wiring on, or before the termination date and accepted by the other party.

10.2.   <u>Termination by Company</u>. Except during the term of a Project Assignment, Company may terminate this Agreement without cause at any time, with termination effective fifteen (15) days after Company's delivery to Consultant of written notice of termination. Company also may terminate this Agreement (a) immediately upon Consultant's breach of Section 4 (Disclosure and Assignment of Work Resulting from Project Assignments), 5 (Confidentiality) or 11 (Noninterference with Business) or
(b) immediately for a breach by Consultant if Consultant's breach of any other provision under this Agreement or obligation under a Project Assignment is not cured within ten (10) days after the date of Company's written notice of breach. Company may terminate a Project Assignment at any time upon three
(3) days' prior written notice to Consultant and, in that event, Company will pay Consultant for services properly performed prior to the date of termination.

10.3.    Termination by Consultant. Except during the term of a Project Assignment, Consultant may terminate this Agreement without cause at any time, with termination effective fifteen (15) days after Consultant's delivery to Company of written notice of termination. Consultant also may terminate this Agreement immediately for a material breach by Company if Company's material breach of any provision of this Agreement is not cured within ten (10) days after the date of Consultant's written notice of breach.

Effect of Expiration or Termination. Upon expiration or termination of this Agreement, Company shall pay Consultant for services properly performed under this Agreement as set forth in each then pending Project Assignment.

10.4.    The definitions contained in this Agreement and the rights and obligations contained in this Section and Sections 4 (Disclosure and Assignment of Work Resulting from Project Assignments), 5 (Confidentiality), 6 (Ownership and Return of Confidential Information and Company Property), 7 (Indemnification), 11 (Noninterference with Business) and 12 (General Provisions) will survive any termination or expiration of this Agreement.

11.    Noninterference with Business. During this Agreement, and for a period of two (2) years immediately following the termination or expiration of this Agreement, Consultant agrees not to solicit or induce any employee or independent contractor involved in the performance of this Agreement to terminate or breach an employment, contractual or other relationship with Company.

12.    General Provisions.

12.1.    Successors and Assigns. Consultant shall not assign its rights or delegate any performance under this Agreement without the prior written consent of Company. For the avoidance of doubt, Consultant may not subcontract performance of any services under this Agreement to any other contractor or consultant without Company's prior written consent. All assignments of rights byConsultant are prohibited under this paragraph, whether they are voluntary or involuntary, by merger, consolidation, dissolution, operation of law, or any other manner. For purposes of this paragraph, (i) a "change of control" is deemed an assignment of rights; and (ii) "merger" refers to any merger in which Consultant participates, regardless of whether it is the surviving or disappearing entity. Any purported assignment of rights or delegation of performance in violation of this paragraph is void. This Agreement will be for the benefit of Company's successors and assigns and will be binding on Consultant's permitted assignees.

12.2.    Injunctive Relief. Consultant's obligations under this Agreement are of a unique character that gives them particular value; Consultant's breach of any of these obligations will cause irreparable and continuing damage to Company for which money damages are insufficient, and Company is entitled to injunctive relief, a decree for specific performance, and all other relief as may be proper (including money damages if appropriate), without the need to post a bond.

12.3.    Notices. Any notice required or permitted by this Agreement shall be in writing and shall be delivered as follows, with notice deemed given as indicated: (a) by personal delivery, when actually delivered; (b) by overnight courier, upon written verification of receipt; (c) by facsimile transmission, upon acknowledgment of receipt of electronic transmission; or (d) by certified or registered mail, return receipt requested, upon verification of receipt. Notice shall be sent to the addresses set forth above or to such other address as either party may provide in writing.

12.4.    Governing Law; Forum. The laws of the United States of America and the State of California govern all matters arising out of or relating to this Agreement without giving effect to any conflict of law principles. Each of the parties irrevocably consents to the exclusive personal jurisdiction of

the federal and state courts located in Los Angeles County, California, as applicable, for any matter arising out of or relating to this Agreement, except that in actions seeking to enforce any order or any judgment of the federal or state courts located in Los Angeles County, California, personal jurisdiction will be non- exclusive. Additionally, notwithstanding anything in the foregoing to the contrary, a claim for equitable relief arising out of or related to this Agreement may be brought in any court of competent jurisdiction. If a proceeding is commenced to resolve any dispute that arises between the parties with respect to the matters covered by this Agreement, the prevailing party in that proceeding is entitled to receive its reasonable attorneys' fees, expert witness fees and out-of-pocket costs, in addition to any other relief to which that prevailing party may be entitled.

12.5.    Severability. If a court of law holds any provision of this Agreement to be illegal, invalid or unenforceable, (a) that provision shall be deemed amended to achieve an economic effect that is as near as possible to that provided by the original provision and (b) the legality, validity and enforceability of the remaining provisions of this Agreement shall not be affected.

12.6.    Waiver; Modification. If Company waives any term, provision or Consultant's breach of this Agreement, such waiver shall not be effective unless it is in writing and signed by Company. No waiver by a party of a breach of this Agreement shall constitute a waiver of any other or subsequent breach by Consultant. This Agreement may be modified only by mutual written agreement of authorized representatives of the parties.

12.7.    Entire Agreement. This Agreement constitutes the final and exclusive agreement between the parties relating to this subject matter and supersedes all agreements, whether prior or contemporaneous, written or oral, concerning such subject matter.

IN WITNESS WHEREOF, the parties are signing this Project Assignment as of the later date below.

"Company"                                          "Consultant"

JAMES ALEXANDER                                    MEGHAN GARDLER

By:_____                       By: _____

Date: :  07/27/2020                                Date:  07/27/2020

Exhibit A

PROJECT ASSIGNMENT

Services and Deliverables to be Provided

1. Marketing – provide Company with a comprehensive 30/60/90 day plan and GTM strategy to distribute crypto financial products and wealth management services. The plan will be including but not limited to the following:

   • Outline of digital marketing including email, social media, website, SEO, digital lead generation, etc.

   • Branding, value proposition, press kit.

   • Public Relations and media strategy when ready for wider launch

2. Prospects – curate lists of prospective clients.

3. Sales Support – support the development and execution of marketing plan to potential clients.

4. KPI Metrics – deliver framework for measuring performance.   And criteria for payment of Bonus.

Milestones and Milestone Dates for Completion of the Services and Delivery of the Deliverables

2020 Milestones

1. Minimum 10 hours per week.

2. 30/60/90 Day Plan due within 1 week of Effective Date.

3. KPI Metrics due within 30 days of Effective Date.

4. Weekly – KPI review to track key metrics.

5. Monthly – At least calendar monthly, a debrief session up to half-day.

6. Quarterly – review.

Acceptance Criteria

Consultant shall provide deliverables based on estimated dates and may from time to time revise the updated delivery dates subject to acceptance by the Company.

Acceptance Procedure

Consultant may provide written request for acceptance of delivery of deliverables and which Company will accept within 72 hours or provide written revisions required for acceptance.

Payment of Fees. 12,000 USDC per calendar month, paid bi-monthly in arrears to

Meghan Gardler: Wells Fargo Bank

ACCT #: 6200019484   ROUTING: 031000503

Payment of Bonus.  An annual discretionary bonus of up to 30% of annualized Fees (7.5% quarterly), payable within 30 days of each calendar quarter, will be available based on KPI Metrics.  The amount payable will be at the sole discretion of the Company.

Expenses. Company will reimburse Consultant for any pre-approved expenses incurred in connection with this Project Assignment upon receipt of proper documentation of those expenses from Consultant, subject to the Company's expense policy in place at the time the expense is incurred.

# Exhibit D

```
 1            IN THE UNITED STATES BANKRUPTCY COURT

 2               FOR THE DISTRICT OF DELAWARE

 3

       _____

 4     In re:                        )

 5     CRED INC., et al.,            )

 6               Debtors.            )

 7     _____)

 8     CRED INC., CRED CAPITAL,      )

 9     INC., and CRED(US)LLC,        )

10               Plaintiffs,         )

11        V.                         )Case No. 20-12836(JTD)

12     JAMES ALEXANDER,              )

13               Defendant.          )

       _____)

14

15     VIDEOTAPED REMOTE DEPOSITION OF JAMES ALEXANDER

16      Deponent testifying from Los Angeles, California

17               Tuesday, February 9, 2021

18                      Volume I

19

20     Stenographically Reported By:

21     Melissa M. Villagran, RPR

22     CSR No. 12543

23     Job No. 4455511

24

25     PAGES 1 - 137
```

Page 1

| | |
|---|---|
| 1     IN THE UNITED STATES BANKRUPTCY COURT | 1  APPEARANCES (Continued): |
| 2      FOR THE DISTRICT OF DELAWARE | 2 |
| 3 | 3     COUSINS LAW, LLC |
| _____ | 4     BY: SCOTT COUSINS |
| 4 In re:       ) | 5     Attorney at Law |
| 5 CRED INC., et al.,   ) | 6     1521 Concord Pike |
| 6     Debtors.   ) | 7     Wilmington, DE 19803 |
| 7 _____) | 8     302.549.0186 |
| 8 CRED INC., CRED CAPITAL,  ) | 9 |
| 9 INC., and CRED(US)LLC,   ) | 10    BROWN RUDNICK |
| 10    Plaintiffs,  ) | 11    BY: PATRICK GILMAN |
| 11    V.    )Case No. 20-12836(JTD) | 12    Attorney at Law |
| 12 JAMES ALEXANDER,     ) | 13    601 Thirteenth Street NW, Suite 600 |
| 13    Defendant.  ) | 14    Washington, District of Columbia 20005 |
| 14 _____) | 15    202.536.1700 |
| 15 | 16    Pgilman@brownrudnick.com |
| 16 | 17 |
| 17    Videotaped Remote deposition of JAMES | 18 |
| 18 ALEXANDER, Volume I, taken on behalf of Plaintiffs. | 19 |
| 19 Deponent testifying from Los Angeles, California, | 20 |
| 20 beginning at 12:07 p.m. and ending at 4:35 p.m. on | 21 |
| 21 Tuesday, February 9, 2021, before Melissa M. | 22 |
| 22 Villagran, RPR, Certified Shorthand Reporter | 23 |
| 23 No. 12543. | 24 |
| 24 | 25 |
| 25 | |
| Page 2 | Page 4 |
| 1 APPEARANCES: | 1 APPEARANCES (Continued): |
| 2 (ALL ATTENDEES APPEARING REMOTELY) | 2 |
| 3 | 3 For U.S. Trustees: |
| 4    BUCHANAN INGERSOLL ROONEY | 4    OFFICE OF THE U.S. TRUSTEE |
| 5    BY: GEOFFREY GRIVNER | 5    BY: JOSEPH McMAHON, ESQ. |
| 6    Attorney at Law | 6    Attorney at Law |
| 7    50 South 16th Street, Suite 3200 | 7    1313 North Market Street |
| 8    Philadelphia, Pennsylvania 19102 | 8    Wilmington, Delaware 19801 |
| 9    215.665.3921 | 9    302.573.6277 |
| 10   Geoffrey.grivner@bipc.com | 10   Joseph.mcmahon@usdoj.com |
| 11 | 11 |
| 12 For Defendants: | 12 Counsel to the Official Committee of Unsecured |
| 13   PAUL HASTINGS | 13 Creditors: |
| 14   BY: AVI LUFT | 14   McDERMOTT WILL & EMERY |
| 15     SCOTT CARLTON | 15   BY: JOSEPH B. EVANS |
| 16   Attorneys at Law | 16    TIMOTHY W. WALSH |
| 17   515 South Flower Street, #25 | 17    DARREN AZMAN |
| 18   Los Angeles, California 90071 | 18    SAMUEL ASHWORTH |
| 19   213.683.6105 | 19   Attorneys at Law |
| 20   Scottcarlton@paulhastings.com | 20   340 Madison Avenue |
| 21   Aviluft@paulhastings.com | 21   New York, New York 10173-1922 |
| 22 | 22   212.547.5400 |
| 23 | 23   jbevans@mwe.com |
| 24 | 24 |
| 25 | 25 |
| Page 3 | Page 5 |

2 (Pages 2 - 5)

1  APPEARANCES (Continued):
2
3  Videographer:
4     Brandon Miller
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                    Page 6

1              INDEX (CONTINUED)
2
3                 EXHIBITS
4  DEPOSITION                      PAGE
5  Exhibit G   July 31, 2020 JPMorgan Chase    95
6          Bank Account Statement
7
8  Exhibit H   Wells Fargo Account Statement    102
9
10 Exhibit I   Excel Spreadsheet           108
11
12 Exhibit J   Coinbase Account Statement      111
13
14
15
16
17         PREVIOUSLY MARKED EXHIBITS
18             (None.)
19
20         INFORMATION REQUESTED
21             (None.)
22
23         INSTRUCTION NOT TO ANSWER
24             (None.)
25
                                    Page 8

1                 INDEX
2
3  DEPONENT                EXAMINATION
4  JAMES ALEXANDER
5  Volume I
6       BY MR. EVANS              11
7
8
9              EXHIBITS
10 DEPOSITION                      PAGE
11 Exhibit A   Wells Fargo Account Detail     42
12
13 Exhibit B   January 31, 2021 Wells Fargo    62
14          Bank Statement
15
16 Exhibit C   Declaration of James Alexander   68
17
18 Exhibit D   Interrogatory Responses       69
19
20 Exhibit E   Coinbase Transaction Report     74
21
22 Exhibit F   Temporary Restraining Order and   85
23          Preliminary Injunction
24
25
                                    Page 7

1  Los Angeles, California, Tuesday, February 9, 2021
2          12:07 p.m.
3
4      THE VIDEOGRAPHER:  Good afternoon.  We're
5  going on the record at 12:07 p.m. Pacific Standard    12:07:13
6  Time on February 9th, 2021.
7      Please note the microphones are very, very
8  sensitive and may pick up whispering.  However,
9  please speak slowly with your voices up at all
10 times.                                12:07:33
11     Please silence all cell phones and place away
12 from microphones, as they can interfere with
13 deposition audio.
14     Audio and video recording will continue to
15 take place, unless all parties agree to go off the    12:07:39
16 record.
17     This is Media No. 1 of the video-recorded
18 deposition of James Alexander taken by counsel in
19 the matter of "In re Cred Inc. et al." filed in
20 United States Bankruptcy Court, the District of    12:07:58
21 Delaware.  Case No. is 20-12836(JTD), Jointly
22 Administered Adversary Proceeding No. 20-51006.
23     This deposition is taking place via virtual
24 Zoom, and all participants are appearing remotely.
25     My name is Brandon Miller from the firm    12:08:26
                                    Page 9

3 (Pages 6 - 9)

1 Veritext Legal Solutions, and I'm the videographer.
2 The court reporter is Melissa Villagran from the
3 firm Veritext Legal Solutions.  I am not related to
4 any party in this action, nor am I financially
5 interested in the outcome.          12:08:39
6       Counsel and all present in the rooms and
7 everyone attending remotely will now state their
8 appearances and affiliations for the record,
9 beginning with the noticing attorney, and the
10 witness may be sworn in.          12:08:53
11       MR. EVANS:  Joseph Evans from McDermott Will
12 & Emery on behalf of the Official Committee of
13 Unsecured Creditors.  I'm here with my colleagues,
14 Timothy Walsh and Samuel Ashworth.
15       MR. GRIVNER:  Geoffrey Grivner of Buchanan    12:09:07
16 Ingersoll & Rooney on behalf of the witness,
17 Mr. Alexander.
18       MR. LUFT:  Avi Luft of Paul Hastings on
19 behalf of the debtor.  With me is my colleague,
20 Scott Carlton, and my colleague, Scott Cousins of    12:09:10
21 the Cousins Law Firm, and my colleague, Mack Wilson,
22 will be joining us later.
23       MR. GILMAN:  This is Patrick Gilman with
24 Brown Rudwick.  I represent the examiner in this
25 matter, Robert Stark.          12:09:31

Page 10

1       MR. McMAHON:  Joseph McMahon, Office of the
2 United States Trustee, Wilmington, Delaware,
3 representing Andrew Vera, the United States trustee
4 for Region 3.
5                 12:09:42
6            EXAMINATION
7 BY MR. EVANS:
8  Q  Good afternoon, Mr. Alexander.
9  A  Good afternoon.
10  Q  I'm going to be asking you some questions    12:09:55
11 today, and I just want to go over some ground rules.
12       We're going to try not to speak over each
13 other.  It's a little difficult on Zoom.  We have a
14 court reporter here, so I'm going to try to speak
15 slowly, and I ask that you do the same.          12:10:06
16       I'm going to ask you a series of questions.
17 We ask for your full and honest answer.
18       Your lawyer is present with you today.  He
19 may object to certain questions.  Unless the
20 objection is on the basis of privilege, you are    12:10:19
21 required to answer those questions, and you cannot
22 consult anyone while a question is pending.
23       Do you understand that?
24  A  Yes.
25  Q  Okay.          12:10:33

Page 11

1       I know we're virtual.
2       There's no one else in the room with you
3 today, is there?
4  A  Sorry?
5  Q  Is there anyone else in the room with you    12:10:40
6 today?
7  A  No.  No.
8  Q  Okay.
9       And I know you probably have your cell phone
10 on you.  I would ask that you not text or    12:10:49
11 communication with anyone while this deposition is
12 pending, unless you are speaking with your lawyer
13 during a break.
14  A  Okay.
15       I'm trying to pause these incoming messages.    12:10:59
16 I'm not sure how to do it.
17       Can you just bear with me for a second?
18       MR. GRIVNER:  Mr. Evans, I will note that
19 while Mr. Alexander is working on that, that the
20 scope of this deposition is limited to the order as    12:11:28
21 issued by -- by the judge previously, and I may
22 instruct the witness not to answer questions if it's
23 beyond the scope of the limited scope of the
24 deposition, as ordered by the judge in this case.
25       MR. EVANS:  I'm not sure what your definition    12:11:50

Page 12

1 is of the scope, Geoffrey, but I'll take your
2 objections as you raise them.
3       MR. LUFT:  Why don't we go off the record
4 while he fixes his problem.
5       MR. EVANS:  Agreed.          12:12:10
6       THE VIDEOGRAPHER:  Okay.  Stand by, please.
7 This marks the end of Media No. 1.  Going off the
8 record at 12:12 p.m. Pacific.
9       (Recess.)
10       THE VIDEOGRAPHER:  We are back on the record    12:14:17
11 at 12:14 p.m. Pacific, and this marks the beginning
12 of Media No. 2, deposition of James Alexander.
13       You may proceed, Counsel.
14 BY MR. EVANS:
15  Q  Mr. Alexander, what is your full legal name?    12:14:34
16  A  James Alexander.
17  Q  Do you have a middle name?
18  A  No middle name.
19  Q  Okay.
20       So just James Alexander.          12:14:44
21       Where do you live?
22  A  California.
23       Do you want to be more specific than that or?
24  Q  Yes.  What is your current address?
25  A  My current mailing address or home address?    12:14:57

Page 13

4 (Pages 10 - 13)

| | |
|---|---|
| 1  Q  Both. | 1  Q  Do you know how much is owed on that |
| 2  A  Current mailing address is 13535 Ventura | 2  mortgage? |
| 3  Boulevard.  And that's Suite C405.  That's Sherman | 3  A  It's -- I can -- I can give you an |
| 4  Oaks, California 91423. | 4  approximate amount.  Is that what you're looking |
| 5      Did you say you wanted my home?    12:15:21 | 5  for?                               12:17:47 |
| 6  Q  Home and business, yes, please. | 6  Q  Sure. |
| 7  A  The home address is 3551 Dixie Canyon Place. | 7  A  Approximately a million dollars. |
| 8  That's Sherman Oaks, California 91423. | 8  Q  And do you have a sense as to the total value |
| 9  Q  Okay. | 9  of the house, at least when you purchased it?  I |
| 10     And how long have you lived at that address?   12:15:35 | 10  assume it was a year ago.                12:17:55 |
| 11  A  About a year. | 11  A  1.260. |
| 12  Q  Where did you live prior to that? | 12  Q  And just -- you did purchase that a year ago, |
| 13  A  Do you -- do you want the address? | 13  right? |
| 14  Q  Yes. | 14  A  About a year ago.  I don't recall the exact |
| 15  A  The address is 4051 Finley, spelled    12:15:48 | 15  date.                                12:18:07 |
| 16  F-i-n-l-e-y, Avenue.  That's Apartment 6, Los | 16  Q  Do you hold a current passport? |
| 17  Angeles, California 90027. | 17  A  Sorry? |
| 18  Q  And how long did you reside at that address? | 18  Q  Do you have a passport? |
| 19  A  Four years. | 19  A  I do, yes. |
| 20  Q  Prior to that?                12:16:02 | 20  Q  When is the last time that you left the    12:18:18 |
| 21  A  Prior to that.  Prior to that... | 21  United States? |
| 22  Q  Where did you reside? | 22  A  I don't -- I don't recall.  I would have to |
| 23  A  Do you want the address? | 23  look back at my records. |
| 24  Q  Yes. | 24  Q  Have you left the United States in the last |
| 25  A  The address prior to that was 427 Alma   12:16:16 | 25  six months?                          12:18:33 |
| Page 14 | Page 16 |
| 1  Street, Palo Alto, California 94301. | 1  A  What month are we now?  I -- I -- I would |
| 2  Q  And your current residence, do you live there | 2  have to check my records.  Sorry.  I can't recall. |
| 3  alone, or do you live with anyone else? | 3  Q  When did you first become involved with |
| 4  A  I live -- I don't live alone.  I live with my | 4  cryptocurrency? |
| 5  family.                          12:16:46 | 5  A  Can -- can -- can you clarify the question?   12:18:54 |
| 6  Q  Okay. | 6  What do you mean? |
| 7      Are you married? | 7  Q  We can take it in a few parts, then. |
| 8  A  Yes. | 8      When did you first purchase cryptocurrency of |
| 9  Q  What's your spouse's name? | 9  any kind? |
| 10  A  Alyiah Alexander.  A-l-y-i-a-h, if you're --   12:16:49 | 10  A  I don't recall the exact date.  I would have   12:19:09 |
| 11  Q  Do you have children? | 11  to look at my records. |
| 12  A  Yes. | 12      Are you looking for an approximate date or? |
| 13  Q  How many? | 13  Q  Sure.  Give me an approximate year.  Give me |
| 14  A  Two. | 14  a year.  That's all I need. |
| 15  Q  Age?                     12:17:03 | 15  A  So are you -- are you talking about purchase   12:19:32 |
| 16  A  18 months, year-and-a-half. | 16  cryptocurrency for myself, or in the contracts of my |
| 17  Q  Both of them? | 17  employment?  I -- I -- I'm trying to understand |
| 18  A  Yes. | 18  the -- the line of question. |
| 19  Q  And your current address, do you own it?  Do | 19  Q  I was talking when you personally first |
| 20  you rent?  What's the status?            12:17:17 | 20  purchased cryptocurrency either for yourself or for   12:19:48 |
| 21  A  The status of our house? | 21  a company.  I'm just asking how long you have been |
| 22  Q  Yes. | 22  involved with cryptocurrency. |
| 23  A  We own. | 23      COURT REPORTER:  Can we -- hold on.  Can |
| 24  Q  And is there a mortgage on that house? | 24  we -- hold on.  Can we go off the record, please? |
| 25  A  There is, yes.                12:17:30 | 25      MR. EVANS:  Yeah.                 12:19:58 |
| Page 15 | Page 17 |

5 (Pages 14 - 17)

1    THE VIDEOGRAPHER: Stand by. Going off the
2 record at 12:20 Pacific.
3    (Recess.)
4    THE VIDEOGRAPHER: We are back on the record
5 at 12:25 p.m. Pacific, and this marks the beginning    12:25:05
6 of Media No. 3, deposition of James Alexander.
7    We also need to still swear in the witness
8 for this proceeding. Would you please do that now,
9 Madam Court Reporter?
10    COURT REPORTER: Mr. Alexander, please raise
11 your right hand.
12    Do you solemnly swear that the testimony you
13 are about to give will be the truth, the whole
14 truth, and nothing but the truth, so help you God?
15    THE DEPONENT: I do.           12:25:33
16    THE VIDEOGRAPHER: Thank you.
17    You may proceed.
18
19       JAMES ALEXANDER,
20 having been administered an oath, was examined and    12:25:34
21 testified as follows:
22
23 BY MR. EVANS:
24    Q  When did you first purchase cryptocurrency?
25    A  Could you clarify the question? Is it for    12:25:41

Page 18

1 myself or for company as directed by me or as done
2 by me directly?
3    Q  Let's do them both ways. When did you first
4 purchase cryptocurrency for yourself?
5    A  I -- I don't recall. I would have to look    12:25:58
6 back at my records.
7    Q  Can you give me a ballpark? What year?
8    A  Approximately 2020 is my -- but I -- that's
9 an estimate.
10    Q  Okay.              12:26:11
11    So prior to 2020, you don't recall purchasing
12 any cryptocurrency for yourself?
13    A  That's correct.
14    Q  When is the first time that you worked in a
15 company that was in the cryptocurrency industry?    12:26:27
16    A  The first time I worked. Was employed?
17    Q  Worked, employed, yeah, sure.
18    A  August of 2018.
19    Q  Okay.
20    So is that when you were hired at Cred?    12:26:46
21    A  That's right, yes.
22    Q  So prior to Cred, you hadn't worked with any
23 companies that dealt in cryptocurrency?
24    A  Can you be more specific?
25    Q  I'm -- I'm not sure what the misunderstanding    12:27:04

Page 19

1 is, but prior to Cred, did you work at any companies
2 that had any involvement with cryptocurrency
3 whatsoever?
4    A  I -- I don't know. I -- I can't answer that
5 question. There were companies that dealt in crypto    12:27:16
6 and I wasn't aware of them dealing in crypto. I
7 can't -- I can't confirm or answer that question.
8    Q  Okay.
9    We'll go the long way then.
10    Where did you go to college?         12:27:27
11    A  Where did I attend or where did I graduate
12 from?
13    Q  Where did you graduate?
14    A  At Western University.
15    Q  Where did you work after that?    12:27:39
16    A  I worked in financial services.
17    Q  What company did you work for after college?
18    A  I don't have my résumé in front of me. I
19 can't answer that without my full résumé.
20    Q  You don't remember your first job out of    12:27:51
21 college? Is that what you are saying today?
22    A  That is correct. It was 20-some years ago,
23 30 years ago.
24    Q  What about your second job out of college?
25 Do you remember that, or you don't remember that    12:28:08

Page 20

1 either?
2    A  I -- I don't recall. I would need to access
3 my résumé or -- or my -- my records.
4    Q  Did you work at Goldman Sachs from 1990 to
5 1992?                12:28:24
6    A  I was a -- I had an internship at Goldman
7 Sachs at -- I don't recall the dates, though.
8    Q  Did you work at RBC Capital Markets from 1993
9 to 1996?
10    A  I don't recall. I -- I believe that    12:28:38
11 company was acquired. Isn't RBC -- wasn't that the
12 acquirer of a company that I worked at previously?
13    Q  I'm not sure. I'm looking at your LinkedIn,
14 Mr. Alexander, that you -- that you control that's
15 on your Website.             12:28:58
16    A  Often -- oftentimes, the companies are
17 acquired, so I can't confirm that.
18    Q  Okay.
19    From January 2000 to January 2010, your
20 LinkedIn says you were a cofounder of Alternative    12:29:10
21 Capital Associates; is that correct?
22    A  That is correct.
23    Q  What does Alternative Capital Associates do?
24    A  Financial services.
25    Q  Okay.              12:29:23

Page 21

6 (Pages 18 - 21)

| | | | |
|---|---|---|---|
| 1 | Does Alternative Capital Associates do any | 1 | that. |
| 2 | financial services that relate to cryptocurrency? | 2 | Q  Look, I'm just asking if you worked there. |
| 3 | A  No. | 3 | Did you work there from January to -- 2015 to |
| 4 | Q  Okay. | 4 | August 2018? |
| 5 | Your next job was at Prosper Marketplace,  12:29:34 | 5 | A  I don't recall.  12:31:33 |
| 6 | right? | 6 | Q  What does A Capital A do? |
| 7 | A  I believe -- I believe so. | 7 | A  Financial services. |
| 8 | Q  Okay. | 8 | Q  Do the financial services provided by A |
| 9 | What did you do at Prosper Marketplace? | 9 | Capital A have anything to do with cryptocurrency? |
| 10 | A  I was involved in financial services.  12:29:48 | 10 | A  No.  12:31:49 |
| 11 | Q  Were the financial services that were | 11 | Q  Okay. |
| 12 | provided by Prosper Marketplace, did they have | 12 | What did you do after you left A Capital A in |
| 13 | anything to do with cryptocurrency? | 13 | August 2018? |
| 14 | A  No. | 14 | A  I was hired by Libra Credit.  Also by Cyber |
| 15 | Q  Your next job was at The Lending Club, right?  12:30:03 | 15 | Quant PTE.  12:32:06 |
| 16 | A  I don't recall.  I -- I have had involvement | 16 | Q  Okay. |
| 17 | with Lending Club.  I believe I was a consultant | 17 | Let's talk about Cyber Quant.  What's Cyber |
| 18 | there. | 18 | Quant? |
| 19 | Q  Okay. | 19 | A  Cyber Quant is an affiliate of Libra Credit, |
| 20 | You were then involved with Colchis Capital  12:30:16 | 20 | a Singapore incorporated company affiliated -- yeah,  12:32:18 |
| 21 | Management, L.P.  you were the head of business | 21 | affiliated to Libra Credit. |
| 22 | development; is that right? | 22 | Q  What was your title at Cyber Quant? |
| 23 | A  That's right. | 23 | A  I don't recall. |
| 24 | Q  Did Colchis Capital Management, L.P. have | 24 | Q  What were your job responsibilities at Cyber |
| 25 | anything to do with cryptocurrency?  12:30:31 | 25 | Quant?  12:32:41 |
| | Page 22 | | Page 24 |

| | | | |
|---|---|---|---|
| 1 | A  Not to my knowledge, no. | 1 | A  I -- I don't -- I don't recall. |
| 2 | Q  You then worked at CircleUp from July 2013 to | 2 | Q  This is a job that you held as recently as |
| 3 | January 2015, right? | 3 | 2020, right? |
| 4 | A  That's correct. | 4 | A  Yeah.  These -- these were affiliated |
| 5 | Q  Did CircleUp have anything to do with  12:30:40 | 5 | companies to what eventually became Cred, so there  12:32:55 |
| 6 | cryptocurrency? | 6 | was some legal reason for my affiliation with Cyber |
| 7 | A  Not to my knowledge. | 7 | Quantum, but I don't recall what it was.  That's why |
| 8 | Q  Okay. | 8 | I can't -- I can't answer questions. |
| 9 | You then worked at Direct Lending | 9 | Because I don't know what the legal reason |
| 10 | Investments, L.L.C. from February 2016 to  12:30:48 | 10 | was for Cyber Quantum's existence and how it was  12:33:14 |
| 11 | October 2016, right? | 11 | affiliated with Libra Credit, which eventually |
| 12 | A  That's correct, yes. | 12 | became Cred.  So that's -- that's the -- that's the |
| 13 | Q  Did that company have anything to do with | 13 | confusion, I think. |
| 14 | cryptocurrency? | 14 | Q  So you mentioned three entities; Libra |
| 15 | A  Not to my knowledge.  12:30:56 | 15 | Credit.  Quant -- Quanta, Quant.  What was -- what  12:33:28 |
| 16 | Q  Okay.  You then worked at A Capital A.  You | 16 | was at Quant? |
| 17 | were a partner there from January 2015 to | 17 | A  Cyber Quantum. |
| 18 | August 2018; is that right? | 18 | Q  Okay.  And what was the third? |
| 19 | A  I don't recall. | 19 | A  Which is a Singapore entity.  And Libra |
| 20 | Q  You were a partner less than three years ago,  12:31:09 | 20 | Credit, which was the predecessor company to Cred  12:33:42 |
| 21 | and you don't recall if you worked there? | 21 | LLC. |
| 22 | A  I think that's the same company you were | 22 | Q  And you mentioned a third entity.  What was |
| 23 | referencing before.  If you are going off my | 23 | that third entity? |
| 24 | LinkedIn, I don't know how it's chronologically | 24 | A  I -- I don't know.  Those are the entities I |
| 25 | stacked, so I -- I can't confirm the exact dates of  12:31:24 | 25 | recall mentioning.  12:33:57 |
| | Page 23 | | Page 25 |

7 (Pages 22 - 25)

Page 26

```
 1   Q   Which ones?
 2   A   So you want to start over?
 3       There's -- there's Libra Credit, which was a
 4   former company or was precursor company to Cred LLC.
 5       And then there was Cyber Quantum, which is a   12:34:14
 6   Singapore company.  So maybe the confusion is in
 7   that PTE at the end, which I understand is a
 8   designation for -- local designation Singapore.
 9   Maybe that's the confusion.
10       I -- I -- I believe I mentioned two entities.   12:34:30
11   And the third being an entity Cred LLC that became
12   Cred LLC from Libra Credit.
13   Q   When you were hired by Cred LLC, what was
14   your job title?
15   A   I don't recall.                 12:34:49
16   Q   You don't recall your job title at Cred?
17   A   No, I don't.  That was from 2018, right?
18   Q   You were hired in August of 2018.  You don't
19   recall what was your title was?
20   A   I -- I don't -- I don't know exactly what it   12:35:11
21   was.  I would have to check back.
22   Q   Were you the chief capital officer of Cred?
23   A   I -- I was eventually, yes.  My title became
24   chief capital officer of Cred.  I don't -- I don't
25   know if that -- I don't recall if that changed   12:35:30
```

Page 27

```
 1   during my tenure there.
 2   Q   And what were your duties and
 3   responsibilities at Cred?
 4   A   Can you be more specific?
 5   Q   What was your job at Cred?             12:35:40
 6   A   Eventually, chief capital officer.
 7   Q   As chief capital officer, what did you have
 8   to do?
 9   A   Financial services.
10   Q   What were your day-to-day responsibilities?   12:35:54
11   A   Financial services.
12   Q   What does financial services mean to you in
13   the context of your job at Cred?
14   A   Providing financial services.
15   Q   James, what were your responsibilities at   12:36:13
16   Cred?
17   A   Financial services, quite broadly.  That
18   was -- that's my best answer.  Unless you can
19   clarify more specifically.  It's -- I --
20       (Speaking simultaneously.)         12:36:27
21   BY MR. EVANS:
22   Q   James, this was your job.  What did you do
23   every day?
24   A   It was a -- a broad agreement to provide
25   financial services, as I've said.         12:36:38
```

Page 28

```
 1   Q   What does financial services mean?
 2   A   A provision of financial services.
 3   Q   James, were you in charge of cryptocurrency
 4   trading?
 5   A   Sorry.  Can you repeat the question, please?   12:36:52
 6   Q   Did you have any involvement in
 7   cryptocurrency trading at Cred?
 8   A   What do you mean by "involvement"?
 9   Q   James, can you answer the question?  What was
10   your job at Cred?  What did you do?  It's not a   12:37:14
11   difficult question.  This is not a trick.  What was
12   your job at Cred?  What were you -- what did you
13   have to do every day?
14   A   I provided financial services.
15   Q   That's not an answer, James.         12:37:24
16   A   That's the best answer I can give you based
17   on the question.
18   Q   Okay.
19       At Cred, what was your involvement with
20   cryptocurrency?                 12:37:36
21   A   Cred, the nature of Cred's business included
22   cryptocurrency.
23   Q   And what were your responsibilities?
24   A   My responsibilities at Cred?
25   Q   Yes.                        12:37:48
```

Page 29

```
 1   A   Chief capital officer.
 2   Q   That was your role.
 3       What were your responsibilities as chief
 4   capital officer?
 5   A   Providing financial services.         12:38:01
 6   Q   What were those financial services that you
 7   were providing?
 8   A   Providing financial services.
 9   Q   Is that your complete answer, James?
10   A   Yes.                        12:38:25
11   Q   You understand you are here under a Court
12   order, right?  You understand that?
13   A   Yes.
14   Q   And there was an emergency application
15   brought and a Court order issued based on the fact   12:38:30
16   that millions of dollars of cryptocurrency were
17   moved by you on January 16th and January 17th, and
18   that's why we're here.
19       Do you understand that?
20       MR. GRIVNER:  And I'm going to note for the   12:38:40
21   record that what -- we are here today to discuss, as
22   Judge Dorsey ordered, a deposition regarding those
23   transfers.
24       And I'll certainly allow background
25   questions, but we want to limit -- the -- the -- the   12:38:53
```

8 (Pages 26 - 29)

Page 30

```
 1   scope of today's deposition is limited to those
 2   transfers -- assets that were transferred from Cred
 3   Capital at that time.
 4        You can certainly answer these questions, but
 5   at some point in time, we have to focus on the --     12:39:08
 6   the issues which Judge Dorsey ordered us -- this
 7   deposition to -- to relate to today.
 8        MR. EVANS:  Geoffrey, the -- the Court
 9   ordered the deposition based on the transfers that
10   Alexander made, all his personal assets, everything   12:39:24
11   he did at Cred, all -- everything in relation to the
12   transfers that he made at Cred.
13        I mean, the Court says it's time for
14   Mr. Alexander to start answering some difficult
15   questions and do so in a way that gives the parties   12:39:35
16   and the Court the ability to understand what's going
17   on here.
18        And I asked Mr. Alexander, "What was your job
19   at Cred?"  He says, "financial services," and
20   refuses to answer.                                     12:39:47
21        Okay?
22        MR. GRIVNER:  And -- and I'm -- I'm
23   instructing him to answer that question to the best
24   of his ability.
25        MR. EVANS:  Thank you.                            12:39:53
```

Page 31

```
 1   BY MR. EVANS:
 2   Q   Mr Alexander, let's try it again.
 3        What was your job --
 4   A   The only way to answer that question is by
 5   having access to my employment agreement, which       12:39:58
 6   has -- should have an attachment discussing my job
 7   description.  I don't have access to that.
 8   Q   James, you worked at Cred for two years.  You
 9   transferred millions of dollars of cryptocurrency
10   from Cred.  You were involved with trading and        12:40:13
11   strategy and hedging, and you were on the investment
12   committee, and we all know this.  It's not a secret.
13        So just answer the question.  What were your
14   job responsibilities at Cred?
15   A   I can't answer that without having my job          12:40:27
16   description in front of me.  I don't have access to
17   it.  You have access to those records.  I -- if you
18   could provide the employment agreement with the job
19   description, I would be happy to review it to
20   confirm or add any detail to what my exact role        12:40:40
21   and -- and day-to-day functions were.
22   Q   Okay.  So, James, your testimony today is
23   that for two years you worked at Cred, but you
24   cannot remember a single thing that you did at Cred?
25   Is that what you are saying?                           12:40:55
```

Page 32

```
 1   A   No.  I am saying that I provided financial
 2   services, and that to answer your question, we need
 3   to reference the job description in my employment
 4   agreement.
 5   Q   I'm asking you for your recollection, James.       12:41:09
 6   You worked there for two years.  What were your job
 7   responsibilities at Cred?
 8   A   I -- I can't provide you with a more precise
 9   answer from what I've provided.
10        MR. EVANS:  Can we go off the record for a        12:41:21
11   second?
12        COURT REPORTER:  All counsel in agreement?
13        MR. GRIVNER:  Yes.
14        MR. LUFT:  Sure.
15        THE VIDEOGRAPHER:  Stand by, please.  This        12:41:33
16   marks the end of Media No. 3.  Going off the record
17   at 12:41 p.m. Pacific.
18        (Recess.)
19        THE VIDEOGRAPHER:  We are back on the record
20   at 12:48 p.m. Pacific, and this marks the beginning    12:48:31
21   of Media No. 4 in the deposition of James Alexander.
22        You may proceed, Counsel.
23   BY MR. EVANS:
24   Q   Mr. Alexander, what were your job
25   responsibilities at Cred?                              12:48:43
```

Page 33

```
 1   A   You know, I -- while we were off the record,
 2   I was able to pull up some documents which, you
 3   know, this is -- we need to have access to a
 4   substantial amount of documents to -- for me to
 5   accurately answer your questions, which -- which I     12:48:58
 6   want to do, but I need to have access to the
 7   documents.
 8        So I have a copy of my original advisory
 9   agreement here.  So to clarify my relationship with
10   Cyber Quantum PTE, Limited -- so I'll spell that       12:49:10
11   out.  It's C-y-b-e-r.  Next word Quantum,
12   Q-u-a-n-t-u-m.  Next word PTE, period.  LTD period.
13        So it would appear I was a consultant to
14   Cyber Quantum PTE Limited starting on the 7th of
15   July 2018, which eventually led to my employment       12:49:36
16   with Libra Credit thereafter.
17        So in this advisory agreement, there's a very
18   specific description of my role, and I can review
19   those.  I'm not sure what the best way to do that
20   is.  To just talk through them or provide you with     12:49:58
21   the agreements?
22   Q   I just want to know what your role was at
23   each of these companies, what were your daily
24   responsibilities?
25   A   So -- and -- and to answer your question, my       12:50:11
```

Page 34:

1 role at Cyber Quantum was effectively the same as
2 the role at Cred. So these -- these lists of
3 descriptions that I'm going to provide you right now
4 of my role is substantively the same as it was at
5 Cred.                                    12:50:32
6     So I hope you understand I'm endeavoring to
7 answer your questions, but I need to answer them
8 accurately, and for that, I will need access to
9 documents.
10    So I'll start with what my job description    12:50:42
11 was at Cyber Quant PTE, and we can go from there, if
12 that makes sense.
13  Q  I just want your recollection, James. I want
14 your recollection of what your job responsibilities
15 were at Cred.                              12:50:59
16  A  Sure.
17  Q  And what your scope of job responsibilities
18 were at Cyber Quantum. That's what I'm asking.
19  A  So No. 1 was to obtain and structure credit
20 facilities for the company. Leveraging our    12:51:05
21 advisors' network of contacts.
22    The second activity was to actively work with
23 the executive team to formulate an overall credit
24 and funding strategy to the company.
25    Third was to assist the company in finding   12:51:21

Page 35:

1 additional potential team members and employees
2 for -- from amongst my network of contacts who could
3 promote the company's business and/or interests.
4     No. 4, assist the company in finding
5 suppliers, customers, strategic partners, and key    12:51:40
6 industry contacts amongst my network of contacts to
7 provide the company business and -- to promote the
8 company's business or interest.
9     Lastly, it was to provide reasonable and time
10 in response to queries by the company's directors,    12:51:58
11 officers, employees on matters that -- that I'm
12 knowledgeable about.
13  Q  Did there come a time when you worked for a
14 company called Cred Capital?
15  A  Cred Capital. Yes.                      12:52:09
16  Q  When was that?
17  A  Began full-time employment at Cred Capital on
18 June 1st. And prior to that, from the March or
19 April time frame, I had functional responsibilities
20 that were formalized on June 1st of 2020.    12:52:32
21  Q  What was Cred Capital?
22  A  Can you repeat the question?
23  Q  What was Cred Capital?
24  A  Cred Capital was an independently established
25 company intended to pursue financial services and    12:52:53

Page 36:

1 asset management services.
2  Q  And what was your responsibility at Cred
3 Capital?
4  A  I was the president and sole director.
5  Q  Okay. What were you in charge of?        12:53:12
6  A  What was I in charge of.
7     I -- I can provide you with my title, but is
8 that not sufficient? Are we going to go into one of
9 these circular discussions again?
10  Q  Well, I hope not.                      12:53:31
11    What did you have to do every day at Cred
12 Capital?
13  A  I -- I need to reference my employment
14 agreement and my job description in order to do
15 that. I don't immediately have that access, you    12:53:42
16 know, to hand.
17  Q  Okay.
18    Let -- let -- let's do it this way. What was
19 Cred Capital's business activities from January to
20 March of 2020?                            12:53:52
21  A  Sorry. January to March --
22  Q  Yep.
23  A  -- of 2020 what were Cred Capital's?
24  Q  Correct.
25  A  What were Cred Capital's.              12:54:06

Page 37:

1     Can you just repeat the question, please.
2  Q  What were the business activities of Cred
3 Capital from January 2020 to March 2020?
4  A  I don't believe Cred Capital had any business
5 operations during that quarter.            12:54:19
6  Q  Okay. So when did Cred Capital begin
7 business operations?
8  A  The second quarter of 2020.
9  Q  Okay. And what about the third quarter of
10 2020? Did Cred Capital have any business        12:54:32
11 operations?
12  A  From -- starting the third quarter of last
13 year, I pursued the business activities of Cred
14 Capital under the presumption I was the sole
15 director of Cred Capital, which I maintain I    12:54:55
16 continued to be.
17  Q  All right. So let's talk about June 2020.
18 What business activities were you pursuing in June
19 of 2020?
20  A  Sorry, guys. I'm -- I'm suffering from poor    12:55:05
21 health. I'm recovering from COVID. I -- I need to
22 take periodic breaks. So if I could ask for a --
23 a -- a logical break point that we could take a -- a
24 short break.
25  Q  When do you need a break, Mr. Alexander?    12:55:29

10 (Pages 34 - 37)

1    A   As soon as possible.  I'm feeling -- I'm
2 feeling unwell.
3        MR. WALSH:  How much time do you need?
4        THE DEPONENT:  Could you give me ten minutes?
5        MR. WALSH:  Of course, no problem.  Hope you    12:55:50
6 feel better.  We'll see you in ten minutes.
7        THE DEPONENT:  Okay.
8        THE VIDEOGRAPHER:  I'm going to go off the
9 record, Mr. Alexander.  Please hold.
10       This marks the end of Media No. 4.  Going off    12:55:55
11 the record at 12:56 p.m. Pacific.
12       (Recess.)
13       THE VIDEOGRAPHER:  Stand by, please.
14       We are back on the record at 1:07 p.m.
15 Pacific.  This marks the beginning of Media No. 5 in    01:07:25
16 the deposition of James Alexander.
17       You may proceed, Counsel.
18 BY MR. EVANS:
19   Q   Mr. Alexander, we're going to jump ahead a
20 little bit.                                           01:07:38
21       Do you recall attending a hearing in the
22 bankruptcy court on Wednesday?
23   A   Joe, before you get started, I can't find my
24 medication for some reason, so maybe we could just
25 plan for 45 minutes for break.                        01:07:50

Page 38

1        Is that agreeable to everyone?
2    Q   You want to take a break at 4:52 is what
3 you're saying?
4    A   Approximately every 45 minutes.  If I'm
5 feeling any -- if I'm feeling unwell, I'll --         01:08:06
6 I'll -- I'll raise my hand, but that's fine.  Just
7 for your sort of flow.  That would be helpful.
8    Q   No.  I appreciate that, and that's fine.  So
9 let's -- let's say we'll take a break in 45 minutes
10 at 4:53.                                             01:08:20
11       Okay?
12       So on February 3rd, 2021, you attended a
13 bankruptcy court hearing via Zoom.
14       Do you remember that?
15   A   Yes.                                          01:08:33
16   Q   And during that hearing, Counsel for the
17 Committee indicated there would be an emergency
18 motion concerning two transactions by you.
19       Do you remember that?
20   A   No, I don't recall that.                      01:08:45
21   Q   Do you recall that during that bankruptcy
22 court hearing that an emergency motion will be made
23 about you?
24   A   I remember reference to that, but I'm -- I
25 I have no idea what it means.  I'm -- I'm not a       01:09:01

Page 39

1 lawyer, and this is my first legal process of this
2 nature, so I -- it -- it doesn't -- didn't mean
3 anything to me.
4    Q   Did you ever see a copy of the motion papers
5 filed by the committee asking for emergency relief    01:09:14
6 because of cryptocurrency transactions you executed?
7    A   Sorry.  Can you repeat that question?
8    Q   Did you ever see a motion filed by the
9 committee seeking emergency relief based on
10 cryptocurrency transactions that you executed?       01:09:34
11   A   I don't know.  There's been so many legal
12 filings going back and forth.  I -- there is a lot
13 of technical terms in there that I have no
14 competency or ability to answer.
15       I have literally gotten hundreds of e-mails    01:09:52
16 since this -- since this Wednesday hearing.  Not a
17 lot of it means much to me.  I'm trying to sift
18 through it.  I'm trying to sift through it with
19 counsel.  But that's the best answer I can give you.
20   Q   You understand there was a motion that was     01:10:07
21 made about you on February 3rd, right?
22   A   It was a motion -- no, I don't know that.
23   Q   Okay.
24       You provided through your counsel copies of a
25 Wells Fargo bank account.                             01:10:26

Page 40

1        Do you recall that?
2    A   Yes.
3    Q   Okay.
4        And you maintained a Wells Fargo bank
5 account, and you said it was for Cred Capital; is    01:10:33
6 that right?
7    A   Well, I -- I maintain bank accounts at Wells
8 Fargo for James Alexander d/b/a James Alexander
9 Cred.
10   Q   Okay.                                         01:10:48
11       Maybe you can explain that to me.  Does this
12 bank account hold Cred Capital assets?
13   A   I -- I can't explain that to you because I
14 don't have the ability to determine whether these
15 are Cred Capital accounts or personal accounts.     01:11:01
16   Q   Uh-huh.
17   A   I maintain these accounts as James Alexander
18 d/b/a James Alexander Cred.  I think we need to make
19 a determination here, but I -- I can't -- I can't
20 make that determination.                            01:11:18
21       MR. EVANS:  Mr. Ashworth, can you please
22 share the February account details for the Wells
23 Fargo account as produced by Mr. Alexander, Account
24 No. 9285?
25       ///

Page 41

11 (Pages 38 - 41)

Page 42

```
 1      (Exhibit A was marked for
 2      identification and is attached
 3      hereto.)
 4   BY MR. EVANS:
 5    Q   Mr. Alexander, this is a bank account that    01:11:36
 6   you produced through your counsel, and the date on
 7   the top is February 7th, 2021.
 8      MR. EVANS:  Mr. Ashworth, if you would please
 9   scroll down to the next page.
10      You could stop there.             01:11:49
11   BY MR. EVANS:
12    Q   On February 4th, 2021, the day after the
13   bankruptcy court hearing you attended, you
14   transferred to Alexander Custom Management $100,000.
15      Do you see that?              01:12:02
16    A   I do.
17    Q   Do you intend on returning that $100,000
18   to the debtors?
19    A   What does that mean, returning to debtors?
20    Q   Will you return the money, Mr. Alexander?    01:12:18
21    A   To -- to whom?
22    Q   To the debtors, to Cred, to the persons that
23   you took it from.
24    A   Well, if -- I can't answer that.  I...
25    Q   It's a -- it's a simple question.  The    01:12:32
```

Page 43

```
 1   $100,000 that was in the account that is now in the
 2   account apparently held by Alexander Custom
 3   Management, are you going to provide that $100,000
 4   back to the debtor?
 5    A   I will rely on advice of counsel on what to    01:12:47
 6   do for any steps at this stage.  I -- I do not have
 7   the legal competency to determine whether I should
 8   or shouldn't be transferring funds.  So I'm doing
 9   nothing until I have advice from counsel.
10    Q   Okay.                   01:13:00
11      And you would -- you would admit that
12   Alexander Custom Management is an account that you
13   control, right?
14    A   Can you be more specific?  Is there an
15   account number or?               01:13:16
16    Q   Sure.
17      There was $100,000 transferred out of this
18   account on February 4th, 2021 to an account held by
19   Alexander Custom Management.
20      The account Alexander Custom Management is    01:13:24
21   owned and controlled by you, right?
22    A   Yes.
23    Q   Okay.
24      On February 4th, 2021, there was a cash
25   withdraw of $60,000.              01:13:35
```

Page 44

```
 1      Do you see that?
 2    A   So to clarify those dates, that's the posted
 3   date of the transaction.  That's not the date the
 4   transaction -- that's not the date of the
 5   transaction.  That's the date of the posting of the    01:13:46
 6   transaction.
 7    Q   Uh-huh.
 8    A   And postings can take many days in -- in
 9   financial services, so --
10    Q   Okay.                   01:13:56
11      So let me make the question a little -- let
12   me make the question a little easier.
13      (Speaking simultaneously.)
14    A   -- transaction date, please.
15    Q   Okay.                   01:14:01
16    A   If you could --
17    Q   If you took --
18    A   If you could confirm that correction --
19      COURT REPORTER:  One at a time, please.
20      THE DEPONENT:  If you could please confirm    01:14:13
21   that correction that these are the posted
22   transaction dates.
23   BY MR. EVANS:
24    Q   You took $60,000 in cash out of this account,
25   right?                     01:14:21
```

Page 45

```
 1    A   Can you confirm that these are the posted
 2   transaction dates?  Because that's an -- that's an
 3   error in my confirmation.
 4    Q   These are your documents, Mr. Alexander.  You
 5   provided them to us.              01:14:33
 6      I'm asking you:  Did take $60,000 out of this
 7   account?
 8    A   And I'm asking to confirm the -- the posted
 9   transaction date is what you meant when you said
10   "transaction date."              01:14:45
11      MR. GRIVNER:  James, I'm going to instruct
12   you to answer the question that's being asked.
13      Okay.
14      Go ahead, Joe.
15   BY MR. EVANS:                 01:14:54
16    Q   Did you withdraw $60,000 in cash from this
17   account?
18    A   Yes.
19    Q   On which day did you withdraw $60,000 from
20   this account?                 01:15:03
21    A   I don't recall.
22    Q   Where is that money now?
23    A   It's -- it's -- it's -- it's with me.
24    Q   Okay.
25      Is it in your house?            01:15:14
```

12 (Pages 42 - 45)

1    A  No.
2    Q  Where is it?
3    A  It's -- it's kept safe.
4    Q  Where is it kept safe?
5    A  It's kept -- it's kept safe just at a      01:15:20
6    location that I will disclose after my counsel tells
7    me to.
8        MR. EVANS:  Mr. Grivner?
9        MR. GRIVNER:  James, I will instruct you to
10   answer that question where those funds currently      01:15:34
11   reside.
12       THE DEPONENT:  Okay.
13       Those are currently in my car.
14   BY MR. EVANS:
15   Q  Where is your car?      01:15:42
16   A  My car is -- is parked at Finley Avenue.
17   Q  What's the full address?
18   A  4501 Finley Avenue.
19   Q  What kind of car is it?
20   A  It's a Mercedes.      01:15:57
21   Q  When did you purchase that Mercedes?
22   A  2014.
23   Q  Okay.
24       Why did you withdraw $60,000 in cash from
25   this account?      01:16:08

Page 46

1    A  I -- to settle the tax liability that I have,
2    which was part of 2020 compensation.
3    Q  Okay.
4        So you were planning on paying the tax
5    authorities in cash?      01:16:26
6    A  I was -- I was planning -- planning on paying
7    the tax authorities, yes.  I just don't know to whom
8    that check has to be made or how to hand over those
9    funds, so it seemed -- it seemed the -- right
10   thing to do.      01:16:38
11   Q  The right thing to do is to pull out $60,000
12   in cash?
13   A  For a tax liability, yes, that's...
14       MR. GRIVNER:  Object to form.
15   BY MR. EVANS:      01:16:49
16   Q  Have you ever paid your taxes in cash before?
17   A  I have, yes, my -- my property taxes.
18   Q  Okay.
19       MR. EVANS:  If you scroll down, Mr. Ashworth.
20   BY MR. EVANS:      01:16:55
21   Q  There's a withdrawal on February 3rd, 2021 of
22   $10,000.
23       Do you see that, Mr. Alexander?
24   A  Yes, and I believe that's a counter check.  I
25   don't believe that's cash.      01:17:11

Page 47

1    Q  Okay.
2        The description says (as read):
3        "Withdrawal made in a branch
4        store."
5        Do you see that?      01:17:16
6    A  Yeah.  Unfortunately, you -- those notations
7    all say withdrawal, but some, if not all, of those
8    transactions are counter checks, which is just a
9    cheaper way to transfer directly to Wells Fargo
10   accounts.      01:17:34
11       And those are payments to consultants, so I
12   would have to get back to you to see exactly who
13   that payment was to.
14   Q  Yeah.  Well, this was just last week.  So
15   let -- let's talk about it now.      01:17:46
16       Who was this $10,000 for?
17   A  I don't recall.  There were a variety of
18   payments there.  It was -- it was either --
19       THE DEPONENT:  Can you scroll down?
20       MR. EVANS:  Go ahead.      01:18:06
21       THE DEPONENT:  Yeah.  I think that's my
22   salary payment for -- for -- yeah, I think that's a
23   salary payment to me.
24   BY MR. EVANS:
25   Q  So your testimony is you took out $10,000 in      01:18:26

Page 48

1    cash to pay yourself a salary?
2    A  Well, a counter check is where -- is a -- is
3    a check.  It's not -- it -- it shows as a withdrawal
4    made in branch, but it's not physical cash.  It's --
5    it's a -- it's a -- it's a check.  It's a counter      01:18:43
6    check.
7    Q  Okay.
8        MR. EVANS:  Can you scroll up, Mr. Ashworth,
9    please?
10   BY MR. EVANS:      01:18:49
11   Q  Okay.
12       So the $100,000 that was transferred on
13   February 4th, the $60,000 that was withdrawn in cash
14   on February 4th, and the $10,000 that was withdrawn
15   that you say was a check written to yourself, will      01:19:03
16   you return that to the debtor?
17   A  I'll have to take counsel on that.  I can't
18   answer.
19   Q  Okay.
20       The $10,000 that you say was a cashier's      01:19:13
21   check, where is that money now?
22   A  That should have been deposited.  I'll have
23   to -- I'll have to confirm that.
24   Q  Where did you deposit it?
25   A  I would deposit it in a personal account,      01:19:34

Page 49

13 (Pages 46 - 49)

1  so...

2  Q  Okay.

3     In what personal account?

4  A  I don't know.  I will -- I will have to get
5  back to you.  Well, it would be my personal account,  01:19:40
6  so I -- I can answer that.  It would be my personal
7  account.

8  Q  Okay.

9     MR. EVANS:  Scroll up, Sam, please.

10    Scroll down.                        01:19:52

11  BY MR. EVANS:

12  Q  The $60,000 that's sitting in your car --

13    MR. GRIVNER:  Is there a question pending?

14  I'm sorry.  I'm just a little bit lost.

15    MR. ASHWORTH:  This is Sam Ashworth of    01:21:42
16  McDermott, Will & Emery for the Committee.  Joe just
17  got kicked off.  I guess the server kicked him off.
18  He should be back.  I see him now.

19    MR. GRIVNER:  Got it.

20    MR. EVANS:  I think I'm back.  Sorry about  01:21:53
21  that.

22    Can everybody hear me?

23    MR. ASHWORTH:  Joe, we lost you just at the
24  $60,000 that's in your car.

25    MR. EVANS:  Okay.                01:22:06

Page 50

1     Are we -- are we still on the record?

2     COURT REPORTER:  Yes.

3  BY MR. EVANS:

4  Q  The question is, the $60,000 that's in your
5  car, will you drive that to your lawyer's office so   01:22:18
6  that your lawyer can provide it to the debtor?

7  A  No.  It's my intention to deposit that cash
8  to my personal account today.

9  Q  So your intention is to take the $60,000 in
10  cash and to put it in your personal account, right?   01:22:37

11  A  It is, where it will be available to -- if --
12  upon instruction, I can transfer it.  It's a little
13  to cumbersome to -- to work with cash or -- or -- or
14  checks for that matter.

15  Q  Yeah, I would agree.              01:22:50

16    So the $60,000 in cash that you took out of
17  the Cred Capital bank account needs to be returned
18  to the debtors immediately.

19    Will you return the $60,000 in cash to the
20  debtors?                          01:23:00

21  A  I will be depositing that in my personal
22  account as soon as possible, which I intended to do
23  several days ago, but I -- I haven't been able
24  to -- to get to the bank.

25  Q  Okay.                        01:23:11

Page 51

1     So let me get this straight.  You're going to
2  take the $60,000 in cash out of the Cred Capital
3  bank account, you put that $60,000 in cash, you put
4  it in the trunk of your car.  You are then going to
5  get in your car, drive to the bank, and put the      01:23:24
6  $60,000 in cash in your personal account,
7  (unintelligible) cash moneys?

8  A  No.  The intention was always to deposit that
9  cash into my account, similar to the way I do with
10  counter checks, but I meant to do it the same day,    01:23:35
11  and it just didn't happen.

12    So I -- my intention is to deposit that
13  money, to whomever any cash is due, I -- I'm -- I
14  want to provide that cash, so -- but I'm -- I'm --
15  I'm lost now in terms of where we stand in this      01:23:54
16  legal process, so I really need to rely on counsel,
17  and I -- I -- I haven't been able to speak with
18  them.  I haven't been able to consult with them
19  since I've been buried in legal documents, frankly,
20  that I've been producing, and so --               01:24:09

21  Q  Maybe I -- maybe I can help you.  This
22  account was a Cred Capital bank account.  The funds
23  in this account that were remaining have been
24  transferred to the debtors because it's a Cred
25  Capital bank account.  The $60,000 in cash that is    01:24:22

Page 52

1  currently in the trunk of your car, those are the
2  debtors assets, and they need to be returned
3  immediately.

4  A  No.  Those are liabilities that were owed to
5  me, and so they're -- whatever the timing was and     01:24:36
6  whatever form I took those out, I believed as a sole
7  director, as I continue to believe, that I am owed
8  that compensation for tax liabilities and salary.

9  And if I want to take them out in pennies, I can
10  take them out in pennies.  And so that is my         01:24:54
11  position.

12  Q  What work did you do for Cred Capital in
13  January of 2020?

14  A  I was the sole director of Cred Capital in
15  January 2020.                      01:25:12

16  Q  What did you do every day?  What was your
17  job?

18  A  Financial services.

19  Q  Uh-huh.

20    You're aware that Cred Capital filed for      01:25:15
21  bankruptcy in November, right?

22  A  I'm not sure of the exact date.

23  Q  Okay.

24    So you're aware that in January of 2020, Cred
25  Capital had already filed for bankruptcy, right?  01:25:26

Page 53

14 (Pages 50 - 53)

1    A  There was a filing that occurred.

2        UNIDENTIFIED SPEAKER:  I think you mean '21,

3 right, 2021?

4        MR. EVANS:  Yes, James.  Thank you.

5        THE DEPONENT:  Can you repeat the question?    01:25:44

6 BY MR. EVANS:

7    Q  You're aware that as of January 2021, Cred

8 Capital had already filed for bankruptcy, right?

9    A  Well, I contend, as I continue to contend,

10 that I'm the sole director of Cred Capital.  I -- I    01:25:55

11 believe, and this is my layman legal expertise --

12 that there has been a judgment as of last Wednesday.

13 But that's as much as I know.

14    Q  Okay.

15        So just -- just so I get a clear answer.  The    01:26:11

16 $170,000 that was transferred either to your

17 account, to cash that's held in your car, or the

18 $10,000 in a check, you're not going to return that

19 back to us today, right?

20    A  I'm taking advice from counsel on that to --    01:26:24

21 as to where the assets should be sent or if I was

22 legitimately entitled to that compensation, so...

23    Q  Uh-huh.

24    A  And I will act accordingly.  I will follow

25 instructions.  And that money will be deposited and    01:26:44

Page 54

1 available in current accounts, so that is my --

2    Q  Let me ask -- let me ask you this:  If you

3 were going to send that $60,000 in cash to a

4 personal bank account, couldn't you have wired that

5 money to another account, as opposed to pulling it    01:27:03

6 out in cash?

7    A  Was it cash or a counter check, though, that

8 we're talking about?

9    Q  Your bank records?

10        (Speaking simultaneously.)            01:27:15

11        THE DEPONENT:  (Unintelligible.)

12 BY MR. EVANS:

13    Q  Your bank records say (as read):

14        "Withdrawal made in a branch

15        store:  $60,000."            01:27:20

16    A  Yes.

17    Q  Okay.

18        You could have executed an account transfer,

19 right, of $60,000 to your personal account, couldn't

20 you?            01:27:35

21    A  Yes.  Yes, I could have.

22    Q  Let me ask you this, then we will -- then we

23 will move on.

24        Of the $60,000 that you pulled out from this

25 bank account, how much of that is still in the trunk    01:27:42

Page 55

1 of your car?

2    A  I -- I -- I don't know exactly.  I -- I don't

3 know.  I don't know.

4    Q  So -- so -- so you spent some of it?

5    A  I -- I don't know.  I can't answer that.    01:27:59

6 I -- I would have to -- have to defer that question.

7 Apologies.

8    Q  Okay.

9        You took $60,000 out in cash a week ago, you

10 say it's in the trunk of your car, and now you can't    01:28:09

11 tell me how much of the 60,000 is still in the trunk

12 of your car?  Is that your answer?

13    A  Yes.  I'm sorry.  I -- I need to deposit it,

14 and then I'll give you the exact number of

15 what's -- what's -- when the deposit is made.            01:28:21

16    Q  Did you spend any of it, James?  Did you

17 spend any of it?

18    A  I don't recall.  Cash -- cash is fungible.

19 I -- I don't recall.

20        MR. EVANS:  Can you scroll down, Sam?            01:28:37

21        Can you stop on January 28th, 2021?

22 BY MR. EVANS:

23    A  On January 28th, 2021, there's a $350,000

24 transaction to Quinn Emanuel.

25    Q  What's that for?            01:28:56

Page 56

1    A  I believe that's privileged, that -- that

2 entry.

3    Q  No.  Payments to law firms are not

4 privileged, so what's that transaction for?

5    A  It was for legal services.            01:29:06

6    Q  Whose legal services?

7    A  That's for Dan Wheeler's legal services.

8    Q  Why are you paying for Dan Wheeler's legal

9 services?

10    A  He's -- he asked me to indemnify him, which I    01:29:23

11 did, and so he asked me to make that payment, which

12 I did.

13    Q  You filed a motion to dismiss the bankruptcy

14 case.

15        Do you recall that?            01:29:36

16    A  Yes.

17    Q  And on January 21st, 2021, Mr. Wheeler

18 submitted a declaration in support of your

19 application to dismiss the bankruptcy case.

20        Do you remember that?            01:29:53

21    A  I do not.

22    Q  Okay.

23        Are you aware that Mr. Wheeler submitted a

24 declaration in support of your bankruptcy -- of your

25 motion to dismiss the bankruptcy cases?            01:30:00

Page 57

15 (Pages 54 - 57)

1    A   Yes.
2    Q   Okay.
3        And one week afterwards, you wire $350,000 to
4  Quinn Emanuel for his legal defense, right?
5    A   Yes.                                01:30:14
6    Q   Okay.
7        When is the last time you spoke to
8  Mr. Wheeler?
9    A   I don't recall.  It was around the 27th
10  of -- 27th of January.                      01:30:32
11    Q   Okay.
12        And what did you talk about?
13    A   We talked about his -- we talked about his
14  indemnification and a lawyer that he had chosen.
15    Q   Okay.                               01:30:49
16        And what lawyer was that?
17    A   Quinn Emanuel.
18    Q   And he asked you to wire $350,000?
19    A   Yes.
20    Q   Okay.                               01:31:01
21        Had he asked you previously to wire $350,000?
22    A   Previous to what?
23    Q   To the conversation on January 27th, 2021.
24    A   Can you -- can you repeat the question?
25    Q   Sure.  Let me rephrase.             01:31:15

Page 58

1      When was the first time Wheeler asked you to
2  pay for his lawyers?
3    A   I'll have to look back on the exact date.  It
4  was -- he asked me to provide him with an
5  indemnification, and I don't recall the date,      01:31:30
6  though.  But if -- if you want to pause for a
7  moment, I can look back and find that document.
8    Q   No.  That's okay.
9        Had -- had the Wheelers spoken to you about
10  paying for his lawyers prior to January 21st, 2021?   01:31:45
11    A   Any lawyers?
12        Can you -- can you -- can you -- or --
13    Q   Had Wheeler asked you to pay for any legal
14  services prior to January 21st, 2021?
15    A   Yes.                               01:32:05
16    Q   When?
17    A   I don't recall the exact date.  I -- as I --
18  as I offered, I could pull up the document, but I
19  don't recall the exact date.
20    Q   What -- what document are you referring to?   01:32:11
21    A   It's an indemnification document that he
22  asked me to write up.
23    Q   Okay.
24        And you have it with you?
25    A   It's somewhere on my -- on my computer.  I'll   01:32:21

Page 59

1  have to pull it -- I'll have to do the search for
2  it.
3    Q   So can you send that to us tonight?
4    A   I guess I would defer that question to Jeff
5  Grivner, if he's available.                   01:32:42
6        I can send it to my lawyer.  I can send it to
7  my counsel.
8    Q   Okay.  Okay.  All right.
9        Did you pay for anybody else's lawyers?
10    A   Can you be more specific?           01:32:56
11    Q   Have you paid for anyone's lawyers who
12  previously worked at Cred or Cred Capital?
13    A   In the context?
14    Q   In any context.
15    A   Ask -- sorry.  Can you ask the question one   01:33:17
16  more time?  Have I paid for anyone's lawyer in?
17    Q   For any -- anyone that worked at Cred or Cred
18  Capital, have you paid for their lawyers, other than
19  Dan Wheeler?
20    A   No.  No.                           01:33:40
21    Q   Okay.
22        And --
23    A   Other than -- other than Wheeler, right?
24    Q   Other than Wheeler, right.
25    A   That's -- that's right.            01:33:50

Page 60

1    Q   Is this through -- okay.  Okay.
2        Is this 350,000 the first time that you paid
3  for Dan Wheeler's lawyers?
4    A   No.  There was another payment made.
5    Q   There was another payment?          01:34:05
6    A   There was another payment around $20,000.  I
7  don't recall the date or to whom it was or the exact
8  amount, but it should -- it -- it is in the -- it is
9  in the bank records, because I considered it a
10  transaction of -- you know, as -- considered it a   01:34:24
11  transaction of Cred Capital, so...
12    Q   Okay.
13        MR. EVANS:  We could pull this document down,
14  Sam.
15        Sam, can you pull up the prior bank statement   01:34:49
16  from January 2021?
17        COURT REPORTER:  Counsel, are we marking
18  these documents?
19        MR. EVANS:  Yeah.  That's Exhibit A, the
20  first one.
21        COURT REPORTER:  So now we're going to B?
22        MR. EVANS:  This is Exhibit B, that's
23  correct.
24        ///
25        ///

Page 61

16 (Pages 58 - 61)

| | |
|---|---|
| 1     (Exhibit B was marked for | 1     THE DEPONENT:  So I have a variety of |
| 2     identification and is attached | 2 consultants that I've worked with for -- since some |
| 3     hereto.) | 3 of them since July of last year to support the |
| 4 BY MR. EVANS: | 4 marketing and sales effort for Cred Capital.  So |
| 5    Q   Mr. Alexander, do you have a trip planned to   01:35:13 | 5 when I refer to "we" in that context, it's the     01:37:57 |
| 6 Switzerland? | 6 marketing and sales consultants that are supporting |
| 7    A   Yeah.  We scheduled -- we scheduled an event | 7 these events. |
| 8 there in August of this year. | 8     And there are supporting documents.  You |
| 9    Q   Okay. | 9 know, e-mail campaigns that go out to people and -- |
| 10     MR. EVANS:  Can you scroll down to     01:35:34 | 10 and other that promote these type of events.  But    01:38:16 |
| 11 January 15th, 2021 payment? | 11 they are a form of business development that we |
| 12 BY MR. EVANS: | 12 pursued at Cred Capital. |
| 13    Q   We have an $11,090 payment on January 15th, | 13 BY MR. EVANS: |
| 14 2021.  Is that for you to go to Switzerland, | 14    Q   You said there's a group of consultants, and |
| 15 Mr. Alexander?     01:35:53 | 15 you were going to go on.  Is this a ski trip?  Is    01:38:35 |
| 16    A   No.  That's a prepayment that they required | 16 that what this was? |
| 17 for the event for the Marriott Hotel in -- or the | 17    A   No.  This was networking and -- and marketing |
| 18 Bonvoy hotel in Geneva. | 18 trip.  And the locations are -- our business relies |
| 19     So it's -- yeah, these events take many | 19 on high-net-worth individuals, so the locations are |
| 20 months to plan, so again, my role as the sole     01:36:10 | 20 sometimes coincidental or -- or in places where    01:38:53 |
| 21 director of -- of the company, the intention was to | 21 high-net-worth people gather.  So |
| 22 organize a variety of -- of marketing and networking | 22 there's -- there's -- that's the only intention |
| 23 events, and this -- this is one of them that -- that | 23 of -- of being there versus someplace else. |
| 24 is planned. | 24    Q   Who, other than you from Cred Capital or Cred |
| 25    Q   So you're planning on going to Switzerland to   01:36:26 | 25 Capital Consultants, attended the trip to Vail?    01:39:12 |
| Page 62 | Page 64 |

| | |
|---|---|
| 1 market Cred Capital?  That's your plan? | 1    A   No others. |
| 2    A   No.  The intention previously back in the | 2    Q   Okay. |
| 3 middle of January was to go to Switzerland.  These | 3     So you went yourself to Vail, right? |
| 4 plans need to be revisited now based on -- on these | 4    A   Yes. |
| 5 recent events.  So there's no current plans to hold   01:36:44 | 5    Q   Did I you go with anyone else?     01:39:20 |
| 6 that event. | 6    A   My wife was there also at the time. |
| 7    Q   When you say "based on these recent events," | 7    Q   Okay. |
| 8 what are you referring to? | 8     So you and your wife went to Vail?  That's |
| 9    A   Based on the uncertainty surrounding Cred | 9 what happened, right? |
| 10 Capital and the bankruptcy and these assets and my    01:36:57 | 10    A   Yes.     01:39:32 |
| 11 personal situation. | 11    Q   And the $6,225.26, that was -- that was |
| 12    Q   On January 19th, 2021, we have a transaction | 12 payment for hotels and travel for you and your wife, |
| 13 $6,225.26 to Marriott Vail. | 13 right? |
| 14     Were you in Vail? | 14    A   No.  That was payment for the -- my |
| 15    A   I was, yeah, for a --     01:37:20 | 15 attendance at the event.     01:39:46 |
| 16    Q   What were you doing in Vail? | 16    Q   Uh-huh. |
| 17    A   We organized a marketing and networking event | 17    A   I believe... |
| 18 there way back in -- and I'll have to look back | 18    Q   Let me ask you this:  Did you go to Turkey on |
| 19 exactly when we organized it. | 19 December 4th, 2020? |
| 20    Q   Okay.     01:37:32 | 20    A   I have to look back in my records.  When was   01:40:12 |
| 21     And what did you do in -- | 21 that. |
| 22     MR. LUFT:  Who is "we"? | 22    Q   I can jog your memory.  You stayed at a hotel |
| 23     COURT REPORTER:  What? | 23 on December 4, 2020 in Istanbul? |
| 24     MR. LUFT:  I misheard.  Who is -- Who is | 24    A   Oh, yes, uh-huh. |
| 25 "we"?     01:37:41 | 25    Q   Yeah.     01:40:23 |
| Page 63 | Page 65 |

17 (Pages 62 - 65)

| | |
|---|---|
| 1    And the Cred Capital bank account paid for | 1    (Exhibit C was marked for |
| 2 that trip too? | 2    identification and is attached |
| 3    A   Absolutely.  We're -- we have a project | 3    hereto.) |
| 4 ongoing there related to international trade finance | 4    MR. ASHWORTH:  Joe, just bear with me.  I'm |
| 5 using the block chain that -- that we were trying to   01:40:32 | 5 having a computer issue.                    01:46:08 |
| 6 get involved with. | 6    MR. EVANS:  I could start with a few |
| 7    Q   Let me ask you this:  The -- the three trips | 7 questions while you're -- while you're working on |
| 8 that were paid for in January and December, the trip | 8 it. |
| 9 to Switzerland, the trip to Vail, and the trip to | 9 BY MR. EVANS: |
| 10 Istanbul --                                01:40:48 | 10    Q   Mr. Alexander, in June of 2020, did you       01:46:19 |
| 11    A   There's no trip to -- there's no trip to | 11 receive 225 Bitcoin from Cred? |
| 12 Switzerland.  You are mistaken.  That's a prepayment | 12    A   Yes. |
| 13 for a -- a future event. | 13    Q   Okay. |
| 14    These events are planned many months in | 14    And who sent you that Bitcoin? |
| 15 advance, so there is often prepayment required, as    01:41:12 | 15    A   It was sent to me by Fireblocks.          01:46:34 |
| 16 in the case of Vail, as in the case of Geneva, so... | 16    Q   Who did you ask to -- |
| 17    MR. ASHWORTH:  This is Sam Ashworth again. | 17    A   And I think -- |
| 18 Joe just went dark, so we may have lost him.  I'll | 18    Q   Who did you ask to transfer the Bitcoin to |
| 19 just ask for your patience for one more moment. | 19 you? |
| 20    MR. LUFT:  Let's go off the record, then.       01:41:37 | 20    A   I asked Daniyal Inamullah.               01:46:46 |
| 21    THE VIDEOGRAPHER:  Okay.  We're in agreement | 21    Do you want me to spell that, or to you |
| 22 to go off record?  Okay.  Stand by. | 22 have... |
| 23    This marks the end of Media No. 5.  Going off | 23    Q   I -- I think it's I-n-a-m-u-l-l-a-h. |
| 24 the record at 1:41 p.m. | 24    A   Sorry.  Say it again. |
| 25    (Recess.)                             01:41:53 | 25    I-n-a-m-u, double l, a-h.                01:47:03 |
| Page 66 | Page 68 |

| | |
|---|---|
| 1    THE VIDEOGRAPHER:  We are back on the record | 1    I -- I asked Daniyal Inamullah to transfer. |
| 2 at 1:44 p.m. Pacific, and this marks the beginning | 2    Q   And why did you ask Daniyal Inamullah to |
| 3 of Media No. 6 in the deposition of James Alexander. | 3 transfer it to you? |
| 4    You can proceed, Counsel. | 4    A   Because I believed the assets were at risk, |
| 5 BY MR. EVANS:                             01:44:36 | 5 and I believed I was the sole director of the          01:47:22 |
| 6    Q   Mr. Alexander, who joined you on your trip to | 6 company, and that the entire actions that were taken |
| 7 Istanbul? | 7 by Schatt and other executives at Cred Inc were |
| 8    A   Nobody. | 8 specifically an asset grab for an independent |
| 9    Q   Okay.  And who did you meet in Istanbul? | 9 company that was independently funded. |
| 10    A   Nobody in Istanbul.  I traveled to a second   01:44:48 | 10    So I sought to put the assets in a safe place  01:47:43 |
| 11 city call Mersin where the -- this agricultural | 11 away from the reach of -- of -- of Cred Inc. |
| 12 group is based. | 12    Q   When you asked Mr. Inamullah to send you the |
| 13    Q   Okay. | 13 225 Bitcoin, did you ask him via WhatsApp? |
| 14    With respect to the prepayment of the | 14    A   I -- I don't recall.  I don't recall. |
| 15 Switzerland trip, the Vail trip, and the Istanbul    01:45:05 | 15    (Exhibit D was marked for                  01:48:06 |
| 16 trip, who authorized you to execute those | 16    identification and is attached |
| 17 transactions out of the Cred Capital account? | 17    hereto.) |
| 18    A   I did in my role as sole director of the | 18 BY MR. EVANS: |
| 19 company. | 19    Q   Do you remember submitting interrogatory |
| 20    MR. EVANS:  Mr. Ashworth, please pull up the    01:45:33 | 20 responses just a few days ago on Saturday?         01:48:13 |
| 21 declaration of James Alexander, which was filed on | 21    A   Uh-huh. |
| 22 January 6th as Exhibit 3. | 22    MR. GRIVNER:  Object to the form. |
| 23    COURT REPORTER:  Exhibit C, right? | 23    COURT REPORTER:  Who said that? |
| 24    MR. EVANS:  C, yes. | 24    MR. GRIVNER:  Mr. Grivner. |
| 25    /// | 25    ///                                  01:48:38 |
| Page 67 | Page 69 |

BY MR. EVANS:

1 BY MR. EVANS:
2 Q   I'll make it easier, Mr. Alexander.
3 A   Which one are you specifically referring to?
4 Q   The --
5    COURT REPORTER:  Wait, wait, wait.  Start
6 over, Mr. Evans.
7 BY MR. EVANS:
8 Q   I said, I'll make this easier, Mr. Alexander.
9    In the document -- in the discovery request
10 we sent you, we asked on Request No. 5 (as read):    01:48:48
11    "All documents, communications,
12    and records concerning the
13    disposition of the cryptocurrency
14    transferred to you on June 24,
15    2020."                    01:48:57
16    You responded (as read):
17    "Alexander is not in possession or
18    control of any responsive documents
19    based on his recollection that
20    communications were via WhatsApp,    01:49:05
21    and Alexander does not have any
22    record of the conversation?
23 A   That's right.  That's my recollection.
24 That's -- which number are you on?
25 Q   That's Request No. 4 -- 5.        01:49:13

Page 70

1 A   What -- Interrogatory 5, or was there
2 another?
3 Q   That one was Request 5.
4 A   Request 5.
5    MR. GRIVNER:  If we're referring to    01:49:33
6 documents, I think that they should at the very
7 least be shared with -- with everyone, and if not,
8 marked as an exhibit.
9    THE DEPONENT:  Yeah.  This is correct as
10 written in Response 5, Joe.  It's -- I don't have a   01:49:44
11 record of that, and I didn't -- I believe -- my
12 recollection is I sent a screenshot to Inamullah
13 when I had received the assets via WhatsApp.
14    But I don't recall how much of our
15 communication was by phone or by e-mail or by    01:50:05
16 WhatsApp.  And I -- and I don't -- and I don't have
17 a record of the WhatsApp communication thread.  By
18 the very nature of that communication, it -- it
19 doesn't retain a record, at least for -- on my side.
20    You may be able to get that from -- from    01:50:20
21 Inamullah.
22    But I -- I -- I can confirm that we did
23 communicate periodically and regularly by WhatsApp.
24 But I don't have a record of it.  So it's -- it's
25 as -- it's -- it's -- it's as it's written there.    01:50:41

Page 71

1 BY MR. EVANS:
2 Q   Did you delete the WhatsApps between yourself
3 and Mr. Inamullah concerning the June 24th, 2020
4 transactions?
5 A   I did not, no.                01:50:51
6 Q   Okay.
7    So where are they?
8 A   As I said, you could either get them from
9 Mr. Inamullah or -- my phone and my WhatsApp does
10 not retain any record of those conversations.  I    01:51:02
11 don't know if his does.
12 Q   Well, you had Mr. -- and -- and -- and just
13 to be clear, it was 225 Bitcoin and 200,000 USDC,
14 right?
15 A   That's right, uh-huh.            01:51:20
16 Q   Okay.
17    And when the funds -- when the cryptocurrency
18 was transferred from the Fireblocks account of Cred
19 to a digital wallet address, that digital wallet
20 address was actually held by another individual,    01:51:34
21 right?
22 A   That's right, yeah.
23 Q   So who is Christopher Giovanni Silvio
24 Spadafora?
25 A   Chris Spadafora is -- is how I know him.  He   01:51:43

Page 72

1 was a consultant to Cred Capital beginning around
2 April of 2020.
3 Q   Why did you ask Mr. Inamullah to send 225
4 Bitcoin and 200,000 USD coin of Cred's
5 cryptocurrency to Chris Spadafora?        01:52:09
6 A   Chris was a consultant, a trusted consultant,
7 and experienced crypto market participant, and so he
8 seemed the most appropriate person.
9    And as I recall, I wasn't in a position to
10 actually receive the cryptocurrency.  I didn't have   01:52:25
11 a receiving wallet available, so yes.
12 Q   Maybe we can unpack that.
13    What do you mean, you did not have a
14 receiving wallet available?
15 A   I -- I didn't have -- I didn't have a wallet.  01:52:42
16 I mean, my -- my crypto trading was -- was --
17 my -- my -- my activity in crypto was through Cred
18 Capital and through the Fireblocks network, and I
19 didn't have access to that.  I was cut off from the
20 tech stack sometime before that.            01:53:04
21 Q   Didn't you have a Coinbase account at that
22 time?
23 A   I don't -- I don't recall.  And if I did,
24 I -- I didn't think to use it.
25 Q   Okay.                    01:53:22

Page 73

19 (Pages 70 - 73)

| | |
|---|---|
| 1　　　MR. EVANS:  Mr. Ashworth, can you please put | 1　Q　So you asked Inamullah to sent it to |
| 2　up Coinbase Transaction History 1?  I think we're at | 2　Spadafora's account because you didn't want Dan |
| 3　Exhibit -- we at Exhibit D, Sam? | 3　Schatt or Joe Podulka to stop you from doing so, |
| 4　　　MR. ASHWORTH:  This is Exhibit E, echo. | 4　right? |
| 5　　　(Exhibit E was marked for　　　01:53:44 | 5　　　MR. GRIVNER:  Object to the form.　　01:56:26 |
| 6　　　identification and is attached | 6　BY MR. EVANS: |
| 7　　　hereto.) | 7　Q　You can answer. |
| 8　BY MR. EVANS: | 8　A　Can you repeat the question, please? |
| 9　Q　This is Exhibit E.  This is a Coinbase | 9　Q　You asked Inamullah to transfer the 225 |
| 10　transaction history that you provided your counsel,　01:53:53 | 10　Bitcoin and 200,000 USD coin to a digital wallet　01:56:44 |
| 11　and your counsel provided us.  And it says your name | 11　address held by Chris Spadafora to avoid Dan Schatt |
| 12　on the top, "Transaction report for James | 12　or Joe Podulka from stopping the transaction, right? |
| 13　Alexander," right? | 13　A　No, that's not correct.  I asked him because |
| 14　A　Yes. | 14　I legitimately considered myself a sole director of |
| 15　Q　And if you scroll down to the second page,　01:54:08 | 15　Cred Capital, and I believed that those assets　01:57:08 |
| 16　you will see transactions dating back to 2018. | 16　needed to be protected from an illegal corporate |
| 17　　　Do you see that? | 17　takeover. |
| 18　　　Mr. Alexander, do you see that? | 18　Q　When you say "illegal corporate takeover," |
| 19　A　2018.  I see 2020.  They're all mixed up, | 19　who are you referring to? |
| 20　these dates.  Is there a time --　　　01:54:39 | 20　A　To -- to those individuals that you　01:57:19 |
| 21　Q　If you look at the -- if you look at the | 21　reference, Schatt and Podulka that orchestrated an |
| 22　third transaction, it's a September 25th, 2018 ether | 22　illegal takeover of Cred Capital. |
| 23　transaction, 10 ether. | 23　Q　Okay. |
| 24　　　Do you see that? | 24　　　But to be clear, you did the transaction in a |
| 25　A　Yeah.　　　　　　01:54:50 | 25　manner so it would not be detected by Schatt or　01:57:33 |
| Page 74 | Page 76 |

| | |
|---|---|
| 1　Q　Okay. | 1　Podulka, right? |
| 2　　　So on June 24th, 2020, when you asked | 2　A　There was -- there was never an attempt to |
| 3　Inamullah to transfer the cryptocurrency to Chris | 3　avoid detection, but rather to put the assets in a |
| 4　Spadafora, you had an open Coinbase account that | 4　safe place. |
| 5　could have received the Bitcoin, right?　　01:55:00 | 5　Q　Okay.　　　　　　01:57:44 |
| 6　A　Well, I -- I don't recall that.  I don't | 6　　　Had you asked Dan Schatt, would he let you |
| 7　recall having that account.  I -- it's as simple as | 7　execute this transaction? |
| 8　that. | 8　A　I can't answer that question. |
| 9　　　I mean, in the context of my work, I'm sure I | 9　Q　Why didn't you ask Dan Schatt if you could |
| 10　investigated a lot of platforms, and I'm sure　01:55:12 | 10　execute this transaction?　　　01:58:02 |
| 11　there's transactions that I don't recall. | 11　A　Schatt had no authorization over Cred |
| 12　　　And, you know, I guess the simple answer is | 12　Capital.  I was the sole director. |
| 13　had I known that I had a wallet to receive them in, | 13　Q　The Bitcoin and U.S. dollar coin were sitting |
| 14　I -- I expect I would have received those coins | 14　in Fireblocks' accounts held by Cred Inc.; isn't |
| 15　directly.　　　　　01:55:31 | 15　that right?　　　　　01:58:15 |
| 16　　　There was -- but I -- and I -- to be clear, I | 16　A　That's not correct.  They were in Fireblocks' |
| 17　ordered a hardware wallet and received it, and once | 17　accounts held by Cred Capital. |
| 18　I received it, I asked -- I directed our consultant, | 18　Q　Uh-huh.  Okay. |
| 19　Chris Spadafora, to send me those 225 coin, which he | 19　　　Did you ask Joe Podulka if you could execute |
| 20　did.　　　　　　01:55:56 | 20　this transaction?　　　　01:58:22 |
| 21　　　And, again, had I known I had a wallet to | 21　A　Joe Podulka had no authorization. |
| 22　receive them directly, I would have, but I -- and -- | 22　Q　So you didn't ask Joe Podulka if you could |
| 23　and clearly, from these transactions, it would | 23　execute this transaction, right? |
| 24　appear this account has been open a lot longer than | 24　A　He had no authorization.  There's no reason I |
| 25　I knew.  So that's the only response I can provide.　01:56:10 | 25　would ask him.　　　　01:58:33 |
| Page 75 | Page 77 |

20 (Pages 74 - 77)

| | |
|---|---|
| 1  Q  So the answer is no, right? | 1  Q  Sure. |
| 2  A  The answer is as I answered it. | 2     The California court ordered that you cannot |
| 3  Q  So you didn't ask him? | 3  move Cred cryptocurrency or Cred Capital |
| 4  A  I did not ask him, no. | 4  cryptocurrency, correct? |
| 5  Q  Okay.  And on July 1st of 2020, you received  01:58:47 | 5  A  I don't know.  I have to consult with counsel  02:01:28 |
| 6  this 224.899 Bitcoin, right? | 6  if you're looking for a specific answer. |
| 7  A  On which date? | 7  Q  Okay. |
| 8  Q  July 1st, 2020. | 8     Isn't it true that the day before the |
| 9  A  That's correct. | 9  hearing, you had transferred 60 -- 65 Bitcoin out of |
| 10  Q  Okay.                           01:59:00 | 10  your wallet and another 200,000 USD coin out of your  02:01:44 |
| 11     MR. EVANS:  Sam, you can take down | 11  wallet? |
| 12  this -- this document. | 12  A  The former transaction I recall.  The latter |
| 13  BY MR. EVANS: | 13  transaction, I do not. |
| 14  Q  And when you received the 225 Bitcoin, you | 14  Q  Okay. |
| 15  received it in one of your Ledger wallets, right?    01:59:11 | 15  A  And that former transaction was part of a  02:01:59 |
| 16  A  Yes. | 16  scheduled liquidation to -- to -- to continue to |
| 17  Q  And what's a Ledger wallet? | 17  fund working capital at Cred Capital, which was a |
| 18  A  A Ledger wallet is a hardware wallet. | 18  pattern that continued from the moment Cred Capital |
| 19  Q  Okay.  What does that mean? | 19  received the initial equity investment through our |
| 20  A  A hardware wallet is from -- from what I  01:59:23 | 20  entire tenure.                      02:02:16 |
| 21  know, a more secure offline way to store assets. | 21     The initial capitalization of Cred Capital |
| 22  Q  Okay. | 22  was meant to be liquidated in a systematic way to |
| 23     So on July 1st, 2020, 225 Bitcoin was | 23  provide working capital. |
| 24  transmitted to you in your Ledger wallet, and you | 24  Q  Okay. |
| 25  took possession of it, right?         01:59:46 | 25     Let's talk about the first transaction.      02:02:28 |
| Page 78 | Page 80 |

| | |
|---|---|
| 1  A  That's correct, yes. | 1     MR. EVANS:  Sam, please pull up Coinbase |
| 2  Q  And on -- let me make sure I get these dates | 2  History 1. |
| 3  right, but on June 26th, Cred fired you, right? | 3     And what exhibit number is this, Sam? |
| 4  A  Cred purported to fire me. | 4     MR. ASWORTH:  This is Exhibit E, Joe.  E, |
| 5  Q  Okay.                           02:00:09 | 5  echo.                              02:02:58 |
| 6     There came a time when Cred sued you in | 6  BY MR. EVANS: |
| 7  California State Court, right? | 7  Q  So the first transaction on this screen, a |
| 8  A  I don't -- I don't know what that means.  I'm | 8  July 1st, 2020 transaction of ten Bitcoin. |
| 9  not a lawyer.  I know there were various legal | 9     Do you see that? |
| 10  actions.  I -- I don't know what that means.  02:00:19 | 10  A  Can you move a cursor or something to bring  02:03:07 |
| 11  Q  Did Cred file a lawsuit against you on | 11  my attention to it otherwise? |
| 12  July 16th, 2020 in San Mateo State Court? | 12     Yes, I see it now, uh-huh. |
| 13  A  I don't know.  I'd have to consult with | 13  Q  Okay. |
| 14  counsel.  I -- I -- I'm not a lawyer. | 14     And do you recall this July 1st, 2020 |
| 15  Q  Do you recall a Temporary Restraining Order  02:00:48 | 15  transaction?                        02:03:20 |
| 16  hearing occurring in California State Court on | 16  A  Not specifically, but this is an account I |
| 17  July 16th, 2020? | 17  control, so I think we should assume that I -- I had |
| 18  A  I do. | 18  control of these accounts. |
| 19  Q  I'm sorry? | 19  Q  And so just so I get it straight, you had a |
| 20  A  Yes.                            02:01:02 | 20  Ledger wallet that held the 225 Bitcoin, and then  02:03:36 |
| 21  Q  Okay. | 21  you also had this Coinbase account, right? |
| 22     And what happened at that court hearing on | 22  A  Yes, that's correct. |
| 23  July 17th, 2020? | 23  Q  Okay. |
| 24  A  I don't recall specifically the legal terms, | 24     So why did you transfer ten Bitcoin from your |
| 25  but can you be more specific?         02:01:15 | 25  Ledger wallet to your Coinbase account on July 1st,  02:03:51 |
| Page 79 | Page 81 |

21 (Pages 78 - 81)

| | |
|---|---|
| 1  2020? | 1    Q    And ultimately, James, you liquidated the 65 |
| 2    A    This was part of a systematic liquidation of | 2  Bitcoin and ten Bitcoin and sent it to where? |
| 3  those original Bitcoin that were an equity | 3    A    I sent it to a dedicated account. |
| 4  contribution to Cred Capital.  It was initially 300. | 4    Q    What is the dedicated -- the dedicated |
| 5  And they were systematically liquidated to provide    02:04:06 | 5  account?                                        02:06:54 |
| 6  working capital for the ongoing operations of Cred | 6    A    I don't know.  I'd have to get back to you on |
| 7  Capital. | 7  exact numbers on that. |
| 8        And its Coinbase was used to liquidate | 8        So -- actually, sorry.  Can I -- can I |
| 9  because it's an exchange, not a wallet, and so it's | 9  correct that answer?  I -- |
| 10  possible to actually liquidate for U.S. dollars in    02:04:20 | 10    Q    Sure.                                  02:07:08 |
| 11  this case, the -- the Bitcoin. | 11    A    So, yeah, I need to refer to my records |
| 12    Q    So what -- what was the capital that you | 12  because I don't think that initial transfer was to a |
| 13  needed?  What was the expense that you needed to pay | 13  dedicated account, so I need to correct that.  But |
| 14  for that caused you to liquidate ten Bitcoin? | 14  I'm going to need to get back to you on exactly |
| 15    A    Well, it was -- it's systematic the way we    02:04:39 | 15  where the proceeds were transferred.  I -- I don't    02:07:26 |
| 16  liquidated, so it was establishing adequate -- what | 16  have access to that -- those account numbers or that |
| 17  I believe to be adequate working capital to operate | 17  data. |
| 18  the business.  So it was the ongoing expenses | 18    Q    So let -- let me just understand it, that the |
| 19  associated with Cred Capital. | 19  75 Bitcoin that was liquidated at Coinbase, those |
| 20    Q    Okay.                                02:04:51 | 20  proceeds were Cred Capital proceeds, right?    02:07:40 |
| 21        And this is July 1st, 2020, and you said that | 21    A    Those -- those were proceeds of an equity |
| 22  Cred purported to fire you on June 26, 2020, right? | 22  investment into Cred Capital, yes.  Is that what you |
| 23    A    From -- from which entity? | 23  mean? |
| 24    Q    From either entity. | 24    Q    You said you liquidated -- you liquidated |
| 25    A    Well, I was terminated on May 30th from Cred    02:05:09 | 25  them to pay for operating expenses for Cred Capital,    02:08:00 |
| Page 82 | Page 84 |

| | |
|---|---|
| 1  Inc., and I became a full-time employee of Cred | 1  right?  That's the purpose for the liquidation? |
| 2  Capital, Inc. on June 1st, 2020. | 2    A    That is correct, yes. |
| 3        So I was purported to have been fired on that | 3    Q    Okay. |
| 4  date that you referenced from Cred Capital. | 4        And do you recall what date you liquidated |
| 5    Q    Okay.                                  02:05:33 | 5  these Bitcoin?                                  02:08:17 |
| 6    A    Which I believe -- I believed at the time and | 6    A    I would have to refer to the transaction log. |
| 7  I continue to believe that there was no | 7  I believe you have that in front of you.  Is there |
| 8  authorization by either Schatt or Podulka to fire | 8  any reason to doubt that, or is there another reason |
| 9  me. | 9  you are asking that question? |
| 10    Q    On July 16th, 2020, there was another 65    02:05:48 | 10    Q    Why don't we do it this way.            02:08:28 |
| 11  Bitcoin transaction. | 11        MR. EVANS:  Sam, can you pull up as Exhibit F |
| 12        Do you see that? | 12  the Temporary Injunction and Restraining Order filed |
| 13    A    Can you hover or otherwise bring my attention | 13  in San Mateo Superior Court? |
| 14  to it? | 14        (Exhibit F was marked for |
| 15    Q    It's the third transaction down the line.    02:05:59 | 15        identification and is attached            02:09:00 |
| 16    A    So that was -- it -- it appears that that's | 16        hereto.) |
| 17  65 Bitcoin received into the Coinbase account. | 17  BY MR. EVANS: |
| 18        Is that -- is that what you're referencing? | 18    Q    So, Mr. Alexander, this is a Temporary |
| 19    Q    Yes. | 19  Restraining Order and Preliminary Injunction that |
| 20        And that 65 Bitcoin came from your Ledger    02:06:12 | 20  was issued on July 17th by the San Mateo State    02:09:07 |
| 21  wallet that originally received the 225 Bitcoin; is | 21  Court. |
| 22  that right? | 22        Do you recall this document? |
| 23    A    On -- yeah.  On July 16th, I sent 65 Bitcoin | 23    A    I do not. |
| 24  from the Ledger hardware device to this Coinbase | 24    Q    Okay. |
| 25  account.                                        02:06:35 | 25        MR. EVANS:  If you want to zoom in a little    02:09:14 |
| Page 83 | Page 85 |

22 (Pages 82 - 85)

1 bit, Sam.
2 BY MR. EVANS:
3    Q   You will see the plaintiffs are Cred Inc. and
4 Cred Capital and the defendant is you.
5       Do you see that?                02:09:24
6    A   Okay.
7    Q   Okay.
8       And do you see that the date is July 17th,
9 2020 at 2:00 p.m.?
10      Do you see that?                02:09:31
11   A   Yes.
12   Q   Okay.
13      And that's the same day that you sent 65
14 Bitcoin from your Ledger account to your Coinbase
15 account, right?                      02:09:40
16   A   No.  It was the prior day, if you look at the
17 timestamps.
18   Q   Oh, so you sent -- you sent it the day before
19 the hearing, you are saying?
20   A   Well, that is coincidental.  It was part of a  02:09:47
21 scheduled liquidation to pay for working capital
22 expenses.  It's -- if you -- can you go back to the
23 Coinbase?
24   Q   Sure.
25      MR. EVANS:  Go back to the last exhibit, Sam,  02:10:03

Page 86

1 please.
2       THE DEPONENT:  And so what date were those
3 assets liquidated?
4 BY MR. EVANS:
5    Q   These are your records, and I'm seeing --    02:10:18
6    A   Yeah.
7    Q   -- a section of 65 Bitcoin and a section of
8 ten Bitcoin.
9    A   And on the 16th, the sale of those Bitcoin
10 occurred, which was fully a day before that court   02:10:27
11 action.
12      So that --
13      MR. GRIVNER:  (Unintelligible) go back.
14      THE DEPONENT:  That filing I think you
15 referred to it as.                    02:10:36
16 BY MR. EVANS:
17   Q   Uh-huh.  And just when you're talking about
18 liquidation, there's 56 Bitcoin and four Bitcoin.
19      So there's still another six, right?
20   A   No.  But those transactions are listed below  02:10:47
21 there.
22   Q   Okay.
23   A   Same date.
24      MR. GRIVNER:  Mr. Alexander asked for a break
25 a while ago, or he had indicated that he needed a   02:11:03

Page 87

1 break.  I will also note that I have a -- a
2 commitment in the next couple minutes, but by all
3 means, wrap up where -- where you are, but I would
4 ask that we have a break in the next few minutes.
5       MR. EVANS:  I only have a few more questions   02:11:16
6 on this topic, and then we will be able to come to a
7 natural break in a few minutes.
8       Sam, can you scroll down just a -- just a
9 hair to the next page?
10 BY MR. EVANS:                        02:11:28
11   Q   Okay.
12      So just so I get this straight,
13 Mr. Alexander, you're saying that the liquidation
14 was the day before the hearing, not the day of the
15 hearing, right?                      02:11:40
16   A   That's what this record indicates, yes.
17   Q   Okay.
18      MR. EVANS:  Sam, can you please refer back to
19 the court document, the preliminary injunction order
20 from the San Mateo State Court?       02:11:47
21 BY MR. EVANS:
22   Q   Mr. Alexander, do you see where it says,
23 "Verified Complaint Filed July 15, 2020"?
24   A   Yes.
25   Q   Okay.                         02:11:58

Page 88

1       So you were sued on July 15th, 2020, and then
2 you liquidated these assets on July 16th, 2020,
3 right?
4    A   Yes, that is correct.
5    Q   Okay.                         02:12:09
6       MR. EVANS:  We can come to a break.  What do
7 you think?  Ten minutes?
8       MR. GRIVNER:  I need slightly more time than
9 that just because of a child thing -- a child
10 commitment.  Can we say 5:35?  I apologize.  I know  02:12:21
11 that's a little bit longer than we otherwise would,
12 but I do have this obligation, and I'm sorry.
13      MR. EVANS:  Okay.  It's not a problem.  We
14 might need the time on the back end.
15      MR. GRIVNER:  Understood.         02:12:30
16      MR. EVANS:  Just so you know.
17      MR. GRIVNER:  Understood.
18      So 5:35.
19      THE VIDEOGRAPHER:  Okay.  Going off the
20 record.  Stand by.  This marks the end of Media      02:12:37
21 No. 6.  Going off the record at 2:12 p.m. Pacific.
22      (Recess.)
23      THE VIDEOGRAPHER:  We are back on the record
24 at 2:38 p.m. Pacific, and this marks the beginning
25 of Media No. 7 in the deposition of James Alexander.  02:38:57

Page 89

23 (Pages 86 - 89)

| | |
|---|---|
| 1      You may proceed, Counsel. | 1  Capital cryptocurrency. |
| 2      MR. EVANS:  Mr. Ashworth, can you please pull | 2      Do you recall that? |
| 3  up the preliminary -- the Temporary Restraining | 3   A  Yes. |
| 4  Order from the California State Court? | 4      Q   And do you also have a Ledger -- a wallet in |
| 5      What exhibit is that, Sam?          02:39:13 | 5  your Ledger accounts that hold a series of different   02:41:23 |
| 6      MR. ASHWORTH:  This is F, Joe. | 6  kinds of cryptocurrency, that are cryptocurrency, |
| 7  BY MR. EVANS: | 7  right? |
| 8   Q   So this is Exhibit F, Mr. Alexander.  This is | 8   A  Yes. |
| 9  a Temporary Restraining Order from the California | 9      Q   And, in fact, the other day you transferred |
| 10  State Court that we talked about previously.      02:39:29 | 10  some of that Cred crypto -- Cred Capital          02:41:33 |
| 11      MR. EVANS:  Can you scroll down to the second | 11  cryptocurrency to the debtors, right? |
| 12  page? | 12   A  As much as I could, yes. |
| 13  BY MR. EVANS: | 13   Q   Okay. |
| 14   Q   Under Paragraph 1, this California State | 14      So following the July 16th -- July 17th, 2020 |
| 15  Court order states the following (as read):      02:39:44 | 15  order from the California State Court, you did, in    02:41:47 |
| 16      "Defendant and his agents are | 16  fact, transfer digital assets that were Cred Capital |
| 17      hereby ordered not to transfer, | 17  digital assets, didn't you? |
| 18      transmit, or use, or cause or permit | 18   A   To answer that question, can we read further |
| 19      anyone else to transfer, transmit, | 19  in this paragraph? |
| 20      or use, any Cred and/or Cred Capital      02:39:55 | 20   Q   Mr. Alexander, it's a simple question.  Did    02:42:14 |
| 21      digital assets in their possession, | 21  you transfer Cred Capital crypto after this order or |
| 22      custody and/or control." | 22  not? |
| 23      Do you see that language, Mr. Alexander? | 23   A   I did, yes. |
| 24   A   Which paragraph is that? | 24   Q   Okay. |
| 25   Q   This is Paragraph 1.          02:40:10 | 25      MR. EVANS:  You can take this down, Sam.      02:42:22 |
| Page 90 | Page 92 |
| 1   A  Yes, I see that. | 1      Can you please pull up Coinbase Transaction |
| 2   Q   Okay. | 2  History 1 and -- and remind the court reporter of |
| 3      And what are the addresses below? | 3  the exhibit.  Sorry.  I don't have the exhibit |
| 4   Q   Mr. Alexander, were you aware of this order? | 4  number in front of me. |
| 5   A  Yes.          02:40:22 | 5      MR. ASHWORTH:  E, echo, Joe.          02:42:51 |
| 6   Q   Okay. | 6      MR. EVANS:  Echo. |
| 7      And you had counsel when you were defending | 7      Scroll to the first page, please. |
| 8  this Temporary Restraining Order, right? | 8  BY MR. EVANS: |
| 9   A  Yes. | 9   Q   Mr. Alexander, these are the transactions |
| 10   Q   Okay.          02:40:32 | 10  that were executed on July 16th, the day before the    02:43:02 |
| 11      And this order is dated July 16th, 2020, | 11  Temporary Restraining Order was issued.  And if you |
| 12  right -- July 17th, 2020?  I apologize. | 12  see the fourth and fifth and sixth and seventh and |
| 13   A  Yeah, July 17th. | 13  eighth transaction on this page, it appears that you |
| 14   Q   Okay. | 14  are liquidating the Bitcoin contained in this |
| 15      Did you transfer, transmit, or use any Cred   02:40:43 | 15  Coinbase account.          02:43:18 |
| 16  or Cred Capital digital assets following July 17, | 16      Is that a fair and accurate description? |
| 17  2020? | 17   A   I don't recognize those transactions.  I |
| 18   A   I don't know.  I -- I don't recognize those | 18  mean, they're -- it looks like they're one -- are |
| 19  addresses there that are referenced. | 19  they one Bitcoin each? |
| 20   Q   Do you recognize the name Cred Capital?      02:40:59 | 20   Q   The first transaction is 4.96 Bitcoin.      02:43:28 |
| 21   A  Yes. | 21      Do you see that? |
| 22   Q   Do you recognize the name Cred? | 22   A  Yeah. |
| 23   A  Yes. | 23   Q   The second transaction is 56 Bitcoin. |
| 24   Q   And before the break, we were talk -- we were | 24      Do you see that? |
| 25  looking at your Coinbase account that held Cred    02:41:09 | 25   A  Yes, I do.          02:43:42 |
| Page 91 | Page 93 |

24 (Pages 90 - 93)

| | |
|---|---|
| 1    Is there any -- I'm sorry.  I don't recognize | 1  BY MR. EVANS: |
| 2  any of the transactions.  I -- I can't answer that. | 2    Q   You have a JPMorgan Chase account, right, |
| 3  I -- I -- I don't know.  I recall the original | 3  Mr. Alexander? |
| 4  transaction, which was a systematic liquidation, but | 4    A   Yes. |
| 5  I don't recognize the smaller ones there.        02:43:53 | 5    Q   And, in fact, you -- you produced the account  02:46:10 |
| 6    I don't know why there would be one, one, | 6  statements for that JPMorgan Chase account earlier |
| 7  three.  I -- I don't know.  I -- I can't... | 7  this week, correct? |
| 8    Q   Okay. | 8    A   Absolutely, yeah. |
| 9    But this -- this is your Coinbase account, | 9    Q   Okay. |
| 10  right?  These are transactions that you executed?   02:44:14 | 10    MR. ASWORTH:  I apologize.  Which date would  02:46:30 |
| 11    A   Yes. | 11  you like on that? |
| 12    Q   Okay. | 12    MR. EVANS:  July 31st.  The document is |
| 13    The -- the only thing I'm getting to is | 13  2020731-statements. |
| 14  the -- the large transaction here, the 56 Bitcoin | 14    MR. ASWORTH:  My Adobe is crashing out.  It |
| 15  transaction, that's $500,430.80, correct?        02:44:19 | 15  will just be one second.  I just have to close this   02:46:58 |
| 16    A   Yes. | 16  part right now. |
| 17    Q   And then we have a series of other | 17    MR. EVANS:  Okay.  Okay. |
| 18  transactions where it appears that a total of 59 or | 18    What letter are we up to, Sam? |
| 19  65 Bitcoin, approximately, are -- are executed.  So | 19    MR. ASWORTH:  It's G, golf. |
| 20  we have the first one -- the fourth transaction was   02:44:38 | 20  BY MR. EVANS:                    02:47:40 |
| 21  4.9. | 21    Q   Mr. Alexander, as Exhibit G, this is a |
| 22    Do you see that? | 22  JPMorgan Chase statement from July 1st, 2020 to |
| 23    A   Yes, uh-huh. | 23  July 31st, 2020, and it has your name on the top. |
| 24    Q   And then we have the sixth transaction for | 24    Do you see that? |
| 25  one, seventh transaction for another one, and then   02:44:50 | 25    A   Yes.                          02:47:55 |
| Page 94 | Page 96 |

| | |
|---|---|
| 1  some time later, we have -- we have three more, but | 1    Q   Okay. |
| 2  that's not till August. | 2    And these are one of the account statements |
| 3    So on July 16th, it appears that there's a | 3  that you provided to us through your counsel, right? |
| 4  liquidation of approximately 62 Bitcoin, correct? | 4    A   Yes. |
| 5    A   That's -- that's correct.          02:45:15 | 5    Q   Okay.                          02:48:03 |
| 6    Q   Okay. | 6    MR. EVANS:  And, Sam, if you could scroll |
| 7    And so once you liquidated -- | 7  down to Page 8. |
| 8    COURT REPORTER:  What's your answer? | 8  BY MR. EVANS: |
| 9    THE DEPONENT:  Yes, that's correct. | 9    Q   Do you see on Page 8, there's a July 22nd, |
| 10  BY MR. EVANS:                        02:45:16 | 10  $500,000 credit into this account?            02:48:21 |
| 11    Q   After this Bitcoin was liquidated on | 11    Do you see that? |
| 12  July -- on July 16th, where did it go? | 12    A   Uh-huh.  Yes. |
| 13    A   I'm going to have to get back to you on that. | 13    Q   Okay. |
| 14  I -- I don't recall where it was transferred to, but | 14    And -- and just so I understand, this |
| 15  it was -- I can confirm it was transferred to an   02:45:32 | 15  JPMorgan Chase account with your name on it, this is   02:48:30 |
| 16  account controlled by me. | 16  holding Cred Capital funds, right? |
| 17    Q   Okay. | 17    A   Yeah.  That -- that's that's the destination |
| 18    A   But I just don't -- I don't have the details. | 18  account for that original transaction in Coinbase to |
| 19  I'll have to get back to you. | 19  fund -- to provide working capital for Cred Capital, |
| 20    MR. EVANS:  Mr. Ashworth, can you pull up the   02:45:44 | 20  yes.                            02:48:46 |
| 21  JPMorgan Chase account statement for July 31st, | 21    Q   Okay. |
| 22  2020? | 22    So everything in this account is to provide |
| 23    (Exhibit G was marked for | 23  working capital for Cred Capital, correct? |
| 24    identification and is attached | 24    A   Well, I -- I -- I can't confirm that to you. |
| 25    hereto.) | 25  Is there an account number in there, something --   02:48:56 |
| Page 95 | Page 97 |

25 (Pages 94 - 97)

1  Q  It's on the top right-hand corner.  It says
2  "B41716006."
3  A  I -- I can't answer that question, but the
4  question I think you're getting at is have I swept
5  that account or provided everything in that account  02:49:10
6  to the debtors, and -- and the answer to that
7  question is yes.  I mean, I don't mean to...
8  Q  So on July 22nd, $500,000 comes into this
9  JPMorgan Chase account.  Is that the proceeds of the
10  Coinbase transactions that we just looked at?  02:49:27
11  A  It is, yes.
12  Q  Okay.
13  And it doesn't appear that this credit came
14  from Coinbase, so where did it come from?
15  A  I -- I -- no.  That -- I mean, as far as I  02:49:38
16  know, that came from Coinbase.
17  Q  Okay.
18  In the description, it says (as read):
19  "Fedwire credit Wells Fargo Bank:
20  James Alexander Sherman Oaks,  02:49:53
21  California."
22  That's your name, right?  This is your
23  account?
24  A  No.  I mean, as I said before, I -- I -- I
25  need to check my records, but my recollection is  02:50:02

Page 98

1  that this is the account that received the initial
2  Coinbase transaction.
3  Thereafter, a dedicated account was
4  established, and that was subsequently used from
5  around August 1st onward, so...  02:50:15
6  Q  When you say "a dedicated account," what do
7  you mean?
8  A  I mean the Wells Fargo statements that you
9  showed me, the account ending 9235, which is the
10  James Alexander d/b/a James Alexander Cred account.  02:50:28
11  Q  Okay.
12  So what about this Wells Fargo account, the
13  one that put in the 500,000 here?  Where did that
14  come from?
15  A  I can't comment on the description.  I -- it  02:50:39
16  wasn't generated by me.  It was generated by -- by
17  Morgan Stanley, and I don't know.  I -- I can't
18  answer that.  I -- I don't know.
19  Q  Okay.
20  A  I can only tell you what my recollection of  02:50:51
21  the series of transactions is.
22  MR. EVANS:  Sam, can you go back to the
23  Coinbase records we were just looking at?
24  BY MR. EVANS:
25  Q  And if you look at these transactions we just  02:51:10

Page 99

1  reviewed, the 56 Bitcoin transaction is 508,000.
2  Do you see that?
3  A  Uh-huh.
4  Q  After fees, it's $500,430.80?
5  A  Okay.  02:51:30
6  Q  Okay.
7  So where is the rest of the proceeds?  You
8  have a $45,000 transaction, a $10,000 transaction,
9  another $10,000 transaction, so where is the rest of
10  it?  02:51:40
11  A  I'm not following you.  Can you...
12  Q  On July 16th, there are four transactions at
13  which Bitcoin was liquidated.
14  A  Yeah.  Joe, I -- I can't answer that.  I
15  don't recall.  I don't know.  02:51:58
16  Q  Okay.
17  So you don't know where the rest of the --
18  where the rest of the cash proceeds were?
19  A  You have all of the bank statements that you
20  have requested, and I will provide any documentation  02:52:03
21  you need, but I don't recall specifically these --
22  these transactions you are referencing.  That's as
23  much as -- as I can say.
24  Q  You are aware that you were required to
25  provide all bank accounts and all bank statements  02:52:16

Page 100

1  that ever had Cred Capital proceeds in them, right?
2  A  I -- I -- I don't know the answer to that.
3  Q  You don't know the answer to that?
4  So did you provide all bank statements --
5  A  I have provided everything --  02:52:31
6  Q  -- for all accounts that are Cred Capital?
7  A  I have provided everything I have been asked
8  to provide and will be absolutely -- and will
9  continue to provide everything that I'm asked to
10  provide.  02:52:43
11  But I -- I can't answer your question because
12  I -- I don't know if it references all of the
13  documents that I have provided or not.  But I have
14  provided everything that I have been asked to
15  provide and have been as complete -- absolutely as  02:52:55
16  complete as possible.
17  Q  Uh-huh.
18  MR. EVANS:  Sam, please go back to the
19  JPMorgan Chase document, Page 8.
20  BY MR. EVANS:  02:53:04
21  Q  We have a July 22nd transaction with a Wells
22  Fargo bank account with your name on it.
23  Do you see that?
24  A  I do.
25  MR. EVANS:  Sam, please pull up the Wells  02:53:36

Page 101

26 (Pages 98 - 101)

| | |
|---|---|
| 1 Fargo bank statements that are provided by | 1    Q   Yeah.  So that's not really how it works. |
| 2 Mr. Alexander. | 2 The order was for you to provide all of the account |
| 3       MR. ASWORTH:  (Simultaneous speech.) | 3 statements and details concerning accounts that held |
| 4       MR. EVANS:  It's called "Wells Fargo Account | 4 Cred Capital assets. |
| 5 Statements." | 5       You have a $500,000 transaction going into        02:56:16 |
| 6       What number -- what letter are we up to, Sam? | 6 the JPMorgan Chase account from a Wells Fargo |
| 7 H? | 7 account with your name on it. |
| 8       MR. ASWORTH:  That's correct, Joe.  This is | 8    A   Yes.  So I confirmed that.  That's my |
| 9 Exhibit H. | 9 recollection of the transactions that occurred also. |
| 10       (Exhibit H was marked for | 10    Q   Okay.                                02:56:30 |
| 11        identification and is attached | 11       So that July 22nd transaction, that was with |
| 12        hereto.) | 12 your personal Wells Fargo account, right? |
| 13 BY MR. EVANS: | 13    A   Can you pull up that statement? |
| 14    Q   Exhibit H. | 14    Q   We don't have your personal statement because |
| 15       This is a August -- these are a series of        02:54:23 | 15 you haven't given it to us.                        02:56:43 |
| 16 bank statements you provided to your counsel.  We | 16    A   Oh, that's part of part two discovery.  Yeah. |
| 17 have talked about them before, the name James | 17 I -- I don't have the data to answer that question, |
| 18 Alexander d/b/a James Alexander Cred? | 18 then. |
| 19       Do you see that? | 19       MR. GRIVNER:  I will note for the record that |
| 20    A   Yes.                                02:54:35 | 20 that information will be provided pursuant to the        02:57:02 |
| 21       MR. EVANS:  Sam, can you go to the first | 21 part two discovery that has been requested. |
| 22 transaction on August 11th? | 22 BY MR. EVANS: |
| 23 BY MR. EVANS: | 23    Q   Did there come a time where you moved 50 |
| 24    Q   It's a $100 deposit to open up this account? | 24 Bitcoin on January 16th, 2021? |
| 25    A   I see that there.                        02:54:46 | 25    A   Yes.                                02:57:22 |
| Page 102 | Page 104 |

| | |
|---|---|
| 1    Q   The JPMorgan Chase transaction for $500,000 | 1    Q   And why did you move 50 Bitcoin on |
| 2 was on July 22nd from an account in your name. | 2 January 16, 2021? |
| 3       Do you have another Wells Fargo account, | 3    A   I was -- I had COVID at the time, and I |
| 4 James? | 4 thought it would be prudent to move those assets |
| 5    A   Sorry.  What do you mean?  Besides this one?   02:54:57 | 5 onto some things more accessible, a more accessible        02:57:37 |
| 6    Q   Yes. | 6 device should I become incapacitated, and so that's |
| 7    A   I have a personal Wells Fargo account that is | 7 what I did. |
| 8 James Alexander and includes this James Alexander | 8    Q   Okay. |
| 9 d/b/a James Alexander Cred. | 9       And when you said you were moving it to |
| 10       So I -- I -- I'm not sure if that answers        02:55:18 | 10 somewhere more accessible, where did you move it?        02:57:52 |
| 11 your question or not, but that's... | 11    A   I moved it to a Coinbase account. |
| 12    Q   Did the July -- did the $500,000 July 22nd | 12    Q   Okay. |
| 13 transaction, did that come from your personal | 13       And who has access to that Coinbase account? |
| 14 account at Wells Fargo? | 14    A   Myself. |
| 15    A   Sorry.  Can you repeat that?                02:55:30 | 15    Q   Okay.                                02:58:02 |
| 16    Q   The July 22nd, $500,000 transaction in the | 16       And what did you do with the 50 Bitcoin after |
| 17 JPMorgan Chase account, did that come from your | 17 it went to the Coinbase account on January 16? |
| 18 Wells Fargo account, your personal line? | 18    A   They were eventually liquidated for dollars. |
| 19    A   I don't -- I don't know.  I've told you my | 19    Q   Okay. |
| 20 recollection of the transactions.  You have the bank   02:55:50 | 20       And on January 16th, 2021, you were aware,        02:58:18 |
| 21 statements here.  I haven't had the benefit of | 21 were you not, that there was a court order |
| 22 reviewing these.  But I told you my recollection. | 22 precluding you from moving any cryptocurrency that |
| 23 If you have the bank statements here, you'll have to | 23 was related to Cred Capital, right? |
| 24 show me the data, and I can confirm it or not | 24    A   Yes. |
| 25 confirm it, but that's...                        02:56:04 | 25    Q   And you moved it anyway?                02:58:30 |
| Page 103 | Page 105 |

1   A  I moved it anyway because I was
2  incapacitated, and I was, you know, in fear of --
3  I -- I thought I was dying, and I didn't want to
4  leave a hardware wallet inaccessible to where those
5  assets couldn't be accessed.          02:58:46
6   Q  Uh-huh.
7      And you never -- you never asked anybody to
8  reach out to the debtors on this issue, did you?
9   A  I did not.  I was incapacitated, as I said.
10   Q  Uh-huh.                02:58:59
11      And on January 17, 2021, you executed an
12  additional 50 Bitcoin transaction, didn't you?
13   A  That -- that's -- that's -- yes, that's
14  right.
15   Q  Okay.                02:59:07
16      And on both of those days, when you executed
17  the transaction, you knew that that was in violation
18  of the Court's order, right?
19   A  I did, yes.
20   Q  Okay.                02:59:16
21      And you did it anyway?
22   A  I did it because I was incapacitated, and I
23  wanted to make these assets more accessible.
24   Q  So what did you do with those assets after
25  they went into your Bitcoin account -- after they   02:59:28
Page 106

1   Q  Okay.
2      So your testimony is you were incapacitated,
3  you executed two transactions of 50 Bitcoin each,
4  and when you realized what happened, you transferred
5  them back to the Ledger wallet?        03:01:05
6      That's what you are saying?
7   A  That is correct.
8      MR. GRIVNER:  Objection to form.
9      MR. EVANS:  Okay.
10      Let's open up the Ledger Live operations   03:01:10
11  wallet, Sam.  And the exhibit letter, if you could.
12      COURT REPORTER:  Mr. Evans, if you could just
13  slow down a little bit.  You get talking pretty fast
14  sometimes.  It's hard to understand you.
15      MR. EVANS:  Sure.              03:01:30
16      MR. ASHWORTH:  This is going to be Exhibit I,
17  Joe.
18      (Exhibit I was marked for
19      identification and is attached
20      hereto.)                03:01:38
21  BY MR. EVANS:
22   Q  So this is Exhibit I.  This is the Ledger
23  Live operations document that was provided to us by
24  you concerning your Ledger wallets.
25      MR. EVANS:  So if you would go to Line   03:01:48
Page 108

1  went into your Coinbase account?  Apologies.
2   A  In both cases on the 16th and 17th, they were
3  liquidated for dollars.  And when -- when I became
4  aware of those transactions and I swept the assets
5  back to the hardware wallet where they were -- where   02:59:46
6  they were supposed to be, and then transferred them
7  subsequently to the debtor.
8   Q  Let -- let -- let's take that in pieces.
9      What do you mean, when you became aware of
10  the transactions?          03:00:02
11   A  Well, I was incapacitated, as I said, and so
12  I -- I -- I -- when I got better and I -- I didn't
13  think I was dying, I stopped the transfer of assets
14  from the Ledger wallet to the Coinbase account and
15  eventually reversed that transaction, put the assets   03:00:24
16  back on the hardware wallet where they -- where --
17  where they were supposed to be.
18   Q  Okay.
19      So when you became aware, you're saying you
20  don't remember transferring the January -- doing --   03:00:38
21  executing the January 16th and January 17th Bitcoin
22  transactions?
23   A  I was -- I was completely incapacitated.
24  I -- that's all I can tell you.  And in the -- you
25  know, in my delirium, that seemed to make sense.   03:00:50
Page 107

1  Item 66, Sam.  You might want to highlight that.
2  BY MR. EVANS:
3   Q  Line Item 66 is a January 16th, 2021 Bitcoin
4  transaction, 50.00014 Bitcoin.
5      Do you see that?              03:02:04
6   A  Yes.
7   Q  Okay.
8      And January 17th, the next day, is the
9  Bitcoin transaction 50.00027.
10      Do you see that?              03:02:15
11   A  Uh-huh.  Yes.
12   Q  Okay.
13      And are those the two transactions that you
14  were talking about where you were incapacitated and
15  you don't remember doing?              03:02:24
16   A  Yes.  I scheduled those transactions, and
17  they were executed, yes.
18   Q  Okay.
19      So this is your digital wallet.  You said
20  you -- you placed them all back into your digital   03:02:30
21  wallet.  So where is that?
22   A  No.  I transferred the -- I don't see that on
23  here.  Why -- where are the dates?  Dates -- the
24  dates seem like they are out of order here.  I -- is
25  there any way to sort this by date?        03:03:07
Page 109

28 (Pages 106 - 109)

1     I mean, the answer to the question is I
2  transferred the assets out of the digital wallet to
3  Coinbase for the reasons I've explained, and then I
4  transferred the proceeds of -- of that liquidation
5  back to the hardware wallet and transferred it to          03:03:29
6  the debtor.  That's my -- that's my recollection.
7     Q  On February 5th, 2021, you recall a lot of
8  the people in this deposition, we were on a Zoom
9  call just like this, and you transferred Bitcoin and
10 other assets back to the debtor?                            03:03:46
11    Okay?
12    A  Yes.
13    Q  Do you remember that?
14    A  Yes.
15    Q  Okay.                                  03:03:49
16    And you transferred 49.98823 Bitcoin back to
17 the debtor, right?
18    A  Yes.
19    Q  Okay.
20    And if you go up to Line Item 63, you will          03:03:57
21 see an out, 49.98823, and that's from you to the
22 debtor, right?
23    A  Yes.
24    Q  Okay.
25    But there were 150 Bitcoin in this account          03:04:10

Page 110

1  BY MR. EVANS:
2     Q  So this is Exhibit J.  This is your Coinbase
3  account.  And it appears that there are liquidations
4  of Bitcoin -- well, conversions of Bitcoin on 1.6 --
5  on January 16th and January 17th.  Sorry.             03:05:54
6  January 17th and January 17th.
7     Do you see that?
8     A  Yeah.  Can you repeat the numbers?  Yeah, 50
9  Bitcoin sold, and the proceed numbers are there,
10 yeah.                                           03:06:09
11    Q  Okay.
12    And what was the proceeds of the first
13 transaction?
14    A  Which one do you mean, the first transaction?
15    Q  The first one on the list, the second          03:06:17
16 transaction down.
17    A  Can you hover over it?  I'm not sure which
18 direction you're going in, up or down.
19    MR. EVANS:  It's the first one, Sam, with the
20 stock price of 35386.17.                         03:06:31
21    THE DEPONENT:  Okay.
22    Do you want me to read a number from this
23 screen?
24 BY MR. EVANS:
25    Q  Yes.  What were the proceeds of that          03:06:39

Page 112

1  before you transferred the 250 Bitcoin transactions
2  out, right?
3     A  Yes, that's correct.
4     Q  Okay.
5     And so where is the other hundred?               03:04:20
6     A  The other hundred were liquidated, and the
7  proceeds available to transfer back were sent back
8  to the hardware wallet in the form of USDC.
9     Q  And did you execute these transact--- where
10 did you execute the transactions to convert them       03:04:44
11 into USDC?
12    A  Can you repeat?
13    Q  You said you converted the Bitcoin into USDC.
14 Where did you do that?
15    A  On -- on Coinbase.                          03:04:58
16    Q  Coinbase.
17    A  You should have a record of those
18 transactions.
19    Q  Uh-huh.
20    MR. EVANS:  Sam, can you pull up Coinbase 2?  03:05:09
21 Can we get a letter for this one, Sam?
22    MR. ASWORTH:  This will be Exhibit J.
23    (Exhibit J was marked for
24    identification and is attached
25    hereto.)                                   03:05:46

Page 111

1  transaction?
2     A  $1,742,946.
3     Q  Okay.
4     And what about the next transaction, the next
5  sale?                                           03:06:57
6     A  Can you hover?  Can you hover over the
7  transaction that you are referring to, please, or
8  give me some other reference?
9     MR. EVANS:  Sam, could you hover over that
10 fourth line?                                     03:07:22
11    THE DEPONENT:  $1,695,010.50.
12 BY MR. EVANS:
13    Q  Okay.
14    And I'm not going to ask you to do the math,
15 but I'm going to represent to you that the total of   03:07:34
16 those transactions is $3,437,956.53.
17    Okay?
18    You can presume that that's -- that's true.
19    MR. EVANS:  So, Sam, if you can go back to
20 the Ledger Live operations.                      03:07:51
21 BY MR. EVANS:
22    Q  Mr. Alexander, on February 5th, 2021, where
23 you transferred the debtor some assets, you did not
24 transfer the debtors $3,437,956.53 in cash, did you?
25    A  I don't know.  Do you have a -- a reference   03:08:08

Page 113

29 (Pages 110 - 113)

| | |
|---|---|
| 1 in the -- in the log to the exact amount? | 1 the discovery that has up to now been asked for. |
| 2  Q  Yes. | 2      And this issue is a -- has been ongoing.  And |
| 3      MR. EVANS:  Sam, can you refer him to the | 3 I am, of course, committed to delivering all the |
| 4 February 5th, 2021 transaction -- February 6th, 2021 | 4 assets I have of the debtors, but I -- I can't |
| 5 transaction.  It's Line 51.          03:08:36 | 5 answer that question today because I just don't know   03:11:36 |
| 6 BY MR. EVANS: | 6 where we stand. |
| 7  Q  Do you see that line, Mr. Alexander? | 7  Q  Mr. Alexander, your lawyers didn't execute |
| 8  A  Do you guys mind if I take another break? | 8 these transactions.  You executed these |
| 9  Q  If you just give me, like, three questions, | 9 transactions. |
| 10 we can take, like, a five-minute break.  Is that all   03:09:03 | 10      Where is the 664,000?              03:11:44 |
| 11 right? | 11  A  That question remains open, and I can't |
| 12  A  As soon as possible.  I'm -- I'm feeling a | 12 answer it, as I have described. |
| 13 bit short of breath here. | 13  Q  This was just a few weeks ago.  You don't |
| 14  Q  I'll -- I'll be -- I'll be very brief.  All | 14 remember where $664,467 went? |
| 15 I'm asking you is, do you see this document reflects   03:09:14 | 15  A  As I said, this -- that question remains        03:11:58 |
| 16 that there was a 2773488 transfer of USDC to the | 16 open, and as far as I know, it hasn't been resolved |
| 17 debtors? | 17 yet as to exactly what the accounting is, whether -- |
| 18      Do you see that? | 18 for example -- whether people agree on that number, |
| 19      COURT REPORTER:  To the what? | 19 and -- and so I can't answer that. |
| 20      MR. EVANS:  To the debtors.          03:09:28 | 20  Q  It's not a legal question.  The question is   03:12:16 |
| 21      THE DEPONENT:  Yes, I see that. | 21 where the money is.  So I'm not asking you to make a |
| 22 BY MR. EVANS: | 22 legal opinion or a legal determination or for |
| 23  Q  Okay. | 23 counsel to have argument.  I'm asking you where the |
| 24      And USDC is a reference to UCD coin, right, | 24 money is.  There is $664,467.53 missing. |
| 25 Mr. Alexander?          03:09:42 | 25      Where is it?          03:12:31 |
| Page 114 | Page 116 |
| 1  A  Yes, that's right. | 1  A  I can't answer that question because I don't |
| 2  Q  And each UCD coin is worth 1 USD; is that | 2 know if the amount is correct, and I don't know what |
| 3 right? | 3 the accounting is for -- for -- for those assets. |
| 4  A  Approximately. | 4  Q  Okay. |
| 5  Q  Okay.          03:09:49 | 5      We looked at the Coinbase records, right?    03:12:42 |
| 6      So the proceeds from the January 16th and | 6  A  Okay. |
| 7 January 17th Bitcoin transactions were 3.437956.53. | 7  Q  Guys, I'm going to need a break.  This is -- |
| 8 You provided the debtors with 2,773,488. | 8 you said a few questions, and now we're ten minutes |
| 9      Where are the additional $664,467.53? | 9 into this and -- |
| 10  A  Yeah.  This has been the subject of        03:10:19 | 10  Q  Well, you're not answering the question.  The   03:12:56 |
| 11 back-and-forth e-mails ongoing, and I don't -- I | 11 question is, where is the 664,000? |
| 12 don't have a complete answer for you today. | 12  A  I have answered the question to the best of |
| 13      I believe it will be part of discovery part | 13 my ability and recollection. |
| 14 two, which -- which I -- so I would -- I have to | 14  Q  You're not going to answer the question? |
| 15 defer that -- I have to defer that to -- to -- I        03:10:38 | 15  A  I have answered the question.              03:13:06 |
| 16 believe I have to defer that. | 16  Q  It's -- it's a very -- it's a very specific |
| 17  Q  Let me understand.  There is 664,000 missing, | 17 question, and you are being very evasive. |
| 18 and you are saying it's in your personal accounts | 18      The question is, where is the missing |
| 19 because that's what's coming in part two? | 19 $664,457, and your answer is "I don't remember"? |
| 20  A  Well, I don't know.  This has -- as I said,    03:10:57 | 20  A  I will answer that question when I'm able to    03:13:19 |
| 21 this has been the subject of an ongoing e-mail | 21 answer it.  It remains an open question because it's |
| 22 conversation between lawyers. | 22 being debated by counsel and others now, so... |
| 23      And I don't know the current status of that | 23  Q  It's a fact question.  It's not a legal |
| 24 conversation, but I -- I believe we will get to the | 24 question.  Where is the 664? |
| 25 bottom of it when we have more -- or -- or all of     03:11:12 | 25      MR. GRIVNER:  And he has answered it to the   03:13:31 |
| Page 115 | Page 117 |

1 best of his ability given his knowledge, sitting
2 here today. And it's been asked multiple times now.
3 THE DEPONENT: Joe, I'm asking for a break,
4 and you're being really inhumane and not really
5 appreciating the state of my recovery, and I don't    03:13:45
6 appreciate it.
7 So I would ask that we maintain a cordial
8 contact here. I am doing the best job that I can to
9 support you in -- in -- in -- in your efforts, and I
10 would appreciate that you maintain some decorum    03:14:02
11 and -- and respect myself and the others on this
12 call.
13 MR. EVANS: If you want to take a break,
14 that's fine. This -- this question and the answers
15 that you have to give us are not going to go away,    03:14:14
16 so if you want to take five minutes, I'm happy to
17 give you five minutes, but there is missing money
18 here, and we need to know where it is.
19 MR. GRIVNER: Let's take the break that's
20 been requested, then. Five minutes.    03:14:26
21 THE VIDEOGRAPHER: Stand by, please,
22 Mr. Alexander. This marks the end of Media No. 7.
23 Going off the record at 3:14 p.m.
24 (Recess.)
25 THE VIDEOGRAPHER: We are back on the record    03:24:07

Page 118

1 at 3:24 p.m. Pacific, and this marks the beginning
2 of Media No. 8 in the deposition of James Alexander.
3 You may proceed, Counsel.
4 MR. GRIVNER: Counsel, I've just been advised
5 that Mr. Alexander has filed for personal    03:24:55
6 bankruptcy. I'm forwarding everyone an e-mail
7 regarding that filing. And that's my understanding
8 as to what has occurred.
9 Our position in light of that filing is that
10 an automatic stay is in place such that this    03:25:10
11 deposition cannot go forward in light of that.
12 MR. EVANS: Where was this bankruptcy filing?
13 MR. GRIVNER: I'm forwarding it right now.
14 It was filed, and I'll tell you, in the Central
15 District of California.    03:25:28
16 MR. EVANS: So it's your position that based
17 on this filing, it supersedes the judge's emergency
18 order that permits this deposition?
19 MR. GRIVNER: I think an automatic stay is in
20 place in connection with Mr. Alexander's bankruptcy    03:25:46
21 filings, such that that is the case, yes.
22 MR. EVANS: So are you directing your client
23 not to answer any more questions today?
24 MR. GRIVNER: At this point, I'm directing
25 him not to answer any further questions.    03:25:58

Page 119

1 I -- I am happy to confer further and consult
2 with Mr. Pfeiffer as well, as well as California
3 counsel regarding those positions.
4 But as of right now, I am instructing him not
5 to answer anything further, subject to further    03:26:12
6 conference regarding this change in circumstances,
7 yes.
8 MR. EVANS: Is it your position you are
9 directing your client not to comply with the Court's
10 order to sit for this deposition and provide    03:26:30
11 information that is required to be provided
12 tomorrow?
13 MR. GRIVNER: In light of his bankruptcy
14 filing, that is my position now. I am happy to
15 engage in a further conference regarding continuing    03:26:40
16 this -- this deposition after all relevant attorneys
17 and parties confer regarding the -- the state of the
18 law as -- as to those issues.
19 I would ask that this deposition at the very
20 least be adjourned until such conference can occur.    03:27:00
21 MR. EVANS: My request is for a -- I think
22 what we need to do here is have -- have a 15-minute
23 recess so I can confer with counsel and see how we
24 want to handle this.
25 This mid-deposition filing, it's pretty    03:27:19

Page 120

1 clearly an effort to obfuscate our fact-finding
2 efforts. We know what's going on here. And we're
3 asking difficult questions, and the second we do,
4 there's a personal bankruptcy filing to disrupt us
5 from doing that.    03:27:36
6 And so we're going to caucus internally and
7 decide how to proceed. If you are directing your
8 client to not comply with the Court's order, that's
9 on you, and we will have that accordingly.
10 I would ask for 15 minutes to talk among    03:27:48
11 counsel and to return on the record to give you our
12 position.
13 MR. GRIVNER: Understood.
14 We will do the same.
15 MR. LUFT: I will note that the deposition    03:27:56
16 remains ongoing, and as such, please don't confer
17 with your client.
18 MR. GRIVNER: Understood.
19 THE VIDEOGRAPHER: Stand by everyone, please.
20 I also can create breakout rooms, if you'd like.    03:28:08
21 I'm going to go off the record first.
22 MR. GRIVNER: No need for a breakout room, at
23 least on our side.
24 THE VIDEOGRAPHER: Thank you.
25 Stand by. I'm going to go off the record.    03:28:13

Page 121

31 (Pages 118 - 121)

1 Is that okay?

2    MR. EVANS:  Yes.

3    THE VIDEOGRAPHER:  Great.

4    This marks the end of Media No. 8.  Going off

5 the record at 3:28 p.m. Pacific.            03:28:21

6    (Recess.)

7    THE VIDEOGRAPHER:  We're back on the record

8 at 4:00 o'clock p.m. Pacific, and this marks the

9 beginning of Media No. 9 in the deposition of

10 James Alexander.                           04:00:46

11    You can proceed, Counsel.

12    MR. EVANS:  Mr. Alexander, will you proceed

13 with this deposition?

14    MR. GRIVNER:  Mr. Alexander, you can -- you

15 can answer that question to the extent you're able   04:01:01

16 to.

17    THE DEPONENT:  I've been advised by counsel

18 not to continue this deposition.

19    MR. EVANS:  Counsel, are -- are you advising

20 your client and directing him to not proceed with   04:01:15

21 this deposition?

22    MR. GRIVNER:  Based upon my conversations

23 with Mr. Alexander's California bankruptcy attorney,

24 Mr. Golubchik, Mr. Golubchik is not advising -- is

25 advising Mr. Alexander not to continue with this

Page 122

1 deposition in light of the bankruptcy filing that

2 has occurred in California.

3    MR. LUFT:  When did Mr. -- when did the

4 bankruptcy counsel give Mr. Alexander that advice?

5    Was it before this deposition or during it?     04:01:44

6    MR. GRIVNER:  It was during the deposition.

7 It was during this break.

8    MR. LUFT:  So he communicated with

9 Mr. Alexander during a pending deposition in -- in

10 Delaware; is that correct?                   04:01:51

11    MR. GRIVNER:  No.  The advice was provided to

12 me by Mr. Golubchik, and I have advised

13 Mr. Alexander, in light of the advice given by

14 Mr. Golubchik, to not -- not continue with this

15 deposition.                               04:02:07

16    I will further represent that I have had --

17 neither me, nor Mr. Pfeiffer, have had any

18 communications with Mr. Golubchik prior to this --

19 the communications that we had with him during this

20 break.                                   04:02:25

21    MR. AZMAN:  Can you articulate --

22    MR. GRIVNER:  Just so I'm clear --

23    MR. AZMAN:  Can you articulate the legal

24 basis for why you are directing him not to continue

25 with the deposition specifically?            04:02:32

Page 123

1    MR. GRIVNER:  Mr. Alexander's filing of his

2 bankruptcy petition in California.

3    MR. AZMAN:  So it is your position that the

4 automatic stay allows Mr. Alexander to no longer sit

5 for a deposition in other pending litigation; is     04:02:42

6 that correct?

7    MR. GRIVNER:  That's correct.

8    MR. AZMAN:  Thank you.

9    MR. LUFT:  Okay.

10    Can I ask a couple follow-up questions just    04:02:53

11 on this?

12    MR. GRIVNER:  To whom?

13    MR. LUFT:  There has been approximately

14 $170,000 of Cred Capital funds that have been

15 identified during this deposition as not the        04:03:04

16 property of Mr. Alexander, but specifically the

17 property of the Cred Capital.  There is a pending

18 order that those funds had to be turned over as of

19 last Friday.

20    Is Mr. Alexander refusing to turn over those   04:03:15

21 funds, despite the fact that they are Cred Capital

22 funds?

23    MR. GRIVNER:  I will advise -- I will confer

24 with Mr. Alexander's team of counsel and respond

25 back to that question as soon as possible.          04:03:25

Page 124

1    MR. LUFT:  Okay.

2    And --

3    MR. WALSH:  Well, this is Tim.

4    What is as soon as possible?

5    I sent the e-mail, like, an hour-and-a-half     04:03:37

6 ago, maybe two hours ago.  So what is as soon as

7 possible?

8    I mean, he has got $60,000 sitting in the

9 trunk of a car.  No one can think that's prudent.

10    MR. GRIVNER:  I -- I understand your          04:03:49

11 position.  We will respond back as soon as possible.

12 I will -- I will make every effort to respond as

13 quickly as possible after I have conferred with

14 counsel for Mr. Alexander that I was not even -- you

15 know, his -- his existence I was not even aware of   04:04:03

16 before about 35 minutes ago.

17    MR. WALSH:  I appreciate that.

18    Can you give me a time frame, please?  We are

19 going to contact chambers.

20    MR. GRIVNER:  We -- I will give you a         04:04:19

21 time -- let me reach out to Mr. Golubchik, and I

22 will give you a time frame within the next hour.

23 And -- and I hope that -- I hope for that to be --

24 that answer to be this evening.

25    MR. LUFT:  Mr. Grivner, I appreciate your      04:04:36

Page 125

32 (Pages 122 - 125)

1 position.  We are not aware any of precedent that
2 indicates that Mr. Alexander's personal bankruptcy
3 filing prevents the continuation of this deposition.
4    Accordingly, we are not going to suspend the
5 deposition which has been Court ordered.    04:04:51
6    MR. GRIVNER:  Uh-huh.
7    MR. LUFT:  It's going to stay pending.
8    If Mr. Golubchik wants to provide us with
9 such precedent, I ask him to do so now.
10    MR. GRIVNER:  Uh-huh.    04:05:01
11    MR. LUFT:  Otherwise, we're going to have --
12 I am going to ask that we continue on with this
13 deposition as the Court ordered it.
14    MR. GRIVNER:  And his instruction is for him
15 not to answer right now.  And we will -- I will    04:05:11
16 relay that -- that message and ask that his position
17 and support be provided, and -- and we will go from
18 there.
19    MR. LUFT:  Okay.  I think we're going to need
20 to go to the Court.  I -- I -- I don't know how else    04:05:26
21 to -- I don't know why Mr. Golubchik is not on this
22 call, to be honest with you right now, if he's the
23 one --
24    I understand the tough position you are in,
25 Mr. Grivner, but, you know, honestly, if he's giving    04:05:38

Page 126

1 directions to counsel -- he's getting instructions
2 from counsel who no one's ever seen.
3    MR. GRIVNER:  I -- I understand your
4 position.  I will relay that message, and
5 Mr. Golubchik will participate to the extent he    04:05:56
6 feels necessary.
7    MR. WALSH:  Let's do this.  Let's go off the
8 record for 15 minutes.  We'll come back.
9    We are going to get in touch with chambers.
10    MR. GRIVNER:  Well, get -- get in touch with    04:06:08
11 chambers?  I don't know why we need to get back on
12 the record for this deposition.
13    MR. LUFT:  It's not suspended.
14    MR. GRIVNER:  You can suspended it until we
15 are ordered to reopen it.  We're not going to agree    04:06:19
16 to continue it, unless the Court orders us to do so.
17    MR. WALSH:  Which is why we are going to try
18 to get the Court right now.
19    MR. GRIVNER:  Okay.
20    MR. WALSH:  See you in 15 minutes.    04:06:30
21    THE VIDEOGRAPHER:  I'm going to go off the
22 record.
23    Is that okay, Counsel?
24    MR. WALSH:  Yes, that's fine.
25    MR. GRIVNER:  Yes.    04:06:36

Page 127

1    THE VIDEOGRAPHER:  Stand by, everyone.  This
2 marks the end of Media No. 9.  Going off the record
3 at 4:06 p.m. Pacific.
4    (Recess.)
5    THE VIDEOGRAPHER:  We are back on the record    04:27:03
6 at 4:28 p.m. Pacific, and this marks the beginning
7 of Media No. 10 in the deposition of James
8 Alexander.
9    Due to certain circumstances, the
10 videographer is using his video as a placeholder.    04:28:27
11    You may proceed, Counsel.
12    MR. EVANS:  We are here to depose James
13 Alexander pursuant to an emergency order issued by
14 the Court on February 5th, 2021.
15    We have been advised by counsel that    04:28:41
16 Mr. Alexander filed for personal bankruptcy during
17 the pendency of the deposition during a break, in
18 which he claimed he was having some issues.
19    I understand that counsel is advising him to
20 not proceed with this deposition.  We think that's    04:28:58
21 improper, but we're here, ready, willing, and able
22 and want to proceed with this deposition, and it
23 should proceed.
24    So if Mr. Grivner has an opposition to
25 proceeding with the Court-ordered deposition, we    04:29:07

Page 128

1 would like to hear that now.
2    MR. GRIVNER:  Yes.  This is Mr. Grivner.
3    Based upon our -- our conference with
4 Mr. Alexander's California bankruptcy attorney, he
5 is being instructed not to continue with this    04:29:21
6 deposition.
7    We have heard that the Court will not be able
8 to hear -- the Delaware court will not be able to
9 hear us this evening regarding that.
10    We will be available at the convenience of    04:29:32
11 the Court.
12    MR. EVANS:  Just to be clear, the -- the
13 Committee -- let me speak for the debtors.  We are
14 not agreeing to extend this deposition or to close
15 this deposition.  The deposition is open, and    04:29:44
16 Mr. Alexander should be answering the questions that
17 the Court required him to answer.  And he should
18 know that under Delaware law, he shouldn't be
19 consulting his -- his attorneys in the meantime.
20    MR. GRIVNER:  And -- and we have no -- no    04:29:56
21 objection to that fact.  This deposition will remain
22 open, unless and until the Court orders it to be
23 closed or otherwise.
24    MR. LUFT:  And, Mr. Grivner, will
25 Mr. Alexander be available tomorrow morning for the    04:30:14

Page 129

33 (Pages 126 - 129)

1 Court?
2     MR. GRIVNER:  For the Court?
3     MR. LUFT:  Yes.  If we proceed with -- if the
4 Court needs Mr. Alexander to appear in front of it,
5 will Mr. Alexander be -- make himself available for    04:30:23
6 that?
7     MR. GRIVNER:  I will have to confer with --
8 with him regarding his availability.  I don't know
9 that -- for the purposes of our conference with the
10 Court, I don't know that he would be needed to    04:30:34
11 testify.
12     If you are looking to call him as a witness
13 in some sort of hearing with the Court tomorrow,
14 please -- please let us know that, and I will
15 determine and let you know as -- as soon as possible    04:30:48
16 whether or not he would be available.
17     But it would seem to me that -- that -- that
18 any hearing conducted before the Court tomorrow
19 would not be evidentiary in nature.  If -- if that
20 is -- if -- if you feel otherwise, please let me    04:31:05
21 know, and I will advise as to his availability.
22     MR. LUFT:  Thank you.
23     Similarly, Mr. Grivner, as we believe this
24 deposition should continue on now and going forward,
25 we request that Mr. Alexander make sure that should    04:31:19

Page 130

1 the Court rule that he has to continue -- that he
2 has to continue with this deposition, that he make
3 himself available tomorrow morning Eastern Time to
4 go ahead with it.
5     MR. GRIVNER:  And -- and I understand that    04:31:31
6 request.  I have not consulted with him regarding
7 his availability, but I will -- I understand the
8 request, and I understand the urgency of -- of the
9 issues at hand, and I will ask that he make every
10 possible availability -- make him available at every    04:31:44
11 possibility to -- to adhere to that.
12     MR. LUFT:  And, finally, I would just note
13 for the record, Mr. Grivner and Mr. Alexander should
14 be made aware that he is currently ordered to appear
15 for this deposition, and in our view, he is -- he is    04:31:59
16 in violation of that order.
17     MR. GRIVNER:  And -- and I -- I will note for
18 the record that the position is that the automatic
19 stay as it relates to the California bankruptcy
20 filing impacts that order.    04:32:15
21     MR. EVANS:  Mr. Grivner, one more thing.
22     Mr. Alexander admitted on the record to have
23 withdrawn $60,000 in cash, which apparently is
24 sitting in the trunk of his vehicle.  He transferred
25 $100,000 to himself and apparently wrote a check to    04:32:35

Page 131

1 himself all out of the Cred Capital bank account.
2     This was all done after Mr. Alexander
3 attended the hearing on February 3rd where he was
4 made aware that this motion was going to be filed.
5 The motion was filed during the pendency of that    04:32:48
6 hearing.
7     Is Mr. Alexander returning that $170,000
8 tonight?
9     MR. GRIVNER:  I will confer with my client
10 and his various counsel and report back to you    04:32:57
11 regarding his position on -- on those facts.
12     MR. EVANS:  What about the $648,000 missing
13 from the January 16 and January 17 Bitcoin
14 transactions?
15     MR. GRIVNER:  I will confer with my    04:33:10
16 counsel -- with my counsel -- with Mr. Alexander's
17 various counsel on those facts and report back to
18 you as well.
19     MR. EVANS:  Will we have an answer by this
20 evening?    04:33:25
21     MR. GRIVNER:  I will provide an answer as
22 soon as it can be available.
23     MR. WALSH:  Okay.  Mr Grivner, it's Tim Walsh
24 on behalf of the Committee.  In the interim, please
25 do your best to ensure that your client safeguards    04:33:42

Page 132

1 the property of the debtors' estate, especially the
2 $60,000 in cash that's sitting in the back of his
3 car.
4     MR. GRIVNER:  Understood.
5     MR. WALSH:  Thank you.    04:33:55
6     THE VIDEOGRAPHER:  Is there anything else we
7 need to put on the record either from the reporter
8 or any other counsel before I conclude today's
9 deposition?
10     MR. LUFT:  We're not concluding the    04:34:07
11 deposition.  You can adjourn the deposition, but it
12 remains open.
13     MR. EVANS:  Correct.
14     COURT REPORTER:  Okay.  Would any counsel
15 like to order the deposition transcript?    04:34:13
16     MR. EVANS:  Yes.
17     MR. LUFT:  Yes.  We'd like it expedited, yes.
18     Mr. Luft and Mr. Evans both would order it.
19 We would both like it expedited, and I would like a
20 rough as well.    04:34:30
21     COURT REPORTER:  Mr. Walsh, do you need a
22 copy?
23     MR. WALSH:  No.  Mr. Evans is with me.  Thank
24 you.
25     COURT REPORTER:  And Grogan?    04:34:44

Page 133

34 (Pages 130 - 133)

1 MR. LUFT: Mr. Grogan is with me.

2 COURT REPORTER: Okay.

3 MR. GROGAN: Yeah. Mr. Luft has got me

4 covered. Thank you.

5 COURT REPORTER: Okay.

6 MR. GRIVNER: And I would like it as well.

7 COURT REPORTER: Grivner?

8 MR. GRIVNER: Correct.

9 COURT REPORTER: Okay. I'm going to see if I

10 can have this for you tomorrow, if I can. And if I    04:35:09

11 can't, it will be the next day. How's that?

12 Does that work for you all with the expedite?

13 MR. LUFT: I think if we could get a rough as

14 soon as possible, that would be great, and given

15 that we are going to be in front of the Court, it    04:35:13

16 would be, I think, really important if we could try

17 to get it for tomorrow.

18 COURT REPORTER: Try to get it for tomorrow?

19 What?

20 MR. LUFT: I am of the view that we really    04:35:23

21 need it for tomorrow. I don't know if others feel

22 differently, but --

23 MR. EVAN: I am of the same view.

24 COURT REPORTER: Wait. Do you need a final

25 tomorrow? That's what I'm trying to find out.

Page 134

---

1 MR. LUFT: Yes. If possible, we need a final

2 for tomorrow.

3 COURT REPORTER: Okay. I will endeavor to

4 get that done.

5 THE VIDEOGRAPHER: Okay. Are we okay to    04:35:44

6 adjourn for today?

7 MR. GRIVNER: That's fine.

8 THE VIDEOGRAPHER: Thank you. We are

9 adjourning today's deposition at 4:35 p.m. Off the

10 record -- excuse me. Going off the record at    04:35:56

11 4:35 p.m. The total number of media used was ten.

12 (Whereupon the deposition was

13 adjourned at 4:35 p.m.)

14 ///

15 ///

16

17

18

19

20

21

22

23

24

25

Page 135

---

1 I, JAMES ALEXANDER, do hereby declare under

2 penalty of perjury that I have read the foregoing

3 transcript; that I have made any corrections as

4 appear noted, in ink, initialed by me, or attached

5 hereto; that my testimony as contained herein, as

6 corrected, is true and correct.

7 EXECUTED this _____ day of _____,

8 _____, at _____, _____.

9 (City)        (State)

10

11

12

13

14 _____

15 JAMES ALEXANDER

16 VOLUME I

17

18

19

20

21

22

23

24

25

Page 136

---

1 I, the undersigned, a Certified Shorthand

2 Reporter of the State of California, Registered

3 Professional Reporter, Certified Live Note Reporter,

4 do hereby certify:

5 That the foregoing proceedings were taken

6 before me at the time and place herein set forth;

7 that any witnesses in the foregoing proceedings,

8 prior to testifying, were duly sworn; that a record

9 of the proceedings was made by me using machine

10 shorthand which was thereafter transcribed under my

11 direction; that the foregoing transcript is a true

12 record of the testimony given.

13 Further, that if the foregoing pertains to

14 the original transcript of a deposition in a Federal

15 Case, before completion of the proceedings, review

16 of the transcript [ ] was [ ] was not requested.

17 I further certify I am neither financially

18 interested in the action nor a relative or employee

19 of any attorney or party to this action.

20 IN WITNESS WHEREOF, I have this date

21 subscribed my name.

22 Dated: February 10, 2021

23

24 MELISSA M. VILLAGRAN

25 CSR No. 12543 RPR

Page 137

---

35 (Pages 134 - 137)

**[& - 3,437,956.53]**

| & |
| --- |
| **&**  5:14 10:12,16 50:16 |

| 1 |
| --- |
| **1**  1:25 9:17 13:7 34:19 74:2 81:2 90:14,25 93:2 115:2 |
| **1,695,010.50.** 113:11 |
| **1,742,946**  113:2 |
| **1.260.**  16:11 |
| **1.6**  112:4 |
| **10**  74:23 128:7 137:22 |
| **10,000**  47:22 48:16 48:25 49:14,20 54:18 100:8,9 |
| **100**  102:24 |
| **100,000**  42:14,17 43:1,3,17 49:12 131:25 |
| **10173-1922**  5:21 |
| **102**  8:8 |
| **108**  8:10 |
| **11**  7:6 |
| **11,090**  62:13 |
| **111**  8:12 |
| **11th**  102:22 |
| **12543**  1:22 2:23 137:25 |
| **12:07**  2:20 9:2,5 |
| **12:12**  13:8 |
| **12:14**  13:11 |
| **12:20**  18:2 |
| **12:25**  18:5 |
| **12:41**  32:17 |
| **12:48**  32:20 |
| **12:56**  38:11 |

| 1313  5:7 |
| --- |
| **13535**  14:2 |
| **137**  1:25 |
| **15**  88:23 120:22 121:10 127:8,20 |
| **150**  110:25 |
| **1521**  4:6 |
| **15th**  62:11,13 89:1 |
| **16**  105:2,17 132:13 |
| **16th**  3:7 29:17 79:12,17 83:10,23 87:9 89:2 91:11 92:14 93:10 95:3 95:12 100:12 104:24 105:20 107:2,21 109:3 112:5 115:6 |
| **17**  91:16 106:11 132:13 |
| **170,000**  54:16 124:14 132:7 |
| **17th**  29:17 79:23 85:20 86:8 91:12 91:13 92:14 107:2 107:21 109:8 112:5,6,6 115:7 |
| **18**  15:16 |
| **19102**  3:8 |
| **19801**  5:8 |
| **19803**  4:7 |
| **1990**  21:4 |
| **1992**  21:5 |
| **1993**  21:8 |
| **1996**  21:9 |
| **19th**  63:12 |
| **1:07**  38:14 |
| **1:41**  66:24 |
| **1:44**  67:2 |
| **1st**  35:18,20 78:5,8 78:23 81:8,14,25 82:21 83:2 96:22 |

| 99:5 |
| --- |

| 2 |
| --- |
| **2**  13:12 111:20 |
| **2,773,488**  115:8 |
| **20**  20:22 |
| **20,000**  61:6 |
| **20-12836**  1:11 2:11 9:21 |
| **20-51006**  9:22 |
| **200,000**  72:13 73:4 76:10 80:10 |
| **2000**  21:19 |
| **20005**  4:14 |
| **2010**  21:19 |
| **2013**  23:2 |
| **2014**  46:22 |
| **2015**  23:3,17 24:3 |
| **2016**  23:10,11 |
| **2018**  19:18 23:18 24:4,13 26:17,18 33:15 74:16,19,22 |
| **202.536.1700**  4:15 |
| **2020**  8:5 19:8,11 25:3 35:20 36:20 36:23 37:3,3,8,10 37:17,19 47:2 53:13,15,24 65:19 65:23 68:10 70:15 72:3 73:2 74:19 75:2 78:5,8,23 79:12,17,23 81:8 81:14 82:1,21,22 83:2,10 86:9 88:23 89:1,2 91:11,12,17 92:14 95:22 96:22,23 |
| **2020731**  96:13 |
| **2021**  1:17 2:21 7:13 9:1,6 39:12 42:7,12 43:18,24 47:21 54:3,7 |

| 56:21,23 57:17 |
| --- |
| 58:23 59:10,14 61:16 62:11,14 63:12 104:24 105:2,20 106:11 109:3 110:7 113:22 114:4,4 128:14 137:22 |
| **21**  54:2 |
| **212.547.5400**  5:22 |
| **213.683.6105**  3:19 |
| **215.665.3921**  3:9 |
| **21st**  57:17 59:10 59:14 |
| **224.899**  78:6 |
| **225**  68:11 69:13 72:13 73:3 75:19 76:9 78:14,23 81:20 83:21 |
| **22nd**  97:9 98:8 101:21 103:2,12 103:16 104:11 |
| **24**  70:14 |
| **24th**  72:3 75:2 |
| **25**  3:17 |
| **250**  111:1 |
| **25th**  74:22 |
| **26**  82:22 |
| **26th**  79:3 |
| **2773488**  114:16 |
| **27th**  58:9,10,23 |
| **28th**  56:21,23 |
| **2:00**  86:9 |
| **2:12**  89:21 |
| **2:38**  89:24 |

| 3 |
| --- |
| **3**  11:4 18:6 32:16 67:22 |
| **3,437,956.53** 113:24 |

PUBLIC VERSION: Filed April 6, 2021

**[3,437,956.53. - account]**

| | | | |
|---|---|---|---|
| **3,437,956.53.** 113:16 | **4:35** 2:20 135:9,11 135:13 | 56:11 125:8 131:23 133:2 | **94301** 15:1 |
| **3.437956.53.** 115:7 | **4:52** 39:2 | **600** 4:13 | **95** 8:5 |
| **30** 20:23 | **4:53** 39:10 | **601** 4:13 | **9th** 9:6 |
| **300** 82:4 | **4th** 42:12 43:18,24 | **62** 7:13 95:4 | |
| **302.549.0186** 4:8 | 49:13,14 65:19 | **63** 110:20 | **a** |
| **302.573.6277** 5:9 | **5** | **648,000** 132:12 | **ability** 30:16,24 |
| **30th** 82:25 | **5** 38:15 66:23 | **65** 80:9 83:10,17 | 40:14 41:14 |
| **31** 7:13 8:5 | 70:10,25 71:1,3,4 | 83:20,23 84:1 | 117:13 118:1 |
| **31st** 95:21 96:12 | 71:10 | 86:13 87:7 94:19 | **able** 33:2 51:23 |
| 96:23 | **50** 3:7 104:23 | **66** 109:1,3 | 52:17,18 71:20 |
| **3200** 3:7 | 105:1,16 106:12 | **664** 117:24 | 88:6 117:20 |
| **340** 5:20 | 108:3 112:8 | **664,000** 115:17 | 122:15 128:21 |
| **35** 125:16 | **50.00014** 109:4 | 116:10 117:11 | 129:7,8 |
| **350,000** 56:23 58:3 | **50.00027.** 109:9 | **664,457** 117:19 | **absolutely** 66:3 |
| 58:18,21 61:2 | **500,000** 97:10 98:8 | **664,467** 116:14 | 96:8 101:8,15 |
| **35386.17.** 112:20 | 99:13 103:1,12,16 | **664,467.53** 115:9 | **access** 21:2 31:5,7 |
| **3551** 14:7 | 104:5 | 116:24 | 31:16,17 33:3,6 |
| **3:14** 118:23 | **500,430.80** 94:15 | **68** 7:16 | 34:8 36:15 73:19 |
| **3:24** 119:1 | 100:4 | **69** 7:18 | 84:16 105:13 |
| **3:28** 122:5 | **508,000** 100:1 | **6th** 67:22 114:4 | **accessed** 106:5 |
| **3rd** 39:12 40:21 | **51** 114:5 | **7** | **accessible** 105:5,5 |
| 47:21 132:3 | **515** 3:17 | | 105:10 106:23 |
| **4** | **56** 87:18 93:23 | **7** 89:25 118:22 | **account** 7:11 8:6,8 |
| **4** 32:21 35:4 38:10 | 94:14 100:1 | **7131** 137:23 | 8:12 40:25 41:5 |
| 65:23 70:25 | **59** 94:18 | **74** 7:20 | 41:12,22,23,23 |
| **4.9.** 94:21 | **5:35** 89:10,18 | **75** 84:19 | 42:5 43:1,2,12,15 |
| **4.96** 93:20 | **5th** 110:7 113:22 | **7th** 33:14 42:7 | 43:18,18,20 44:24 |
| **4051** 14:15 | 114:4 128:14 | **8** | 45:7,17,20 46:25 |
| **42** 7:11 | **6** | | 49:25 50:3,5,7 |
| **427** 14:25 | **6** 14:16 67:3 89:21 | **8** 97:7,9 101:19 | 51:8,10,17,22 52:3 |
| **4455511** 1:23 | **6,225.26** 63:13 | 119:2 122:4 | 52:6,9,22,22,23,25 |
| **45** 38:25 39:4,9 | 65:11 | **85** 7:22 | 54:17 55:4,5,18,19 |
| **45,000** 100:8 | **60** 80:9 | **9** | 55:25 66:1 67:17 |
| **4501** 46:18 | **60,000** 43:25 44:24 | **9** 1:17 2:21 9:1 | 72:18 73:21 75:4 |
| **49.98823** 110:16 | 45:6,16,19 46:24 | 122:9 128:2 | 75:7,24 76:2 |
| 110:21 | 47:11 49:13 50:12 | **90027** 14:17 | 81:16,21,25 83:17 |
| **4:00** 122:8 | 50:24 51:4,9,16,19 | **90071** 3:18 | 83:25 84:3,5,13,16 |
| **4:06** 128:3 | 52:2,3,6,25 55:3 | **91423** 14:4,8 | 86:14,15 91:25 |
| **4:28** 128:6 | 55:15,19,24 56:9 | **9235** 99:9 | 93:15 94:9 95:16 |
| | | **9285** 41:24 | 95:21 96:2,5,6 |
| | | | 97:2,10,15,18,22 |
| | | | 97:25 98:5,5,9,23 |

**[account - answer]**

| | | | |
|---|---|---|---|
| 99:1,3,6,9,10,12 | adhere  131:11 | agreeable  39:1 | 130:25 131:13,22 |
| 101:22 102:4,24 | adjourn  133:11 | agreed  13:5 | 132:2,7 136:1,15 |
| 103:2,3,7,14,17,18 | 135:6 | agreeing  129:14 | alexander's |
| 104:2,6,7,12 | adjourned  120:20 | agreement  27:24 | 119:20 122:23 |
| 105:11,13,17 | 135:13 | 31:5,18 32:4,12 | 124:1,24 126:2 |
| 106:25 107:1,14 | adjourning  135:9 | 33:9,17 36:14 | 129:4 132:16 |
| 110:25 112:3 | administered  9:22 | 66:21 | allow  29:24 |
| 132:1 | 18:20 | agreements  33:21 | allows  124:4 |
| accounting  116:17 | admit  43:11 | agricultural  67:11 | alma  14:25 |
| 117:3 | admitted  131:22 | ahead  38:19 45:14 | alternative  21:20 |
| accounts  41:7,15 | adobe  96:14 | 48:20 131:4 | 21:23 22:1 |
| 41:15,17 48:10 | advance  66:15 | al  1:5 2:5 9:19 | alto  15:1 |
| 55:1 77:14,17 | adversary  9:22 | alexander  1:12,15 | alyiah  15:10 |
| 81:18 92:5 100:25 | advice  43:5,9 | 2:12,18 7:4,16 | amount  16:4 33:4 |
| 101:6 104:3 | 54:20 123:4,11,13 | 9:18 10:17 11:8 | 61:8 114:1 117:2 |
| 115:18 | advise  124:23 | 12:19 13:12,15,16 | andrew  11:3 |
| accurate  93:16 | 130:21 | 13:20 15:10 18:6 | angeles  1:16 2:19 |
| accurately  33:5 | advised  119:4 | 18:10,19 21:14 | 3:18 9:1 14:17 |
| 34:8 | 122:17 123:12 | 30:10,14,18 31:2 | answer  8:23 11:17 |
| acquired  21:11,17 | 128:15 | 32:21,24 37:25 | 11:21 12:22 20:4 |
| acquirer  21:12 | advising  122:19 | 38:9,16,19 41:8,8 | 20:7,19 25:8 |
| act  54:24 | 122:24,25 128:19 | 41:17,18,23 42:5 | 27:18 28:9,15,16 |
| action  10:4 87:11 | advisors  34:21 | 42:14,20 43:2,12 | 29:9 30:4,20,23 |
| 137:18,19 | advisory  33:8,17 | 43:19,20 45:4 | 31:4,13,15 32:2,9 |
| actions  69:6 79:10 | affiliate  24:19 | 47:23 62:5,15 | 33:5,25 34:7,7 |
| actively  34:22 | affiliated  24:20,21 | 67:3,6,21 68:10 | 40:14,19 42:24 |
| activities  36:19 | 25:4,11 | 70:2,8,17,21 74:13 | 45:12 46:10 49:18 |
| 37:2,13,18 | affiliation  25:6 | 74:18 85:18 87:24 | 50:6 54:15 56:5 |
| activity  34:22 | affiliations  10:8 | 88:13,22 89:25 | 56:12 75:12 76:7 |
| 73:17 | afternoon  9:4 11:8 | 90:8,23 91:4 | 77:8 78:1,2 80:6 |
| add  31:20 | 11:9 | 92:20 93:9 96:3 | 84:9 92:18 94:2 |
| additional  35:1 | age  15:15 | 96:21 98:20 99:10 | 95:8 98:3,6 99:18 |
| 106:12 115:9 | agents  90:16 | 99:10 102:2,18,18 | 100:14 101:2,3,11 |
| address  13:24,25 | ago  16:10,12,14 | 103:8,8,9 113:22 | 104:17 110:1 |
| 13:25 14:2,7,10,13 | 20:22,23 23:20 | 114:7,25 116:7 | 115:12 116:5,12 |
| 14:15,18,23,25 | 51:23 56:9 69:20 | 118:22 119:2,5 | 116:19 117:1,14 |
| 15:19 46:17 72:19 | 87:25 116:13 | 122:10,12,14,25 | 117:19,20,21 |
| 72:20 76:11 | 125:6,6,16 | 123:4,9,13 124:4 | 119:23,25 120:5 |
| addresses  91:3,19 | agree  9:15 51:15 | 124:16,20 125:14 | 122:15 125:24 |
| adequate  82:16,17 | 116:18 127:15 | 128:8,13,16 | 126:15 129:17 |
| | | 129:16,25 130:4,5 | 132:19,21 |

Veritext Legal Solutions
866 299-5127

**[answered - back]**

answered  78:2
117:12,15,25
answering  30:14
117:10 129:16
answers  103:10
118:14
anybody  60:9
106:7
anyone's  60:11,16
anyway  105:25
106:1,21
apartment  14:16
apologies  56:7
107:1
apologize  89:10
91:12 96:10
apparently  43:2
131:23,25
appear  33:13
75:24 98:13 130:4
131:14 136:4
appearances  3:1
4:1 5:1 6:1 10:8
appearing  3:2
9:24
appears  83:16
93:13 94:18 95:3
112:3
application  29:14
57:19
appreciate  39:8
118:6,10 125:17
125:25
appreciating
118:5
appropriate  73:8
approximate  16:4
17:12,13
approximately
16:7 19:8 39:4
94:19 95:4 115:4

124:13
april  35:19 73:2
argument  116:23
articulate  123:21
123:23
ashworth  5:18
10:14 41:21 42:8
47:19 49:8 50:15
50:15,23 66:17,17
67:20 68:4 74:1,4
90:2,6 93:5 95:20
108:16
asked  30:18 45:12
57:10,11 58:18,21
59:1,4,13,22 68:20
69:1,12 70:10
75:2,18 76:1,9,13
77:6 87:24 101:7
101:9,14 106:7
116:1 118:2
asking  11:10
17:21 24:2 32:5
34:18 40:5 45:6,8
85:9 114:15
116:21,23 118:3
121:3
asset  36:1 69:8
assets  30:2,10
41:12 53:2 54:21
63:10 69:4,10
71:13 76:15 77:3
78:21 87:3 89:2
90:21 91:16 92:16
92:17 104:4 105:4
106:5,23,24 107:4
107:13,15 110:2
110:10 113:23
116:4 117:3
assist  34:25 35:4
associated  82:19

associates  21:21
21:23 22:1
assume  16:10
81:17
asworth  81:4
96:10,14,19 102:3
102:8 111:22
attached  42:2 62:2
68:2 69:16 74:6
85:15 95:24
102:11 108:19
111:24 136:4
attachment  31:6
attempt  77:2
attend  20:11
attendance  65:15
attended  39:12
42:13 64:25 132:3
attendees  3:2
attending  10:7
38:21
attention  81:11
83:13
attorney  3:6 4:5
4:12 5:6 10:9
122:23 129:4
137:19
attorneys  3:16
5:19 120:16
129:19
audio  9:13,14
august  19:18
23:18 24:4,13
26:18 62:8 95:2
99:5 102:15,22
authorities  47:5,7
authorization
77:11,21,24 83:8
authorized  67:16
automatic  119:10
119:19 124:4

131:18
availability  130:8
130:21 131:7,10
available  51:11
55:1 60:5 73:11
73:14 111:7
129:10,25 130:5
130:16 131:3,10
132:22
avenue  5:20 14:16
46:16,18
avi  3:14 10:18
aviluft  3:21
avoid  76:11 77:3
aware  20:6 53:20
53:24 54:7 57:23
91:4 100:24
105:20 107:4,9,19
125:15 126:1
131:14 132:4
azman  5:17
123:21,23 124:3,8

**b**

b  5:15 7:13 33:11
41:8,18 61:21,22
62:1 99:10 102:18
103:9
b41716006  98:2
back  13:10 16:23
18:4 19:6 26:21
32:19 38:14 40:12
43:4 48:12 50:5
50:18,20 54:19
59:3,7 63:2,18,18
65:20 67:1 74:16
84:6,14 86:22,25
87:13 88:18 89:14
89:23 95:13,19
99:22 101:18
107:5,16 108:5
109:20 110:5,10

Page 4

**[back - capital's]**

110:16 111:7,7
113:19 115:11
118:25 122:7
124:25 125:11
127:8,11 128:5
132:10,17 133:2
**background** 29:24
**ballpark** 19:7
**bank** 7:14 8:6
40:25 41:4,7,12
42:5 51:17,24
52:3,5,22,25 55:4
55:9,13,25 61:9,15
66:1 98:19 100:19
100:25,25 101:4
101:22 102:1,16
103:20,23 132:1
**bankruptcy** 1:1
2:1 9:20 38:22
39:13,21 42:13
53:21,25 54:8
57:13,19,24,25
63:10 119:6,12,20
120:13 121:4
122:23 123:1,4
124:2 126:2
128:16 129:4
131:19
**based** 28:16 29:15
30:9 40:9 63:4,7,9
67:12 70:19
119:16 122:22
129:3
**basis** 11:20 123:24
**bear** 12:17 68:4
**began** 35:17
**beginning** 2:20
10:9 13:11 18:5
32:20 38:15 67:2
73:1 89:24 119:1
122:9 128:6

**behalf** 2:18 10:12
10:16,19 132:24
**believe** 21:10 22:7
22:7,17 26:10
37:4 47:24,25
53:7 54:11 57:1
65:17 71:11 82:17
83:6,7 85:7
115:13,16,24
130:23
**believed** 53:6 69:4
69:5 76:15 83:6
**benefit** 103:21
**best** 27:18 28:16
30:23 33:19 40:19
117:12 118:1,8
132:25
**better** 38:6 107:12
**beyond** 12:23
**bipc.com** 3:10
**bit** 38:20 50:14
86:1 89:11 108:13
114:13
**bitcoin** 68:11,14
68:18 69:13 72:13
73:4 75:5 76:10
77:13 78:6,14,23
80:9 81:8,20,24
82:3,11,14 83:11
83:17,20,21,23
84:2,2,19 85:5
86:14 87:7,8,9,18
87:18 93:14,19,20
93:23 94:14,19
95:4,11 100:1,13
104:24 105:1,16
106:12,25 107:21
108:3 109:3,4,9
110:9,16,25 111:1
111:13 112:4,4,9
115:7 132:13

**block** 66:5
**bonvoy** 62:18
**bottom** 115:25
**boulevard** 14:3
**branch** 48:3 49:4
55:14
**brandon** 6:4 9:25
**break** 12:13 37:23
37:24,25 38:25
39:2,9 87:24 88:1
88:4,7 89:6 91:24
114:8,10 117:7
118:3,13,19 123:7
123:20 128:17
**breakout** 121:20
121:22
**breaks** 37:22
**breath** 114:13
**brief** 114:14
**bring** 81:10 83:13
**broad** 27:24
**broadly** 27:17
**brought** 29:15
**brown** 4:10 10:24
**brownrudnick.c...**
4:16
**buchanan** 3:4
10:15
**buried** 52:19
**business** 14:6
22:21 28:21 35:3
35:7,8 36:19 37:2
37:4,7,10,13,18
64:11,18 82:18

| c |
| --- |

**c** 7:16 33:11 67:23
67:24 68:1
**c405** 14:3
**california** 1:16
2:19 3:18 9:1
13:22 14:4,8,17

15:1 79:7,16 80:2
90:4,9,14 92:15
98:21 119:15
120:2 122:23
123:2 124:2 129:4
131:19 137:2
**call** 67:11 110:9
118:12 126:22
130:12
**called** 35:14 102:4
**campaigns** 64:9
**canyon** 14:7
**capital** 1:8 2:8
21:8,21,23 22:1,20
22:24 23:16 24:6
24:9,12 26:22,24
27:6,7 29:1,4 30:3
35:14,15,17,21,23
35:24 36:3,12
37:3,4,6,10,14,15
41:5,12,15 51:17
52:2,22,25 53:12
53:14,20,25 54:8
54:10 60:12,18
61:11 63:1,10
64:4,12,24,25 66:1
67:17 73:1,18
76:15,22 77:12,17
80:3,17,17,18,21
80:23 82:4,6,7,12
82:17,19 83:2,4
84:20,22,25 86:4
86:21 90:20 91:16
91:20 92:1,10,16
92:21 97:16,19,19
97:23,23 101:1,6
104:4 105:23
124:14,17,21
132:1
**capital's** 36:19,23
36:25

Veritext Legal Solutions
PUBLIC VERSION: Filed April 6, 2021
866 299-5127

**[capitalization - conclude]**

| | | | |
|---|---|---|---|
| **capitalization** 80:21 | **change** 120:6 | **close** 96:15 129:14 | 40:5,9 50:16 |
| **car** 46:13,15,16,19 | **changed** 26:25 | **closed** 129:23 | 129:13 132:24 |
| 50:12,24 51:5 | **charge** 28:3 36:5,6 | **club** 22:15,17 | **communicate** |
| 52:4,5 53:1 54:17 | **chase** 8:5 95:21 | **cofounder** 21:20 | 71:23 |
| 56:1,10,12 125:9 | 96:2,6,22 97:15 | **coin** 73:4 75:19 | **communicated** |
| 133:3 | 98:9 101:19 103:1 | 76:10 77:13 80:10 | 123:8 |
| **carlton** 3:15 10:20 | 103:17 104:6 | 114:24 115:2 | **communication** |
| **case** 1:11 2:11 | **cheaper** 48:9 | **coinbase** 7:20 8:12 | 12:11 71:15,17,18 |
| 9:21 12:24 57:14 | **check** 17:2 26:21 | 73:21 74:2,9 75:4 | **communications** |
| 57:19 66:16,16 | 47:8,24 49:2,3,5,6 | 81:1,21,25 82:8 | 70:11,20 123:18 |
| 82:11 119:21 | 49:15,21 54:18 | 83:17,24 84:19 | 123:19 |
| 137:15 | 55:7 98:25 131:25 | 86:14,23 91:25 | **companies** 19:23 |
| **cases** 57:25 107:2 | **checks** 48:8 51:14 | 93:1,15 94:9 | 20:1,5 21:16 25:5 |
| **cash** 43:24 44:24 | 52:10 | 97:18 98:10,14,16 | 33:23 |
| 45:16 46:24 47:5 | **chief** 26:22,24 | 99:2,23 105:11,13 | **company** 17:21 |
| 47:12,16,25 49:1,4 | 27:6,7 29:1,3 | 105:17 107:1,14 | 19:1,15 20:17 |
| 49:13 51:7,10,13 | **child** 89:9,9 | 110:3 111:15,16 | 21:11,12 23:13,22 |
| 51:16,19 52:2,3,6 | **children** 15:11 | 111:20 112:2 | 24:20 25:20 26:4 |
| 52:7,9,13,14,25 | **chosen** 58:14 | 117:5 | 26:4,6 34:20,24,25 |
| 54:17 55:3,6,7 | **chris** 72:25 73:5,6 | **coincidental** 64:20 | 35:4,7,14,25 62:21 |
| 56:9,18,18 100:18 | 75:3,19 76:11 | 86:20 | 67:19 69:6,9 |
| 113:24 131:23 | **christopher** 72:23 | **coins** 75:14 | **company's** 35:3,8 |
| 133:2 | **chronologically** | **colchis** 22:20,24 | 35:10 |
| **cashier's** 49:20 | 23:24 | **colleague** 10:19,20 | **compensation** |
| **caucus** 121:6 | **circleup** 23:2,5 | 10:21 | 47:2 53:8 54:22 |
| **cause** 90:18 | **circular** 36:9 | **colleagues** 10:13 | **competency** 40:14 |
| **caused** 82:14 | **circumstances** | **college** 20:10,17 | 43:7 |
| **cell** 9:11 12:9 | 120:6 128:9 | 20:21,24 | **complaint** 88:23 |
| **central** 119:14 | **city** 67:11 136:9 | **columbia** 4:14 | **complete** 29:9 |
| **certain** 11:19 | **claimed** 128:18 | **come** 35:13 88:6 | 101:15,16 115:12 |
| 128:9 | **clarify** 17:5 18:25 | 89:6 98:14 99:14 | **completely** 107:23 |
| **certainly** 29:24 | 27:19 33:9 44:2 | 103:13,17 104:23 | **completion** 137:15 |
| 30:4 | **clear** 54:15 72:13 | 127:8 | **comply** 120:9 |
| **certified** 2:22 | 75:16 76:24 | **comes** 98:8 | 121:8 |
| 137:1,3 | 123:22 129:12 | **coming** 115:19 | **computer** 59:25 |
| **certify** 137:4,17 | **clearly** 75:23 | **comment** 99:15 | 68:5 |
| **chain** 66:5 | 121:1 | **commitment** 88:2 | **concerning** 39:18 |
| **chambers** 125:19 | **client** 119:22 | 89:10 | 70:12 72:3 104:3 |
| 127:9,11 | 120:9 121:8,17 | **committed** 116:3 | 108:24 |
| | 122:20 132:9,25 | **committee** 5:12 | **conclude** 133:8 |
| | | 10:12 31:12 39:17 | |

[concluding - cred]

**concluding**  133:10
**concord**  4:6
**conducted**  130:18
**confer**  120:1,17,23
  121:16 124:23
  130:7 132:9,15
**conference**  120:6
  120:15,20 129:3
  130:9
**conferred**  125:13
**confirm**  20:7
  21:17 23:25 31:20
  44:18,20 45:1,8
  49:23 71:22 95:15
  97:24 103:24,25
**confirmation**  45:3
**confirmed**  104:8
**confusion**  25:13
  26:6,9
**connection**  119:20
**considered**  61:9
  61:10 76:14
**consult**  11:22
  52:18 79:13 80:5
  120:1
**consultant**  22:17
  33:13 73:1,6,6
  75:18
**consultants**  48:11
  64:2,6,14,25
**consulted**  131:6
**consulting**  129:19
**contact**  118:8
  125:19
**contacts**  34:21
  35:2,6,6
**contained**  93:14
  136:5
**contend**  54:9,9
**context**  27:13
  60:13,14 64:5

75:9
**continuation**
  126:3
**continue**  9:14 53:7
  54:9 80:16 83:7
  101:9 122:18,25
  123:14,24 126:12
  127:16 129:5
  130:24 131:1,2
**continued**  4:1 5:1
  6:1 8:1 37:16
  80:18
**continuing**  120:15
**contracts**  17:16
**contribution**  82:4
**control**  21:14
  43:13 70:18 81:17
  81:18 90:22
**controlled**  43:21
  95:16
**convenience**
  129:10
**conversation**
  58:23 70:22
  115:22,24
**conversations**
  72:10 122:22
**conversions**  112:4
**convert**  111:10
**converted**  111:13
**copies**  40:24
**copy**  33:8 40:4
  133:22
**cordial**  118:7
**corner**  98:1
**corporate**  76:16
  76:18
**correct**  19:13
  20:22 21:21,22
  23:4,12 36:24
  61:23 71:9 76:13

77:16 78:9 79:1
  80:4 81:22 84:9
  84:13 85:2 89:4
  94:15 95:4,5,9
  96:7 97:23 102:8
  108:7 111:3 117:2
  123:10 124:6,7
  133:13 134:8
  136:6
**corrected**  136:6
**correction**  44:18
  44:21
**corrections**  136:3
**counsel**  5:12 9:18
  10:6 13:13 32:12
  32:22 38:17 39:16
  40:19,24 42:6
  43:5,9 46:6 49:17
  52:16 54:20 60:7
  61:17 67:4 74:10
  74:11 79:14 80:5
  90:1 91:7 97:3
  102:16 116:23
  117:22 119:3,4
  120:3,23 121:11
  122:11,17,19
  123:4 124:24
  125:14 127:1,2,23
  128:11,15,19
  132:10,16,16,17
  133:8,14
**counter**  47:24
  48:8 49:2,5 52:10
  55:7
**couple**  88:2
  124:10
**course**  38:5 116:3
**court**  1:1 2:1 9:20
  10:2 11:14 17:23
  18:9,10 29:11,15
  30:8,13,16 32:12

38:22 39:13,22
  42:13 44:19 51:2
  61:17,21 63:23
  67:23 69:23 70:5
  79:7,12,16,22 80:2
  85:13,21 87:10
  88:19,20 90:4,10
  90:15 92:15 93:2
  95:8 105:21
  108:12 114:19
  126:5,13,20
  127:16,18 128:14
  128:25 129:7,8,11
  129:17,22 130:1,2
  130:4,10,13,18
  131:1 133:14,21
  133:25 134:2,5,7,9
  134:15,18,24
  135:3
**court's**  106:18
  120:9 121:8
**cousins**  4:3,4
  10:20,21
**covered**  134:4
**covid**  37:21 105:3
**crashing**  96:14
**create**  121:20
**cred**  1:5,8,8,9 2:5
  2:8,8,9 9:19 19:20
  19:22 20:1 25:5
  25:12,20 26:4,11
  26:12,13,16,22,24
  27:3,5,13,16 28:7
  28:10,12,19,21,24
  30:2,11,12,19 31:8
  31:10,14,23,24
  32:7,25 34:2,5,15
  35:14,15,17,21,23
  35:24 36:2,11,19
  36:23,25 37:2,4,6
  37:10,13,15 41:5,9

Page 7

[cred - deposition]

41:12,15,18 42:22
51:17 52:2,22,24
53:12,14,20,24
54:7,10 60:12,12
60:17,17 61:11
63:1,9 64:4,12,24
64:24 66:1 67:17
68:11 69:7,11
72:18 73:1,17
76:15,22 77:11,14
77:17 79:3,4,6,11
80:3,3,17,18,21
82:4,6,19,22,25
83:1,4 84:20,22,25
86:3,4 90:20,20
91:15,16,20,22,25
92:10,10,16,21
97:16,19,23 99:10
101:1,6 102:18
103:9 104:4
105:23 124:14,17
124:21 132:1
**cred's** 28:21 73:4
**credit** 24:14,19,21
25:11,15,20 26:3
26:12 33:16 34:19
34:23 97:10 98:13
98:19
**creditors** 5:13
10:13
**crypto** 20:5,6 73:7
73:16,17 92:10,21
**cryptocurrency**
17:4,8,16,20,22
18:24 19:4,12,15
19:23 20:2 22:2
22:13,25 23:6,14
24:9 28:3,7,20,22
29:16 31:9 40:6
40:10 70:13 72:17
73:5,10 75:3 80:3

80:4 92:1,6,6,11
105:22
**csr** 1:22 137:25
**cumbersome**
51:13
**current** 13:24,25
14:2 15:2,19
16:16 55:1 63:5
115:23
**currently** 46:10,13
53:1 131:14
**cursor** 81:10
**custody** 90:22
**custom** 42:14 43:2
43:12,19,20
**customers** 35:5
**cut** 73:19
**cyber** 24:14,17,17
24:19,22,24 25:6
25:10,17 26:5
33:10,14 34:1,11
34:18

**d**

**d** 7:18 41:8,18
69:15 74:3 99:10
102:18 103:9
**daily** 33:23
**dan** 57:7,8 60:19
61:3 76:2,11 77:6
77:9
**daniyal** 68:20 69:1
69:2
**dark** 66:18
**darren** 5:17
**data** 84:17 103:24
104:17
**date** 16:15 17:10
17:12 42:6 44:3,3
44:4,5,14 45:9,10
53:22 59:3,5,17,19
61:7 78:7 83:4

85:4 86:8 87:2,23
96:10 109:25
137:20
**dated** 91:11
137:22
**dates** 21:7 23:25
44:2,22 45:2
74:20 79:2 109:23
109:23,24
**dating** 74:16
**day** 27:10,10,23
28:13 31:21,21
36:11 42:12 45:19
52:10 53:16 80:8
86:13,16,18 87:10
88:14,14 92:9
93:10 109:8
134:11 136:7
**days** 44:8 51:23
69:20 106:16
**de** 4:7
**dealing** 20:6
**dealt** 19:23 20:5
**debated** 117:22
**debtor** 10:19 43:4
49:16 51:6 107:7
110:6,10,17,22
113:23
**debtors** 1:6 2:6
42:18,19,22 51:18
51:20 52:24 53:2
92:11 98:6 106:8
113:24 114:17,20
115:8 116:4
129:13 133:1
**december** 65:19
65:23 66:8
**decide** 121:7
**declaration** 7:16
57:18,24 67:21

**declare** 136:1
**decorum** 118:10
**dedicated** 84:3,4,4
84:13 99:3,6
**defendant** 1:13
2:13 86:4 90:16
**defendants** 3:12
**defending** 91:7
**defense** 58:4
**defer** 56:6 60:4
115:15,15,16
**definition** 12:25
**delaware** 1:2 2:2
5:8 9:21 11:2
123:10 129:8,18
**delete** 72:2
**delirium** 107:25
**delivering** 116:3
**deponent** 1:16
2:19 7:3 18:15
38:4,7 44:20
46:12 48:19,21
54:5 55:11 64:1
71:9 87:2,14 95:9
112:21 113:11
114:21 118:3
122:17
**depose** 128:12
**deposit** 49:24,25
51:7 52:8,12
56:13,15 102:24
**deposited** 49:22
54:25
**depositing** 51:21
**deposition** 1:15
2:17 7:10 8:4 9:13
9:18,23 12:11,20
12:24 13:12 18:6
29:22 30:1,7,9
32:21 38:16 67:3
89:25 110:8 119:2

**[deposition - ether]**

119:11,18 120:10
120:16,19,25
121:15 122:9,13
122:18,21 123:1,5
123:6,9,15,25
124:5,15 126:3,5
126:13 127:12
128:7,17,20,22,25
129:6,14,15,15,21
130:24 131:2,15
133:9,11,11,15
135:9,12 137:14
**described** 116:12
**description** 31:7
31:16,19 32:3
33:18 34:10 36:14
48:2 93:16 98:18
99:15
**descriptions** 34:3
**designation** 26:8,8
**despite** 124:21
**destination** 97:17
**detail** 7:11 31:20
**details** 41:22
95:18 104:3
**detected** 76:25
**detection** 77:3
**determination**
41:19,20 116:22
**determine** 41:14
43:7 130:15
**development**
22:22 64:11
**device** 83:24 105:6
**different** 92:5
**differently** 134:22
**difficult** 11:13
28:11 30:14 121:3
**digital** 72:19,19
76:10 90:21 91:16
92:16,17 109:19

109:20 110:2
**direct** 23:9
**directed** 19:1
75:18
**directing** 119:22
119:24 120:9
121:7 122:20
123:24
**direction** 112:18
137:11
**directions** 127:1
**directly** 19:2 48:9
75:15,22
**director** 36:4
37:15 53:7,14
54:10 62:21 67:18
69:5 76:14 77:12
**directors** 35:10
**disclose** 46:6
**discovery** 70:9
104:16,21 115:13
116:1
**discuss** 29:21
**discussing** 31:6
**discussions** 36:9
**dismiss** 57:13,19
57:25
**disposition** 70:13
**disrupt** 121:4
**district** 1:2 2:2
4:14 9:20 119:15
**dixie** 14:7
**document** 59:7,18
59:20,21 61:13
70:9 78:12 85:22
88:19 96:12
101:19 108:23
114:15
**documentation**
100:20

**documents** 33:2,4
33:7 34:9 45:4
52:19 61:18 64:8
70:11,18 71:6
101:13
**doing** 43:8 63:16
76:3 107:20
109:15 118:8
121:5
**dollar** 77:13
**dollars** 16:7 29:16
31:9 82:10 105:18
107:3
**dorsey** 29:22 30:6
**double** 68:25
**doubt** 85:8
**drive** 51:5 52:5
**due** 52:13 128:9
**duly** 137:8
**duties** 27:2
**dying** 106:3
107:13

**e**

**e** 7:20 14:16 33:11
40:15 64:9 71:15
74:4,5,9 81:4,4
93:5 115:11,21
119:6 125:5
**earlier** 96:6
**easier** 44:12 70:2,8
**eastern** 131:3
**echo** 74:4 81:5
93:5,6
**effectively** 34:1
**effort** 64:4 121:1
125:12
**efforts** 118:9
121:2
**eighth** 93:13
**either** 17:20 21:1
48:18 54:16 72:8

82:24 83:8 133:7
**else's** 60:9
**emanuel** 56:24
58:4,17
**emergency** 29:14
39:17,22 40:5,9
119:17 128:13
**emery** 5:14 10:12
50:16
**employed** 19:16
19:17
**employee** 83:1
137:18
**employees** 35:1,11
**employment** 17:17
31:5,18 32:3
33:15 35:17 36:13
**endeavor** 135:3
**endeavoring** 34:6
**engage** 120:15
**ensure** 132:25
**entire** 69:6 80:20
**entities** 25:14,24
26:10
**entitled** 54:22
**entity** 25:19,22,23
26:11 82:23,24
**entry** 57:2
**equity** 80:19 82:3
84:21
**error** 45:3
**especially** 133:1
**esq** 5:5
**established** 35:24
99:4
**establishing** 82:16
**estate** 133:1
**estimate** 19:9
**et** 1:5 2:5 9:19
**ether** 74:22,23

[evan - final]

**evan**  134:23
**evans**  5:15 7:6
10:11,11 11:7
12:18,25 13:5,14
17:25 18:23 27:21
30:8,25 31:1
32:10,23 38:18
41:21 42:4,8,11
44:23 45:15 46:8
46:14 47:15,19,20
48:20,24 49:8,10
50:9,11,20,25 51:3
54:4,6 55:12
56:20,22 61:13,19
61:22 62:4,10,12
64:13 67:5,20,24
68:6,9 69:18 70:1
70:6,7 72:1 74:1,8
76:6 78:11,13
81:1,6 85:11,17,25
86:2,25 87:4,16
88:5,10,18,21 89:6
89:13,16 90:2,7,11
90:13 92:25 93:6
93:8 95:10,20
96:1,12,17,20 97:6
97:8 99:22,24
101:18,20,25
102:4,13,21,23
104:22 108:9,12
108:15,21,25
109:2 111:20
112:1,19,24 113:9
113:12,19,21
114:3,6,20,22
118:13 119:12,16
119:22 120:8,21
122:2,12,19
128:12 129:12
131:21 132:12,19
133:13,16,18,23

**evasive**  117:17
**evening**  125:24
129:9 132:20
**event**  62:7,17 63:6
63:17 65:15 66:13
**events**  62:19,23
63:5,7 64:7,10
66:14
**eventually**  25:5,11
26:23 27:6 33:15
105:18 107:15
**everybody**  50:22
**evidentiary**
130:19
**exact**  16:14 17:10
23:25 31:20 53:22
56:14 59:3,17,19
61:7 84:7 114:1
**exactly**  26:20
48:12 56:2 63:19
84:14 116:17
**examination**  7:3
11:6
**examined**  18:20
**examiner**  10:24
**example**  116:18
**excel**  8:10
**exchange**  82:9
**excuse**  135:10
**execute**  67:16 77:7
77:10,19,23 111:9
111:10 116:7
**executed**  40:6,10
55:18 93:10 94:10
94:19 106:11,16
108:3 109:17
116:8 136:7
**executing**  107:21
**executive**  34:23
**executives**  69:7

**exhibit**  7:11,13,16
7:18,20,22 8:5,8
8:10,12 42:1
61:19,22 62:1
67:22,23 68:1
69:15 71:8 74:3,3
74:4,5,9 81:3,4
85:11,14 86:25
90:5,8 93:3,3
95:23 96:21 102:9
102:10,14 108:11
108:16,18,22
111:22,23 112:2
**exhibits**  7:9 8:3,17
**existence**  25:10
125:15
**expect**  75:14
**expedite**  134:12
**expedited**  133:17
133:19
**expense**  82:13
**expenses**  82:18
84:25 86:22
**experienced**  73:7
**expertise**  54:11
**explain**  41:11,13
**explained**  110:3
**extend**  129:14
**extent**  122:15
127:5

**f**

**f**  7:22 14:16 85:11
85:14 90:6,8
**facilities**  34:20
**fact**  29:15 92:9,16
96:5 117:23 121:1
124:21 129:21
**facts**  132:11,17
**fair**  93:16
**family**  15:5

**far**  98:15 116:16
**fargo**  7:11,13 8:8
40:25 41:4,8,23
48:9 98:19 99:8
99:12 101:22
102:1,4 103:3,7,14
103:18 104:6,12
**fast**  108:13
**fear**  106:2
**february**  1:17
2:21 9:1,6 23:10
39:12 40:21 41:22
42:7,12 43:18,24
47:21 49:13,14
110:7 113:22
114:4,4 128:14
132:3 137:22
**federal**  137:14
**fedwire**  98:19
**feel**  38:6 130:20
134:21
**feeling**  38:1,2 39:5
39:5 114:12
**feels**  127:6
**fees**  100:4
**fifth**  93:12
**file**  79:11
**filed**  9:19 40:5,8
53:20,25 54:8
57:13 67:21 85:12
88:23 119:5,14
128:16 132:4,5
**filing**  54:1 87:14
119:7,9,12,17
120:14,25 121:4
123:1 124:1 126:3
131:20
**filings**  40:12
119:21
**final**  134:24 135:1

PUBLIC VERSION: Filed April 6, 2021

[finally - golubchik]

| | | | |
|---|---|---|---|
| **finally** 131:12 | **focus** 30:5 | **funded** 69:9 | **giving** 126:25 |
| **finance** 66:4 | **follow** 54:24 | **funding** 34:24 | **go** 9:15 11:11 13:3 |
| **financial** 20:16 | 124:10 | **funds** 43:8 46:10 | 17:24 20:9,10 |
| 21:24 22:2,10,11 | **following** 90:15 | 47:9 52:22 72:17 | 32:10 34:11 36:8 |
| 24:7,8 27:9,11,12 | 91:16 92:14 | 97:16 124:14,18 | 38:8 45:14 48:20 |
| 27:14,17,25 28:1,2 | 100:11 | 124:21,22 | 62:14 63:3 64:9 |
| 28:14 29:5,6,8 | **follows** 18:21 | **fungible** 56:18 | 64:15 65:5,18 |
| 30:19 32:1 35:25 | **foregoing** 136:2 | **further** 92:18 | 66:20,22 86:22,25 |
| 44:9 53:18 | 137:5,7,11,13 | 119:25 120:1,5,5 | 87:13 95:12 99:22 |
| **financially** 10:4 | **form** 47:14 53:6 | 120:15 123:16 | 101:18 102:21 |
| 137:17 | 64:11 69:22 76:5 | 137:13,17 | 108:25 110:20 |
| **find** 38:23 59:7 | 108:8 111:8 | **future** 66:13 | 113:19 118:15 |
| 134:25 | **formalized** 35:20 | | 119:11 121:21,25 |
| **finding** 34:25 35:4 | **former** 26:4 80:12 | **g** | 126:17,20 127:7 |
| 121:1 | 80:15 | **g** 8:5 95:23 96:19 | 127:21 131:4 |
| **fine** 39:6,8 118:14 | **formulate** 34:23 | 96:21 | **god** 18:14 |
| 127:24 135:7 | **forth** 40:12 115:11 | **gather** 64:21 | **going** 9:5 11:10,12 |
| **finley** 14:15 46:16 | 137:6 | **generated** 99:16 | 11:14,16 13:7 |
| 46:18 | **forward** 119:11 | 99:16 | 18:1 23:23 29:20 |
| **fire** 79:4 82:22 | 130:24 | **geneva** 62:18 | 30:16 32:16 34:3 |
| 83:8 | **forwarding** 119:6 | 66:16 | 36:8 38:8,10,19 |
| **fireblocks** 68:15 | 119:13 | **geoffrey** 3:5 10:15 | 40:12 43:3 45:11 |
| 72:18 73:18 77:14 | **four** 14:19 87:18 | 13:1 30:8 | 52:1,4 54:18 55:3 |
| 77:16 | 100:12 | **geoffrey.grivner** | 61:21 62:25 64:15 |
| **fired** 79:3 83:3 | **fourth** 93:12 94:20 | 3:10 | 66:23 84:14 89:19 |
| **firm** 9:25 10:3,21 | 113:10 | **getting** 94:13 98:4 | 89:21 95:13 104:5 |
| **firms** 57:3 | **frame** 35:19 | 127:1 | 108:16 112:18 |
| **first** 17:3,8,19 | 125:18,22 | **gilman** 4:11 10:23 | 113:14,15 117:7 |
| 18:24 19:3,14,16 | **frankly** 52:19 | 10:23 | 117:14 118:15,23 |
| 20:20 40:1 59:1 | **friday** 124:19 | **giovanni** 72:23 | 121:2,6,21,25 |
| 61:2,20 80:25 | **front** 20:18 31:16 | **give** 16:3 17:13,13 | 122:4 125:19 |
| 81:7 93:7,20 | 85:7 93:4 130:4 | 18:13 19:7 28:16 | 126:4,7,11,12,19 |
| 94:20 102:21 | 134:15 | 38:4 40:19 56:14 | 127:9,15,17,21 |
| 112:12,14,15,19 | **full** 11:17 13:15 | 113:8 114:9 | 128:2 130:24 |
| 121:21 | 20:19 35:17 46:17 | 118:15,17 121:11 | 132:4 134:9,15 |
| **five** 114:10 118:16 | 83:1 | 123:4 125:18,20 | 135:10 |
| 118:17,20 | **fully** 87:10 | 125:22 | **goldman** 21:4,6 |
| **fixes** 13:4 | **functional** 35:19 | **given** 104:15 | **golf** 96:19 |
| **flow** 39:7 | **functions** 31:21 | 118:1 123:13 | **golubchik** 122:24 |
| **flower** 3:17 | **fund** 80:17 97:19 | 134:14 137:12 | 122:24 123:12,14 |
| | | **gives** 30:15 | 123:18 125:21 |

[golubchik - indicates]

| | h | hereto 42:3 62:3 | hundred 111:5,6 |
|---|---|---|---|
| 126:8,21 127:5 | | 68:3 69:17 74:7 | hundreds 40:15 |

**good** 9:4 11:8,9
**gotten** 40:15
**grab** 69:8
**graduate** 20:11,13
**great** 122:3 134:14
**grivner** 3:5 10:15
  10:15 12:18 29:20
  30:22 32:13 45:11
  46:8,9 47:14
  50:13,19 60:5
  69:22,24,24 71:5
  76:5 87:13,24
  89:8,15,17 104:19
  108:8 117:25
  118:19 119:4,13
  119:19,24 120:13
  121:13,18,22
  122:14,22 123:6
  123:11,22 124:1,7
  124:12,23 125:10
  125:20,25 126:6
  126:10,14,25
  127:3,10,14,19,25
  128:24 129:2,2,20
  129:24 130:2,7,23
  131:5,13,17,21
  132:9,15,21,23
  133:4 134:6,7,8
  135:7
**grogan** 133:25
  134:1,3
**ground** 11:11
**group** 64:14 67:12
**guess** 50:17 60:4
  75:12
**guys** 37:20 114:8
  117:7

**h** 8:8 15:10 68:23
  68:25 102:7,9,10
  102:14
**hair** 88:9
**half** 15:16 125:5
**hand** 18:11 36:16
  39:6 47:8 98:1
  131:9
**handle** 120:24
**happen** 52:11
**happened** 65:9
  79:22 108:4
**happy** 31:19
  118:16 120:1,14
**hard** 108:14
**hardware** 75:17
  78:18,20 83:24
  106:4 107:5,16
  110:5 111:8
**hastings** 3:13
  10:18
**head** 22:21
**health** 37:21
**hear** 50:22 129:1,8
  129:9
**heard** 129:7
**hearing** 38:21
  39:13,16,22 40:16
  42:13 79:16,22
  80:9 86:19 88:14
  88:15 130:13,18
  132:3,6
**hedging** 31:11
**held** 25:2 43:2,18
  54:17 72:20 76:11
  77:14,17 81:20
  91:25 104:3
**help** 18:14 52:21
**helpful** 39:7

**hereto** 42:3 62:3
  68:3 69:17 74:7
  85:16 95:25
  102:12 108:20
  111:25 136:5
**high** 64:19,21
**highlight** 109:1
**hired** 19:20 24:14
  26:13,18
**history** 74:2,10
  81:2 93:2
**hold** 16:16 17:23
  17:24 38:9 41:12
  63:5 92:5
**holding** 97:16
**home** 13:25 14:5,6
  14:7
**honest** 11:17
  126:22
**honestly** 126:25
**hope** 34:6 36:10
  38:5 125:23,23
**hotel** 62:17,18
  65:22
**hotels** 65:12
**hour** 125:5,22
**hours** 125:6
**house** 15:21,24
  16:9 45:25
**hover** 83:13
  112:17 113:6,6,9
**how's** 134:11
**huh** 41:16 44:7
  53:19 54:23 65:16
  65:24 69:21 72:15
  77:18 81:12 87:17
  94:23 97:12 100:3
  101:17 106:6,10
  109:11 111:19
  126:6,10

**hundred** 111:5,6
**hundreds** 40:15

**i**

**idea** 39:25
**identification** 42:2
  62:2 68:2 69:16
  74:6 85:15 95:24
  102:11 108:19
  111:24
**identified** 124:15
**illegal** 76:16,18,22
**immediately** 36:15
  51:18 53:3
**impacts** 131:20
**important** 134:16
**improper** 128:21
**inaccessible** 106:4
**inamullah** 68:20
  69:1,2,10 71:12,21
  72:3,9 73:3 75:3
  76:1,9
**incapacitated**
  105:6 106:2,9,22
  107:11,23 108:2
  109:14
**included** 28:21
**includes** 103:8
**incoming** 12:15
**incorporated**
  24:20
**indemnification**
  58:14 59:5,21
**indemnify** 57:10
**independent** 69:8
**independently**
  35:24 69:9
**index** 7:1 8:1
**indicated** 39:17
  87:25
**indicates** 88:16
  126:2

Page 12

[individual - know]

| | | | |
|---|---|---|---|
| **individual** 72:20 | **interrogatory** | **january** 7:13 | **jpmorgan** 8:5 |
| **individuals** 64:19 | 7:18 69:19 71:1 | 21:19,19 23:3,17 | 95:21 96:2,6,22 |
| 76:20 | **investigated** 75:10 | 24:3 29:17,17 | 97:15 98:9 101:19 |
| **industry** 19:15 | **investment** 31:11 | 36:19,21 37:3 | 103:1,17 104:6 |
| 35:6 | 80:19 84:22 | 53:13,15,24 54:7 | **jtd** 1:11 2:11 9:21 |
| **information** 8:20 | **investments** 23:10 | 56:21,23 57:17 | **judge** 12:21,24 |
| 104:20 120:11 | **involved** 17:3,22 | 58:10,23 59:10,14 | 29:22 30:6 |
| **ingersoll** 3:4 10:16 | 22:10,20 31:10 | 61:16 62:11,13 | **judge's** 119:17 |
| **inhumane** 118:4 | 66:6 | 63:3,12 66:8 | **judgment** 54:12 |
| **initial** 80:19,21 | **involvement** 20:2 | 67:22 104:24 | **july** 8:5 23:2 33:15 |
| 84:12 99:1 | 22:16 28:6,8,19 | 105:2,17,20 | 64:3 78:5,8,23 |
| **initialed** 136:4 | **issue** 68:5 106:8 | 106:11 107:20,21 | 79:12,17,23 81:8 |
| **initially** 82:4 | 116:2 | 107:21 109:3,8 | 81:14,25 82:21 |
| **injunction** 7:23 | **issued** 12:21 29:15 | 112:5,5,6,6 115:6 | 83:10,23 85:20 |
| 85:12,19 88:19 | 85:20 93:11 | 115:7 132:13,13 | 86:8 88:23 89:1,2 |
| **ink** 136:4 | 128:13 | **jbevans** 5:23 | 91:11,12,13,16 |
| **instruct** 12:22 | **issues** 30:6 120:18 | **jeff** 60:4 | 92:14,14 93:10 |
| 45:11 46:9 | 128:18 131:9 | **job** 1:23 20:20,24 | 95:3,12,12,21 |
| **instructed** 129:5 | **istanbul** 65:23 | 22:5,15 24:24 | 96:12,22,23 97:9 |
| **instructing** 30:23 | 66:10 67:7,9,10,15 | 25:2 26:14,16 | 98:8 100:12 |
| 120:4 | **item** 109:1,3 | 27:5,13,22 28:10 | 101:21 103:2,12 |
| **instruction** 8:23 | 110:20 | 28:12 30:18 31:3 | 103:12,16 104:11 |
| 51:12 126:14 | | 31:6,14,15,18 32:3 | **jump** 38:19 |
| **instructions** 54:25 | **j** | 32:6,24 34:10,14 | **june** 35:18,20 |
| 127:1 | | 34:17 36:14 53:17 | 37:17,18 68:10 |
| **intend** 42:17 | **j** 8:12 111:22,23 | 118:8 | 70:14 72:3 75:2 |
| **intended** 35:25 | 112:2 | **joe** 38:23 45:14 | 79:3 82:22 83:2 |
| 51:22 | **james** 1:12,15 2:12 | 50:16,23 66:18 | |
| **intention** 51:7,9 | 2:17 7:4,16 9:18 | 68:4 71:10 76:3 | **k** |
| 52:8,12 62:21 | 13:12,16,20 18:6 | 76:12 77:19,21,22 | |
| 63:2 64:22 | 18:19 27:15,22 | 81:4 90:6 93:5 | **kept** 46:3,4,5,5 |
| **interest** 35:8 | 28:3,9,15 29:9 | 100:14 102:8 | **key** 35:5 |
| **interested** 10:5 | 31:8,22 32:5,21 | 108:17 118:3 | **kicked** 50:17,17 |
| 137:18 | 34:13 38:16 41:8 | **jog** 65:22 | **kind** 17:9 46:19 |
| **interests** 35:3 | 41:8,17,18 45:11 | **joined** 67:6 | **kinds** 92:6 |
| **interfere** 9:12 | 46:9 54:4 56:16 | **joining** 10:22 | **knew** 75:25 |
| **interim** 132:24 | 67:3,21 74:12 | **jointly** 9:21 | 106:17 |
| **internally** 121:6 | 84:1 89:25 98:20 | **joseph** 5:5,15 | **know** 12:1,9 16:1 |
| **international** 66:4 | 99:10,10 102:17 | 10:11 11:1 | 20:4 23:24 25:9 |
| **internship** 21:6 | 102:18 103:4,8,8,9 | **joseph.mcmahon** | 25:24 26:20,25 |
| | 119:2 122:10 | 5:10 | 31:12 33:1,3,22 |
| | 128:7,12 136:1,15 | | 36:16 40:11,22 |
| | | | 47:7 50:4 54:13 |

Veritext Legal Solutions
PUBLIC VERSION: Filed April 6, 2021
866 299-5127

**[know - mail]**

56:2,3,3,5 61:10
64:9 72:11,25
75:12 78:21 79:8
79:9,10,13 80:5
84:6 89:10,16
91:18 94:3,6,7
98:16 99:17,18
100:15,17 101:2,3
101:12 103:19
106:2 107:25
113:25 115:20,23
116:5,16 117:2,2
118:18 121:2
125:15 126:20,21
126:25 127:11
129:18 130:8,10
130:14,15,21
134:21
**knowledge** 23:1,7
23:15 118:1
**knowledgeable**
35:12
**known** 75:13,21

**l**

**l** 14:16 15:10
68:23,23,25
**l.l.c.** 23:10
**l.p.** 22:21,24
**language** 90:23
**large** 94:14
**lastly** 35:9
**law** 3:6,16 4:3,5
4:12 5:6,19 10:21
57:3 120:18
129:18
**lawsuit** 79:11
**lawyer** 11:18
12:12 40:1 51:6
58:14,16 60:6,16
79:9,14

**lawyer's** 51:5
**lawyers** 59:2,10
59:11 60:9,11,18
61:3 115:22 116:7
**layman** 54:11
**leave** 106:4
**led** 33:15
**ledger** 78:15,17,18
78:24 81:20,25
83:20,24 86:14
92:4,5 107:14
108:5,10,22,24
113:20
**left** 16:20,24 24:12
**legal** 10:1,3 13:15
25:6,9 40:1,11
43:7 52:16,19
54:11 57:5,6,7,8
58:4 59:13 79:9
79:24 116:20,22
116:22 117:23
123:23
**legitimately** 54:22
76:14
**lending** 22:15,17
23:9
**letter** 96:18 102:6
108:11 111:21
**leveraging** 34:20
**liabilities** 53:4,8
**liability** 47:1,13
**libra** 24:14,19,21
25:11,14,19 26:3
26:12 33:16
**light** 119:9,11
120:13 123:1,13
**limit** 29:25
**limited** 12:20,23
30:1 33:10,14
**line** 17:18 83:15
103:18 108:25

109:3 110:20
113:10 114:5,7
**linkedin** 21:13,20
23:24
**liquidate** 82:8,10
82:14
**liquidated** 80:22
82:5,16 84:1,19,24
84:24 85:4 87:3
89:2 95:7,11
100:13 105:18
107:3 111:6
**liquidating** 93:14
**liquidation** 80:16
82:2 85:1 86:21
87:18 88:13 94:4
95:4 110:4
**liquidations** 112:3
**list** 112:15
**listed** 87:20
**lists** 34:2
**literally** 40:15
**litigation** 124:5
**little** 11:13 38:20
44:11,12 50:14
51:12 85:25 89:11
108:13
**live** 13:21 14:12
15:2,3,4,4,4
108:10,23 113:20
137:3
**lived** 14:10
**llc** 1:9 2:9 4:3
25:21 26:4,11,12
26:13
**local** 26:8
**location** 46:6
**locations** 64:18,19
**log** 85:6 114:1
**logical** 37:23

**long** 14:10,18
17:21 20:9
**longer** 75:24 89:11
124:4
**look** 16:23 17:11
19:5 24:2 59:3,7
63:18 65:20 74:21
74:21 86:16 99:25
**looked** 98:10
117:5
**looking** 16:4 17:12
21:13 80:6 91:25
99:23 130:12
**looks** 93:18
**los** 1:16 2:19 3:18
9:1 14:16
**lost** 50:14,23 52:15
66:18
**lot** 40:12,17 75:10
75:24 110:7
**luft** 3:14 10:18,18
13:3 32:14 63:22
63:24 66:20
121:15 123:3,8
124:9,13 125:1,25
126:7,11,19
127:13 129:24
130:3,22 131:12
133:10,17,18
134:1,3,13,20
135:1

**m**

**m** 1:21 2:21 33:12
68:23,25 137:24
**machine** 137:9
**mack** 10:21
**madam** 18:9
**madison** 5:20
**mail** 64:9 71:15
115:21 119:6
125:5

[mailing - neither]

**mailing** 13:25 14:2
**mails** 40:15
  115:11
**maintain** 37:15
  41:7,17 118:7,10
**maintained** 41:4
**management**
  22:21,24 36:1
  42:14 43:3,12,19
  43:20
**manner** 76:25
**march** 35:18
  36:20,21 37:3
**marked** 8:17 42:1
  62:1 68:1 69:15
  71:8 74:5 85:14
  95:23 102:10
  108:18 111:23
**market** 5:7 63:1
  73:7
**marketing** 62:22
  63:17 64:4,6,17
**marketplace** 22:5
  22:9,12
**markets** 21:8
**marking** 61:17
**marks** 13:7,11
  18:5 32:16,20
  38:10,15 66:23
  67:2 89:20,24
  118:22 119:1
  122:4,8 128:2,6
**married** 15:7
**marriott** 62:17
  63:13
**mateo** 79:12 85:13
  85:20 88:20
**math** 113:14
**matter** 9:19 10:25
  51:14

**matters** 35:11
**mcdermott** 5:14
  10:11 50:16
**mcmahon** 5:5 11:1
  11:1
**mean** 17:6 27:12
  28:1,8 30:13 40:2
  42:19 54:2 73:13
  73:16 75:9 78:19
  84:23 93:18 98:7
  98:7,15,24 99:7,8
  103:5 107:9 110:1
  112:14 125:8
**means** 39:25 40:17
  79:8,10 88:3
**meant** 45:9 52:10
  80:22
**media** 9:17 13:7
  13:12 18:6 32:16
  32:21 38:10,15
  66:23 67:3 89:20
  89:25 118:22
  119:2 122:4,9
  128:2,7 135:11
**medication** 38:24
**meet** 67:9
**melissa** 1:21 2:21
  10:2 137:24
**members** 35:1
**memory** 65:22
**mentioned** 25:14
  25:22 26:10
**mentioning** 25:25
**mercedes** 46:20,21
**mersin** 67:11
**message** 126:16
  127:4
**messages** 12:15
**microphones** 9:7
  9:12

**mid** 120:25
**middle** 13:17,18
  63:3
**miller** 6:4 9:25
**million** 16:7
**millions** 29:16
  31:9
**mind** 114:8
**minute** 114:10
  120:22
**minutes** 38:4,6,25
  39:4,9 88:2,4,7
  89:7 117:8 118:16
  118:17,20 121:10
  125:16 127:8,20
**misheard** 63:24
**missing** 115:17
  116:24 117:18
  118:17 132:12
**mistaken** 66:12
**misunderstanding**
  19:25
**mixed** 74:19
**moment** 59:7
  66:19 80:18
**money** 42:20
  45:22 49:21 52:13
  54:25 55:5 116:21
  116:24 118:17
**moneys** 52:7
**month** 17:1
**months** 15:16
  16:25 62:20 66:14
**morgan** 99:17
**morning** 129:25
  131:3
**mortgage** 15:24
  16:2
**motion** 39:18,22
  40:4,8,20,22 57:13
  57:25 132:4,5

**move** 55:23 80:3
  81:10 105:1,4,10
**moved** 29:17
  104:23 105:11,25
  106:1
**moving** 105:9,22
**multiple** 118:2
**mwe.com** 5:23

**n**

**n** 14:16 33:12
  68:23,25
**name** 9:25 13:15
  13:17,18 15:9
  74:11 91:20,22
  96:23 97:15 98:22
  101:22 102:17
  103:2 104:7
  137:21
**natural** 88:7
**nature** 28:21 40:2
  71:18 130:19
**necessary** 127:6
**need** 17:14 18:7
  21:2 32:2 33:3,6
  34:7,8 36:13
  37:21,25 38:3
  41:18 52:16 53:2
  56:13 63:4 84:11
  84:13,14 89:8,14
  98:25 100:21
  117:7 118:18
  120:22 121:22
  126:19 127:11
  133:7,21 134:21
  134:24 135:1
**needed** 76:16
  82:13,13 87:25
  130:10
**needs** 51:17 130:4
**neither** 123:17
  137:17

**[net - p.m.]**

net  64:19,21
network  34:21
  35:2,6 73:18
networking  62:22
  63:17 64:17
never  77:2 106:7,7
new  5:21,21
north  5:7
notations  48:6
note  9:7 12:18
  29:20 88:1 104:19
  121:15 131:12,17
  137:3
noted  136:4
noticing  10:9
november  53:21
number  43:15
  56:14 70:24 81:3
  93:4 97:25 102:6
  112:22 116:18
  135:11
numbers  84:7,16
  112:8,9
nw  4:13

**o**

o'clock  122:8
oaks  14:4,8 98:20
oath  18:20
obfuscate  121:1
object  11:19 47:14
  69:22 76:5
objection  11:20
  108:8 129:21
objections  13:2
obligation  89:12
obtain  34:19
occur  120:20
occurred  54:1
  87:10 104:9 119:8
  123:2

occurring  79:16
october  23:11
offered  59:18
office  5:4 11:1
  51:5
officer  26:22,24
  27:6,7 29:1,4
officers  35:11
official  5:12 10:12
offline  78:21
oftentimes  21:16
oh  65:24 86:18
  104:16
okay  11:25 12:8
  12:14 13:6,19
  14:9 15:6 19:10
  19:19 20:8 21:18
  21:25 22:4,8,19
  23:8,16 24:11,16
  25:18 28:18 30:21
  31:22 36:5,17
  37:6,9 38:7 39:11
  40:23 41:3,10
  43:10,23 44:10,15
  45:13,24 46:12,23
  47:3,18 48:1 49:7
  49:11,19 50:2,8,25
  51:25 53:23 54:14
  55:17 56:8 57:22
  58:2,6,11,15,20
  59:8,23 60:8,8,21
  61:1,1,12 62:9
  63:20 65:2,7
  66:21,22 67:9,13
  68:13 72:6,16
  73:25 75:1 76:23
  77:5,18 78:5,10,19
  78:22 79:5,21
  80:7,14,24 81:13
  81:23 82:20 83:5
  85:3,24 86:6,7,12

87:22 88:11,17,25
  89:5,13,19 91:2,6
  91:10,14 92:13,24
  94:8,12 95:6,17
  96:9,17,17 97:1,5
  97:13,21 98:12,17
  99:11,19 100:5,6
  100:16 104:10
  105:8,12,15,19
  106:15,20 107:18
  108:1,9 109:7,12
  109:18 110:11,15
  110:19,24 111:4
  112:11,21 113:3
  113:13,17 114:23
  115:5 117:4,6
  122:1 124:9 125:1
  126:19 127:19,23
  132:23 133:14
  134:2,5,9 135:3,5
  135:5
once  75:17 95:7
one's  127:2
ones  26:1 94:5
ongoing  66:4 82:6
  82:18 115:11,21
  116:2 121:16
onward  99:5
open  75:4,24
  102:24 108:10
  116:11,16 117:21
  129:15,22 133:12
operate  82:17
operating  84:25
operations  37:5,7
  37:11 82:6 108:10
  108:23 113:20
opinion  116:22
opposed  55:5
opposition  128:24

orchestrated
  76:21
order  7:22 12:20
  29:12,15 36:14
  79:15 85:12,19
  88:19 90:4,9,15
  91:4,8,11 92:15,21
  93:11 104:2
  105:21 106:18
  109:24 119:18
  120:10 121:8
  124:18 128:13
  131:16,20 133:15
  133:18
ordered  12:24
  29:22 30:6,9
  75:17 80:2 90:17
  126:5,13 127:15
  128:25 131:14
orders  127:16
  129:22
organize  62:22
organized  63:17
  63:19
original  33:8 82:3
  94:3 97:18 137:14
originally  83:21
outcome  10:5
overall  34:23
owed  16:1 53:4,7
owned  43:21

**p**

p.m.  2:20,20 9:2,5
  13:8,11 18:5
  32:17,20 38:11,14
  66:24 67:2 86:9
  89:21,24 118:23
  119:1 122:5,8
  128:3,6 135:9,11
  135:13

[pacific - presumption]

| | | | |
|---|---|---|---|
| **pacific** 9:5 13:8,11 18:2,5 32:17,20 38:11,15 67:2 89:21,24 119:1 122:5,8 128:3,6 | 86:21 **paying** 47:4,6 57:8 59:10 **payment** 48:13,22 48:23 57:11 61:4 61:5,6 62:11,13 65:12,14 | **pgilman** 4:16 **philadelphia** 3:8 **phone** 12:9 71:15 72:9 **phones** 9:11 **physical** 49:4 **pick** 9:8 | 77:22 83:8 **point** 30:5 37:23 119:24 **poor** 37:20 **position** 53:11 73:9 119:9,16 120:8,14 121:12 |

**page** 7:10 8:4 42:9 74:15 88:9 90:12 93:7,13 97:7,9 101:19
**pages** 1:25
**paid** 47:16 60:11 60:16,18 61:2 66:1,8
**palo** 15:1
**papers** 40:4
**paragraph** 90:14 90:24,25 92:19
**parked** 46:16
**part** 47:2 80:15 82:2 86:20 96:16 104:16,16,21 115:13,13,19
**participant** 73:7
**participants** 9:24
**participate** 127:5
**parties** 9:15 30:15 120:17
**partner** 23:17,20
**partners** 35:5
**parts** 17:7
**party** 10:4 137:19
**passport** 16:16,18
**patience** 66:19
**patrick** 4:11 10:23
**pattern** 80:18
**paul** 3:13 10:18
**paulhastings.com** 3:20,21
**pause** 12:15 59:6
**pay** 49:1 59:2,13 60:9 82:13 84:25

**payments** 48:11 48:18 57:3
**penalty** 136:2
**pendency** 128:17 132:5
**pending** 11:22 12:12 50:13 123:9 124:5,17 126:7
**pennies** 53:9,10
**pennsylvania** 3:8
**people** 64:9,21 110:8 116:18
**period** 33:12,12
**periodic** 37:22
**periodically** 71:23
**perjury** 136:2
**permit** 90:18
**permits** 119:18
**person** 73:8
**personal** 30:10 41:15 49:25 50:3 50:5,6 51:8,10,21 52:6 55:4,19 63:11 103:7,13,18 104:12,14 115:18 119:5 121:4 126:2 128:16
**personally** 17:19
**persons** 42:22
**pertains** 137:13
**petition** 124:2
**pfeiffer** 120:2 123:17

**pieces** 107:8
**pike** 4:6
**place** 9:11,15,23 14:7 69:10 77:4 119:10,20 137:6
**placed** 109:20
**placeholder** 128:10
**places** 64:20
**plaintiffs** 1:10 2:10,18 86:3
**plan** 38:25 62:20 63:1
**planned** 62:5,24 66:14
**planning** 47:4,6,6 62:25
**plans** 63:4,5
**platforms** 75:10
**please** 9:7,9,11 13:6 14:6 17:24 18:8,10 28:5 32:15 37:1 38:9 38:13 41:21 42:8 44:14,19,20 49:9 50:9 67:20 74:1 76:8 81:1 87:1 88:18 90:2 93:1,7 101:18,25 113:7 118:21 121:16,19 125:18 130:14,14 130:20 132:24
**podulka** 76:3,12 76:21 77:1,19,21

**point** 30:5 37:23 119:24
**poor** 37:20
**position** 53:11 73:9 119:9,16 120:8,14 121:12 124:3 125:11 126:1,16,24 127:4 131:18 132:11
**positions** 120:3
**possession** 70:17 78:25 90:21
**possibility** 131:11
**possible** 38:1 51:22 82:10 101:16 114:12 124:25 125:4,7,11 125:13 130:15 131:10 134:14 135:1
**posted** 44:2,21 45:1,8
**posting** 44:5
**postings** 44:8
**potential** 35:1
**precedent** 126:1,9
**precise** 32:8
**precluding** 105:22
**precursor** 26:4
**predecessor** 25:20
**preliminary** 7:23 85:19 88:19 90:3
**prepayment** 62:16 66:12,15 67:14
**present** 10:6 11:18
**president** 36:4
**presume** 113:18
**presumption** 37:14

PUBLIC VERSION: Filed April 6, 2021

**[pretty - reason]**

| | | | |
|---|---|---|---|
| **pretty** 108:13 120:25 | **promote** 35:3,7 64:10 | **purchase** 16:12 17:8,15 18:24 19:4 46:21 | 58:24 60:4,15 76:8 77:8 85:9 92:18,20 98:3,4,7 |
| **prevents** 126:3 | **property** 47:17 124:16,17 133:1 | **purchased** 16:9 17:20 | 101:11 103:11 104:17 110:1 |
| **previous** 58:22 | **prosper** 22:5,9,12 | **purchasing** 19:11 | 116:5,11,15,20,20 |
| **previously** 8:17 12:21 21:12 58:21 60:12 63:2 90:10 | **protected** 76:16 | **purported** 79:4 82:22 83:3 | 117:1,10,11,12,14 117:15,17,18,20 117:21,23,24 |
| **price** 112:20 | **provide** 27:24 31:18 32:8 33:20 34:3 35:7,9 36:7 | **purpose** 85:1 | 118:14 122:15 124:25 |
| **prior** 14:12,20,21 14:21,25 19:11,22 20:1 35:18 59:10 59:14 61:15 86:16 123:18 137:8 | 43:3 51:6 52:14 59:4 75:25 80:23 82:5 97:19,22 100:20,25 101:4,8 101:9,10,15 104:2 120:10 126:8 132:21 | **purposes** 130:9 | **questions** 11:10,16 11:19,21 12:22 25:8 29:25 30:4 |
| | | **pursuant** 104:20 128:13 | 30:15 33:5 34:7 68:7 88:5 114:9 |
| | | **pursue** 35:25 | 117:8 119:23,25 |
| | | **pursued** 37:13 64:12 | 121:3 124:10 129:16 |
| **privilege** 11:20 | | **pursuing** 37:18 | **quickly** 125:13 |
| **privileged** 57:1,4 | **provided** 22:12 24:8 28:14 32:1,9 40:24 45:5 74:10 74:11 97:3 98:5 101:5,7,13,14 102:1,16 104:20 108:23 115:8 120:11 123:11 126:17 | **put** 51:10 52:3,3,5 69:10 74:1 77:3 99:13 107:15 133:7 | **quinn** 56:24 58:4 58:17 |
| **probably** 12:9 | | | **quite** 27:17 |
| **problem** 13:4 38:5 89:13 | | | **r** |
| **proceed** 13:13 18:17 32:22 38:17 67:4 90:1 112:9 119:3 121:7 122:11,12,20 128:11,20,22,23 130:3 | | **q** | **r** 33:11 |
| | | **quant** 24:15,17,18 24:19,22,25 25:15 25:15,16 34:11 | **raise** 13:2 18:10 39:6 |
| | | | **rbc** 21:8,11 |
| | | **quanta** 25:15 | **reach** 69:11 106:8 125:21 |
| | **providing** 27:14 29:5,7,8 | **quantum** 25:7,17 26:5 33:10,11,14 34:1,18 | **read** 48:2 55:13 70:10,16 90:15 |
| **proceeding** 9:22 18:8 128:25 | **provision** 28:2 | | 92:18 98:18 112:22 136:2 |
| **proceedings** 137:5 137:7,9,15 | **prudent** 105:4 125:9 | **quantum's** 25:10 | **ready** 128:21 |
| **proceeds** 84:15,20 84:20,21 98:9 100:7,18 101:1 110:4 111:7 112:12,25 115:6 | **pte** 24:15 26:7 33:10,12,14 34:11 | **quarter** 37:5,8,9 37:12 | **realized** 108:4 |
| | | **queries** 35:10 | **really** 52:16 104:1 118:4,4 134:16,20 |
| | **pull** 33:2 47:11 59:18 60:1 61:13 61:15 67:20 81:1 85:11 90:2 93:1 95:20 101:25 104:13 111:20 | **question** 11:22 17:5,18 18:25 20:5,7 28:5,9,11 28:17 30:23 31:4 31:13 32:2 33:25 35:22 37:1 40:7 42:25 44:11,12 45:12 46:10 50:13 51:4 54:5 56:6 | **reason** 25:6,9 38:24 77:24 85:8 85:8 |
| **process** 40:1 52:16 | | | |
| **produced** 41:23 42:6 96:5 | | | |
| **producing** 52:20 | | | |
| **professional** 137:3 | **pulled** 55:24 | | |
| **project** 66:3 | **pulling** 55:5 | | |

Veritext Legal Solutions
PUBLIC VERSION: Filed April 6, 2021
866 299-5127

[reasonable - responses]

| | | | |
|---|---|---|---|
| **reasonable** 35:9 | 32:10,16,19 33:1 | **refusing** 124:20 | 111:12 112:8 |
| **reasons** 110:3 | 38:9,11,14 51:1 | **regarding** 29:22 | **rephrase** 58:25 |
| **recall** 16:14,22 | 66:20,22,24 67:1 | 119:7 120:3,6,15 | **report** 7:20 74:12 |
| 17:2,10 19:5,11 | 70:22 71:11,17,19 | 120:17 129:9 | 132:10,17 |
| 21:2,7,10 22:16 | 71:24 72:10 88:16 | 130:8 131:6 | **reported** 1:20 |
| 23:19,21 24:5,23 | 89:20,21,23 | 132:11 | **reporter** 2:22 10:2 |
| 25:1,7,25 26:15,16 | 104:19 111:17 | **region** 11:4 | 11:14 17:23 18:9 |
| 26:19,25 38:21 | 118:23,25 121:11 | **registered** 137:2 | 18:10 32:12 44:19 |
| 39:20,21 41:1 | 121:21,25 122:5,7 | **regularly** 71:23 | 51:2 61:17,21 |
| 45:21 48:17 56:18 | 127:8,12,22 128:2 | **relate** 22:2 30:7 | 63:23 67:23 69:23 |
| 56:19 57:15 58:9 | 128:5 131:13,18 | **related** 10:3 66:4 | 70:5 93:2 95:8 |
| 59:5,17,19 61:7 | 131:22 133:7 | 105:23 | 108:12 114:19 |
| 69:14,14 71:14 | 135:10,10 137:8 | **relates** 131:19 | 133:7,14,21,25 |
| 73:9,23 75:6,7,11 | 137:12 | **relation** 30:11 | 134:2,5,7,9,18,24 |
| 79:15,24 80:12 | **recorded** 9:17 | **relationship** 33:9 | 135:3 137:2,3,3 |
| 81:14 85:4,22 | **recording** 9:14 | **relative** 137:18 | **represent** 10:24 |
| 92:2 94:3 95:14 | **records** 16:23 17:2 | **relay** 126:16 127:4 | 113:15 123:16 |
| 100:15,21 110:7 | 17:11 19:6 21:3 | **relevant** 120:16 | **representing** 11:3 |
| **receive** 68:11 | 31:17 55:9,13 | **relief** 40:5,9 | **request** 70:9,10,25 |
| 73:10 75:13,22 | 61:9 65:20 70:12 | **relies** 64:18 | 71:3,4 120:21 |
| **received** 71:13 | 84:11 87:5 98:25 | **rely** 43:5 52:16 | 130:25 131:6,8 |
| 75:5,14,17,18 78:5 | 99:23 117:5 | **remain** 129:21 | **requested** 8:20 |
| 78:14,15 80:19 | **recovering** 37:21 | **remaining** 52:23 | 100:20 104:21 |
| 83:17,21 99:1 | **recovery** 118:5 | **remains** 116:11,15 | 118:20 137:16 |
| **receiving** 73:11,14 | **refer** 64:5 84:11 | 117:21 121:16 | **required** 11:21 |
| **recess** 13:9 18:3 | 85:6 88:18 114:3 | 133:12 | 62:16 66:15 |
| 32:18 38:12 66:25 | **reference** 32:3 | **remember** 20:20 | 100:24 120:11 |
| 89:22 118:24 | 36:13 39:24 76:21 | 20:25,25 31:24 | 129:17 |
| 120:23 122:6 | 113:8,25 114:24 | 39:14,19,24 57:20 | **reside** 14:18,22 |
| 128:4 | **referenced** 83:4 | 69:19 107:20 | 46:11 |
| **recognize** 91:18 | 91:19 | 109:15 110:13 | **residence** 15:2 |
| 91:20,22 93:17 | **references** 101:12 | 116:14 117:19 | **resolved** 116:16 |
| 94:1,5 | **referencing** 23:23 | **remind** 93:2 | **respect** 67:14 |
| **recollection** 32:5 | 83:18 100:22 | **remote** 1:15 2:17 | 118:11 |
| 34:13,14 70:19,23 | **referred** 87:15 | **remotely** 3:2 9:24 | **respond** 124:24 |
| 71:12 98:25 99:20 | **referring** 59:20 | 10:7 | 125:11,12 |
| 103:20,22 104:9 | 63:8 70:3 71:5 | **rent** 15:20 | **responded** 70:16 |
| 110:6 117:13 | 76:19 113:7 | **reopen** 127:15 | **response** 35:10 |
| **record** 9:5,16 10:8 | **reflects** 114:15 | **repeat** 28:5 35:22 | 71:10 75:25 |
| 13:3,8,10 17:24 | **refuses** 30:20 | 37:1 40:7 54:5 | **responses** 7:18 |
| 18:2,4 29:21 | | 58:24 76:8 103:15 | 69:20 |

Veritext Legal Solutions
PUBLIC VERSION: Filed April 6, 2021        Page 604
866 299-5127

[responsibilities - series]

| | | | |
|---|---|---|---|
| **responsibilities** 24:24 27:3,10,15 28:23,24 29:3 31:14 32:7,25 33:24 34:14,17 35:19 | 78:1,6,15,25 79:3 79:3,7 81:21 82:22 83:22 84:20 85:1 86:15 87:19 88:15 89:3 91:8 91:12 92:7,11 | **sale** 87:9 113:5 **sales** 64:4,6 **sam** 50:9,15 56:20 61:14,15 66:17 74:3 78:11 81:1,3 85:11 86:1,25 | 93:7 97:6 **search** 60:1 **second** 12:17 20:24 32:11 34:22 37:8 67:10 74:15 90:11 93:23 96:15 |
| **responsibility** 36:2 **responsive** 70:18 **rest** 100:7,9,17,18 **restraining** 7:22 79:15 85:12,19 90:3,9 91:8 93:11 | 94:10 96:2,16 97:3,16 98:1,22 101:1 104:12 105:23 106:14,18 110:17,22 111:2 114:11,24 115:1,3 117:5 119:13 | 88:8,18 90:5 92:25 96:18 97:6 99:22 101:18,25 102:6,21 108:11 109:1 111:20,21 112:19 113:9,19 114:3 | 112:15 121:3 **secret** 31:12 **section** 87:7,7 **secure** 78:21 **see** 38:6 40:4,8 42:15 44:1 47:23 48:5,12 50:18 74:16,17,18,19,24 |
| **retain** 71:19 72:10 **return** 42:20 49:16 51:19 54:18 121:11 | 120:4 126:15,22 127:18 **risk** 69:4 **robert** 10:25 | **samuel** 5:18 10:14 **san** 79:12 85:13,20 88:20 **saturday** 69:20 | 81:9,12 83:12 86:3,5,8,10 88:22 90:23 91:1 93:12 93:21,24 94:22 |
| **returned** 51:17 53:2 **returning** 42:17 42:19 132:7 **reversed** 107:15 **review** 31:19 33:18 137:15 | **role** 29:2 31:20 33:18,22 34:1,2,4 62:20 67:18 **room** 12:2,5 121:22 **rooms** 10:6 121:20 | **saying** 20:21 31:25 32:1 39:3 86:19 88:13 107:19 108:6 115:18 **says** 21:20 30:13 30:19 48:2 74:11 | 96:24 97:9,11 100:2 101:23 102:19,25 109:5 109:10,22 110:21 112:7 114:7,15,18 114:21 120:23 127:20 134:9 |
| **reviewed** 100:1 **reviewing** 103:22 **revisited** 63:4 **right** 16:13 18:11 19:21 22:6,15,22 22:23 23:3,11,18 25:3 26:17 29:12 | **rooney** 3:4 10:16 **rough** 133:20 134:13 **rpr** 1:21 2:22 137:25 **rudnick** 4:10 **rudwick** 10:24 | 88:22 98:1,18 **schatt** 69:7 76:3 76:11,21,25 77:6,9 77:11 83:8 **scheduled** 62:7,7 80:16 86:21 109:16 | **seeing** 87:5 **seeking** 40:9 **seen** 127:2 **send** 55:3 60:3,6,6 69:12 73:3 75:19 **sense** 16:8 34:12 107:25 |
| 34:3 37:17 40:21 41:6 43:13,21 44:25 47:9,11 51:10 53:21,25 54:3,8,19 55:19 58:4 60:8,23,24,25 65:3,9,13 67:23 70:23 72:14,15,21 72:22 74:13 75:5 76:4,12 77:1,15,23 | **rule** 131:1 **rules** 11:11 **résumé** 20:18,19 21:3 | **scope** 12:20,23,23 13:1 30:1 34:17 **scott** 3:15 4:4 10:20,20 | **sensitive** 9:8 **sent** 54:21 68:14 68:15 70:10 71:12 76:1 83:23 84:2,3 86:13,18,18 111:7 125:5 |
| | **s** | **scottcarlton** 3:20 **screen** 81:7 112:23 **screenshot** 71:12 **scroll** 42:9 47:19 48:19 49:8 50:9 50:10 56:20 62:10 74:15 88:8 90:11 | **september** 74:22 **series** 11:16 92:5 94:17 99:21 |
| | **sachs** 21:4,7 **safe** 46:3,4,5 69:10 77:4 **safeguards** 132:25 **salary** 48:22,23 49:1 53:8 | | |

Veritext Legal Solutions
PUBLIC VERSION - Filed April 6, 2021
866 299-5127

**[series - submitted]**

102:15

**server** 50:17

**services** 20:16
21:24 22:2,10,11
24:7,8 27:9,11,12
27:14,17,25 28:1,2
28:14 29:5,6,8
30:19 32:2 35:25
36:1 44:9 53:18
57:5,6,7,9 59:14

**set** 137:6

**settle** 47:1

**seventh** 93:12
94:25

**share** 41:22

**shared** 71:7

**sherman** 14:3,8
98:20

**short** 37:24 114:13

**shorthand** 2:22
137:1,10

**show** 103:24

**showed** 99:9

**shows** 49:3

**side** 71:19 121:23

**sift** 40:17,18

**signature** 137:23

**silence** 9:11

**silvio** 72:23

**similar** 52:9

**similarly** 130:23

**simple** 42:25 75:7
75:12 92:20

**simultaneous**
102:3

**simultaneously**
27:20 44:13 55:10

**singapore** 24:20
25:19 26:6,8

**single** 31:24

**sit** 120:10 124:4

**sitting** 50:12 77:13
118:1 125:8
131:24 133:2

**situation** 63:11

**six** 16:25 87:19

**sixth** 93:12 94:24

**ski** 64:15

**slightly** 89:8

**slow** 108:13

**slowly** 9:9 11:15

**smaller** 94:5

**sold** 112:9

**sole** 36:4 37:14
53:6,14 54:10
62:20 67:18 69:5
76:14 77:12

**solemnly** 18:12

**solutions** 10:1,3

**someplace** 64:23

**soon** 38:1 51:22
114:12 124:25
125:4,6,11 130:15
132:22 134:14

**sorry** 12:4 16:17
17:2 28:5 36:21
37:20 40:7 50:14
50:20 56:13 60:15
68:24 79:19 84:8
89:12 93:3 94:1
103:5,15 112:5

**sort** 39:7 109:25
130:13

**sought** 69:10

**south** 3:7,17

**spadafora** 72:24
72:25 73:5 75:4
75:19 76:11

**spadafora's** 76:2

**speak** 9:9 11:12,14
52:17 129:13

**speaker** 54:2

**speaking** 12:12
27:20 44:13 55:10

**specific** 13:23
19:24 27:4 33:18
43:14 60:10 79:25
80:6 117:16

**specifically** 27:19
69:8 70:3 79:24
81:16 100:21
123:25 124:16

**speech** 102:3

**spell** 33:10 68:21

**spelled** 14:15

**spend** 56:16,17

**spent** 56:4

**spoke** 58:7

**spoken** 59:9

**spouse's** 15:9

**spreadsheet** 8:10

**stack** 73:20

**stacked** 23:25

**stage** 43:6

**stand** 13:6 18:1
32:15 38:13 52:15
66:22 89:20 116:6
118:21 121:19,25
128:1

**standard** 9:5

**stanley** 99:17

**stark** 10:25

**start** 26:2 30:14
34:10 68:6 70:5

**started** 38:23

**starting** 33:14
37:12

**state** 10:7 79:7,12
79:16 85:20 88:20
90:4,10,14 92:15
118:5 120:17
136:9 137:2

**statement** 7:14 8:6
8:8,12 61:15
95:21 96:22
104:13,14

**statements** 96:6
96:13 97:2 99:8
100:19,25 101:4
102:1,5,16 103:21
103:23 104:3

**states** 1:1 2:1 9:20
11:2,3 16:21,24
90:15

**status** 15:20,21
115:23

**stay** 119:10,19
124:4 126:7
131:19

**stayed** 65:22

**stenographically**
1:20

**steps** 43:6

**stock** 112:20

**stop** 42:10 56:21
76:3

**stopped** 107:13

**stopping** 76:12

**store** 48:4 55:15
78:21

**straight** 52:1
81:19 88:12

**strategic** 35:5

**strategy** 31:11
34:24

**street** 3:7,17 4:13
5:7 15:1

**structure** 34:19

**subject** 115:10,21
120:5

**submitted** 57:18
57:23

**[submitting - tough]**

| submitting 69:19 | **t** | terminated 82:25 | tim 125:3 132:23 |
|---|---|---|---|

submitting 69:19
subscribed 137:21
subsequently 99:4
  107:7
substantial 33:4
substantively 34:4
sued 79:6 89:1
suffering 37:20
sufficient 36:8
suite 3:7 4:13 14:3
superior 85:13
supersedes 119:17
suppliers 35:5
support 57:18,24
  64:3 118:9 126:17
supporting 64:6,8
supposed 107:6,17
sure 12:16,25 16:6
  17:13 19:17,25
  21:13 32:14 33:19
  34:16 43:16 53:22
  58:25 75:9,10
  79:2 80:1 84:10
  86:24 103:10
  108:15 112:17
  130:25
surrounding 63:9
suspend 126:4
suspended 127:13
  127:14
swear 18:7,12
sweeped 98:4
  107:4
switzerland 62:6
  62:14,25 63:3
  66:9,12 67:15
sworn 10:10 137:8
systematic 80:22
  82:2,15 94:4
systematically
  82:5

**t**

t 33:12
take 9:15 13:1
  17:7 37:22,23
  39:2,9 44:8 45:6
  49:17 51:9 52:2
  53:9,10 62:19
  78:11 92:25 107:8
  114:8,10 118:13
  118:16,19
taken 2:18 9:18
  69:6 137:5
takeover 76:17,18
  76:22
talk 24:17 33:20
  37:17 48:15 58:12
  80:25 91:24
  121:10
talked 58:13,13
  90:10 102:17
talking 17:15,19
  55:8 87:17 108:13
  109:14
tax 47:1,4,7,13
  53:8
taxes 47:16,17
team 34:23 35:1
  124:24
tech 73:20
technical 40:13
tell 56:11 99:20
  107:24 119:14
tells 46:6
temporary 7:22
  79:15 85:12,18
  90:3,9 91:8 93:11
ten 38:4,6 81:8,24
  82:14 84:2 87:8
  89:7 117:8 135:11
tenure 27:1 80:20

terminated 82:25
terms 40:13 52:15
  79:24
testified 18:21
testify 130:11
testifying 1:16
  2:19 137:8
testimony 18:12
  31:22 48:25 108:2
  136:5 137:12
text 12:10
thank 18:16 30:25
  54:4 121:24 124:8
  130:22 133:5,23
  134:4 135:8
thing 31:24 47:10
  47:11 89:9 94:13
  131:21
things 105:5
think 23:22 25:13
  41:18 48:21,22
  50:20 54:2 68:17
  68:23 71:6 73:24
  74:2 81:17 84:12
  87:14 89:7 98:4
  107:13 119:19
  120:21 125:9
  126:19 128:20
  134:13,16
third 25:18,22,23
  26:11 34:25 37:9
  37:12 74:22 83:15
thirteenth 4:13
thought 105:4
  106:3
thread 71:17
three 23:20 25:14
  66:7 94:7 95:1
  114:9
till 95:2

tim 125:3 132:23
time 9:6 16:20
  19:14,16 30:3,5,13
  35:9,13,17,19 38:3
  44:19 58:7 59:1
  60:16 61:2 65:6
  73:22 74:20 79:6
  83:1,6 89:8,14
  95:1 104:23 105:3
  125:18,21,22
  131:3 137:6
times 9:10 118:2
timestamps 86:17
timing 53:5
timothy 5:16
  10:14
title 24:22 26:14
  26:16,19,23 36:7
today 11:11,18
  12:3,6 20:21
  29:21 30:7 31:22
  51:8 54:19 115:12
  116:5 118:2
  119:23 135:6
today's 30:1 133:8
  135:9
told 103:19,22
tomorrow 120:12
  129:25 130:13,18
  131:3 134:10,17
  134:18,21,25
  135:2
tonight 60:3 132:8
top 42:7 74:12
  96:23 98:1
topic 88:6
total 16:8 94:18
  113:15 135:11
touch 127:9,10
tough 126:24

PUBLIC VERSION: Filed April 6, 2021

[trade - vera]

**trade**  66:4
**trading**  28:4,7
  31:10 73:16
**transact**  111:9
**transaction**  7:20
  44:3,4,5,6,14,22
  45:2,9,10 56:24
  57:4 61:10,11
  63:12 74:2,10,12
  74:22,23 76:12,24
  77:7,10,20,23
  80:12,13,15,25
  81:7,8,15 83:11,15
  85:6 93:1,13,20,23
  94:4,14,15,20,24
  94:25 97:18 99:2
  100:1,8,8,9 101:21
  102:22 103:1,13
  103:16 104:5,11
  106:12,17 107:15
  109:4,9 112:13,14
  112:16 113:1,4,7
  114:4,5
**transactions**  39:18
  40:6,10 48:8
  67:17 72:4 74:16
  75:11,23 87:20
  93:9,17 94:2,10,18
  98:10 99:21,25
  100:12,22 103:20
  104:9 107:4,10,22
  108:3 109:13,16
  111:1,10,18
  113:16 115:7
  116:8,9 132:14
**transcribed**
  137:10
**transcript**  133:15
  136:3 137:11,14
  137:16

**transfer**  48:9
  51:12 55:18 68:18
  69:1,3 75:3 76:9
  81:24 84:12 90:17
  90:19 91:15 92:16
  92:21 107:13
  111:7 113:24
  114:16
**transferred**  30:2
  31:9 42:14 43:17
  49:12 52:24 54:16
  70:14 72:18 80:9
  84:15 92:9 95:14
  95:15 107:6 108:4
  109:22 110:2,4,5,9
  110:16 111:1
  113:23 131:24
**transferring**  43:8
  107:20
**transfers**  29:23
  30:2,9,12
**transmit**  90:18,19
  91:15
**transmitted**  78:24
**travel**  65:12
**traveled**  67:10
**trick**  28:11
**trip**  62:5 64:15,18
  64:25 66:2,8,9,9
  66:11,11 67:6,15
  67:15,16
**trips**  66:7
**true**  80:8 113:18
  136:6 137:11
**trunk**  52:4 53:1
  55:25 56:10,11
  125:9 131:24
**trusted**  73:6
**trustee**  5:4 11:2,3
**trustees**  5:3

**truth**  18:13,14,14
**try**  11:12,14 31:2
  127:17 134:16,18
**trying**  12:15 17:17
  40:17,18 66:5
  134:25
**tuesday**  1:17 2:21
  9:1
**turkey**  65:18
**turn**  124:20
**turned**  124:18
**two**  15:14 26:10
  31:8,23 32:6
  39:18 104:16,21
  108:3 109:13
  115:14,19 125:6
**type**  64:10

**u**

**u**  33:12,12 68:23
  68:25
**u.s.**  5:3,4 77:13
  82:10
**ucd**  114:24 115:2
**uh**  41:16 44:7
  53:19 54:23 65:16
  65:24 69:21 72:15
  77:18 81:12 87:17
  94:23 97:12 100:3
  101:17 106:6,10
  109:11 111:19
  126:6,10
**ultimately**  84:1
**uncertainty**  63:9
**undersigned**  137:1
**understand**  11:23
  17:17 26:7 29:11
  29:12,19 30:16
  34:6 40:20 84:18
  97:14 108:14
  115:17 125:10
  126:24 127:3

**128**:19 **131**:5,7,8
**understanding**
  119:7
**understood**  89:15
  89:17 121:13,18
  133:4
**unfortunately**
  48:6
**unidentified**  54:2
**unintelligible**  52:7
  55:11 87:13
**united**  1:1 2:1 9:20
  11:2,3 16:21,24
**university**  20:14
**unpack**  73:12
**unsecured**  5:12
  10:13
**unwell**  38:2 39:5
**urgency**  131:8
**usd**  73:4 76:10
  80:10 115:2
**usdc**  72:13 111:8
  111:11,13 114:16
  114:24
**usdoj.com**  5:10
**use**  73:24 90:18,20
  91:15

**v**

**v**  1:11 2:11
**vail**  63:13,14,16
  64:25 65:3,8 66:9
  66:16 67:15
**value**  16:8
**variety**  48:17
  62:22 64:1
**various**  79:9
  132:10,17
**vehicle**  131:24
**ventura**  14:2
**vera**  11:3

Veritext Legal Solutions
PUBLIC VERSION: Filed April 6, 2021
866 299-5127

**[verified - zoom]**

| | | | |
|---|---|---|---|
| **verified** 88:23 | **wallets** 78:15 | **western** 20:14 | 64:2 |
| **veritext** 10:1,3 | 108:24 | **whatsapp** 69:13 | **working** 12:19 |
| **versus** 64:23 | **walsh** 5:16 10:14 | 70:20 71:13,16,17 | 68:7 80:17,23 |
| **video** 9:14,17 | 38:3,5 125:3,17 | 71:23 72:9 | 82:6,17 86:21 |
| 128:10 | 127:7,17,20,24 | **whatsapps** 72:2 | 97:19,23 |
| **videographer** 6:3 | 132:23,23 133:5 | **whatsoever** 20:3 | **works** 104:1 |
| 9:4 10:1 13:6,10 | 133:21,23 | **wheeler** 57:17,23 | **worth** 64:19,21 |
| 18:1,4,16 32:15,19 | **want** 11:11 13:23 | 58:8 59:1,13 | 115:2 |
| 38:8,13 66:21 | 14:13,23 26:2 | 60:19,23,24 | **wrap** 88:3 |
| 67:1 89:19,23 | 29:25 33:6,22 | **wheeler's** 57:7,8 | **write** 59:22 |
| 118:21,25 121:19 | 34:13,13 39:2 | 61:3 | **written** 49:15 |
| 121:24 122:3,7 | 52:14 53:9 59:6 | **wheelers** 59:9 | 71:10,25 |
| 127:21 128:1,5,10 | 68:21 76:2 85:25 | **whereof** 137:20 | **wrote** 131:25 |
| 133:6 135:5,8 | 106:3 109:1 | **whispering** 9:8 | **y** |
| **videotaped** 1:15 | 112:22 118:13,16 | **wife** 65:6,8,12 | **y** 14:16 15:10 |
| 2:17 | 120:24 128:22 | **willing** 128:21 | 33:11 |
| **view** 131:15 | **wanted** 14:5 | **wilmington** 4:7 | **yeah** 17:25 19:17 |
| 134:20,23 | 106:23 | 5:8 11:2 | 24:20 25:4 48:6 |
| **villagran** 1:21 | **wants** 126:8 | **wilson** 10:21 | 48:14,21,22 51:15 |
| 2:22 10:2 137:24 | **washington** 4:14 | **wire** 58:3,18,21 | 61:19 62:7,19 |
| **violation** 106:17 | **way** 20:9 30:15 | **wired** 55:4 | 63:15 65:25 71:9 |
| 131:16 | 31:4 33:19 36:18 | **withdraw** 43:25 | 72:22 74:25 83:23 |
| **virtual** 9:23 12:1 | 48:9 52:9 63:18 | 45:16,19 46:24 | 84:11 87:6 91:13 |
| **voices** 9:9 | 78:21 80:22 82:15 | **withdrawal** 47:21 | 93:22 96:8 97:17 |
| **volume** 1:18 2:18 | 85:10 109:25 | 48:3,7 49:3 55:14 | 100:14 104:1,16 |
| 7:5 136:16 | **ways** 19:3 | **withdrawn** 49:13 | 112:8,8,10 115:10 |
| **w** | **website** 21:15 | 49:14 131:23 | 134:3 |
| **w** 5:16 | **wednesday** 38:22 | **witness** 10:10,16 | **year** 14:11 15:16 |
| **wait** 70:5,5,5 | 40:16 54:12 | 12:22 18:7 130:12 | 16:10,12,14 17:13 |
| 134:24 | **week** 48:14 56:9 | 137:20 | 17:14 19:7 37:13 |
| **wallet** 72:19,19 | 58:3 96:7 | **witnesses** 137:7 | 62:8 64:3 |
| 73:11,14,15 75:13 | **weeks** 116:13 | **word** 33:11,12 | **years** 14:19 20:22 |
| 75:17,21 76:10 | **wells** 7:11,13 8:8 | **work** 20:1,15,17 | 20:23 23:20 31:8 |
| 78:17,18,18,20,24 | 40:25 41:4,7,22 | 21:4,8 24:3 34:22 | 31:23 32:6 |
| 80:10,11 81:20,25 | 48:9 98:19 99:8 | 51:13 53:12 75:9 | **yep** 36:22 |
| 82:9 83:21 92:4 | 99:12 101:21,25 | 134:12 | **york** 5:21,21 |
| 106:4 107:5,14,16 | 102:4 103:3,7,14 | **worked** 19:14,16 | **z** |
| 108:5,11 109:19 | 103:18 104:6,12 | 19:17,22 20:16 | **zoom** 9:24 11:13 |
| 109:21 110:2,5 | **went** 65:3,8 66:18 | 21:12 23:2,9,16,21 | 39:13 85:25 110:8 |
| 111:8 | 105:17 106:25 | 24:2 31:8,23 32:6 | |
| | 107:1 116:14 | 35:13 60:12,17 | |

PUBLIC VERSION: Filed April 6, 2021

# Exhibit E

Redacted in its entirety

# Exhibit F

Redacted:  Pages 630 - 800

| Fill in this information to identify your case: | |
| --- | --- |
| Debtor 1 | **James Alexander** |
| | First Name          Middle Name          Last Name |
| Debtor 2 | |
| (Spouse if, filing) | First Name          Middle Name          Last Name |
| United States Bankruptcy Court for the: | CENTRAL DISTRICT OF CALIFORNIA - SAN FERNANDO |
| Case number (if known) | **1:21-bk-10214-MB** |

☐ Check if this is an amended filing

## Official Form 106Sum
## Summary of Your Assets and Liabilities and Certain Statistical Information   12/15

**Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. Fill out all of your schedules first; then complete the information on this form. If you are filing amended schedules after you file your original forms, you must fill out a new *Summary* and check the box at the top of this page.**

**Part 1:    Summarize Your Assets**

| | **Your assets** Value of what you own |
| --- | --- |

| | |
| --- | --- |
| 1.    **Schedule A/B: Property** (Official Form 106A/B) | |
|        1a. Copy line 55, Total real estate, from Schedule A/B............................................................................ | $        1,260,000.00 |
|        1b. Copy line 62, Total personal property, from Schedule A/B.................................................................. | $           757,433.56 |
|        1c. Copy line 63, Total of all property on Schedule A/B............................................................................ | $        2,017,433.56 |

**Part 2:    Summarize Your Liabilities**

| | **Your liabilities** Amount you owe |
| --- | --- |

| | |
| --- | --- |
| 2.    *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 106D) 2a. Copy the total you listed in Column A, *Amount of claim*, at the bottom of the last page of Part 1 of *Schedule D*... | $        1,058,576.00 |
| 3.    *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 106E/F) 3a. Copy  the total claims from Part 1 (priority unsecured claims) from line 6e of *Schedule E/F*................................ | $                    0.00 |
|        3b. Copy  the total claims from Part 2 (nonpriority unsecured claims) from line 6j of *Schedule E/F*............................ | $           255,564.44 |
| **Your total liabilities** | $        1,314,140.44 |

**Part 3:    Summarize Your Income and Expenses**

| | |
| --- | --- |
| 4.    *Schedule I: Your Income* (Official Form 106I) Copy your combined monthly income from line 12 of *Schedule I*................................................................ | $                    0.00 |
| 5.    *Schedule J: Your Expenses* (Official Form 106J) Copy your monthly expenses from line 22c of *Schedule J*.......................................................................... | $             15,000.16 |

**Part 4:    Answer These Questions for Administrative and Statistical Records**

6.    **Are you filing for bankruptcy under Chapters 7, 11, or 13?**

☐ No. You have nothing to report on this part of the form. Check this box and submit this form to the court with your other schedules.

■ Yes

7.    **What kind of debt do you have?**

☐ **Your debts are primarily consumer debts.** *Consumer debts* are those "incurred by an individual primarily for a personal, family, or household purpose." 11 U.S.C. § 101(8). Fill out lines 8-9g for statistical purposes. 28 U.S.C. § 159.

■ **Your debts are not primarily consumer debts.** You have nothing to report on this part of the form. *Check this box* and submit this form to the court with your other schedules.

| | | |
| --- | --- | --- |
| Official Form 106Sum | Summary of Your Assets and Liabilities and Certain Statistical Information | page 1 of 2 |

Debtor 1   **James Alexander**                              Case number *(if known)*  **1:21-bk-10214-MB**

8. **From the *Statement of Your Current Monthly Income*:** Copy your total current monthly income from Official Form 122A-1 Line 11; **OR**, Form 122B Line 11; **OR**, Form 122C-1 Line 14.                                      $ _____

9. **Copy the following special categories of claims from Part 4, line 6 of *Schedule E/F*:**

| From Part 4 on *Schedule E/F*, copy the following: | Total claim |
|---|---|
| 9a. Domestic support obligations (Copy line 6a.) | $ _____ 0.00 |
| 9b. Taxes and certain other debts you owe the government. (Copy line 6b.) | $ _____ 0.00 |
| 9c. Claims for death or personal injury while you were intoxicated. (Copy line 6c.) | $ _____ 0.00 |
| 9d. Student loans. (Copy line 6f.) | $ _____ 0.00 |
| 9e. Obligations arising out of a separation agreement or divorce that you did not report as priority claims. (Copy line 6g.) | $ _____ 0.00 |
| 9f. Debts to pension or profit-sharing plans, and other similar debts. (Copy line 6h.) | +$ _____ 0.00 |

9g. **Total.** Add lines 9a through 9f.                                                        $ _____ 0.00

Software Copyright (c) 1996-2020 Best Case, LLC - www.bestcase.com                                                    Best Case Bankruptcy

| **Fill in this information to identify your case and this filing:** | | | |
|---|---|---|---|
| Debtor 1 | **James Alexander** | | |
| | First Name | Middle Name | Last Name |
| Debtor 2 | | | |
| (Spouse, if filing) | First Name | Middle Name | Last Name |
| United States Bankruptcy Court for the: | CENTRAL DISTRICT OF CALIFORNIA - SAN FERNANDO | | |
| Case number | | | |

☐ Check if this is an
amended filing

## Official Form 106A/B
# Schedule A/B: Property                                                     12/15

In each category, separately list and describe items. List an asset only once. If an asset fits in more than one category, list the asset in the category where you think it fits best. Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write your name and case number (if known). Answer every question.

**Part 1:**  Describe Each Residence, Building, Land, or Other Real Estate You Own or Have an Interest In

1.  **Do you own or have any legal or equitable interest in any residence, building, land, or similar property?**

☐ No. Go to Part 2.

■ Yes.  Where is the property?

| 1.1 | | | |
|---|---|---|---|
| **3551 Dixie Canyon Pl.** | **What is the property?** Check all that apply | | Do not deduct secured claims or exemptions. Put the amount of any secured claims on *Schedule D: Creditors Who Have Claims Secured by Property.* |
| Street address, if available, or other description | ■ Single-family home | | |
| | ☐ Duplex or multi-unit building | | |
| | ☐ Condominium or cooperative | | |
| | ☐ Manufactured or mobile home | | |
| **Sherman Oaks   CA   91423-0000** | ☐ Land | | **Current value of the entire property?**   **Current value of the portion you own?** |
| City            State   ZIP Code | ☐ Investment property | | $1,260,000.00       $1,260,000.00 |
| | ☐ Timeshare | | |
| | ☐ Other | | **Describe the nature of your ownership interest (such as fee simple, tenancy by the entireties, or a life estate), if known.** |
| | **Who has an interest in the property?** Check one | | |
| **Los Angeles** | ■ Debtor 1 only | | **Fee simple** |
| County | ☐ Debtor 2 only | | |
| | ☐ Debtor 1 and Debtor 2 only | | |
| | ☐ At least one of the debtors and another | | ☐ **Check if this is community property** (see instructions) |
| | **Other information you wish to add about this item, such as local property identification number:** | | |

2.  **Add the dollar value of the portion you own for all of your entries from Part 1, including any entries for pages you have attached for Part 1. Write that number here**.........................................................=>

| $1,260,000.00 |
|---|

**Part 2:**  Describe Your Vehicles

**Do you own, lease, or have legal or equitable interest in any vehicles, whether they are registered or not?** Include any vehicles you own that someone else drives. If you lease a vehicle, also report it on *Schedule G: Executory Contracts and Unexpired Leases.*

Debtor 1   **James Alexander**                                            Case number *(if known)* _____

3. **Cars, vans, trucks, tractors, sport utility vehicles, motorcycles**

☐ No
■ Yes

| 3.1 | Make: | **Mercedes** |
|---|---|---|
| | Model: | **E350** |
| | Year: | **2012** |
| | Approximate mileage: | **69,000** |
| | Other information: | |

**Who has an interest in the property?** Check one

■ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another

☐ Check if this is community property
  (see instructions)

Do not deduct secured claims or exemptions. Put the amount of any secured claims on *Schedule D: Creditors Who Have Claims Secured by Property.*

**Current value of the entire property?**     **Current value of the portion you own?**

$13,000.00          $13,000.00

4. **Watercraft, aircraft, motor homes, ATVs and other recreational vehicles, other vehicles, and accessories**
   *Examples:* Boats, trailers, motors, personal watercraft, fishing vessels, snowmobiles, motorcycle accessories

■ No
☐ Yes

5   Add the dollar value of the portion you own for all of your entries from Part 2, including any entries for pages you have attached for Part 2. Write that number here...........................................................=>

$13,000.00

**Part 3:  Describe Your Personal and  Household Items**

Do you own or have any legal or equitable interest in any of the following items?

**Current value of the portion you own?**
Do not deduct secured claims or exemptions.

6. **Household goods and furnishings**
   *Examples:* Major appliances, furniture, linens, china, kitchenware
   ☐ No
   ■ Yes.  Describe.....

Debtor 1    **James Alexander**                                                              Case number *(if known)*

| | |
|---|---|
| Misc household goods and furnishings:Hot water heater  $100<br>Washer/Dryer  $743<br>Ikea Baby Cribs  $100<br>Couch  $100<br>Mirror Consol  $100<br>Office desk  $100<br>Padded chairs x4  $100<br>Wood chairs x2  $100<br>Childrens toys  $100<br>Linens  $100<br>Kitchen table  $100<br>Kitchen chairs x4  $100<br>Kitchen buffet  $100<br>Misc. Kitchenware  $100<br>Photo frames family photos x16  $100<br>Flatware  $100<br>Kitchen counter-top appliances  $100<br>Dishwasher  $100<br>Refrigerator  $100<br>Stove/Oven  $100<br>Installed Shelving  $100<br>Pantry foodstuff  $100<br>Beds 2x  $100<br>Large sitting chairs x2  $100<br>Side tables x4  $100<br>Gun safes x3  $100<br>Standing lamps x2  $100<br>Glass and metal mirror set  $100<br>Misc. House. Goods  $100 | $3,543.00 |

7. **Electronics**
   *Examples:* Televisions and radios; audio, video, stereo, and digital equipment; computers, printers, scanners; music collections; electronic devices including cell phones, cameras, media players, games
   ☐ No
   ■ Yes.  Describe.....

| | |
|---|---|
| Misc electronics at home: | $2,096.00 |

8. **Collectibles of value**
   *Examples:* Antiques and figurines; paintings, prints, or other artwork; books, pictures, or other art objects; stamp, coin, or baseball card collections; other collections, memorabilia, collectibles
   ☐ No
   ■ Yes.  Describe.....

| | |
|---|---|
| MIsc pictures and artwork | $1,100.00 |

9. **Equipment for sports and hobbies**
   *Examples:* Sports, photographic, exercise, and other hobby equipment; bicycles, pool tables, golf clubs, skis; canoes and kayaks; carpentry tools; musical instruments
   ☐ No
   ■ Yes.  Describe.....

| | |
|---|---|
| Household games and sports equipment | $800.00 |

10. **Firearms**
    *Examples:* Pistols, rifles, shotguns, ammunition, and related equipment
    ☐ No
    ■ Yes.  Describe.....

Software Copyright (c) 1996-2020 Best Case, LLC - www.bestcase.com                                          Best Case Bankruptcy

Debtor 1    **James Alexander**                                    Case number *(if known)*

| AR15 M4, Smith & Wesson 38  and ammunition | $2,119.00 |

**11. Clothes**
*Examples:* Everyday clothes, furs, leather coats, designer wear, shoes, accessories
☐ No
■ Yes.  Describe.....

| Misc clothes at home: Used clothing | $100.00 |

**12. Jewelry**
*Examples:* Everyday jewelry, costume jewelry, engagement rings, wedding rings, heirloom jewelry, watches, gems, gold, silver
■ No
☐ Yes.  Describe.....

**13. Non-farm animals**
*Examples:* Dogs, cats, birds, horses
■ No
☐ Yes.  Describe.....

**14. Any other personal and household items you did not already list, including any health aids you did not list**
■ No
☐ Yes.  Give specific information.....

15. **Add the dollar value of all of your entries from Part 3, including any entries for pages you have attached for Part 3. Write that number here** ..........................................................................   | $9,758.00 |

| **Part 4:** | Describe Your Financial Assets |

| **Do you own or have any legal or equitable interest in any of the following?** | **Current value of the portion you own?** Do not deduct secured claims or exemptions. |

**16. Cash**
*Examples:* Money you have in your wallet, in your home, in a safe deposit box, and on hand when you file your petition
■ No
☐ Yes.................................................................................................

**17. Deposits of money**
*Examples:* Checking, savings, or other financial accounts; certificates of deposit; shares in credit unions, brokerage houses, and other similar institutions. If you have multiple accounts with the same institution, list each.
☐ No
■ Yes......................                    Institution name:

| | | | |
|---|---|---|---|
| 17.1. | Other financial account | Funds on deposit with JP Morgan Chase (x6006) | $93,197.34 |
| 17.2. | | Wells Fargo account ending x9285 | $246.84 |
| 17.3. | | Wells Fargo Account ending x1923 | $480.71 |
| 17.4. | Checking Account | DIP Wells Fargo Account ending x0816 | $121,484.00 |
| 17.5. | Joint checking account | Wells Fargo joint x2155 | $6,140.04 |

Official Form 106A/B                    Schedule A/B: Property                                    page 4

| Debtor 1 | **James Alexander** | | Case number *(if known)* | |
|---|---|---|---|---|

| | 17.6. | **Savings** | **Other Wells Fargo** | | $700.00 |

---

18. **Bonds, mutual funds, or publicly traded stocks**
    *Examples:* Bond funds, investment accounts with brokerage firms, money market accounts
    ■ No
    ☐ Yes.................                Institution or issuer name:

19. **Non-publicly traded stock and interests in incorporated and unincorporated businesses, including an interest in an LLC, partnership, and joint venture**
    ☐ No
    ■ Yes.  Give specific information about them...................
    Name of entity:                                          % of ownership:

| | **CircleUp** | | % | $3,347.36 |

---

20. **Government and corporate bonds and other negotiable and non-negotiable instruments**
    *Negotiable instruments* include personal checks, cashiers' checks, promissory notes, and money orders.
    *Non-negotiable instruments* are those you cannot transfer to someone by signing or delivering them.
    ■ No
    ☐ Yes. Give specific information about them
    Issuer name:

21. **Retirement or pension accounts**
    *Examples:* Interests in IRA, ERISA, Keogh, 401(k), 403(b), thrift savings accounts, or other pension or profit-sharing plans
    ☐ No
    ■ Yes. List each account separately.
    Type of account:           Institution name:

| **IRA** | **Etrade** | $22,212.34 |
| **IRA** | **Personal Capital; X6555** | $59,186.54 |
| **IRA** | **Personal Capital; X7330** | $78,591.12 |
| **401(k)** | **Sequoia One (Mass. Mutual)** | $50,640.27 |

---

22. **Security deposits and prepayments**
    Your share of all unused deposits you have made so that you may continue service or use from a company
    *Examples:* Agreements with landlords, prepaid rent, public utilities (electric, gas, water), telecommunications companies, or others
    ■ No
    ☐ Yes. ....................                Institution name or individual:

23. **Annuities** (A contract for a periodic payment of money to you, either for life or for a number of years)
    ■ No
    ☐ Yes.............                Issuer name and description.

24. **Interests in an education IRA, in an account in a qualified ABLE program, or under a qualified state tuition program.**
    26 U.S.C. §§ 530(b)(1), 529A(b), and 529(b)(1).
    ■ No
    ☐ Yes.............                Institution name and description. Separately file the records of any interests.11 U.S.C. § 521(c):

25. **Trusts, equitable or future interests in property (other than anything listed in line 1), and rights or powers exercisable for your benefit**
    ■ No
    ☐ Yes.  Give specific information about them...

---

| Debtor 1 | James Alexander | Case number *(if known)* |
|---|---|---|

**26. Patents, copyrights, trademarks, trade secrets, and other intellectual property**
   *Examples:* Internet domain names, websites, proceeds from royalties and licensing agreements
   ■ No
   ☐ Yes.  Give specific information about them...

**27. Licenses, franchises, and other general intangibles**
   *Examples:* Building permits, exclusive licenses, cooperative association holdings, liquor licenses, professional licenses
   ■ No
   ☐ Yes.  Give specific information about them...

| Money or property owed to you? | Current value of the portion you own? Do not deduct secured claims or exemptions. |
|---|---|

**28. Tax refunds owed to you**
   ■ No
   ☐ Yes. Give specific information about them, including whether you already filed the returns and the tax years.......

**29. Family support**
   *Examples:* Past due or lump sum alimony, spousal support, child support, maintenance, divorce settlement, property settlement
   ■ No
   ☐ Yes. Give specific information......

**30. Other amounts someone owes you**
   *Examples:* Unpaid wages, disability insurance payments, disability benefits, sick pay, vacation pay,  workers' compensation, Social Security benefits; unpaid loans you made to someone else
   ■ No
   ☐ Yes.  Give specific information..

**31. Interests in insurance policies**
   *Examples:* Health, disability, or life insurance; health savings account (HSA); credit, homeowner's, or renter's insurance
   ☐ No
   ■ Yes. Name the insurance company of each policy and list its value.

| Company name: | Beneficiary: | Surrender or refund value: |
|---|---|---|
| Northwestern Mutual term life insurance | Unknown | Unknown |

**32. Any interest in property that is due from someone who has died**
   If you are the beneficiary of a living trust, expect proceeds from a life insurance policy, or are currently entitled to receive property because someone has died.
   ■ No
   ☐ Yes.  Give specific information..

**33. Claims against third parties, whether or not you have filed a lawsuit or made a demand for payment**
   *Examples:* Accidents, employment disputes, insurance claims, or rights to sue
   ☐ No
   ■ Yes.  Describe each claim.........

| Cred Capital, Inc. D&O or E&O Insurance | $250,000.00 |
|---|---|

**34. Other contingent and unliquidated claims of every nature, including counterclaims of the debtor and rights to set off claims**
   ■ No
   ☐ Yes.  Describe each claim.........

**35. Any financial assets you did not already list**
   ☐ No
   ☐ Yes.  Give specific information..

Debtor 1    **James Alexander**    Case number *(if known)* _____

| LBA tokens 4,374,799 and BTC token 1 | $47,449.00 |
|---|---|

36.  **Add the dollar value of all of your entries from Part 4, including any entries for pages you have attached for Part 4. Write that number here**.................................................................................................................    **$733,675.56**

**Part 5:**    Describe Any Business-Related Property You Own or Have an Interest In. List any real estate in Part 1.

37.  **Do you own or have any legal or equitable interest in any business-related property?**
☐ No. Go to Part 6.
■ Yes.  Go to line 38.

**Current value of the portion you own?**
Do not deduct secured claims or exemptions.

38.  **Accounts receivable or commissions you already earned**
■ No
☐ Yes.  Describe.....

39.  **Office equipment, furnishings, and supplies**
*Examples:* Business-related computers, software, modems, printers, copiers, fax machines, rugs, telephones, desks, chairs, electronic devices
■ No
☐ Yes.  Describe.....

40.  **Machinery, fixtures, equipment, supplies you use in business, and tools of your trade**
☐ No
■ Yes.  Describe.....

| misc computer and electronics | $1,000.00 |
|---|---|

41.  **Inventory**
■ No
☐ Yes.  Describe.....

42.  **Interests in partnerships or joint ventures**
■ No
☐ Yes.  Give specific information about them...................    Name of entity:        % of ownership:

43.  **Customer lists, mailing lists, or other compilations**
■ No.
☐ **Do your lists include personally identifiable information** (as defined in 11 U.S.C. § 101(41A))?

    ■ No
    ☐ Yes.  Describe.....

44.  **Any business-related property you did not already list**
■ No
☐ Yes. Give specific information.........

Official Form 106A/B    Schedule A/B: Property    page 7

| Debtor 1 | **James Alexander** | Case number *(if known)* |
|---|---|---|

45. **Add the dollar value of all of your entries from Part 5, including any entries for pages you have attached for Part 5. Write that number here**.............................................................................................................. | **$1,000.00**

**Part 6:** Describe Any Farm- and Commercial Fishing-Related Property You Own or Have an Interest In.
If you own or have an interest in farmland, list it in Part 1.

46. **Do you own or have any legal or equitable interest in any farm- or commercial fishing-related property?**
- ■ No. Go to Part 7.
- ☐ Yes.  Go to line 47.

**Part 7:**    Describe All Property You Own or Have an Interest in That You Did Not List Above

53. **Do you have other property of any kind you did not already list?**
*Examples:* Season tickets, country club membership
- ■ No
- ☐ Yes. Give specific information.........

54. **Add the dollar value of all of your entries from Part 7. Write that number here** ...................................... | **$0.00**

**Part 8:**    List the Totals of Each Part of this Form

| | | |
|---|---|---|
| 55. | **Part 1: Total real estate, line 2** ............................................................................................................... | **$1,260,000.00** |
| 56. | **Part 2: Total vehicles, line 5** | **$13,000.00** | |
| 57. | **Part 3: Total personal and household items, line 15** | **$9,758.00** | |
| 58. | **Part 4: Total financial assets, line 36** | **$733,675.56** | |
| 59. | **Part 5: Total business-related property, line 45** | **$1,000.00** | |
| 60. | **Part 6: Total farm- and fishing-related property, line 52** | **$0.00** | |
| 61. | **Part 7: Total other property not listed, line 54** | + | **$0.00** | |
| 62. | **Total personal property.** Add lines 56 through 61... | **$757,433.56** | Copy personal property total | **$757,433.56** |
| 63. | **Total of all property on Schedule A/B.** Add line 55 + line 62 | | **$2,017,433.56** |

Official Form 106A/B | Schedule A/B: Property | page 8
Software Copyright (c) 1996-2020 Best Case, LLC - www.bestcase.com | | Best Case Bankruptcy

**Fill in this information to identify your case:**

| | |
|---|---|
| Debtor 1 | **James Alexander** |
| | First Name          Middle Name          Last Name |
| Debtor 2 | |
| (Spouse if, filing) | First Name          Middle Name          Last Name |
| United States Bankruptcy Court for the: | CENTRAL DISTRICT OF CALIFORNIA - SAN FERNANDO |
| Case number (if known) | |

☐ Check if this is an amended filing

Official Form 106C

# Schedule C: The Property You Claim as Exempt

4/19

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. Using the property you listed on *Schedule A/B: Property* (Official Form 106A/B) as your source, list the property that you claim as exempt. If more space is needed, fill out and attach to this page as many copies of *Part 2: Additional Page* as necessary. On the top of any additional pages, write your name and case number (if known).

**For each item of property you claim as exempt, you must specify the amount of the exemption you claim. One way of doing so is to state a specific dollar amount as exempt. Alternatively, you may claim the full fair market value of the property being exempted up to the amount of any applicable statutory limit. Some exemptions—such as those for health aids, rights to receive certain benefits, and tax-exempt retirement funds—may be unlimited in dollar amount. However, if you claim an exemption of 100% of fair market value under a law that limits the exemption to a particular dollar amount and the value of the property is determined to exceed that amount, your exemption would be limited to the applicable statutory amount.**

**Part 1:**     Identify the Property You Claim as Exempt

1. **Which set of exemptions are you claiming?** *Check one only, even if your spouse is filing with you.*

    ☑ You are claiming state and federal nonbankruptcy exemptions.   11 U.S.C. § 522(b)(3)

    ☐ You are claiming federal exemptions.   11 U.S.C. § 522(b)(2)

2. **For any property you list on *Schedule A/B* that you claim as exempt, fill in the information below.**

| Brief description of the property and line on *Schedule A/B* that lists this property | Current value of the portion you own<br>Copy the value from *Schedule A/B* | Amount of the exemption you claim<br>*Check only one box for each exemption.* | Specific laws that allow exemption |
|---|---|---|---|
| **3551 Dixie Canyon Pl. Sherman Oaks, CA 91423  Los Angeles County**<br>Line from *Schedule A/B*: **1.1** | **$1,260,000.00** | ☑           **$600,000.00**<br>☐ 100% of fair market value, up to any applicable statutory limit | **C.C.P. § 704.730** |
| **2012 Mercedes E350 69,000 miles**<br>Line from *Schedule A/B*: **3.1** | **$13,000.00** | ☑           **$3,325.00**<br>☐ 100% of fair market value, up to any applicable statutory limit | **C.C.P. § 704.010** |
| **Misc household goods and furnishings:**Hot water heater **$100**<br>**Washer/Dryer $743**<br>**Ikea Baby Cribs  $100**<br>**Couch  $100**<br>**Mirror Consol  $100**<br>**Office desk  $100**<br>**Padded chairs x4  $100**<br>**Wood chairs x2  $100**<br>**Childrens toys  $100**<br>**Linens  $100**<br>**Kitchen**<br>Line from *Schedule A/B*: **6.1** | **$3,543.00** | ☑           **100%**<br>☐ 100% of fair market value, up to any applicable statutory limit | **C.C.P. § 704.020** |

| Debtor 1 | **James Alexander** | | | Case number (if known) | |
|---|---|---|---|---|---|

| Brief description of the property and line on *Schedule A/B* that lists this property | Current value of the portion you own<br><br>Copy the value from *Schedule A/B* | Amount of the exemption you claim<br><br>*Check only one box for each exemption.* | Specific laws that allow exemption |
|---|---|---|---|
| **Misc electronics at home:**<br>Line from *Schedule A/B*: **7.1** | **$2,096.00** | ■ 100%<br>☐ 100% of fair market value, up to any applicable statutory limit | **C.C.P. § 704.020** |
| **MIsc pictures and artwork**<br>Line from *Schedule A/B*: **8.1** | **$1,100.00** | ■ 100%<br>☐ 100% of fair market value, up to any applicable statutory limit | **C.C.P. § 704.040** |
| **Household games and sports equipment**<br>Line from *Schedule A/B*: **9.1** | **$800.00** | ■ 100%<br>☐ 100% of fair market value, up to any applicable statutory limit | **C.C.P. § 704.020** |
| **AR15 M4, Smith & Wesson 38  and ammunition**<br>Line from *Schedule A/B*: **10.1** | **$2,119.00** | ■ 100%<br>☐ 100% of fair market value, up to any applicable statutory limit | **C.C.P. § 704.020** |
| **Misc clothes at home: Used clothing**<br>Line from *Schedule A/B*: **11.1** | **$100.00** | ■ 100%<br>☐ 100% of fair market value, up to any applicable statutory limit | **C.C.P. § 704.020** |
| **IRA: Etrade**<br>Line from *Schedule A/B*: **21.1** | **$22,212.34** | ☐<br>■ 100% of fair market value, up to any applicable statutory limit | **C.C.P. § 704.115(a)(1) & (2), (b)** |
| **IRA: Personal Capital; X6555**<br>Line from *Schedule A/B*: **21.2** | **$59,186.54** | ☐<br>■ 100% of fair market value, up to any applicable statutory limit | **C.C.P. § 704.115(a)(1) & (2), (b)** |
| **IRA: Personal Capital; X7330**<br>Line from *Schedule A/B*: **21.3** | **$78,591.12** | ☐<br>■ 100% of fair market value, up to any applicable statutory limit | **C.C.P. § 704.115(a)(1) & (2), (b)** |
| **401(k): Sequoia One (Mass. Mutual)**<br>Line from *Schedule A/B*: **21.4** | **$50,640.27** | ☐<br>■ 100% of fair market value, up to any applicable statutory limit | **C.C.P. § 704.115(a)(1) & (2), (b)** |
| **Northwestern Mutual term life insurance**<br>**Beneficiary: Unknown**<br>Line from *Schedule A/B*: **31.1** | **Unknown** | ■ 0%<br>☐ 100% of fair market value, up to any applicable statutory limit | **C.C.P. § 704.100(a)** |
| **misc computer and electronics**<br>Line from *Schedule A/B*: **40.1** | **$1,000.00** | ■ 100%<br>☐ 100% of fair market value, up to any applicable statutory limit | **C.C.P. § 704.060** |
| **misc computer and electronics**<br>Line from *Schedule A/B*: **40.1** | **$1,000.00** | ■ 0%<br>☐ 100% of fair market value, up to any applicable statutory limit | **C.C.P. § 704.020** |

Debtor 1    **James Alexander**                                    Case number (if known) _____

3. **Are you claiming a homestead exemption of more than $170,350?**
   (Subject to adjustment on 4/01/22 and every 3 years after that for cases filed on or after the date of adjustment.)

   ☐ No

   ☑ Yes. Did you acquire the property covered by the exemption within 1,215 days before you filed this case?

   ☐ No

   ☑ Yes

| Fill in this information to identify your case: |
|---|

| Debtor 1 | **James Alexander** | | |
|---|---|---|---|
| | First Name | Middle Name | Last Name |
| Debtor 2 | | | |
| (Spouse if, filing) | First Name | Middle Name | Last Name |
| United States Bankruptcy Court for the: | CENTRAL DISTRICT OF CALIFORNIA - SAN FERNANDO | | |
| Case number | | | |
| (if known) | | | |

☐ Check if this is an amended filing

## Official Form 106D

# Schedule D: Creditors Who Have Claims Secured by Property          12/15

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, copy the Additional Page, fill it out, number the entries, and attach it to this form. On the top of any additional pages, write your name and case number (if known).

**1. Do any creditors have claims secured by your property?**

☐ No. Check this box and submit this form to the court with your other schedules. You have nothing else to report on this form.

☑ Yes. Fill in all of the information below.

### Part 1:    List All Secured Claims

**2. List all secured claims.** If a creditor has more than one secured claim, list the creditor separately for each claim. If more than one creditor has a particular claim, list the other creditors in Part 2. As much as possible, list the claims in alphabetical order according to the creditor's name.

| | | Column A<br>Amount of claim<br>Do not deduct the<br>value of collateral. | Column B<br>Value of collateral<br>that supports this<br>claim | Column C<br>Unsecured<br>portion<br>If any |
|---|---|---|---|---|
| **2.1** **JP Morgan Chase** | **Describe the property that secures the claim:** | $65,000.00 | $93,197.34 | $0.00 |

Creditor's Name

**Describe the property that secures the claim:**

Other financial account: Funds on deposit with JP Morgan Chase (x6006)

**As of the date you file, the claim is:** Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

_____
Number, Street, City, State & Zip Code

**Nature of lien.** Check all that apply.
☑ An agreement you made (such as mortgage or secured car loan)

**Who owes the debt?** Check one.
☑ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another
☐ Check if this claim relates to a community debt

☐ Statutory lien (such as tax lien, mechanic's lien)
☐ Judgment lien from a lawsuit
☐ Other (including a right to offset) _____

Date debt was incurred _____     Last 4 digits of account number _____

| **2.2** **JPMCB HOME** | **Describe the property that secures the claim:** | $993,576.00 | $1,260,000.00 | $0.00 |
|---|---|---|---|---|

Creditor's Name

**Describe the property that secures the claim:**

3551 Dixie Canyon Pl. Sherman Oaks, CA 91423  Los Angeles County

**As of the date you file, the claim is:** Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

**700 KANSAS LN
Monroe, LA 71203**
Number, Street, City, State & Zip Code

**Nature of lien.** Check all that apply.
☑ An agreement you made (such as mortgage or secured car loan)

**Who owes the debt?** Check one.
☑ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another
☑ Check if this claim relates to a community debt

☐ Statutory lien (such as tax lien, mechanic's lien)
☐ Judgment lien from a lawsuit
☐ Other (including a right to offset) _____

Date debt was incurred _____     Last 4 digits of account number _____

Software Copyright (c) 1996-2020 Best Case, LLC - www.bestcase.com                    Best Case Bankruptcy

PUBLIC VERSION:  Filed April 6, 2021          Page 814

| Debtor 1 | **James Alexander** | | Case number (if known) | |
| | First Name | Middle Name | Last Name | |

| 2.3 | **Los Angeles County Tax Collector** | | Describe the property that secures the claim: | **Unknown** | **$1,260,000.00** | **Unknown** |

Creditor's Name

**P.O. Box 54018
Los Angeles, CA
90054-0018**

Number, Street, City, State & Zip Code

**Who owes the debt?** Check one.

- ■ Debtor 1 only
- ☐ Debtor 2 only
- ☐ Debtor 1 and Debtor 2 only
- ☐ At least one of the debtors and another
- ☐ **Check if this claim relates to a community debt**

**Date debt was incurred**

---

**3551 Dixie Canyon Pl. Sherman Oaks, CA 91423  Los Angeles County**

**As of the date you file, the claim is:** Check all that apply.

- ☐ Contingent
- ☐ Unliquidated
- ☐ Disputed

**Nature of lien.** Check all that apply.

- ☐ An agreement you made (such as mortgage or secured car loan)
- ■ Statutory lien (such as tax lien, mechanic's lien)
- ☐ Judgment lien from a lawsuit
- ☐ Other (including a right to offset) _____

**Last 4 digits of account number** _____

---

| Add the dollar value of your entries in Column A on this page. Write that number here: | **$1,058,576.00** |
| If this is the last page of your form, add the dollar value totals from all pages. Write that number here: | **$1,058,576.00** |

**Part 2:**  List Others to Be Notified for a Debt That You Already Listed

Use this page only if you have others to be notified about your bankruptcy for a debt that you already listed in Part 1. For example, if a collection agency is trying to collect from you for a debt you owe to someone else, list the creditor in Part 1, and then list the collection agency here. Similarly, if you have more than one creditor for any of the debts that you listed in Part 1, list the additional creditors here. If you do not have additional persons to be notified for any debts in Part 1, do not fill out or submit this page.

---

Software Copyright (c) 1996-2020 Best Case, LLC - www.bestcase.com

**Fill in this information to identify your case:**

| | |
|---|---|
| Debtor 1 | **James Alexander** |
| | First Name          Middle Name          Last Name |
| Debtor 2 | |
| (Spouse if, filing) | First Name          Middle Name          Last Name |
| United States Bankruptcy Court for the: | CENTRAL DISTRICT OF CALIFORNIA - SAN FERNANDO |
| Case number (if known) | |

☐ Check if this is an
    amended filing

Official Form 106E/F
## Schedule E/F: Creditors Who Have Unsecured Claims                    12/15

Be as complete and accurate as possible. Use Part 1 for creditors with PRIORITY claims and Part 2 for creditors with NONPRIORITY claims. List the other party to any executory contracts or unexpired leases that could result in a claim. Also list executory contracts on Schedule A/B: Property (Official Form 106A/B) and on Schedule G: Executory Contracts and Unexpired Leases (Official Form 106G). Do not include any creditors with partially secured claims that are listed in Schedule D: Creditors Who Have Claims Secured by Property. If more space is needed, copy the Part you need, fill it out, number the entries in the boxes on the left. Attach the Continuation Page to this page. If you have no information to report in a Part, do not file that Part. On the top of any additional pages, write your name and case number (if known).

**Part 1:    List All of Your PRIORITY Unsecured Claims**

1. **Do any creditors have priority unsecured claims against you?**

    ☐ No. Go to Part 2.

    ☑ Yes.

2. **List all of your priority unsecured claims.** If a creditor has more than one priority unsecured claim, list the creditor separately for each claim. For each claim listed, identify what type of claim it is. If a claim has both priority and nonpriority amounts, list that claim here and show both priority and nonpriority amounts. As much as possible, list the claims in alphabetical order according to the creditor's name. If you have more than two priority unsecured claims, fill out the Continuation Page of Part 1. If more than one creditor holds a particular claim, list the other creditors in Part 3.

    (For an explanation of each type of claim, see the instructions for this form in the instruction booklet.)

| | | Total claim | Priority amount | Nonpriority amount |
|---|---|---|---|---|

**2.1** | **Franchise Tax Board**

Priority Creditor's Name

**Special Procedures**
**POB 2952**
**Sacramento, CA 95812**
Number Street City State Zip Code

**Who incurred the debt?** Check one.

☑ Debtor 1 only

☐ Debtor 2 only

☐ Debtor 1 and Debtor 2 only

☐ At least one of the debtors and another

☐ **Check if this claim is for a  community debt**

**Is the claim subject to offset?**

☑ No

☐ Yes

Last 4 digits of account number _____    **$0.00**    **$0.00**    **$0.00**

When was the debt incurred? _____

As of the date you file, the claim is: Check all that apply

☐ Contingent

☐ Unliquidated

☐ Disputed

**Type of PRIORITY unsecured claim:**

☐ Domestic support obligations

☑ Taxes and certain other debts you owe the government

☐ Claims for death or personal injury while you were intoxicated

☐ Other. Specify _____

**For totice purposes only**

Debtor 1    **James Alexander**

Case number (if known) _____

| | | | |
|---|---|---|---|
| 2.2 | **Internal Revenue Service** | Last 4 digits of account number ___ ___ ___ ___ | $0.00 |

**Priority Creditor's Name**

**Insolvency I Stop 5022**
**300 N. Los Angeles St., #4062**
**Los Angeles, CA 90012-9903**

Number Street City State Zip Code

**Who incurred the debt? Check one.**

When was the debt incurred? _____

■ Debtor 1 only

☐ Debtor 2 only

☐ Debtor 1 and Debtor 2 only

☐ At least one of the debtors and another

☐ **Check if this claim is for a community debt**

**Is the claim subject to offset?**

■ No

☐ Yes

**As of the date you file, the claim is:** Check all that apply

☐ Contingent

☐ Unliquidated

☐ Disputed

**Type of PRIORITY unsecured claim:**

☐ Domestic support obligations

■ Taxes and certain other debts you owe the government

☐ Claims for death or personal injury while you were intoxicated

☐ Other. Specify _____

**For notice purposes only**

---

**Part 2:    List All of Your NONPRIORITY Unsecured Claims**

3. **Do any creditors have nonpriority unsecured claims against you?**

   ☐ No. You have nothing to report in this part. Submit this form to the court with your other schedules.

   ■ Yes.

4. **List all of your nonpriority unsecured claims in the alphabetical order of the creditor who holds each claim.** If a creditor has more than one nonpriority unsecured claim, list the creditor separately for each claim. For each claim listed, identify what type of claim it is. Do not list claims already included in Part 1. If more than one creditor holds a particular claim, list the other creditors in Part 3.If you have more than three nonpriority unsecured claims fill out the Continuation Page of Part 2.

**Total claim**

| | | | |
|---|---|---|---|
| 4.1 | **Barclay's Bank Delaware** | Last 4 digits of account number ___ ___ ___ ___ | $3,575.43 |

**Nonpriority Creditor's Name**

**PO BOX 8803**
**Wilmington, DE 19899**

Number Street City State Zip Code

**Who incurred the debt? Check one.**

When was the debt incurred? _____

■ Debtor 1 only

☐ Debtor 2 only

☐ Debtor 1 and Debtor 2 only

☐ At least one of the debtors and another

☐ **Check if this claim is for a community debt**

**Is the claim subject to offset?**

■ No

☐ Yes

**As of the date you file, the claim is:** Check all that apply

☐ Contingent

☐ Unliquidated

☐ Disputed

**Type of NONPRIORITY unsecured claim:**

☐ Student loans

☐ Obligations arising out of a separation agreement or divorce that you did not report as priority claims

☐ Debts to pension or profit-sharing plans, and other similar debts

■ Other. Specify    **Credit card**

---

Debtor 1    **James Alexander**                                                                    Case number (if known) _____

---

| 4.2 | **Buchanon Ingersoll Rooney** | Last 4 digits of account number _____ | **$104,711.01** |
|---|---|---|---|

Nonpriority Creditor's Name
**919 North Market Street, Suite 990**
**Wilmington, DE 19801**
Number Street City State Zip Code

**Who incurred the debt? Check one.**

■ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another
☐ **Check if this claim is for a community debt**

**Is the claim subject to offset?**

■ No
☐ Yes

When was the debt incurred? _____

**As of the date you file, the claim is: Check all that apply**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Type of NONPRIORITY unsecured claim:**

☐ Student loans
☐ Obligations arising out of a separation agreement or divorce that you did not report as priority claims
☐ Debts to pension or profit-sharing plans, and other similar debts
■ Other. Specify    **Legal fees**

---

| 4.3 | **Capital One Bank USA** | Last 4 digits of account number _____ | **$347.00** |
|---|---|---|---|

Nonpriority Creditor's Name
**PO BOX 31293**
**Salt Lake City, UT 84131**
Number Street City State Zip Code

**Who incurred the debt? Check one.**

■ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another
☐ **Check if this claim is for a community debt**

**Is the claim subject to offset?**

■ No
☐ Yes

When was the debt incurred? _____

**As of the date you file, the claim is: Check all that apply**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Type of NONPRIORITY unsecured claim:**

☐ Student loans
☐ Obligations arising out of a separation agreement or divorce that you did not report as priority claims
☐ Debts to pension or profit-sharing plans, and other similar debts
■ Other. Specify    **credit card**

---

| 4.4 | **Citicard** | Last 4 digits of account number _____ | **$1,513.00** |
|---|---|---|---|

Nonpriority Creditor's Name
**PO BOX 6241**
**Sioux Falls, SD 57117**
Number Street City State Zip Code

**Who incurred the debt? Check one.**

■ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another
☐ **Check if this claim is for a community debt**

**Is the claim subject to offset?**

■ No
☐ Yes

When was the debt incurred? _____

**As of the date you file, the claim is: Check all that apply**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Type of NONPRIORITY unsecured claim:**

☐ Student loans
☐ Obligations arising out of a separation agreement or divorce that you did not report as priority claims
☐ Debts to pension or profit-sharing plans, and other similar debts
■ Other. Specify    **credit card**

---

Debtor 1   **James Alexander**                                   Case number (if known) _____

| 4.5 | **Cred Inc. et al,** | | Last 4 digits of account number _____ | **$0.00** |
|---|---|

**Cred Inc. et al,**
Nonpriority Creditor's Name
**c/o Scott Cousins, Esq.**
**1521 Concord Pike, Suite 301**
**Wilmington, DE 19803**
Number Street City State Zip Code

**Who incurred the debt?** Check one.

■ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another
☐ **Check if this claim is for a community debt**

**Is the claim subject to offset?**

■ No
☐ Yes

Last 4 digits of account number _____

**When was the debt incurred?** _____

**As of the date you file, the claim is:** Check all that apply

■ Contingent
■ Unliquidated
■ Disputed

**Type of NONPRIORITY unsecured claim:**

☐ Student loans
☐ Obligations arising out of a separation agreement or divorce that you did not report as priority claims
☐ Debts to pension or profit-sharing plans, and other similar debts
■ Other. Specify   **Pending bankruptcy cases**

---

| 4.6 | **Discover Student Loans** | | Last 4 digits of account number _____ | **$86,000.00** |
|---|---|

**Discover Student Loans**
Nonpriority Creditor's Name
**PO BOX 30948**
**Salt Lake City, UT 84130**
Number Street City State Zip Code

**Who incurred the debt?** Check one.

■ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another
☐ **Check if this claim is for a community debt**

**Is the claim subject to offset?**

■ No
☐ Yes

Last 4 digits of account number _____

**When was the debt incurred?** _____

**As of the date you file, the claim is:** Check all that apply

☐ Contingent
☐ Unliquidated
☐ Disputed

**Type of NONPRIORITY unsecured claim:**

☐ Student loans
☐ Obligations arising out of a separation agreement or divorce that you did not report as priority claims
☐ Debts to pension or profit-sharing plans, and other similar debts
■ Other. Specify   **Student loans**

---

| 4.7 | **SOFI** | | Last 4 digits of account number _____ | **$4,438.00** |
|---|---|

**SOFI**
Nonpriority Creditor's Name
**2750 E COTTONWOOD PKWY**
**Salt Lake City, UT 84121**
Number Street City State Zip Code

**Who incurred the debt?** Check one.

■ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another
☐ **Check if this claim is for a community debt**

**Is the claim subject to offset?**

■ No
☐ Yes

Last 4 digits of account number _____

**When was the debt incurred?** _____

**As of the date you file, the claim is:** Check all that apply

☐ Contingent
☐ Unliquidated
☐ Disputed

**Type of NONPRIORITY unsecured claim:**

☐ Student loans
☐ Obligations arising out of a separation agreement or divorce that you did not report as priority claims
☐ Debts to pension or profit-sharing plans, and other similar debts
■ Other. Specify   **unsecured loan**

---

Debtor 1    **James Alexander**                                   Case number (if known) _____

---

| 4.8 | **US Bank** | Last 4 digits of account number _____ | **$15,314.00** |

Nonpriority Creditor's Name
**PO BOX 13**
**Hillsboro, OH 45133**
Number Street City State Zip Code

**When was the debt incurred?** _____

**Who incurred the debt? Check one.**

■ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another
☐ **Check if this claim is for a community debt**

**Is the claim subject to offset?**
■ No
☐ Yes

**As of the date you file, the claim is: Check all that apply**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Type of NONPRIORITY unsecured claim:**

☐ Student loans
☐ Obligations arising out of a separation agreement or divorce that you did not report as priority claims
☐ Debts to pension or profit-sharing plans, and other similar debts
■ Other. Specify    **Auto Lease**

---

| 4.9 | **USAA** | Last 4 digits of account number _____ | **$1,471.00** |

Nonpriority Creditor's Name
**PO BOX 47504**
**San Antonio, TX 78265**
Number Street City State Zip Code

**When was the debt incurred?** _____

**Who incurred the debt? Check one.**

■ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another
☐ **Check if this claim is for a community debt**

**Is the claim subject to offset?**
■ No
☐ Yes

**As of the date you file, the claim is: Check all that apply**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Type of NONPRIORITY unsecured claim:**

☐ Student loans
☐ Obligations arising out of a separation agreement or divorce that you did not report as priority claims
☐ Debts to pension or profit-sharing plans, and other similar debts
■ Other. Specify    **Credit card**

---

| 4.10 | **Wells Fargo Bank** | Last 4 digits of account number _____ | **$32,260.00** |

Nonpriority Creditor's Name
**PO BOX 14517**
**Des Moines, IA 50306**
Number Street City State Zip Code

**When was the debt incurred?** _____

**Who incurred the debt? Check one.**

■ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another
☐ **Check if this claim is for a community debt**

**Is the claim subject to offset?**
■ No
☐ Yes

**As of the date you file, the claim is: Check all that apply**

☐ Contingent
☐ Unliquidated
☐ Disputed

**Type of NONPRIORITY unsecured claim:**

☐ Student loans
☐ Obligations arising out of a separation agreement or divorce that you did not report as priority claims
☐ Debts to pension or profit-sharing plans, and other similar debts
■ Other. Specify    **credit card**

---

PUBLIC VERSION:  Filed April 6, 2021

Debtor 1  **James Alexander**                                    Case number (if known) _____

| 4.1 | | |
|---|---|---|

| **WF Credit Services** | Last 4 digits of account number _____ | **$5,935.00** |

Nonpriority Creditor's Name

**PO BOX 14517**
**Des Moines, IA 50306**

Number Street City State Zip Code

**Who incurred the debt?** Check one.

■ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another
☐ **Check if this claim is for a community debt**

**Is the claim subject to offset?**

■ No
☐ Yes

**When was the debt incurred?** _____

**As of the date you file, the claim is:** Check all that apply

☐ Contingent
☐ Unliquidated
☐ Disputed

**Type of NONPRIORITY unsecured claim:**

☐ Student loans
☐ Obligations arising out of a separation agreement or divorce that you did not report as priority claims
☐ Debts to pension or profit-sharing plans, and other similar debts
☐ Other. Specify  **Credit card**

---

5. **Use this page only if you have others to be notified about your bankruptcy, for a debt that you already listed in Parts 1 or 2. For example, if a collection agency is trying to collect from you for a debt you owe to someone else, list the original creditor in Parts 1 or 2, then list the collection agency here. Similarly, if you have more than one creditor for any of the debts that you listed in Parts 1 or 2, list the additional creditors here. If you do not have additional persons to be notified for any debts in Parts 1 or 2, do not fill out or submit this page.**

6. **Total the amounts of certain types of unsecured claims. This information is for statistical reporting purposes only. 28 U.S.C. §159. Add the amounts for each type of unsecured claim.**

| | | | | Total Claim |
|---|---|---|---|---|
| **Total claims from Part 1** | 6a. | **Domestic support obligations** | 6a. | $ 0.00 |
| | 6b. | **Taxes and certain other debts you owe the government** | 6b. | $ 0.00 |
| | 6c. | **Claims for death or personal injury while you were intoxicated** | 6c. | $ 0.00 |
| | 6d. | **Other.** Add all other priority unsecured claims. Write that amount here. | 6d. | $ 0.00 |
| | 6e. | **Total Priority.** Add lines 6a through 6d. | 6e. | $ 0.00 |

| | | | | Total Claim |
|---|---|---|---|---|
| **Total claims from Part 2** | 6f. | **Student loans** | 6f. | $ 0.00 |
| | 6g. | **Obligations arising out of a separation agreement or divorce that you did not report as priority claims** | 6g. | $ 0.00 |
| | 6h. | **Debts to pension or profit-sharing plans, and other similar debts** | 6h. | $ 0.00 |
| | 6i. | **Other.** Add all other nonpriority unsecured claims. Write that amount here. | 6i. | $ 255,564.44 |
| | 6j. | **Total Nonpriority.** Add lines 6f through 6i. | 6j. | $ 255,564.44 |

---

| Fill in this information to identify your case: |
|---|

| Debtor 1 | **James Alexander** | | |
|---|---|---|---|
| | First Name | Middle Name | Last Name |
| Debtor 2 | | | |
| (Spouse if, filing) | First Name | Middle Name | Last Name |
| United States Bankruptcy Court for the: | CENTRAL DISTRICT OF CALIFORNIA - SAN FERNANDO | | |
| Case number | | | |
| (if known) | | | |

☐ Check if this is an amended filing

## Official Form 106G
## Schedule G: Executory Contracts and Unexpired Leases          12/15

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, copy the additional page, fill it out, number the entries, and attach it to this page. On the top of any additional pages, write your name and case number (if known).

1.  **Do you have any executory contracts or unexpired leases?**
    ■ No. Check this box and file this form with the court with your other schedules.  You have nothing else to report on this form.
    ☐ Yes. Fill in all of the information below even if the contacts of leases are listed on *Schedule A/B:Property* (Official Form 106 A/B).

2.  **List separately each person or company with whom you have the contract or lease. Then state what each contract or lease is for (for example, rent, vehicle lease, cell phone).** See the instructions for this form in the instruction booklet for more examples of executory contracts and unexpired leases.

| Person or company with whom you have the contract or lease | State what the lease or contract is for |
|---|---|
| Name, Number, Street, City, State and ZIP Code | State what the contract or lease is for |

| 2.1 | |
|---|---|
| Name | |
| Number       Street | |
| City                    State          ZIP Code | |

| 2.2 | |
|---|---|
| Name | |
| Number       Street | |
| City                    State          ZIP Code | |

| 2.3 | |
|---|---|
| Name | |
| Number       Street | |
| City                    State          ZIP Code | |

| 2.4 | |
|---|---|
| Name | |
| Number       Street | |
| City                    State          ZIP Code | |

| 2.5 | |
|---|---|
| Name | |
| Number       Street | |
| City                    State          ZIP Code | |

**Fill in this information to identify your case:**

| | |
|---|---|
| Debtor 1 | **James Alexander** |
| | First Name     Middle Name     Last Name |
| Debtor 2 | |
| (Spouse if, filing) | First Name     Middle Name     Last Name |
| United States Bankruptcy Court for the: | CENTRAL DISTRICT OF CALIFORNIA - SAN FERNANDO |
| Case number | |
| (if known) | |

☐ Check if this is an
amended filing

## Official Form 106H
## Schedule H: Your Codebtors
**12/15**

Codebtors are people or entities who are also liable for any debts you may have. Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, copy the Additional Page, fill it out, and number the entries in the boxes on the left. Attach the Additional Page to this page. On the top of any Additional Pages, write your name and case number (if known). Answer every question.

**1. Do you have any codebtors?** (If you are filing a joint case, do not list either spouse as a codebtor.)

■ No
☐ Yes

**2. Within the last 8 years, have you lived in a community property state or territory?** (*Community property states and territories* include Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Puerto Rico, Texas, Washington, and Wisconsin.)

■ No. Go to line 3.
☐ Yes. Did your spouse, former spouse, or legal equivalent live with you at the time?

**3. In Column 1, list all of your codebtors. Do not include your spouse as a codebtor if your spouse is filing with you. List the person shown in line 2 again as a codebtor only if that person is a guarantor or cosigner. Make sure you have listed the creditor on Schedule D (Official Form 106D), Schedule E/F (Official Form 106E/F), or Schedule G (Official Form 106G). Use Schedule D, Schedule E/F, or Schedule G to fill out Column 2.**

| *Column 1:* **Your codebtor** | *Column 2:* **The creditor to whom you owe the debt** |
|---|---|
| Name, Number, Street, City, State and ZIP Code | Check all schedules that apply: |

3.1

Name

Number     Street
City                              State                    ZIP Code

☐ Schedule D, line _____
☐ Schedule E/F, line _____
☐ Schedule G, line _____

3.2

Name

Number     Street
City                              State                    ZIP Code

☐ Schedule D, line _____
☐ Schedule E/F, line _____
☐ Schedule G, line _____

Fill in this information to identify your case:

| | |
|---|---|
| Debtor 1 | **James Alexander** |
| Debtor 2 (Spouse, if filing) | |
| United States Bankruptcy Court for the: | CENTRAL DISTRICT OF CALIFORNIA - SAN FERNANDO |
| Case number (If known) | |

Check if this is:

☐ An amended filing

☐ A supplement showing postpetition chapter 13 income as of the following date:

_____
MM / DD/ YYYY

## Official Form 106I

## Schedule I: Your Income

12/15

Be as complete and accurate as possible. If two married people are filing together (Debtor 1 and Debtor 2), both are equally responsible for supplying correct information. If you are married and not filing jointly, and your spouse is living with you, include information about your spouse. If you are separated and your spouse is not filing with you, do not include information about your spouse. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write your name and case number (if known). Answer every question.

| Part 1: | Describe Employment |
|---|---|

1. **Fill in your employment information.**

   If you have more than one job, attach a separate page with information about additional employers.

   Include part-time, seasonal, or self-employed work.

   Occupation may include student or homemaker, if it applies.

| | | Debtor 1 | Debtor 2 or non-filing spouse |
|---|---|---|---|
| | Employment status | ☐ Employed<br>☑ Not employed | ☐ Employed<br>☐ Not employed |
| | Occupation | | |
| | Employer's name | | |
| | Employer's address | | |
| | How long employed there? | | |

| Part 2: | Give Details About Monthly Income |
|---|---|

Estimate monthly income as of the date you file this form. If you have nothing to report for any line, write $0 in the space. Include your non-filing spouse unless you are separated.

If you or your non-filing spouse have more than one employer, combine the information for all employers for that person on the lines below. If you need more space, attach a separate sheet to this form.

| | | | For Debtor 1 | For Debtor 2 or non-filing spouse |
|---|---|---|---|---|
| 2. | List monthly gross wages, salary, and commissions (before all payroll deductions). If not paid monthly, calculate what the monthly wage would be. | 2. | $ 0.00 | $ N/A |
| 3. | Estimate and list monthly overtime pay. | 3. | +$ 0.00 | +$ N/A |
| 4. | Calculate gross Income. Add line 2 + line 3. | 4. | $ 0.00 | $ N/A |

PUBLIC VERSION: Filed April 6, 2021

Schedule I: Your Income

Debtor 1  **James Alexander**                                          Case number (*if known*)

|  |  |  | For Debtor 1 | For Debtor 2 or non-filing spouse |
|---|---|---|---|---|
| Copy line 4 here | 4. | $ | 0.00 | $ N/A |

5. **List all payroll deductions:**

| | | | For Debtor 1 | For Debtor 2 or non-filing spouse |
|---|---|---|---|---|
| 5a. | Tax, Medicare, and Social Security deductions | 5a. | $ 0.00 | $ N/A |
| 5b. | Mandatory contributions for retirement plans | 5b. | $ 0.00 | $ N/A |
| 5c. | Voluntary contributions for retirement plans | 5c. | $ 0.00 | $ N/A |
| 5d. | Required repayments of retirement fund loans | 5d. | $ 0.00 | $ N/A |
| 5e. | Insurance | 5e. | $ 0.00 | $ N/A |
| 5f. | Domestic support obligations | 5f. | $ 0.00 | $ N/A |
| 5g. | Union dues | 5g. | $ 0.00 | $ N/A |
| 5h. | Other deductions. Specify: | 5h.+ | $ 0.00 | + $ N/A |

6. **Add the payroll deductions.** Add lines 5a+5b+5c+5d+5e+5f+5g+5h.   6.  $ 0.00   $ N/A

7. **Calculate total monthly take-home pay.** Subtract line 6 from line 4.   7.  $ 0.00   $ N/A

8. **List all other income regularly received:**

| | | | For Debtor 1 | For Debtor 2 or non-filing spouse |
|---|---|---|---|---|
| 8a. | **Net income from rental property and from operating a business, profession, or farm** Attach a statement for each property and business showing gross receipts, ordinary and necessary business expenses, and the total monthly net income. | 8a. | $ 0.00 | $ N/A |
| 8b. | **Interest and dividends** | 8b. | $ 0.00 | $ N/A |
| 8c. | **Family support payments that you, a non-filing spouse, or a dependent regularly receive** Include alimony, spousal support, child support, maintenance, divorce settlement, and property settlement. | 8c. | $ 0.00 | $ N/A |
| 8d. | **Unemployment compensation** | 8d. | $ 0.00 | $ N/A |
| 8e. | **Social Security** | 8e. | $ 0.00 | $ N/A |
| 8f. | **Other government assistance that you regularly receive** Include cash assistance and the value (if known) of any non-cash assistance that you receive, such as food stamps (benefits under the Supplemental Nutrition Assistance Program) or housing subsidies. Specify: | 8f. | $ 0.00 | $ N/A |
| 8g. | **Pension or retirement income** | 8g. | $ 0.00 | $ N/A |
| 8h. | **Other monthly income.** Specify: | 8h.+ | $ 0.00 | + $ N/A |

9. **Add all other income.** Add lines 8a+8b+8c+8d+8e+8f+8g+8h.   9.  $ 0.00   $ N/A

10. **Calculate monthly income.** Add line 7 + line 9.   10.  $ 0.00  + $ N/A  = $ 0.00
    Add the entries in line 10 for Debtor 1 and Debtor 2 or non-filing spouse.

11. **State all other regular contributions to the expenses that you list in** *Schedule J.*
    Include contributions from an unmarried partner, members of your household, your dependents, your roommates, and other friends or relatives.
    Do not include any amounts already included in lines 2-10 or amounts that are not available to pay expenses listed in *Schedule J.*
    Specify:                                                                11.  + $ 0.00

12. **Add the amount in the last column of line 10 to the amount in line 11.** The result is the combined monthly income.
    Write that amount on the *Summary of Schedules* and *Statistical Summary of Certain Liabilities* and Related *Data*, if it applies                                                     12.  $ 0.00

                                                                         **Combined monthly income**

13. **Do you expect an increase or decrease within the year after you file this form?**
    ■ No.
    ☐ Yes. Explain:

PUBLIC VERSION: Filed April 6, 2021   *Schedule I: Your Income*   Page 825 page 2

Fill in this information to identify your case:

| | |
|---|---|
| Debtor 1 | **James Alexander** |
| Debtor 2 (Spouse, if filing) | |
| United States Bankruptcy Court for the: | CENTRAL DISTRICT OF CALIFORNIA - SAN FERNANDO |
| Case number (If known) | |

Check if this is:

☐ An amended filing

☐ A supplement showing postpetition chapter 13 expenses as of the following date:

_____

MM / DD / YYYY

**Official Form 106J**

## Schedule J: Your Expenses

12/15

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, attach another sheet to this form. On the top of any additional pages, write your name and case number (if known). Answer every question.

### Part 1:  Describe Your Household

1. **Is this a joint case?**

   ■ No. Go to line 2.

   ☐ Yes. **Does Debtor 2 live in a separate household?**

     ☐ No

     ☐ Yes. Debtor 2 must file Official Form 106J-2, *Expenses for Separate Household* of Debtor 2.

2. **Do you have dependents?** ☐ No

   Do not list Debtor 1 and Debtor 2.

   ■ Yes. Fill out this information for each dependent..............

   Do not state the dependents names.

| Dependent's relationship to Debtor 1 or Debtor 2 | Dependent's age | Does dependent live with you? |
|---|---|---|
| child | 1.5 | ☐ No  ■ Yes |
| Child | 1.5 | ☐ No  ■ Yes |
| | | ☐ No  ☐ Yes |
| | | ☐ No  ☐ Yes |

3. **Do your expenses include expenses of people other than yourself and your dependents?**

   ■ No

   ☐ Yes

### Part 2:  Estimate Your Ongoing Monthly Expenses

Estimate your expenses as of your bankruptcy filing date unless you are using this form as a supplement in a Chapter 13 case to report expenses as of a date after the bankruptcy is filed. If this is a supplemental *Schedule J*, check the box at the top of the form and fill in the applicable date.

Include expenses paid for with non-cash government assistance if you know the value of such assistance and have included it on *Schedule I: Your Income* (Official Form 106I.)

|  | | **Your expenses** |
|---|---|---|

| | | |
|---|---|---|
| 4. **The rental or home ownership expenses for your residence.** Include first mortgage payments and any rent for the ground or lot. | 4. $ | 4,885.27 |
| If not included in line 4: | | |
| 4a. Real estate taxes | 4a. $ | 1,312.50 |
| 4b. Property, homeowner's, or renter's insurance | 4b. $ | 180.96 |
| 4c. Home maintenance, repair, and upkeep expenses | 4c. $ | 1,150.00 |
| 4d. Homeowner's association or condominium dues | 4d. $ | 0.00 |
| 5. **Additional mortgage payments for your residence,** such as home equity loans | 5. $ | 0.00 |

| Debtor 1 | **James Alexander** | | Case number (if known) | |
|---|---|---|---|---|

| | | | | | |
|---|---|---|---|---|---|
| 6. | **Utilities:** | | | | |
| | 6a. | Electricity, heat, natural gas | 6a. | $ | 554.46 |
| | 6b. | Water, sewer, garbage collection | 6b. | $ | 0.00 |
| | 6c. | Telephone, cell phone, Internet, satellite, and cable services | 6c. | $ | 490.00 |
| | 6d. | Other. Specify: | 6d. | $ | 0.00 |
| 7. | **Food and housekeeping supplies** | | 7. | $ | 1,300.00 |
| 8. | **Childcare and children's education costs** | | 8. | $ | 0.00 |
| 9. | **Clothing, laundry, and dry cleaning** | | 9. | $ | 100.00 |
| 10. | **Personal care products and services** | | 10. | $ | 100.00 |
| 11. | **Medical and dental expenses** | | 11. | $ | 380.00 |
| 12. | **Transportation.** Include gas, maintenance, bus or train fare. | | 12. | $ | 560.00 |
| | Do not include car payments. | | | | |
| 13. | **Entertainment, clubs, recreation, newspapers, magazines, and books** | | 13. | $ | 100.00 |
| 14. | **Charitable contributions and religious donations** | | 14. | $ | 20.00 |
| 15. | **Insurance.** | | | | |
| | Do not include insurance deducted from your pay or included in lines 4 or 20. | | | | |
| | 15a. | Life insurance | 15a. | $ | 0.00 |
| | 15b. | Health insurance | 15b. | $ | 1,605.14 |
| | 15c. | Vehicle insurance | 15c. | $ | 1,115.68 |
| | 15d. | Other insurance. Specify: | 15d. | $ | 0.00 |
| 16. | **Taxes.** Do not include taxes deducted from your pay or included in lines 4 or 20. | | 16. | $ | 0.00 |
| | Specify: | | | | |
| 17. | **Installment or lease payments:** | | | | |
| | 17a. | Car payments for Vehicle 1 | 17a. | $ | 1,146.15 |
| | 17b. | Car payments for Vehicle 2 | 17b. | $ | 0.00 |
| | 17c. | Other. Specify: | 17c. | $ | 0.00 |
| | 17d. | Other. Specify: | 17d. | $ | 0.00 |
| 18. | **Your payments of alimony, maintenance, and support that you did not report as deducted from your pay on line 5,** *Schedule I, Your Income* **(Official Form 106I).** | | 18. | $ | 0.00 |
| 19. | **Other payments you make to support others who do not live with you.** | | 19. | $ | 0.00 |
| | Specify: | | | | |
| 20. | **Other real property expenses not included in lines 4 or 5 of this form or on** *Schedule I: Your Income.* | | | | |
| | 20a. | Mortgages on other property | 20a. | $ | 0.00 |
| | 20b. | Real estate taxes | 20b. | $ | 0.00 |
| | 20c. | Property, homeowner's, or renter's insurance | 20c. | $ | 0.00 |
| | 20d. | Maintenance, repair, and upkeep expenses | 20d. | $ | 0.00 |
| | 20e. | Homeowner's association or condominium dues | 20e. | $ | 0.00 |
| 21. | **Other:** Specify: | | 21. | +$ | 0.00 |

| | | | | |
|---|---|---|---|---|
| 22. | **Calculate your monthly expenses** | | | |
| | 22a. Add lines 4 through 21. | | $ | 15,000.16 |
| | 22b. Copy line 22 (monthly expenses for Debtor 2), if any, from Official Form 106J-2 | | $ | |
| | 22c. Add line 22a and 22b.  The result is your monthly expenses. | | $ | 15,000.16 |
| 23. | **Calculate your monthly net income.** | | | |
| | 23a. Copy line 12 *(your combined monthly income)* from Schedule I. | 23a. | $ | 0.00 |
| | 23b. Copy your monthly expenses from line 22c above. | 23b. | -$ | 15,000.16 |
| | 23c. Subtract your monthly expenses from your monthly income. The result is your *monthly net income.* | 23c. | $ | -15,000.16 |

24. **Do you expect an increase or decrease in your expenses within the year after you file this form?**
For example, do you expect to finish paying for your car loan within the year or do you expect your mortgage payment to increase or decrease because of a modification to the terms of your mortgage?

■ **No.**
☐ **Yes.**  Explain here:

**Fill in this information to identify your case:**

| | |
|---|---|
| Debtor 1 | **James Alexander** |
| | First Name        Middle Name        Last Name |
| Debtor 2 | |
| (Spouse if, filing) | First Name        Middle Name        Last Name |
| United States Bankruptcy Court for the: | CENTRAL DISTRICT OF CALIFORNIA - SAN FERNANDO |
| Case number | |
| (if known) | |

☐ Check if this is an
amended filing

Official Form 106Dec

# Declaration About an Individual Debtor's Schedules

12/15

If two married people are filing together, both are equally responsible for supplying correct information.

**You must file this form whenever you file bankruptcy schedules or amended schedules. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $250,000, or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.**

### Sign Below

**Did you pay or agree to pay someone who is NOT an attorney to help you fill out bankruptcy forms?**

☑ No

☐ Yes. Name of person _____    Attach *Bankruptcy Petition Preparer's Notice, Declaration, and Signature* (Official Form 119)

**Under penalty of perjury, I declare that I have read the summary and schedules filed with this declaration and that they are true and correct.**

X _____    X _____
**James Alexander**                        Signature of Debtor 2
Signature of Debtor 1

Date  **February 22, 2021**                Date _____

Official Form 106Dec              **Declaration About an Individual Debtor's Schedules**

Software Copyright (c) 1996-2020 Best Case, LLC - www.bestcase.com                Best Case Bankruptcy

**Fill in this information to identify your case:**

| | |
|---|---|
| Debtor 1 | **James Alexander** |
| | First Name     Middle Name     Last Name |
| Debtor 2 | |
| (Spouse if, filing) | First Name     Middle Name     Last Name |
| United States Bankruptcy Court for the: | CENTRAL DISTRICT OF CALIFORNIA - SAN FERNANDO |
| Case number (if known) | |

☐ Check if this is an amended filing

## Official Form 107
## Statement of Financial Affairs for Individuals Filing for Bankruptcy                    4/19

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write your name and case number (if known). Answer every question.

**Part 1:    Give Details About Your Marital Status and Where You Lived Before**

1.  **What is your current marital status?**

    ■ Married
    ☐ Not married

2.  **During the last 3 years, have you lived anywhere other than where you live now?**

    ☐ No
    ■ Yes. List all of the places you lived in the last 3 years. Do not include where you live now.

| Debtor 1 Prior Address: | Dates Debtor 1 lived there | Debtor 2 Prior Address: | Dates Debtor 2 lived there |
|---|---|---|---|
| **4501 Finley Ave, #406 Los Angeles, CA 90025** | From-To: **1/12/16-2/1/20** | ☐ Same as Debtor 1 | ☐ Same as Debtor 1 From-To: |

3.  **Within the last 8 years, did you ever live with a spouse or legal equivalent in a community property state or territory?** (*Community property states and territories* include Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Puerto Rico, Texas, Washington and Wisconsin.)

    ■ No
    ☐ Yes. Make sure you fill out *Schedule H: Your Codebtors* (Official Form 106H).

**Part 2    Explain the Sources of Your Income**

4.  **Did you have any income from employment or from operating a business during this year or the two previous calendar years?**
    Fill in the total amount of income you received from all jobs and all businesses, including part-time activities.
    If you are filing a joint case and you have income that you receive together, list it only once under Debtor 1.

    ☐ No
    ■ Yes. Fill in the details.

| | Debtor 1 | | Debtor 2 | |
|---|---|---|---|---|
| | Sources of income Check all that apply. | Gross income (before deductions and exclusions) | Sources of income Check all that apply. | Gross income (before deductions and exclusions) |
| From January 1 of current year until the date you filed for bankruptcy: | ■ Wages, commissions, bonuses, tips | $30,000.00 | ☐ Wages, commissions, bonuses, tips | |
| | ☐ Operating a business | | ☐ Operating a business | |

Official Form 107                    Statement of Financial Affairs for Individuals Filing for Bankruptcy                    page 1

Debtor 1    **James Alexander** _____     Case number *(if known)* _____

| | Debtor 1 | | Debtor 2 | |
|---|---|---|---|---|
| | **Sources of income** Check all that apply. | **Gross income** (before deductions and exclusions) | **Sources of income** Check all that apply. | **Gross income** (before deductions and exclusions) |
| **For last calendar year:** (January 1 to December 31, 2020 ) | ■ Wages, commissions, bonuses, tips ☐ Operating a business | **$340,000.00** | ☐ Wages, commissions, bonuses, tips ☐ Operating a business | |
| **For the calendar year before that:** (January 1 to December 31, 2019 ) | ■ Wages, commissions, bonuses, tips ☐ Operating a business | **$120,000.00** | ☐ Wages, commissions, bonuses, tips ☐ Operating a business | |

5. **Did you receive any other income during this year or the two previous calendar years?**
   Include income regardless of whether that income is taxable. Examples of *other income* are alimony; child support; Social Security, unemployment, and other public benefit payments; pensions; rental income; interest; dividends; money collected from lawsuits; royalties; and gambling and lottery winnings. If you are filing a joint case and you have income that you received together, list it only once under Debtor 1.

   List each source and the gross income from each source separately. Do not include income that you listed in line 4.

   ■ No
   ☐ Yes. Fill in the details.

| | Debtor 1 | | Debtor 2 | |
|---|---|---|---|---|
| | **Sources of income** Describe below. | **Gross income from each source** (before deductions and exclusions) | **Sources of income** Describe below. | **Gross income** (before deductions and exclusions) |

**Part 3:    List Certain Payments You Made Before You Filed for Bankruptcy**

6. **Are either Debtor 1's or Debtor 2's debts primarily consumer debts?**
   ■ No. **Neither Debtor 1 nor Debtor 2 has primarily consumer debts.** *Consumer debts* are defined in 11 U.S.C. § 101(8) as "incurred by an individual primarily for a personal, family, or household purpose."

   During the 90 days before you filed for bankruptcy, did you pay any creditor a total of $6,825* or more?
   ☐ No.    Go to line 7.
   ■ Yes    List below each creditor to whom you paid a total of $6,825* or more in one or more payments and the total amount you paid that creditor. Do not include payments for domestic support obligations, such as child support and alimony. Also, do not include payments to an attorney for this bankruptcy case.
   * Subject to adjustment on 4/01/22 and every 3 years after that for cases filed on or after the date of adjustment.

   ☐ Yes. **Debtor 1 or Debtor 2 or both have primarily consumer debts.**
   During the 90 days before you filed for bankruptcy, did you pay any creditor a total of $600 or more?

   ☐ No.    Go to line 7.
   ☐ Yes    List below each creditor to whom you paid a total of $600 or more and the total amount you paid that creditor. Do not include payments for domestic support obligations, such as child support and alimony. Also, do not include payments to an attorney for this bankruptcy case.

| Creditor's Name and Address | Dates of payment | Total amount paid | Amount you still owe | Was this payment for ... |
|---|---|---|---|---|
| **Chase Home Services 700 Kansas Lane Monroe, LA 71203** | 1/21/2021 | $34,196.89 | $1,046,674.2 9 | ■ Mortgage ☐ Car ☐ Credit Card ☐ Loan Repayment ☐ Suppliers or vendors ☐ Other___ |

| Debtor 1 | **James Alexander** | | Case number *(if known)* | |
|---|---|---|---|---|

| Creditor's Name and Address | Dates of payment | Total amount paid | Amount you still owe | Was this payment for ... |
|---|---|---|---|---|
| **Chase Credit Card**<br>PO Box 6294<br>Carol Stream, IL 60197 | 1/19/2021 | $11,523.92 | $1,460.00 | ☐ Mortgage<br>☐ Car<br>■ Credit Card<br>☐ Loan Repayment<br>☐ Suppliers or vendors<br>☐ Other___ |
| **Cultural Care Au Pere**<br>1 Education Street<br>Cambridge, MA 02141 | 12/23/220 | $14,947.58 | $0.00 | ☐ Mortgage<br>☐ Car<br>☐ Credit Card<br>☐ Loan Repayment<br>☐ Suppliers or vendors<br>■ Other **childcare** |

7. **Within 1 year before you filed for bankruptcy, did you make a payment on a debt you owed anyone who was an insider?**
   *Insiders* include your relatives; any general partners; relatives of any general partners; partnerships of which you are a general partner; corporations of which you are an officer, director, person in control, or owner of 20% or more of their voting securities; and any managing agent, including one for a business you operate as a sole proprietor. 11 U.S.C. § 101. Include payments for domestic support obligations, such as child support and alimony.

   ■ No
   ☐ Yes. List all payments to an insider.

| Insider's Name and Address | Dates of payment | Total amount paid | Amount you still owe | Reason for this payment |
|---|---|---|---|---|

8. **Within 1 year before you filed for bankruptcy, did you make any payments or transfer any property on account of a debt that benefited an insider?**
   Include payments on debts guaranteed or cosigned by an insider.

   ■ No
   ☐ Yes. List all payments to an insider

| Insider's Name and Address | Dates of payment | Total amount paid | Amount you still owe | Reason for this payment<br>Include creditor's name |
|---|---|---|---|---|

**Part 4:    Identify Legal Actions, Repossessions, and Foreclosures**

9. **Within 1 year before you filed for bankruptcy, were you a party in any lawsuit, court action, or administrative proceeding?**
   List all such matters, including personal injury cases, small claims actions, divorces, collection suits, paternity actions, support or custody modifications, and contract disputes.

   ☐ No
   ■ Yes. Fill in the details.

| Case title<br>Case number | Nature of the case | Court or agency | Status of the case |
|---|---|---|---|
| **CRED INC., CRED CAPITAL, INC., and CRED (US) LLC vs. James Alexander**<br>**Adv. Proc. No: 20-51006** | **Turnover** | **US Bankruptcy Court - Delaware** | ■ Pending<br>☐ On appeal<br>☐ Concluded |
| **Cred Inc. (f/k/a Cred LLC) and Cred Capital, Inc. v. James Alexander**<br>**20-CIV-02915** | **Turnover** | **Superior Court of California** | ■ Pending<br>☐ On appeal<br>☐ Concluded |

Software Copyright (c) 1996-2020 Best Case, LLC - www.bestcase.com                    Best Case Bankruptcy

PUBLIC VERSION:  Filed April 6, 2021                    Page 831

| Debtor 1 | **James Alexander** | | Case number *(if known)* |
|---|---|---|---|

---

10. **Within 1 year before you filed for bankruptcy, was any of your property repossessed, foreclosed, garnished, attached, seized, or levied?**
Check all that apply and fill in the details below.

- ■ No. Go to line 11.
- ☐ Yes. Fill in the information below.

| Creditor Name and Address | Describe the Property<br><br>Explain what happened | Date | Value of the property |
|---|---|---|---|

11. **Within 90 days before you filed for bankruptcy, did any creditor, including a bank or financial institution, set off any amounts from your accounts or refuse to make a payment because you owed a debt?**

- ■ No
- ☐ Yes. Fill in the details.

| Creditor Name and Address | Describe the action the creditor took | Date action was taken | Amount |
|---|---|---|---|

12. **Within 1 year before you filed for bankruptcy, was any of your property in the possession of an assignee for the benefit of creditors, a court-appointed receiver, a custodian, or another official?**

- ■ No
- ☐ Yes

## Part 5:    List Certain Gifts and Contributions

13. **Within 2 years before you filed for bankruptcy, did you give any gifts with a total value of more than $600 per person?**

- ■ No
- ☐ Yes. Fill in the details for each gift.

| Gifts with a total value of more than $600 per person<br><br>Person to Whom You Gave the Gift and Address: | Describe the gifts | Dates you gave the gifts | Value |
|---|---|---|---|

14. **Within 2 years before you filed for bankruptcy, did you give any gifts or contributions with a total value of more than $600 to any charity?**

- ☐ No
- ■ Yes. Fill in the details for each gift or contribution.

| Gifts or contributions to charities that  total more than $600<br>Charity's Name<br>Address (Number, Street, City, State and ZIP Code) | Describe what you contributed | Dates you contributed | Value |
|---|---|---|---|
| St. Sophia cathedral<br>1324 Normandy Ave<br>Los Angeles, CA 90006 | monthly parish contribution | 1/11/2020 | $2,000.00 |

## Part 6:    List Certain Losses

15. **Within 1 year before you filed for bankruptcy or since you filed for bankruptcy, did you lose anything because of theft, fire, other disaster, or gambling?**

- ■ No
- ☐ Yes. Fill in the details.

| Describe the property you lost and how the loss occurred | Describe any insurance coverage for the loss<br>Include the amount that insurance has paid. List pending insurance claims on line 33 of *Schedule A/B: Property.* | Date of your loss | Value of property lost |
|---|---|---|---|

PUBLIC VERSION:  Filed April 6, 2021          Page 832

| Debtor 1 | **James Alexander** | | Case number *(if known)* |
|---|---|---|---|

| **Part 7:** | **List Certain Payments or Transfers** |
|---|---|

**16.** **Within 1 year before you filed for bankruptcy, did you or anyone else acting on your behalf pay or transfer any property to anyone you consulted about seeking bankruptcy or preparing a bankruptcy petition?**
Include any attorneys, bankruptcy petition preparers, or credit counseling agencies for services required in your bankruptcy.

☐ No
☑ Yes. Fill in the details.

| Person Who Was Paid<br>Address<br>Email or website address<br>Person Who Made the Payment, if Not You | Description and value of any property transferred | Date payment or transfer was made | Amount of payment |
|---|---|---|---|
| **Levene, Neale, Bender, Yoo<br>& Brill L.L.P.<br>10250 Constellation Blvd. # 1700<br>Los Angeles, CA 90067<br>http://www.lnbyb.com** | **$20,000** | **2/4/2021** | **$20,000.00** |

**17.** **Within 1 year before you filed for bankruptcy, did you or anyone else acting on your behalf pay or transfer any property to anyone who promised to help you deal with your creditors or to make payments to your creditors?**
Do not include any payment or transfer that you listed on line 16.

☑ No
☐ Yes. Fill in the details.

| Person Who Was Paid<br>Address | Description and value of any property transferred | Date payment or transfer was made | Amount of payment |
|---|---|---|---|

**18.** **Within 2 years before you filed for bankruptcy, did you sell, trade, or otherwise transfer any property to anyone, other than property transferred in the ordinary course of your business or financial affairs?**
Include both outright transfers and transfers made as security (such as the granting of a security interest or mortgage on your property). Do not include gifts and transfers that you have already listed on this statement.

☑ No
☐ Yes. Fill in the details.

| Person Who Received Transfer<br>Address<br><br>Person's relationship to you | Description and value of property transferred | Describe any property or payments received or debts paid in exchange | Date transfer was made |
|---|---|---|---|

**19.** **Within 10 years before you filed for bankruptcy, did you transfer any property to a self-settled trust or similar device of which you are a beneficiary?** (These are often called *asset-protection devices.*)

☑ No
☐ Yes. Fill in the details.

| Name of trust | Description and value of the property transferred | Date Transfer was made |
|---|---|---|

| **Part 8:** | **List of Certain Financial Accounts, Instruments, Safe Deposit Boxes, and Storage Units** |
|---|---|

**20.** **Within 1 year before you filed for bankruptcy, were any financial accounts or instruments held in your name, or for your benefit, closed, sold, moved, or transferred?**
Include checking, savings, money market, or other financial accounts; certificates of deposit; shares in banks, credit unions, brokerage houses, pension funds, cooperatives, associations, and other financial institutions.

☑ No
☐ Yes. Fill in the details.

| Name of Financial Institution and<br>Address (Number, Street, City, State and ZIP Code) | Last 4 digits of account number | Type of account or instrument | Date account was closed, sold, moved, or transferred | Last balance before closing or transfer |
|---|---|---|---|---|

| Debtor 1    **James Alexander** | Case number (if known) |
|---|---|

21. **Do you now have, or did you have within 1 year before you filed for bankruptcy, any safe deposit box or other depository for securities, cash, or other valuables?**

■ No
☐ Yes. Fill in the details.

| Name of Financial Institution<br>**Address** (Number, Street, City, State and ZIP Code) | Who else had access to it?<br>**Address** (Number, Street, City, State and ZIP Code) | Describe the contents | Do you still have it? |
|---|---|---|---|

22. **Have you stored property in a storage unit or place other than your home within 1 year before you filed for bankruptcy?**

■ No
☐ Yes. Fill in the details.

| Name of Storage Facility<br>**Address** (Number, Street, City, State and ZIP Code) | Who else has or had access to it?<br>**Address** (Number, Street, City, State and ZIP Code) | Describe the contents | Do you still have it? |
|---|---|---|---|

**Part 9:**    Identify Property You Hold or Control for Someone Else

23. **Do you hold or control any property that someone else owns? Include any property you borrowed from, are storing for, or hold in trust for someone.**

■ No
☐ Yes. Fill in the details.

| Owner's Name<br>**Address** (Number, Street, City, State and ZIP Code) | Where is the property?<br>(Number, Street, City, State and ZIP Code) | Describe the property | Value |
|---|---|---|---|

**Part 10:**    Give Details About Environmental Information

For the purpose of Part 10, the following definitions apply:

■ *Environmental law* means any federal, state, or local statute or regulation concerning pollution, contamination, releases of hazardous or toxic substances, wastes, or material into the air, land, soil, surface water, groundwater, or other medium, including statutes or regulations controlling the cleanup of these substances, wastes, or material.

■ *Site* means any location, facility, or property as defined under any environmental law, whether you now own, operate, or utilize it or used to own, operate, or utilize it, including disposal sites.

■ *Hazardous material* means anything an environmental law defines as a hazardous waste, hazardous substance, toxic substance, hazardous material, pollutant, contaminant, or similar term.

Report all notices, releases, and proceedings that you know about, regardless of when they occurred.

24. **Has any governmental unit notified you that you may be liable or potentially liable under or in violation of an environmental law?**

■ No
☐ Yes. Fill in the details.

| Name of site<br>**Address** (Number, Street, City, State and ZIP Code) | Governmental unit<br>**Address** (Number, Street, City, State and ZIP Code) | Environmental law, if you know it | Date of notice |
|---|---|---|---|

25. **Have you notified any governmental unit of any release of hazardous material?**

■ No
☐ Yes. Fill in the details.

| Name of site<br>**Address** (Number, Street, City, State and ZIP Code) | Governmental unit<br>**Address** (Number, Street, City, State and ZIP Code) | Environmental law, if you know it | Date of notice |
|---|---|---|---|

Software Copyright (c) 1996-2020 Best Case, LLC - www.bestcase.com    Best Case Bankruptcy

PUBLIC VERSION:  Filed April 6, 2021    Page 834

| Debtor 1 | **James Alexander** | | Case number *(if known)* |
|---|---|---|---|

**26.** Have you been a party in any judicial or administrative proceeding under any environmental law? Include settlements and orders.

■ No
☐ Yes. Fill in the details.

| Case Title Case Number | Court or agency Name Address (Number, Street, City, State and ZIP Code) | Nature of the case | Status of the case |
|---|---|---|---|
| | | | |

| **Part 11:** | **Give Details About Your Business or Connections to Any Business** |
|---|---|

**27.** Within 4 years before you filed for bankruptcy, did you own a business or have any of the following connections to any business?

☐ A sole proprietor or self-employed in a trade, profession, or other activity, either full-time or part-time

☐ A member of a limited liability company (LLC) or limited liability partnership (LLP)

☐ A partner in a partnership

■ An officer, director, or managing executive of a corporation

■ An owner of at least 5% of the voting or equity securities of a corporation

☐ No. None of the above applies.  Go to Part 12.

■ Yes. Check all that apply above and fill in the details below for each business.

| Business Name Address (Number, Street, City, State and ZIP Code) | Describe the nature of the business Name of accountant or bookkeeper | Employer Identification number Do not include Social Security number or ITIN. Dates business existed |
|---|---|---|
| **Cred Capital, Inc.** **2121 S. El Camino Real** **San Mateo, CA 94403** | **investment management** **Joe Podulka** | EIN: From-To   3/15/2020 -1/7/2020 |
| **A Capital A, Inc.** **4501 Finley Ave, Apt 406** **Los Angeles, CA 90027** | **Consulting** **Alex fard** | EIN:   81-1117798 From-To   1/1/2014 - 12/31/2018 |

**28.** Within 2 years before you filed for bankruptcy, did you give a financial statement to anyone about your business? Include all financial institutions, creditors, or other parties.

■ No
☐ Yes. Fill in the details below.

| Name Address (Number, Street, City, State and ZIP Code) | Date Issued |
|---|---|
| | |

| **Part 12:** | **Sign Below** |
|---|---|

I have read the answers on this *Statement of Financial Affairs* and any attachments, and I declare under penalty of perjury that the answers are true and correct. I understand that making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $250,000, or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

| James Alexander Signature of Debtor 1 | Signature of Debtor 2 |
|---|---|
| Date   **February 22, 2021** | Date |

Did you attach additional pages to *Your Statement of Financial Affairs for Individuals Filing for Bankruptcy* (Official Form 107)?
■ No
☐ Yes

Did you pay or agree to pay someone who is not an attorney to help you fill out bankruptcy forms?
■ No

Debtor 1  **James Alexander**                                         Case number *(if known)* _____

☐ Yes. Name of Person _____. Attach the *Bankruptcy Petition Preparer's Notice, Declaration, and Signature* (Official Form 119).

PUBLIC VERSION:  Filed April 6, 2021                    Page 836

Fill in this information to identify your case:

Debtor 1    James Alexander
_____
First Name          Middle Name          Last Name

Debtor 2
(Spouse, if filing) _____
First Name          Middle Name          Last Name

United States Bankruptcy Court for the:    Central District of California

Case number    1:21-bk-10214-MB
(If known)

☐ Check if this is an amended filing

Official Form 122B

# Chapter 11 Statement of Your Current Monthly Income

04/20

**You must file this form if you are an individual and are filing for bankruptcy under Chapter 11. If more space is needed, attach a separate sheet to this form. Include the line number to which the additional information applies. On the top of any additional pages, write your name and case number (if known).**

## Part 1:    Calculate Your Current Monthly Income

1. **What is your marital and filing status?** Check one only.

   ☐ **Not married.** Fill out Column A, lines 2-11.

   ☐ **Married and your spouse is filing with you.** Fill out both Columns A and B, lines 2-11.

   ☑ **Married and your spouse is NOT filing with you.** Fill out Column A, lines 2-11.

   Fill in the average monthly income that you received from all sources, derived during the 6 full months before you file this bankruptcy case. 11 U.S.C. § 101(10A). For example, if you are filing on September 15, the 6-month period would be March 1 through August 31. If the amount of your monthly income varied during the 6 months, add the income for all 6 months and divide the total by 6. Fill in the result. Do not include any income amount more than once. For example, if both spouses own the same rental property, put the income from that property in one column only. If you have nothing to report for any line, write $0 in the space.

|  | Column A<br>Debtor 1 | Column B<br>Debtor 2 |
|---|---|---|
| 2. **Your gross wages, salary, tips, bonuses, overtime, and commissions** (before all payroll deductions). | $ 0.00 | $ |
| 3. **Alimony and maintenance payments.** Do not include payments from a spouse if Column B is filled in. | $ 0.00 | $ |
| 4. **All amounts from any source which are regularly paid for household expenses of you or your dependents, including child support.** Include regular contributions from an unmarried partner, members of your household, your dependents, parents, and roommates. Include regular contributions from a spouse only if Column B is not filled in. Do not include payments you listed on line 3. | $ 0.00 | $ |

5. **Net income from operating a business, profession, or farm**

| | Debtor 1 | Debtor 2 | | | |
|---|---|---|---|---|---|
| Gross receipts (before all deductions) | $ 0.00 | $ | | | |
| Ordinary and necessary operating expenses | − $ | − $ | | | |
| Net monthly income from a business, profession, or farm | $ 0.00 | $ | Copy here ➔ | $ 0.00 | $ |

6. **Net income from rental and other real property**

| | Debtor 1 | Debtor 2 | | | |
|---|---|---|---|---|---|
| Gross receipts (before all deductions) | $ 0.00 | $ | | | |
| Ordinary and necessary operating expenses | − $ | − $ | | | |
| Net monthly income from rental or other real property | $ 0.00 | $ | Copy here ➔ | $ 0.00 | $ |

Debtor 1    James Alexander
         First Name    Middle Name    Last Name

Case number (*if known*)  1:21-bk-10214-MB

| | Column A Debtor 1 | Column B Debtor 2 |
|---|---|---|

7. **Interest, dividends, and royalties**    $ 135.00    $_____

8. **Unemployment compensation**    $ 0.00    $_____

Do not enter the amount if you contend that the amount received was a benefit under the Social Security Act. Instead, list it here:................................↓

For you ..........................................................    $_____ 0.00

For your spouse.............................................    $_____

9. **Pension or retirement income.** Do not include any amount received that was a benefit under the Social Security Act. Also, except as stated in the next sentence, do not include any compensation, pension, pay, annuity, or allowance paid by the United States Government in connection with a disability, combat-related injury or disability, or death of a member of the uniformed services. If you received any retired pay paid under chapter 61 of title 10, then include that pay only to the extent that it does not exceed the amount of retired pay to which you would otherwise be entitled if retired under any provision of title 10 other than chapter 61 of that title.    $_____ 0.00    $_____

10. **Income from all other sources not listed above.** Specify the source and amount. Do not include any benefits received under the Social Security Act; payments made under the Federal law relating to the national emergency declared by the President under the National Emergencies Act (50 U.S.C. 1601 et seq.) with respect to the coronavirus disease 2019 (COVID-19); payments received as a victim of a war crime, a crime against humanity, or international or domestic terrorism; or compensation, pension, pay, annuity, or allowance paid by the United States Government in connection with a disability, combat-related injury or disability, or death of a member of the uniformed services. If necessary, list other sources on a separate page and put the total below.

_____    $_____ 0.00    $_____

_____    $_____    $_____

Total amounts from separate pages, if any.    + $_____    + $_____

11. **Calculate your total current monthly income.** Add lines 2 through 10 for each column. Then add the total for Column A to the total for Column B.    $ 135.00    + $_____    = $ 135.00

**Total current monthly income**

| Part 2: | Sign Below |
|---|---|

By signing here, under penalty of perjury I declare that the information on this statement and in any attachments is true and correct.

✖ _____    ✖ _____
Signature of Debtor    Signature of Debtor 2

Date  02/23/2021    Date _____
     MM / DD / YYYY         MM / DD / YYYY

B2030 (Form 2030) (12/15)

# United States Bankruptcy Court
## Central District of California - San Fernando

In re __James Alexander__       Case No. _____

                                                 Debtor(s)       Chapter    __11__

## DISCLOSURE OF COMPENSATION OF ATTORNEY FOR DEBTOR(S)

1. Pursuant to 11 U .S.C. § 329(a) and Fed. Bankr. P. 2016(b), I certify that I am the attorney for the above named debtor(s) and that compensation paid to me within one year before the filing of the petition in bankruptcy, or agreed to be paid to me, for services rendered or to be rendered on behalf of the debtor(s) in contemplation of or in connection with the bankruptcy case is as follows:

   | | | |
   |---|---|---:|
   | For legal services, I have agreed to accept | $ | **20,000.00** |
   | Prior to the filing of this statement I have received | $ | **20,000.00** |
   | Balance Due | $ | **0.00** |

2. $__**1,738.00**__ of the filing fee has been paid.

3. The source of the compensation paid to me was:

   ■ Debtor      ☐ Other (specify):

4. The source of compensation to be paid to me is:

   ■ Debtor      ☐ Other (specify):

5. ■ I have not agreed to share the above-disclosed compensation with any other person unless they are members and associates of my law firm.

   ☐ I have agreed to share the above-disclosed compensation with a person or persons who are not members or associates of my law firm. A copy of the agreement, together with a list of the names of the people sharing in the compensation is attached.

6. In return for the above-disclosed fee, I have agreed to render legal service for all aspects of the bankruptcy case, including:

   a. Analysis of the debtor's financial situation, and rendering advice to the debtor in determining whether to file a petition in bankruptcy;
   b. Preparation and filing of any petition, schedules, statement of affairs and plan which may be required;
   c. Representation of the debtor at the meeting of creditors and confirmation hearing, and any adjourned hearings thereof;
   d. Representation of the debtor in adversary proceedings and other contested bankruptcy matters;
   e. [Other provisions as needed]
   **Advising the Debtor with regard to the requirements of the Bankruptcy Court, Bankruptcy Rules and the Office of the United States Trustee as they pertain to the Debtor; advising the Debtor with regard to certain rights and remedies of its bankruptcy estate and the rights, claims and interests of creditors; representing the CHapter 11 Debtor in any proceeding or hearing in the Bankruptcy Court involving its estate unless the Debtor is represented in such proceeding or hearing by other special counsel; conducting examinations of witnesses, claimants or adverse parties and representing the Debtor in any adversary proceeding except to the extent that any such adversary proceeding is in an area outside of LNBYB's expertise or which is beyond LNBYB's staffing capabilities;  preparing and assisting the Debtor in the preparation of reports, applications, pleadings and orders including, but not limited to, applications to employ professionals, interim statements and operating reports, initial filing requirements, schedules and statement of financial affairs, lease pleadings, cash collateral pleadings, financing pleadings, and pleadings with respect to the Debtor's use, sale or lease of property outside the ordinary course of business; representing the Debtor with regard to obtaining use of debtor in possession financing and/or cash collateral including, but not limited to, negotiating and seeking Bankruptcy Court approval of any debtor in possession financing and/or cash collateral pleading or stipulation and preparing any pleadings relating to obtaining use of debtor in possession financing and/or cash collateral; assisting the Debtor in the negotiation, formulation, preparation and confirmation of a plan of reorganization and the preparation and approval of a disclosure statement in respect of the plan; and performing any other services which may be appropriate in LNBYB's representation of the Debtor in Possession during the Chapter 11 bankruptcy case.**

7. By agreement with the debtor(s), the above-disclosed fee does not include the following service:
   **Matters which are outside of LNBYB's specialization, any matters outside of a Chatper 11 proceeding and any nondischargeability investigation or litigation**

In re    **James Alexander**                                          Case No.    **1:21-bk-10214-MB**
_____
            Debtor(s)

## DISCLOSURE OF COMPENSATION OF ATTORNEY FOR DEBTOR(S)
### (Continuation Sheet)

<table>
<tr><td colspan="2"><b>CERTIFICATION</b></td></tr>
<tr><td colspan="2">I certify that the foregoing is a complete statement of any agreement or arrangement for payment to me for representation of the debtor(s) in this bankruptcy proceeding.</td></tr>
<tr>
<td>
<b>February 23, 2021</b><br>
<i>Date</i>
</td>
<td>
<b>/s/ David B. Golubchik</b><br>
<b>David B. Golubchik 185520</b><br>
<i>Signature of Attorney</i><br>
<b>Levene, Neale, Bender, Yoo & Brill L.L.P.</b><br>
<b>10250 Constellation Blvd., Suite 1700</b><br>
<b>Los Angeles, CA 90067</b><br>
<b>(310) 229-1234</b><br>
<i>Name of law firm</i>
</td>
</tr>
</table>

| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| **David B. Golubchik 185520**<br>**10250 Constellation Blvd., Suite 1700**<br>**Los Angeles, CA 90067**<br>**(310) 229-1234**<br>California State Bar Number: **185520 CA** | |

☐  *Debtor(s) appearing without an attorney*

■  *Attorney for Debtor*

### UNITED STATES BANKRUPTCY COURT
### CENTRAL DISTRICT OF CALIFORNIA - SAN FERNANDO

| In re:<br><br>     **James Alexander**<br><br><br><br><br>                                                      Debtor(s). | CASE NO.:<br>CHAPTER: **11**<br><br>**VERIFICATION OF MASTER<br>MAILING LIST OF CREDITORS**<br><br>**[LBR 1007-1(a)]** |
|---|---|

Pursuant to LBR 1007-1(a), the Debtor, or the Debtor's attorney if applicable, certifies under penalty of perjury that the master mailing list of creditors filed in this bankruptcy case, consisting of __3__ sheet(s) is complete, correct, and consistent with the Debtor's schedules and I/we assume all responsibility for errors and omissions.

Date: __**February 22, 2021**__

_____
Signature of Debtor 1

Date: _____

_____
Signature of Debtor 2 (joint debtor) ) (if applicable)

Date: __**February 22, 2021**__

_____
Signature of Attorney for Debtor (if applicable)

This form is optional. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

*December 2015*                                                                 **F 1007-1.MAILING.LIST.VERIFICATION**
PUBLIC VERSION:  Filed April 6, 2021                                                                 Page 841

James Alexander
13535 Ventura Blvd
Ste C, PMB 405
Sherman Oaks, CA 91423


David B. Golubchik
Levene, Neale, Bender, Yoo & Brill L.L.P.
10250 Constellation Blvd., Suite 1700
Los Angeles, CA 90067


U.S. Trustee  San Fernando  Valley
915 Wilshire Blvd.
Suite 1850
Los Angeles, CA 90017


Barclay's Bank Delaware
PO BOX 8803
Wilmington, DE 19899


Buchanon Ingersoll Rooney
919 North Market Street, Suite 990
Wilmington, DE 19801


Capital One Bank USA
PO BOX 31293
Salt Lake City, UT 84131


Citicard
PO BOX 6241
Sioux Falls, SD 57117


Cred Inc. et al,
c/o Scott Cousins, Esq.
1521 Concord Pike, Suite 301
Wilmington, DE 19803

Discover Student Loans
PO BOX 30948
Salt Lake City, UT 84130


Franchise Tax Board
Special Procedures
POB 2952
Sacramento, CA 95812


Internal Revenue Service
Insolvency I Stop 5022
300 N. Los Angeles St., #4062
Los Angeles, CA 90012-9903


JP Morgan Chase


JPMCB HOME
700 KANSAS LN
Monroe, LA 71203


Los Angeles County Tax Collector
P.O. Box 54018
Los Angeles, CA 90054-0018


SOFI
2750 E COTTONWOOD PKWY
Salt Lake City, UT 84121


US Bank
PO BOX 13
Hillsboro, OH 45133

USAA
PO BOX 47504
San Antonio, TX 78265


Wells Fargo Bank
PO BOX 14517
Des Moines, IA 50306


WF Credit Services
PO BOX 14517
Des Moines, IA 50306

| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| **David B. Golubchik 185520**<br>**10250 Constellation Blvd., Suite 1700**<br>**Los Angeles, CA 90067**<br>**(310) 229-1234**<br>**185520 CA** | |
| ☐ *Debtor(s) appearing without an attorney*<br>☐ *Attorney for Debtor(s)* | |

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA - SAN FERNANDO**

| In re:<br><br>**James Alexander** | CASE NO.:<br><br>CHAPTER: **11** |
|---|---|
| | **DECLARATION BY DEBTOR(S)**<br>**AS TO WHETHER INCOME WAS RECEIVED**<br>**FROM AN EMPLOYER WITHIN 60 DAYS OF**<br>**THE PETITION DATE**<br>[11 U.S.C. § 521(a)(1)(B)(iv)] |
| Debtor(s). | [No hearing Required] |

Debtor(s) provides the following declaration(s) as to whether income was received from an employer within 60 days of the Debtor(s) filing this bankruptcy case (Petition Date), as required by 11 U.S.C. § 521(a)(1)(B)(iv):

<u>Declaration of Debtor 1</u>

1. ☐ I am Debtor 1 in this case, and I declare under penalty of perjury that the following information is true and correct:

   **During the 60-day period before the Petition Date** (<u>Check only ONE box below</u>):

   ☐ **I was paid by an employer.** Attached are copies of all statements of earnings, pay stubs, or other proof of employment income I received from my employer during this 60-day period. (If the Debtor's social security number or bank account is on a pay stub or other proof of income, the Debtor must cross out (redact) the number(s) before filing this declaration.)

   ☑ **I was not paid by an employer** because I was either self-employed only, or not employed.

Date: __February 22, 2021__    __James Alexander__    _____
                               Printed name of Debtor 1         Signature of Debtor 1

PUBLIC VERSION Filed April 6, 2021

Declaration of Debtor 2 (Joint Debtor) (if applicable)

2. ☐ I am Debtor 2 in this case, and I declare under penalty of perjury that the following information is true and correct:

**During the 60-day period before the Petition Date** (<u>Check only ONE box below</u>):

☐ **I was paid by an employer.** Attached are copies of all statements of earnings, pay stubs, or other proof of employment income I received from my employer during this 60-day period. (If the Debtor's social security number or bank account is on a pay stub or other proof of income, the Debtor must cross out (redact) the number(s) before filing this declaration.)

☐ **I was not paid by an employer** because I was either self-employed only, or not employed.

Date: _____    _____    _____
                                  Printed name of Debtor 2              Signature of Debtor 2

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

*December 2015*                                   Page 2                                **F 1002-1.EMP.INCOME.DEC**

PUBLIC VERSION - Filed April 6, 2021                                                    Page 846

# Exhibit G

Redacted in its entirety

# Exhibit H

March 21, 2021

**BY EMAIL**

James Alexander c/o
Mark Pfeiffer/Geoffrey Grivner
Buchanan Ingersoll & Rooney PC
919 North Market Street, Suite 990
Wilmington, Delaware 19801

**Re: *In re Cred Inc., et al.*, No. 20-bk-12836 (Bankr. D. Del.)**

Dear Mark,

As you are aware, the Committee uncovered that your client James Alexander improperly transferred and liquidated at least 100 Bitcoin of the Debtors' assets during the pendency of the Bankruptcy Cases.  Accordingly, the Committee sought emergency relief (the "Emergency Motion"), and the Court entered an emergency order requiring your client to turn over all Cred cryptocurrency and other assets in his possession and to submit to comprehensive discovery (the "Emergency Order").  Put plainly, the Court ordered that "[i]t is time for Alexander to start answering some difficult questions and do so in a way that gives the parties and the Court the ability to understand what's going on here."  (Hearing Tr. at 23.)[1]  Alexander has failed to comply with the Emergency Order.

We have engaged in countless emails, phone calls, and Zoom conferences in connection with our good faith efforts to obtain compliance from Alexander.  On Wednesday, March 17, 2021, you asked the Committee to provide a list of outstanding items from the Emergency Order that Alexander has failed to complete.  The Committee has provided these outstanding items on many occasions, but it will do so again here.  The Committee requests a response, document production, and a supplemental declaration by **March 24, 2021.**

**A.      The Declaration is Insufficient**

Alexander has failed to provide the detailed declaration required by the Emergency Order.  Both of Alexander's declarations fail to provide the information required by the Emergency Order.

---

[1] The transcript of the hearing on the Committee's motion for emergency relief will be referred to herein as the "Hearing Tr."

The Court ordered Alexander to "submit a declaration by sometime today that lays out exactly what he has, when he got it, how he got it, where it was transferred to, how it was liquidated, where the liquidated funds are located," (Hearing Tr. at 24), " provide an explanation for each of the transfers subsequent to the initial transfer of all the Bitcoin, as well as an explanation for why he liquidated the Bitcoin and where that money is located," ( Hearing Tr. at 35), and "[w]hen he's describing the transfer's, he's describing who the funds were – or who the Bitcoin or who the funds were transferred to and where they're currently residing so – and not just some anonymous account number.  He has to provide full disclosure here."  (Hearing Tr. at 37).  Alexander has failed to do so.

Alexander failed to meet the February 4, 2021 5:00PM deadline required by the Court and submitted a completely deficient declaration on February 6, 2021 (the "Alexander Declaration").  Since the entry of the Emergency Order, the Committee has been actively seeking a declaration that complies with the requirements of the Emergency Order.  Hours after receiving the Alexander Declaration, the Committee notified you, as counsel to Alexander, that the declaration was insufficient.  The Committee sent comprehensive emails to you on February 7, 2021 and February 23, 2021, identifying in detail the shortcomings in the Alexander Declaration.  You never substantively responded.

The Committee followed up on February 25, 2021, March 1, 2021, and March 14, 2021.  Although you responded to some of these emails indicating that Alexander was "working on it," You did not provide any substantive responses.  Accordingly, the Committee moved for contempt.  An hour prior to the hearing on the contempt motion, Alexander provided a supplemental declaration that failed to address any of the deficiencies outlined by the Committee (the "Alexander Supplemental Declaration").

Alexander's Supplemental Declaration does not comply with the Emergency Order.  Based on documents provided by Alexander and his admissions during his deposition, we know that he engaged in at least two key liquidations of Cred Bitcoin.  Alexander's Supplemental Declaration fails to explain those liquidations and Alexander's subsequent use of the proceeds of those liquidations.

The first known liquidation occurred in July and August of 2020 of approximately 75 Bitcoin.  Alexander's most substantial liquidation occurred on July 16, 2020 of approximately 56 Bitcoin.  This was the day after Cred filed a civil complaint against Alexander in California and the day before the temporary restraining order hearing.  Based on certain bank records and Alexander's deposition testimony, it is clear that some (but not all) of the proceeds of that liquidation were ultimately remitted to a JP Morgan Chase account controlled by Alexander and subsequently transferred to a Wells Fargo Account controlled by Alexander.  Following that transfer, Alexander executed a series of cash withdrawals, payments to so-called "consultants," other transactions that appear to be personal expenses, and a series of other transactions.  The Emergency Order requires Alexander to explain each of these transactions in detail.  Alexander merely provides the following explanation:



This is obviously deficient.  This does not explain the reasons for the transactions, the recipients of these transactions, and an explanation as to why Alexander has not returned to the Debtors these 75 Bitcoin or the proceeds derived from the liquidation.

Alexander's description is equally deficient concerning his January 16 and 17, 2021 liquidation of 100 of Cred's Bitcoin.  Alexander has provided certain bank records and Coinbase account records reflecting a massive liquidation of Bitcoin, followed by significant cash withdrawals, payments to "consultants," payments for trips, payments for other expenses that appear to be personal, and a series of other transactions.  Nevertheless, Alexander merely states the following with respect to the liquidation and subsequent use of 100 Bitcoin:



These descriptions are deficient.  This does not explain the reasons for these transactions or any of the subsequent transfers reflected in Alexander's bank statements.

Alexander has also not explained any of his significant cash withdrawals.  We have identified over $170,000 in cash withdrawals in just one of Alexander's Wells Fargo accounts.  According to Alexander, that Wells Fargo Account was a "dedicated account" funded entirely by the liquidation of Cred's cryptocurrency.  Nevertheless, Alexander does not explain any of these cash withdrawals in the Alexander Declaration or Supplemental Declaration.

Alexander must comply with the Emergency Order.  This is not a mere discovery dispute.  Alexander has not returned any of the proceeds from the liquidation of the 75 Bitcoin in July and August of 2020 and has returned only a portion of the proceeds from the liquidation of 100 Bitcoin in January 16 and 17, 2021.

The Committee demands a supplemental declaration containing the following by **March 24, 2021**:

1.    Identify in detail all cryptocurrency and fiat transactions traceable to Cred,[2] including (1) the date of each transaction; (2) the amount of each transaction; (3) the reason for each transaction; (4) the name and address of the natural person or entity receiving each transaction; and (5) the current location of the proceeds of each transaction.

2.    Identify in detail all cryptocurrency and fiat transactions related in any way to the July and August 2020 liquidation of 75 Bitcoin and all proceeds derived therefrom, including (1) the date of each transaction; (2) the amount of each transaction; (3) the reason for each transaction; (4) the name and address of the natural person or entity receiving each transaction; and (5) the current location of the proceeds of that transaction.

3.    Identify in detail all cryptocurrency and fiat transactions related in any way to the January 16 and 17, 2021 liquidation of 100 Bitcoin and all proceeds derived therefrom, including (1) the date of each transaction; (2) the amount of each transaction; (3) the reason for each transaction; (4) the name and address of the natural person or entity receiving each transaction; and (5) the current location of the proceeds of that transaction.

4.    Identify in detail all transactions in the "dedicated" Wells Fargo Account (9285) and any other bank account, cryptocurrency exchange account, or digital wallet which received any of the proceeds of any sales of Cred cryptocurrency or other assets, including (1) the date of each transaction; (2) the amount of each transaction; (3) the reason for each transaction; (4) the name and address of the natural person or entity receiving each transaction; and (5) the current location of the proceeds of that transaction.

**B.    Alexander Has Failed to Produce Records of Known Accounts Held By Financial Institutions**

The Committee knows Alexander has failed to produce bank records from known bank accounts. 41 days after the Committee served its document requests pursuant to the Emergency Order seeking account statements and other information about Alexander's personal bank accounts, his response is simply "Alexander will provide remaining bank statements." (*See* Alexander Responses to Phase Two Discovery Requests and Interrogatories, Response to Request 2.) Alexander needs to produce account statements and other information for all bank accounts that he owns or has access to by **March 24, 2021**.

---

[2] Alexander may limit these descriptions to transactions that exceed $500 USD.

As you know, the Committee sent Alexander comprehensive discovery requests and interrogatories on February 5, 2021.  The Committee also followed up on February 24, 2021 with a detailed email explaining that Alexander had failed to provide bank statements and other information concerning his personal bank accounts.[3]  As explained in the February 24, 2021 email, certain of these bank accounts received the proceeds of the liquidation of Cred Bitcoin.  Alexander admitted during his deposition that at least one Wells Fargo bank account that he has not produced received the proceeds of the 75 Bitcoin he liquidated in July and August of 2020.  (Alexander Dep. Tr. at 104.)  During the deposition, with respect to that Wells Fargo account, counsel stated "I will note for the record that information will be provided pursuant to the part two discovery that has been requested."  (Alexander Dep. Tr. at 104.)  However, Alexander still has not produced documents concerning that account or any other of his accounts.  The Committee has also identified other bank accounts in the Alexander Schedules that he has yet to produce.

Alexander has also produced sparing productions related to his cryptocurrency exchange accounts.  The Committee has merely received "transaction history reports" from Alexander's Coinbase accounts.  These reports do not reflect any fiat transactions or show how Alexander funded these accounts.  Coinbase is a financial institution that maintains comprehensive records for every account, including records of all fiat transactions.  Similarly, Alexander merely provided one excel file concerning his LedgerLive wallet.  The Committee is also aware that Alexander maintains accounts with DAI, but he has not produced any records concerning those accounts.  Alexander is required to produce all records concerning all of his accounts held at cryptocurrency exchanges and digital wallets.

Accordingly, the Committee demands that Alexander produce the following by **March 24, 2021**:

1.  All account statements, records, documents, and correspondence concerning all accounts at financial institutions that Alexander owns or has access to.  This request pertains to any and all bank accounts, cryptocurrency exchange accounts, digital wallets, and accounts with any cryptocurrency or blockchain company which Alexander has had access to in the last 24 months.

2.  All account statements, records, documents, and correspondence concerning the following bank accounts:

    a.  The Wells Fargo account that transferred $500,000 into Alexander's JP Morgan Chase Account (6006).  (*See* JP Morgan Chase (6006), July 31, 2020 Account Statement, at 10 ████████████████████████████████████████████ ████████████████████████████████████████

---

[3] Alexander produced some account statements for one Wells Fargo Account (9285), one DIP account, and one J.P. Morgan Chase account.

█████████████████████████████████████████████

b.    The Alexander Custom Management bank account – This account received the "salary," the $100,000 "prepaid salary," and a series of other bank transfers from the "dedicated" Wells Fargo account (9285).  (*See* Alexander Dep. Tr. at 43 ("Q. There was $100,000 transferred out of this account on February 4th, 2021 to an account held by Alexander Custom Management.  The Account Alexander Custom Management is owned and controlled by you, right? A. Yes.")).

c.    Wells Fargo Account (1923).  (*See* Alexander Schedules at 6.)[4]

d.    Wells Fargo Account (2155).  (*See* Alexander Schedules at 6.)

e.    "Other Wells Fargo."  (*See* Alexander Schedules at 7.)

f.    DIP Wells Fargo Account (0816).  (*See*  Alexander Schedules at 6.)

**C.    Alexander Simply Refers to his Personal "Bankruptcy Schedules" in Response to Interrogatories and Document Requests, but his Bankruptcy Schedules are Demonstrably Incomplete**

Alexander does not substantively respond and just refers to the "bankruptcy schedules" for 25 of 28 interrogatories and 10 of 17 document requests.  This is insufficient for a number of reasons.  Perhaps the most important reason is the fact that Alexander's Schedules are demonstrably incomplete.

For example, on Alexander's Schedules on Official Form 106A/B, Alexander lists that he has "0" cash in his possession.  Alexander testified that he had $60,000 in the trunk of his car on February 9, 2021.  We have also identified significant repeated cash withdrawals from the "dedicated" Cred Wells Fargo bank account of over $170,000.  You represented that Alexander has transferred all cash in his possession to his Debtor in Possession bank account (the "DIP Account").  But we have received a copy of the account statement from the DIP Account and there are no such cash deposits.  Alexander withdrew a significant amount of cash and his simple reference to the Alexander's Schedules which list "0" cash is plainly insufficient.

As another example, Alexander stated that all cryptocurrency, cryptocurrency accounts, and digital wallets that he owns or has access to are set forth in the Alexander Schedules.  But Alexander's Schedules list zero cryptocurrency accounts and no digital wallets.  This too is false.  Alexander maintains at least two (and likely more) Coinbase accounts, Alexander owns at least one "off-exchange" ledgerlive wallet, and Alexander maintains a DAI account.  Alexander only discloses in the Alexander Schedules that he controls one Bitcoin and some LBA tokens.  The Committee knows that Alexander has other cryptocurrency in his ledgerlive wallet and that he

---

[4] The schedules that Alexander submitted in connection with his personal bankruptcy will be referred to herein as the "Alexander Schedules."

has other cryptocurrency including Ethereum and DAI.  The Committee strongly suspects that Alexander controls other cryptocurrency that he has not disclosed.

Alexander has also not provided other basic information that the Committee requested. This includes personal financial statements and any applications he has made in connection with mortgage lenders and other credit applications.

The Committee demands the following by **March 24, 2021**:

1.      Produce documents responsive to the Committee's document requests, without reference to the Alexander Schedules.

2.      Respond to the Committee's interrogatory responses, without reference to the Alexander Schedules.

**D.      Alexander Provided Unmarked Documents Without any Explanation**

Alexander produced some unmarked documents the night before the contempt hearing. They appear to reflect some transactions.  Alexander produced unmarked .pdfs, which do not appear to be bank records, and do not contain headers, footers, or other identifiers.  We requested an explanation about what these documents are on March 17, 2021.  Please explain what these documents are by **March 24, 2021**.

* * *

As you know, the Committee is aggressively pursuing Alexander's compliance with the Emergency Order.  As directed by Judge Dorsey, the Committee will be seeking relief from the United States District Court for the District of Delaware.  The Committee demands compliance by **March 24, 2021**.  This request is without prejudice to all other rights and remedies.  In connection with this submission, the Committee reserves all rights and waives none.

Sincerely,

Timothy W. Walsh

CC:     Darren Azman (dazman@mwe.com)
        Joseph Evans (jbevans@mwe.com)

# Exhibit I

Redacted:  Pages 865 - 1511



**Geoffrey G. Grivner**
302 552 4207
geoffrey.grivner@bipc.com

919 North Market Street, Suite 990
Wilmington, DE  19801-3036

T 302 552 4200
F 302 552 4295

March 30, 2021

**VIA ELECTRONIC MAIL**

Timothy W. Walsh
Partner
McDermott Will & Emery LLP
340 Madison Avenue
New York, New York 10173-1922
Tel: (212) 547-5837
Fax: (212) 547-5444
Email: twwalsh@mwe.com

     **Re**: *In re Cred Inc., et al.*, No 20-bk-12836 (Bankr. D. Del.)

Dear Timothy:

     I write on behalf of James Alexander ("Mr. Alexander") in response to your March 21, 2021 letter (the "Letter") on behalf of the Official Committee of Unsecured Creditors in the above-referenced action.  We have conferred with our client and have obtained further information to supplement Mr. Alexander's prior productions and submissions based on your Letter.  Enclosed herewith, please find:

- A Second Supplemental Declaration of James Alexander, providing further information as to the July 1-16, 2020 and January 16-17, 2021 transactions;

- A supplemental production of documents including:

  o Account statements from June 2019 through January 2021 for Mr. Alexander's JP Morgan Chase Bank, N.A. account ending x6006;

  o Account statements from August 2020 through February 2021 and a Check Register for Mr. Alexander's Wells Fargo Business Choice Checking account (dba James Alexander Cred) ending x9285;

March 30, 2021
Page - 2 -

    o   Account statements from June 2019 through February 2021 and a Check Register for Mr. Alexander's Wells Fargo Custom Management Checking account ending x1923;

    o   Account statements from February 2021 for Mr. Alexander's Wells Fargo Everyday Checking account (Debtor in Possession Ch 11 Case 12-10214 (CCA)) ending x0816;

    o   Account statements from June 2019 through February 2021 for Mr. Alexander's Wells Fargo Business Everyday Checking account ending x2155;

    o   Account statements from July 2020 through February 2021 for Mr. Alexander's Wells Fargo Way2Save Savings account ending x6552;

    o   A screen shot of Mr. Alexander's Bittrex account;[1] and

    o   Screen shots of Mr. Alexander's Coinbase account.

In your Letter, you requested additional documentation related to Mr. Alexander's Coinbase account, apart from the transaction reports that were provided in connection with Mr. Alexander's initial production of documents. I understand that the Coinbase transaction reports that have already provided are complete records as to all transactions that occurred in the Coinbase accounts. As such, there are no additional documents to be provided related to that account.

Your Letter also requested additional documentation related to Mr. Alexander's LedgerLive wallet, apart from the transaction reports provided in connection with Mr. Alexander's initial production of documents. I understand from Mr. Alexander that the file called "ledgerlive-operations-2021.02.07.csv" provided to you on February 7, 2021 is the complete record of all transactions that occurred on the Hardware Wallet.[2] Additionally, any transaction that occurred in the Hardware Wallet is publicly available through https://etherscan.io/ ("Etherscan") which allows for verification of all transactions provided in the Hardware Wallet. The Official Committee is also in possession of the Seed Phrase that allows control of the Hardware Wallet and which would enable them to perform any operation.  Since providing this seed phrase around February 7, Mr. Alexander no longer has unique control of the Hardware Wallet and anybody in possession of the

---

[1] As I believe was noted previously, Mr. Alexander's Bittrex account has been disabled for several months. Efforts are ongoing to get the account re-enabled. As soon as the assets are available, the LBA will be transferred to the Debtor and the BTC will be transferred to the California Bankruptcy Trustee.

[2] LedgerLive is an "app" that links to the Hardware Wallet.  LedgerLive transactions are only possibly through the Hardware Wallet.

March 30, 2021
Page - 3 -

Seed Phrase could undertake any transaction in this Hardware Wallet. The Blockchain and crypto transactions offer publicly verifiable and complete transparency.

Your Letter further requested documentation related to Mr. Alexander's accounts with DAI. I understand from Mr. Alexander that DAI is a stable coin which would be an asset in the Coinbase or LedgerLive accounts.  As noted above, the complete transactions histories for Coinbase and Ledger accounts have been provided.  Any DAI transactions would be captured in the transaction histories and can be verified publicly through Etherscan.  Although already referenced in the Coinbase accounts, there is a Coinbase wallet linked to a Coinbase account.  For clarity, the publicly-available data related to this wallet can be accessed at: https://etherscan.io/address/0xb390258d2b0c9e384014a9108366786aec334fc3. This provides an example of how any transaction can be publicly reconciled within the Coinbase or Hardware Wallet.

Your Letter also requested clarification as to certain PDFs produced to you on March 16th. These documents produced in PDF format to you were provided to me by Mr. Alexander as Excel files titled "Checking3", "Checking3 (1)", and "Checking3 (2)". Mr. Alexander has explained to me that these documents are .csv records of all activity in Mr. Alexander's Wells Fargo Custom Management Checking account ending x1923. These PDFs previously provided are supplemented by the statements provided herewith, as noted above.

Further, your Letter requested further supplementation of Mr. Alexander's Declaration. Enclosed herewith please find a Second Supplemental Declaration of James Alexander which elaborates on the July 1-16, 2020 and January 16-17, 2020 transactions as well as the status of the $60,000 cash Mr. Alexander disclosed in the February 9, 2021 deposition.  If you have questions related to any individual expenses from the liquidated bitcoin (listed in the Wells Fargo "dba Cred Capital" account ending x9285), these should be specified.

Should you have any questions, please feel free to contact me at your convenience.


Respectfully submitted,

*/s/ Geoffrey G. Grivner*
Geoffrey G. Grivner, Esq.


Cc:   Darren Azman (*via* E-Mail)
       Joseph B. Evans (*via* E-Mail)
       Mark Pfeiffer (*via* E-Mail)
       James Alexander (*via* E-Mail)

# Exhibit J

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:

CRED INC., *et al.*,[1]

Debtors.

Chapter 11
Case No. 20-12836 (JTD)
Jointly Administered

## NOTICE OF TRANSFER OF ASSETS

PLEASE TAKE NOTICE THAT, at the direction of the Court following the hearing on February 5, 2021, James Alexander transferred the identified Bitcoin and USD stablecoin to Debtors' representative pursuant to the instructions received from those representatives, except for a small amount of additional cryptocurrency that he and the Debtors' representative were unable to transfer for technical reasons. The parties agreed to revisit this issue and Mr. Alexander remains committed to effectuating the transfer of this cryptocurrency at the earliest possible moment.

Respectfully submitted,

**BUCHANAN INGERSOLL & ROONEY PC**

*/s/ Geoffrey G. Grivner*
Geoffrey G. Grivner (#4711)
919 North Market Street, Suite 990
Wilmington, DE 19801
Telephone: (302) 552-4200
Facsimile: (302) 552-4295
Email: geoffrey.grivner@bipc.com

*Attorneys for James Alexander*

Dated: February 6, 2021

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), Cred (Puerto Rico) LLC (3566). The Debtors' mailing address is 3 East Third Avenue, San Mateo, California 94401.