**mwe.com**

Ethan H. Townsend
Attorney at Law
ehtownsend@mwe.com
+1 302 485-3911

June 1, 2021

**VIA E-FILING**

The Honorable Maryellen Noreika
District Court of Delaware
J. Caleb Boggs Federal Building
844 N. King Street, Unit 31, Room 4124
Wilmington, Delaware 19801-3555

Re:     *Official Committee of Unsecured Creditors of Cred, Inc. v. James Alexander*, No. 21-cv-417

Dear Judge Noreika:

We write on behalf of the Cred Inc. Liquidation Trust, as successor-in-interest to the Official Committee of Unsecured Creditors of Cred Inc. (the "Trust") to supplement the motion for contempt by advising the Court of Defendant James Alexander's conduct during recent deposition sessions.  Specifically, the Trust continued the February 9, 2021 deposition of Mr. Alexander on May 13, 2021, May 14, 2021 and May 19, 2021.[1]  Alexander refused to answer questions, constantly complained that the Trust was acting in "bad faith," and repeatedly claimed that he had not had time to prepare to answer questions about his cryptocurrency transactions.  These deposition sessions culminated in Alexander asserting the Fifth Amendment in response to questions about Quantcoin and whether he stole 800 Bitcoin, refusing to answer the question "are you in the United States," and abruptly exiting the Zoom deposition following a direction from his counsel to answer the pending question about his current whereabouts. Accordingly, we respectfully request that the Court consider this information in connection with the pending motion for contempt, to issue a bench warrant, and to force Alexander to provide the Trust and this Court with the information that the Honorable John T. Dorsey of the Bankruptcy Court for the District of Delaware ordered him to provide.

1.     **Procedural Background**

On February 5, 2021, the Bankruptcy Court entered an Emergency Order requiring Alexander to sit for a deposition and provide comprehensive discovery to the Trust and the Debtors.  (*See In re Cred Inc., et al.*, No. 20-12836, ECF No. 486) (the "Emergency Order").  The Emergency Order compelled Alexander to "sit for [a] deposition at the committee and debtors' time, whatever time of their choosing."  (ECF No. 645, Ex. G)(the "Feb. 5, 2021 Hr'g Tr.")[2]  The Emergency Order also required Alexander to turn over the Debtors' cryptocurrency, to submit a detailed declaration, and to comply with

---

[1] Each deposition session was for a limited amount of time due to Alexander's purported health issues.

[2] The February 5, 2021 hearing transcript is attached as Exhibit A.  The February 9, 2021, May 13, 2021, May 14, 2021, and May 19, 2021 deposition transcripts are attached under seal as Exhibits B-E.



Letter to the Honorable Maryellen Noreika
June 1, 2021
Page 2

comprehensive discovery.  (*Id.*)  Nearly four months later, Alexander has yet to fulfill his obligations under the Emergency Order.

Between February 5, 2021, and March 15, 2021, the Trust issued interrogatories and discovery requests authorized by the Emergency Order, sent three discovery letters identifying transactions for Alexander to explain pursuant to the Emergency Order, and proactively engaged with Alexander's counsel to obtain the information as quickly and efficiently as possible.  Despite these efforts, Alexander's obstructive behavior continued and refused to provide substantive answers explaining the transactions reflected on his account statements in contravention of the Emergency Order.  As a result, the Trust filed an Emergency Motion for Contempt on March 15, 2021.  (ECF No. 643) (the "Contempt Motion").

**2.     The May 19, 2021 Deposition Session Revealed at Least One Previously Undisclosed Coinbase Account**

The location of the cryptocurrency that Alexander stole from Cred has been of particular interest to the Trust.  Throughout this painstaking discovery process, Alexander has been particularly evasive concerning cryptocurrency transactions and his cryptocurrency accounts and wallets.  Alexander first represented he held one Coinbase account, then disclosed two Coinbase accounts, and it was not until the May 19, 2021 deposition that it became clear that he has yet another Coinbase account.  Alexander also held a LedgerLive wallet, which held the cryptocurrency Alexander took from Cred.  The cryptocurrency transactions in the LedgerLive wallet are still a mystery because Alexander has not provided documentation or meaningful explanations about the origin or destination of many of those transactions.

During a recorded Zoom video call on February 6, 2021, Alexander asserted that he held only one Coinbase account and "[did] not personally have access to another Coinbase account."  (*See* Recorded Zoom Call at 1:50:45.)  That statement was false.  Alexander subsequently provided Coinbase account statements for two Coinbase accounts.

It was not until the fourth deposition session on May 19, 2021, that Alexander revealed that he holds at least one more previously undisclosed Coinbase account.  The Trust examined Alexander on the various transactions in his LedgerLive wallet.  The Trust focused on transactions in the LedgerLive wallet which were not reflected in Alexander's Coinbase records.  These transactions were of interest because the origin and destination of these transactions are unknown.  Alexander was generally obstructive when asked about these transactions.  However, perhaps errantly, he revealed information about one transaction after looking at his iPhone, which established that he has another previously undisclosed Coinbase account:

Q.     The question was about the September 17th, 2020 transaction of $89,995.92 going out of your Ledger Live.  It's Line Item 47.  Where were you sending that money?

A.     It came from Coinbase to the Ledger wallet.

Q.     This is an out transaction.  So this is [USDC] from the Ledger Live wallet out to somewhere else and I want to know where it went.



Letter to the Honorable Maryellen Noreika
June 1, 2021
Page 3

A.    From Ledger to Coinbase.

Q.    One moment.  Which Coinbase account did this go to?

A.    Coinbase wallet address ending ▮▮▮

Q.    What is the e-mail account on that Coinbase account?

A.    I'm on the mobile app here.  It's only showing user name – oh.  Here it is.  It's the Level Capital.

Q.    How many Level Capital Coinbase accounts do you have?

A.    Just one to my recollection.

(Ex. E, May 19, 2021 Dep. Tr. at 83-84.)

At this point, the Trust showed Alexander the Coinbase account records he produced and asked him to identify the $89,995.52 transaction.  Alexander admitted that it was not in the Coinbase records he provided, and stated:  "I have a record of it right here on my mobile app."  (*Id.* at 86.)  The Trust repeatedly asked Alexander if he had any Coinbase accounts other than the two he provided to which Alexander answered "not that I'm aware of."  (*Id.*)  The Trust continued to press the issue concerning this Coinbase account with a wallet address ▮▮▮, which Alexander had not previously disclosed:

Q.    You produced account records for two Coinbase accounts.  On neither of those records is this $89,995 transaction reflected.

A.    No.  I agree.  I don't see it, but I see it on my app—my mobile app.  I don't have an answer for you.

(*Id.* at 85.)

That was not the only transaction that Alexander revealed was sent to a previously undisclosed Coinbase account.  A November 16, 2020 $50,000 transaction apparently went to either the same or another undisclosed Coinbase account.  (*Id.* at 96 ("Joe, same problem, I'm seeing it here in my mobile app and I'm not seeing that here [in the Coinbase records Alexander produced")].)  When asked additional questions about this previously undisclosed Coinbase account, Alexander took it upon himself to object:

Q.    So there are other—there are Coinbase account records from an account which you control that have not yet been provided; is that what you're saying?

A.    No.  That's not what I'm saying at all.  I'm showing on my mobile app here the transaction and it's not reflected on the statement.  I really don't appreciate the way you twist my words around or maybe you were just misunderstanding me.



Letter to the Honorable Maryellen Noreika
June 1, 2021
Page 4

Q.      Maybe, because I'm looking at the Coinbase records you provided that is
        supposed to be the full and complete set and you're identifying another
        Coinbase Record which are not—

A.      Okay.  Well, I just object to the manner in which you're talking to me at
        this stage—

Q.      That's not how this works –

A.      - and I –

Q.      Your lawyer can object.  You can't object.  That's not how this works.
        On December 30th, 2020 there is a transaction for $39,995 USDC coming
        in.  It is on the second page of Coinbase 2.

A.      I need a break, Joe.  I'm not feeling too well, so is this a good juncture to
        pause for a moment?

Q.      Sure.  Why don't you take – you want to make [it] ten minutes, come
        back at 3:31.

(*Id.* at 96-97.)

The Trust has exhausted its options to attempt to obtain meaningful compliance from Alexander, who is
obviously playing a shell game with his cryptocurrency accounts.  It is still unknown how many other
cryptocurrency accounts Alexander may be hiding.  It is also notable that prior to this May 19, 2021
deposition session, Alexander had disclosed one LedgerLive wallet, two Coinbase accounts, and a
Bittrex account he claims he cannot access.  Alexander opened the LedgerLive wallet on July 1, 2020
when he deposited the proceeds of sales of Cred's Bitcoin.  The two Coinbase accounts he disclosed
contained only a trace amount of cryptocurrency before he began depositing Cred's Bitcoin and the
proceeds thereof in mid-late 2020.  To take Alexander at his word that these are his only cryptocurrency
accounts and wallets would mean that he personally held only a trace amount of cryptocurrency prior to
mid-2020.  This is despite the fact that he has been in the cryptocurrency industry for years and was the
Chief Capital Officer of Cred who was personally responsible for developing complex trading strategies
involving tens of millions of dollars' worth of customer cryptocurrency.  It is simply not credible.

**3.      Alexander Was Obstructive and Non-Compliant During the Deposition**

During each deposition session, Alexander was willing to speak at length about other executives at Cred
and what he claimed to be "mismanagement," but when asked questions about a series of "cash
withdrawals" from his bank accounts and his cryptocurrency transactions he was obstructive, evasive,
and claimed to be short of breath.  He repeatedly asked for breaks and more time to prepare.  The Trust
granted him these luxuries, but nevertheless Alexander remained non-compliant and feigned surprise
that the Trust would be asking questions about particular large cryptocurrency transactions, each of
which were in excess of $20,000.



Letter to the Honorable Maryellen Noreika
June 1, 2021
Page 5

During the May 13, 2021 deposition session, the Trust asked Alexander a series of questions about transactions in his Ledger Live wallet. The Emergency Order required Alexander to explain all of these transactions in detail in February, there has been a prior deposition session in February, and repetitious letter writing on the subject of Alexander's cryptocurrency transactions and the current location of the cryptocurrency he stole from Cred. Despite months of notice that the Trust would be asking about these transactions, Alexander complained and argued that the Trust should provide Alexander with more data or lend its consultants to him to help him answer questions. (*See* Ex. C, May 13, 2021 Dep. Tr. at 88 ("A.…But I don't know what that wallet address is. If you could provide me with some more detail I, you know, would be more than happy to respond. That's as much as I can tell you today. Q. Try another transaction. The issue with, James, these are your wallets, your transactions. So the detail is going to be with you."); *id.* at 92 ("A. Yeah, I tried to give you as much color of what I think it is, Joe. I don't know. As I said, if you could provide me with more data from your consultants, we could try and break the transactions down chronologically, or some way that we can track them . . . Q. We are dealing with the data you provided. The dat[a] of the transaction[s] you executed. The details are going to be with you not with us.") Alexander argued that the Trust or its consultants were obliged to help him answer questions about the cryptocurrency transactions he executed using Cred's cryptocurrency. (*See, e.g.,* Ex. D, May 14, 2021 Dep. Tr. at 16 ("I would also recommend that you engage with your consultants to provide any additional data that might be helpful to track these.").)

Before the next deposition session on May 14, 2021, the Trust provided Alexander with copies of the three cryptocurrency account records that he had previously produced. The transactions at issue were the subject of the February 9, 2021 deposition, the May 13, 2021 deposition session, written discovery requests, three discovery letters, and countless emails. Nevertheless, during the May 14, 2021 deposition session, Alexander feigned ignorance that he would be asked questions about these cryptocurrency transactions. In an obvious effort to delay answering questions, Alexander claimed there was further "research" that apparently he had not yet performed:

> Q: Okay. So there is work that you can do to figure out what these transactions are for, who sent you the money, and for what reason, and you can give us those answers in the future?
>
> A. I can look into it. I can research it. I don't know if I'll have an answer for you or not. If I do have an answer, I will provide it to you.
>
> Q. On September 11, 2020, line 33, there's a $100,000 transaction out. Where were you sending $100,000?
>
> A. Joe, I don't recall. I, you know—If you'd given me some time to prepare for this—these questions, I could have, but just by putting a ledger in front of me with a wallet reference, I'm not—I'm not going to be able to tell you.
>
> Q. So these are your documents that you provided to us in response to an order that required you to give us all transaction data related to these accounts, related to the Coinbase records, and related to the cryptocurrency. You knew these questions were coming, didn't you, that we were going to ask you about these transactions?



Letter to the Honorable Maryellen Noreika
June 1, 2021
Page 6

               Mr. Grivner: Object to the form.

A.      I did not, Joe.

(*Id.* at 10.)  The Trust reminded Alexander of the following:  "[t]he emergency order requires him to explain [all of these transactions].  Mr. Alexander was well aware that the Trust would be asking questions about these transactions.  These have been at issue for the past five months.  It is not a surprise that we would be asking about transactions in excess of hundreds of thousands of dollars in and out of an account that was funded entirely by Cred Capital funds—or Cred Inc. funds, better said."  (*Id.* at 18.)

Thereafter, counsel for Alexander stated that Alexander would research these transactions if the deposition was adjourned:  "Mr. Evans, as we discussed, we don't object to keeping the deposition open in light of the testimony that was proffered today … Mr. Alexander has represented that apparently significant research needs to be done with respect to find answers to certain of your questions.  We will continue the dialogue with respect to the appropriate time, but we do not object to keeping the deposition open."  (*Id.* at 31.)  The parties agreed to reconvene the deposition on May 19, 2021, so that Alexander would have sufficient time to conduct the "research" he claimed he heeded to answer questions about his own cryptocurrency transactions.

Any "research" that Alexander conducted did not make him any more forthcoming during the May 19, 2021 deposition session.  Alexander continued to feign ignorance about the cryptocurrency transactions.  Alexander argued and complained throughout the deposition:

Q.      Joe, as a general comment, we've been through this and it would be a lot more productive and I could be more helpful if you would highlight specific questions and I'd have time to prepare responses for.  You know, you've chosen random transactions for the second time in since the last deposition and this deposition and it's not fair to me to be put on the spot trying to identify transactions where there are so many and so many documents."

Q.      Okay.  These –

A.      So I –

Q.      These are the same questions –

A.      Like to –

Q.      These are the same questions we've been asking since February, okay, and we've asked this now this is the fourth day of depositions and you're telling me its unfair to answer these questions.  There's a court order requiring you to answer these questions –

A.      Joe, there are thousands of pages of documents, okay –

Q.      There are three pages


McDermott
Will & Emery

Letter to the Honorable Maryellen Noreika
June 1, 2021
Page 7

A.       - there are dozens –

Q.      There are three –

A.      - if not hundreds of do –

Q.      No.  I'm not arguing with you.  On September 11th, 2020, there's a $100,000 transaction going out.  What is the purpose of that transaction?

A.      I've answered the question the question to the best of my ability given the limited time I've had to prepare and the pressure that you're putting me under to randomly ask one day – to provide specific details about one data point among many thousands.

Q.      There are – these are not –

A.      Quite easily have prepared –

Q.      I told you – excuse me.  There's no question pending, okay.  These are transactions that are in your Ledger Live account that are not reflected in the Coinbase accounts that you provided.  You were required to produce all cryptocurrency transactions, all cryptocurrency wallets, all asset account statements, and other records reflecting your personal assets, as well as the trading, and sale, the ultimate liquidation of Cred's cryptocurrency.  We are going over very specific transactions.  This is not – this isn't a surprise James.  These were all on your document request in February.  And that transaction that I just asked about, $100,000 is a new transaction, so I'll repeat the question again.  On September 11th, 2020, there is a $100,000 transaction of USDC going out, what is the purpose of that transaction.

A.      I've answered that question.

Q.      What's the answer?

A.      I've already answered the question.  Please refer to my previous response.

(Ex. E, May 19, 2021 Dep. Tr. at 62.)

Each question about cryptocurrency transactions of tens and hundreds of thousands of dollars were met with the same complaints and obfuscation.  With respect to a number of other cryptocurrency transactions, Alexander claimed that the "out" transaction would be followed by an "in" transaction because it was subject to a decentralized finance or "defi" contract.  There has been no substantiation whatsoever that these transactions were subject to any defi contract.  Nevertheless, when the Trust identified "out" transactions and asked Alexander to identify the "in" transaction in the LedgerLive wallet, Alexander was unable to do so, resorted to accusing the Trust of acting in bad faith, and otherwise refused to answer.  (*See id.* at 74 ("Q.  Are you able to identify for me on the Ledger Live



Letter to the Honorable Maryellen Noreika
June 1, 2021
Page 8

account records that you provided to us in February the transaction which you claim shows that a $100,000 plus interest came back into this account from this Zapper DeFi transaction? A. Asked and answered. Q. No, it wasn't. A. I disagree."); *id.* at 76 ("Q. Which of the transactions d[o] you claim the $34,925 of Cred Capital's funds came back to Cred Capital plus interest? A. I'm—I'm unable to answer that question. I don't have sufficient time to prepare a response during a live deposition."); *id.* at 79-80 ("Q. Can you identify for me the out placement for which this transaction is the in placement? A. Not in a live deposition as I – it's not realistic."). In response to questions about cryptocurrency transactions, Alexander accused Trust counsel of "bad faith" on eight separate occasions. (*See* Ex. D, May 14, 2021 Dep. Tr. at 32; Ex. E, May 19, 2021, Dep. Tr. at 64, 65, 66, 77, 96, 106.)

Alexander continuously demanded that the Trust lend its consultants to Alexander to help him answer the questions about his own cryptocurrency transactions and said that he was not prepared to answer questions about certain cryptocurrency transactions. The Trust told Alexander repeatedly that it was his obligation to answer these questions and his obligation to do so has been outstanding since February 5, 2021. (*See, e.g., id.* at 103-105 ("There is an emergency order requiring you to explain every transaction in meticulous detail, every single one. That order's been outstanding February . . . You're coming here today claiming for the – this is the fourth time we've done this . . . We're asking you questions about [these transactions] and you're saying you're not prepared to answer them. That's not sufficient James. It's not sufficient and [these questions] are not a surprise. We're keeping this deposition open. This is not complete. You're not prepared to answer these questions apparently or you don't want to answer the questions because you asked for more time, your counsel asked for more time. You asked for more time to prepare and do research. And here we are again and you're still saying you don't have the information or data that you need - - A. Joe, about half of what you said is true -- Q. -- this is information that you are required to provide to us. We don't work for you. We are not your consultants – A. Joe - - Q. – we don't have to answer these questions. You are required to provide this information to us, so we're keeping this deposition open. The information has to be provided and you had to produce it in February and we find out today there's another Coinbase account with records that we don't have yet three months after the emergency order.")

Although Alexander claimed repeatedly that there were "hundreds" of transactions and "thousands" of data points, the Trust actually only asked about a total of ten transactions from the Ledger Live account during these deposition sessions. (*See* Ex. D, May 14, 2021 Dep. Tr. at 67.) Alexander produced only two .pdfs of Coinbase records and one excel file of LedgerLive wallet account records. Each question the Trust asked were about large transactions in excess of $20,000 into and out of Alexander's LedgerLive wallet or Coinbase accounts.[3]

Alexander also claimed to be experiencing health issues that required multiple breaks, and requested that the Trust limit the duration of each day's deposition session. Alexander testified expansively about mismanagement at Cred by other executives without being prompted by additional questions (*see, e.g.,*

---

[3] This LedgerLive wallet excel file contains a total of 71 transactions, many of them are for *de minimus* amounts for which no questions were asked.



Letter to the Honorable Maryellen Noreika
June 1, 2021
Page 9

Ex. D, May 14, 2021 Dep. Tr. at 33-53), but when confronted about cryptocurrency transactions and cash withdrawals, he suddenly became afflicted with health issues.[4]

**4.      Alexander's Useless Responses to Discovery Requests**

Alexander's obstructive behavior extends to written discovery.  For four months, the Trust has attempted to obtain a fulsome declaration addressing the requirements of the Emergency Order.  Alexander's most recent submission, the Third Supplemental Declaration of James Alexander (the "Third Supplemental Declaration")[5] is essentially worthless because instead of providing answers about what each transaction was for, he instead provided multiple options for most transactions, including that the recipient and reason for the transaction is "unknown."  Alexander doubled-down on these insufficient responses by testifying during his testimony that those were his final responses "as of today."  (Ex. E, May 19, 2021 Dep. Tr. at 111.)

In its Discovery Requests and three written discovery letters, the Trust identified a series of questionable transactions from one of Alexander's checking accounts ending ████ many of which are identified in the bank records as "cash withdrawals."  In the Third Supplemental Declaration, Alexander finally addressed these transactions by stating a series of two to five options for each transaction including some combination of payments to consultants, payments for salary, payments for reimbursement, or "doesn't know." (*See* Ex. F, Third Supp. Dec. at 4-5.)  As one example, regarding a $5,000 cash withdrawal in November of 2020, Alexander responded that the withdrawal was "either payment to Delon de Metz for consulting services, expense reimbursement myself [sic] or unknown." (*Id* at 6.)  He also referred to a number of cash withdrawals as "either my salary or unknown." (*See, e.g., id.* at 5 ("The $10,000 cash withdrawal on November 27, 2020 was either my salary or unknown."); *see also id.* at 6 ("The $10,000 cash withdrawal on February 3, 2021 was either expense reimbursement or my salary or unknown.")  Out of 21 identified transactions, Alexander was only able to provide a definitive answer regarding six. (*Id* at 4-6.)  Alexander confirmed that these responses were his final answers "as of today." (Ex. E, May 19, 2021 Dep. Tr. at 110-111 ("Q. Your descriptions of cash withdrawals for each of these cash withdrawals identified two, or three, or four different purposes that this transaction might be for.  I'm asking you, do you have any further information today than you had on May 10th [the date of the declaration] or are these your final answers.  A. Those are the answers as of today.")

These answers are insufficient.  Although Alexander purportedly operated Cred Capital as the sole executive and director, after four declarations and four months of efforts by the Trust, he remains



[5] A copy of the Third Supplemental Declaration has been attached as Exhibit F and filed under seal.



Letter to the Honorable Maryellen Noreika
June 1, 2021
Page 10

unwilling to identify the purpose and current location of "cash withdrawals" and other significant
transactions from his bank accounts.

**5.     Alexander Asserted His Fifth Amendment Privilege Regarding a Massive Theft**

Finally, Alexander asserted his Fifth Amendment right, but only to questions about whether he stole 800
Bitcoin from Cred in connection with the "Quantcoin" fraud.  Shortly thereafter, he refused to answer
whether he was currently located in the United States and exited the deposition while it was pending.

When the Trust asked about Quantcoin, Alexander immediately asserted the Fifth Amendment and
refused to answer.  (*See* Ex. E, May 19, 2021 Dep. Tr. at 111 ("Q. When did you first learn of the
opportunity for Cred to invest in Quantcoin? A. On advice of counsel, I assert my Fifth Amendment
privilege to respond to that question."))  Alexander refused to answer any questions about Quantcoin
and asserted the Fifth Amendment throughout this line of questioning apparently because he fears
criminal prosecution:

> Q.       You're asserting your Fifth Amendment Privilege because you fear criminal
>          prosecution if you answer these questions?  Is that so?
>
> Mr. Sparks:    James, if you're asserting your Fifth Amendment Privilege, please
>                say so for the record.
>
> The Witness:  Yes.

(*Id.* at 113.)

Alexander asserted the Fifth Amendment in response to every question regarding the theft of 800
Bitcoin from Cred, including the following:

> Q.       800 Bitcoin went missing from Cred in connection with the Quantcoin
>          situation.  Do you have that 800 Bitcoin?
>
> A.       On advice of counsel, I assert my Fifth Amendment privilege in response
>          to that question.
>
> . . .
>
> Q.       Cred lost 800 Bitcoin in connection with Quantcoin.  Are you aware of the
>          current location of that 800 Bitcoin or the proceeds thereof?
>
> A.       On advice of counsel, I assert my Fifth Amendment privilege in response
>          to that question.
>
> . . .



Letter to the Honorable Maryellen Noreika
June 1, 2021
Page 11

      Q.      Did you take the 800 Bitcoin or any proceeds thereof for yourself, your family, or any consulting company, corporate entity, or any other person?

      A.      On advice of counsel, I assert my Fifth Amendment privilege in response to that question.

      Q.      Did you steal the 800 Bitcoin?

      A.      On advice of counsel, I assert my Fifth Amendment privilege in response to that question.

      . . .

      Q      You purchased your house on February 11th 2020.  Did you use any of the proceeds of the Quantcoin transaction to purchase your house?

      A.      On advice of counsel, I assert my Fifth Amendment privilege in response to that question

      . . .

      Q.      Do you own or have access to any cryptocurrency accounts or wallets that hold the proceeds of the 800 Bitcoin that was lost in connection with the Quantcoin transactions?

      A.      On advice of counsel, I assert my Fifth Amendment privilege in response to that question.

      Q.      Do you own, control, or have access to any bank accounts in the United States or anywhere in the world that contain the proceeds of the 800 Bitcoin that were lost in connection with Quantcoin transactions?

      A.      On advice of counsel, I assert my Fifth Amendment privilege in response to that question.

(*Id.* at 111-18.)

Following this line of questioning, Alexander claimed that he was feeling unwell.  The Trust asked Alexander repeatedly if he was currently located in the United States.  He refused to answer the question.  When his counsel directed him to answer the question, he exited Zoom while the question was pending:

      Q.      Are you in the United States?  It's a yes or no question.  Are you in the United States?

      MR. SPARKS:      James, you have to answer the question.



Letter to the Honorable Maryellen Noreika
June 1, 2021
Page 12

      (Whereupon, the witness exited the deposition.)

(*Id.* at 119-120.)

Alexander's conduct during the deposition sessions was obstructive and evasive.  He failed to answer questions and exited the deposition while a question was pending.  This is the latest in a long line of Alexander's refusals to comply with the Emergency Order and to respect the judicial process.

**6.**      **The Pending Contempt Motion**

For nearly five months, the Trust has attempted to obtain the required information through discovery requests and has further enumerated transactions at issue for Alexander to address individually.  Alexander's continued evasive behavior and escalating hostility towards the lines of questions required by the Emergency Order suggest that further efforts by the Trust to obtain Alexander's compliance would be futile.  Alexander has consistently refused to provide the required information.

The Trust continues to spend an exorbitant amount of time, money, and effort due to Alexander's misconduct.  As this Court knows, these recent deposition sessions followed Alexander claiming he was short of breath during a February 19, 2021 deposition and filing for personal bankruptcy during the break, motion practice in the Northern District of California Bankruptcy Court in which that Court lifted the automatic stay so that the Trust could obtain Alexander's compliance with the Emergency Order, the filing of this Contempt Motion, and Alexander's refusal to participate in the deposition while the Contempt Motion was pending.  When the Trust was finally able to continue these depositions, Alexander remained non-compliant and obstructive.  It is clear that Court intervention is required finally to coerce Alexander to comply.

The Trust respectfully requests that this Court hold Alexander in civil contempt and to issue a bench warrant for his arrest so that he will be incarcerated until he complies with the Emergency Order, including, at a minimum that he simultaneously submits the following under seal to the Court and the Trust:

(1)      A comprehensive declaration which complies with the Emergency Order that explains each transaction, including (a) a detailed explanation (including the sender, recipient, and explanation) of each cryptocurrency transaction in all Coinbase accounts, Ledger Live wallets, and any other cryptocurrency wallet or account that he owns or has access to; and (b) a detailed explanation (including the sender, recipient, and explanation) for each "cash withdrawal" and other transaction in excess of $500 in Alexander's Wells Fargo accounts ███████ █ and JP Morgan Chase accounts.

(2)      Complete records for each Coinbase account, including the unknown account ending in ███;

(3)      Complete records of all cryptocurrency accounts and wallets in Alexander's custody or control;



Letter to the Honorable Maryellen Noreika
June 1, 2021
Page 13

      (4)      Complete account statements for all bank accounts owned or controlled by Alexander, including those held in foreign countries; and

      (5)      Following the satisfactory completion of (1)-(4), that Alexander sit for a deposition.

Following the completion of these orders, the Trust requests that each party file a letter detailing their position on whether Alexander has complied with the Emergency Order and whether he should be released from custody.

Respectfully submitted,

/s/ *Ethan H. Townsend*

Ethan H. Townsend (#5813)

cc:    David R. Hurst
       Timothy W. Walsh
       Andrew B. Kratenstein
       Darren Azman
       Joseph B. Evans

