12:52:37 1                    IN THE UNITED STATES DISTRICT COURT

2                     FOR THE DISTRICT OF DELAWARE

3

4      OFFICIAL COMMITTEE OF UNSECURED )
       CREDITORS OF CRED, INC.,        )
5                                      )
                 Plaintiff,            )
6                                      ) C.A. No. 21-417(MN)
       v.                              )
7                                      )
       JAMES ALEXANDER,                )
8                                      )
                 Defendant.            )
9

10

                        Monday, June 14, 2021
11                      1:00 p.m.
                        Teleconference
12

13                       844 King Street
                        Wilmington, Delaware
14

15

       BEFORE:   THE HONORABLE MARYELLEN NOREIKA
16               United States District Court Judge

17

18

19     APPEARANCES:

20

                        McDERMOTT WILL & EMERY
21                      BY:  ETHAN H. TOWNSEND, ESQ.
                        BY:  JOSEPH B. EVANS, ESQ.
22                      BY:  SAMUEL ASHWORTH

23
                             Counsel for the Plaintiff
24

25

1    APPEARANCES CONTINUED:

2

3                BUCHANAN INGERSOLL & ROONEY
                 BY:  GEOFFREY GRIVNER, ESQ.
4
                 -and-
5
                 COUSINS LAW LLC
6                BY:  SCOTT D. COUSINS, ESQ.

7                          Counsel for the Defendant

8

9                OFFICE OF THE UNITED STATES TRUSTEE
                 BY:  JOSEPH McMAHON, ESQ.

10                         Counsel for the United States Trustee
                           Andrew Vera
11

12                    - - - - - - - - - -

13

12:59:23 14              THE COURT:  Good afternoon, counsel.  Who is

12:59:25 15    there, please?

13:11:22 16              MR. TOWNSEND:  Good afternoon, Your Honor.  This

13:11:24 17    is Ethan Townsend from McDermott Will & Emery.  With me on

13:11:28 18    the line is Joseph Evans from our New York office as well as

13:11:33 19    Sam Ashworth.  With the Court's permission, Mr. Evans will

13:11:36 20    be addressing any of the Court's questions.

13:11:38 21              THE COURT:  All right.

13:11:38 22              MR. GRIVNER:  Good afternoon, Your Honor.

13:11:42 23    Geoffrey Grivner on behalf of James Alexander.  With me on

13:11:42 24    the line is my colleague, Scott Cousins.

13:11:46 25              THE COURT:  Good afternoon to you as well.  So

13:11:48 1      --

13:11:53 2                  Mr. McMAHON:  Your Honor, I'm sorry.  It's

13:11:55 3      Joseph McMahon from the Office of the United States Trustee

13:11:59 4      in Wilmington, Delaware, for Andrew Vera, the United States

13:12:05 5      Trustee.

13:12:05 6                  THE COURT:  All right.  Thank you.  Anyone else?

13:12:12 7                  Okay.  So I have in front of me the documents

13:12:18 8      that have been submitted since our last call with the -- it

13:12:25 9      was the back and forth between the Trust and Mr. Alexander.

13:12:32 10     The first was documents as to what documents there were, and

13:12:42 11     then we have the Trust's requests for information on

13:12:49 12     particular transactions.  We have Mr. Alexander's

13:12:55 13     declaration and explanation to the extent there was an

13:12:58 14     explanation for some of the transfers, and then I have the

13:13:01 15     letter of today.

13:13:03 16                  So I guess where we are is back to where we

13:13:09 17     started which is there is a motion to find Mr. Alexander in

13:13:15 18     contempt and to issue a bench warrant.  The request in the

13:13:22 19     letter that I received today from the Trust is somewhat more

13:13:28 20     moderated, and that is harkening back to our last call

13:13:34 21     asking that I find that there is no explanation for certain

13:13:39 22     of the transactions that were requested.

13:13:46 23                  So in reading the letter and in looking through

13:13:54 24     the detail of the transactions where many things are unknown

13:14:00 25     or unexplained, I guess I would like to hear from

13:14:05 1    Mr. Alexander's counsel as to why those responses are

13:14:12 2    sufficient in order for me to find that Mr. Alexander has

13:14:18 3    complied with the bankruptcy court's order.

13:14:24 4              MR. GRIVNER:  Thank you, Your Honor.  This is

13:14:27 5    Geoffrey Grivner on behalf of Mr. Alexander.

13:14:28 6              THE COURT:  Mr. Grivner, I did have one question

13:14:31 7    before we began and that is that Mr. Alexander submitted a

13:14:36 8    declaration to me and at least as I recall the statute when

13:14:48 9    we have declarations, there is different language if you are

13:14:51 10   in the United States and outside of the United States.  Can

13:14:54 11   you tell me, did he swear to that declaration while inside

13:14:59 12   the United States or outside of the United States?

13:15:02 13             MR. GRIVNER:  Mr. Alexander is currently located

13:15:05 14   in Turkey.  The Committee, or the trustee is well aware of

13:15:11 15   that fact.  So he did not swear to it in the United States,

13:15:14 16   but he signed the declaration under the penalty of perjury

13:15:18 17   as a United States citizen located outside of the country.

13:15:23 18             THE COURT:  And doesn't it require that it say

13:15:27 19   that it be under penalty of perjury under the laws of the

13:15:31 20   United States if you are not executing it within the United

13:15:35 21   States?

13:15:35 22             MR. GRIVNER:  Your Honor, honestly, that's not

13:15:38 23   an issue that has been previously raised by the Committee.

13:15:42 24   We have been using this language for the declaration.  You

13:15:45 25   very well could be pointing out an issue that we had not

13:15:49 1   previously flagged and if there is concern regarding the

13:15:54 2   authenticity of the swear or the effectiveness of the sworn

13:15:57 3   statement, we will certainly promptly correct that, but we

13:16:00 4   can look into that.  It was certainly nothing done

13:16:04 5   intentionally.

13:16:04 6          THE COURT:  So you understand it to be a sworn

13:16:08 7   declaration that when it says -- that it was referring to

13:16:16 8   perjury, we're talking about perjury in terms of the United

13:16:23 9   States' laws; correct?

13:16:25 10          MR. GRIVNER:  Correct, Your Honor.

13:16:26 11          THE COURT:  I am sorry, I interrupted you when I

13:16:30 12   had already asked you a question.  So go ahead.

13:16:32 13          MR. GRIVNER:  Not a problem at all, Your Honor.

13:16:35 14          With respect to the process that we undertook,

13:16:38 15   as Your Honor saw we have produced various records regarding

13:16:42 16   the accounts at issue.  Thereafter we received a request to

13:16:49 17   provide additional information for 177 transactions.  That

13:16:54 18   was far more than we were expecting and I think far more

13:16:59 19   than was suggested would be the workload with respect to

13:17:02 20   these obligations.  Nevertheless, we undertook that process.

13:17:08 21   Many, many hours were utilized both within my firm as well

13:17:11 22   as by Mr. Alexander individually to ascertain any and all

13:17:17 23   information that could be determined with respect to the

13:17:20 24   transactions that were identified in the committee's letter.

13:17:27 25          There is a reality here, Your Honor, which I

think we highlighted to the Court previously that

Mr. Alexander was operating Cred Capital, Inc. to his

knowledge and to his understanding as the sole officer and

director of that company without accounting support, without

a management team and things of that nature.  So there are

not sophisticated business records regarding many of the

expenditures of this company.

We searched for them, we asked for them, we

engaged in a process to determine all of the information

that was available for the 177 transactions that were

identified by the Committee and we did our level best to

supply --

THE COURT:  And Mr. Grivner, should the

Committee go back to the bankruptcy court and seek to have

those transactions deemed inappropriate or to get a finding

that he breached his fiduciary duty in making those

transactions, is it your understanding that Mr. Alexander

would attempt to show that they were in fact appropriate

given that he can't say what they're for?

MR. GRIVNER:  Your Honor, I think you're

searching for the right word regarding inappropriate versus

fraudulent as the term that the committee's counsel has

proposed in their letter versus some sort of concept that

these were -- these are unaccounted for payments or

transactions carried out in the name of Cred Capital, I

think that -- I think there is some -- there is some term and there is some concept that Mr. Alexander would fully agree to and consent to.  These are transactions that he undertook in what he believed to be his capacity as the sole officer and director of Cred Capital.  The bankruptcy court very well might make a determination that he had no right to make any of those payments.  A motion to dismiss the bankruptcy on that basis has already been denied.  There may be some res judicata effect to that already.

But to answer your question, if Mr. Alexander is going to try to prove that they were legitimate, I don't believe Mr. Alexander will be in a position to do that because Your Honor has ordered us to search for and produce and provide all of the information available with respect to these transactions.  That's what we have done and there is nothing more to uncover.  We are not hiding the ball to say ah-hah, here is the receipt for the $500 expense at Staples. We have looked for that sort of information and we don't have that information.

THE COURT:  And what about the fact that it seems like every time we go back and talk about things, another account comes up or another wallet comes up that wasn't previously disclosed.  Now after I think during the last call we were limited to the particular bank accounts that were listed, now it turns out that there actually is

13:21:25 1    another bank account.  What do we do with that going

13:21:29 2    forward?  I mean, how are we supposed to get to the bottom

13:21:35 3    of what accounts he has?

13:21:39 4           MR. GRIVNER:  Your Honor, with respect to the

13:21:41 5    bank account that was disclosed in this latest -- in this

13:21:47 6    latest declaration, that's something that we found out about

13:21:51 7    on Friday.  It was disclosed to the Committee immediately.

13:21:56 8    This is a personal bankruptcy -- sorry, this is a personal

13:22:01 9    bank account that was opened by Mr. Alexander as he was

13:22:06 10   trying to come out of his personal bankruptcy.  This is not

13:22:10 11   something that's been hidden from the Committee.  It's not

13:22:13 12   some long-standing account that relates to these other

13:22:16 13   issues.  We found out about it.  We debated as to whether or

13:22:19 14   not it even needed to be disclosed under the circumstances.

13:22:22 15   But in the interest of full disclosure and transparency, we

13:22:27 16   have made that fact known.

13:22:32 17          Additionally with respect to the Coinbase

13:22:34 18   account, here are all the documents we had, et ceterea, et

13:22:37 19   cetera.  What we endeavored to do thereafter was to set up a

13:22:42 20   Zoom call with the Committee crypto experts and hand over

13:22:46 21   all of the passwords.  During that process we explained how

13:22:49 22   the different wallets work and things of that nature.

13:22:52 23   Mr. Alexander who is better versed in this than me explained

13:22:56 24   how the different wallets are set up and things of that

13:22:59 25   nature.  And the committee's expert said oh, I get it.  I

13:23:03 1   agree.  I see what you're talking about here.  The Committee

13:23:06 2   really thinks that there is some great mystery that is being

13:23:10 3   kept from them, and that is just not the case.

13:23:15 4          MR. EVANS:  Your Honor, this is Joe Evans from

13:23:18 5   the Trust.  I would like to address first the Turkey bank

13:23:22 6   issue.  I was surprised that there was another bank account

13:23:27 7   that we just learned about on Friday.  It had not been

13:23:30 8   listed on any of his bankruptcy disclosures or any of his

13:23:34 9   prior deposition testimony or discovery responses.  And

13:23:38 10  Mr. Grivner said it's not like it was being hidden from the

13:23:41 11  Trust, but on May 13, 2021, we took the deposition of

13:23:45 12  Mr. Alexander and asked him specifically do you have access

13:23:47 13  to any other bank accounts.  He said no, the only two

13:23:50 14  accounts he has is the USAA Bank and the JP Morgan.  This

13:23:57 15  was a month after he opened up the Turkish bank account.  He

13:23:57 16  also said in his declaration that all of the assets in this

13:24:00 17  Turkish bank account are withdraws from retirement accounts.

13:24:02 18  But then he goes on in paragraphs 128 and 129 to identify a

13:24:06 19  $20,000 transaction and a $45,000 transaction, a wire out to

13:24:12 20  this KurveyTurk bank account.  And those aren't retirement

13:24:12 21  accounts.

13:24:12 22          So we still have not received any account

13:24:18 23  statements or details or anything else from this Turkish

13:24:22 24  bank account.  We also asked him if he within Turkey had any

13:24:26 25  financial institutions or opened any bank accounts, he said

13:24:28 1    no.   This is just another example of another account that

13:24:31 2    was revealed during the course of our investigation not

13:24:33 3    because he voluntarily did it but because we went through

13:24:37 4    this process where we identified a specific transaction, the

13:24:39 5    20,000 April 14th and the 20,000 April 23rd and he had to

13:24:43 6    identify it.

13:24:45 7             With respect to the Coinbase account

13:24:47 8    Mr. Alexander did join, in conference with Bitcoin experts

13:24:51 9    we did confirm there was an additional wallet.  We're

13:24:58 10   looking into it.  We're looking into whether there are any

13:25:01 11   other Bit currency accounts.  Unfortunately that account is

13:25:05 12   empty right now.  So our concern is we're getting sworn

13:25:09 13   statements under oath on the record that are just not

13:25:11 14   correct.  They're not correct.  A month after the account is

13:25:14 15   open, he said there is no other account.  It's just not

13:25:17 16   factual.  It's not accurate.  That's with respect to those

13:25:20 17   two.  So what we put in our letter with respect to

13:25:27 18   KurveyTurk account, the Turkish account is I suppose we have

13:25:30 19   to go through the same process again where we identify a

13:25:33 20   transaction and he tries to explain it.  We haven't received

13:25:37 21   anything from it.  We don't know what is in there.

13:25:40 22             THE COURT:  Okay.  What about the issue of -- I

13:25:48 23   mean, I think that you would probably agree at this point

13:25:52 24   your request for a bench warrant isn't exactly going to get

13:25:56 25   you what you want given that Mr. Alexander appears to be out

13:26:00 1   of the country.  But the sanction that you seem to be

13:26:06 2   requesting in your latest letter is that I determine that

13:26:09 3   those transfers were fraudulent.  And I guess my question

13:26:12 4   there is what is it that you are going to be using those

13:26:22 5   for?

13:26:25 6            As I read the complaint, I'm not sure that to

13:26:30 7   prevail you don't need a finding that the transfers were

13:26:35 8   fraudulent, you simply need a finding that he didn't have

13:26:41 9   the right to make those transfers for something like that.

13:26:49 10  Why is it that you are asking me to find that there was a

13:26:52 11  fraudulent purpose?  Because I'm not sure that's what we --

13:26:58 12  I'm not sure that's what we had discussed on the last call

13:27:01 13  where I thought it was precluding him from asserting that

13:27:04 14  there was a proper purpose.

13:27:07 15           MR. EVANS:  I suppose it would be twofold.  So

13:27:11 16  if we pursue the claim against Mr. Alexander concerning the

13:27:14 17  misuse of these funds, we would want a conclusive ruling, a

13:27:19 18  ruling that he was required to do these things and didn't

13:27:21 19  provide the information, so he's precluded from arguing that

13:27:24 20  those transactions were legitimate.  Also, if there was an

13:27:28 21  action for a fraudulent conveyance or a fraudulent transfer,

13:27:30 22  if you can identify the other people that received these

13:27:35 23  funds pertinent to our investigation, we would want to be

13:27:40 24  able to use it there, too, that would be the reason for that

13:27:42 25  request.

13:27:43 1        THE COURT:  I'm sorry.  I apologize.  Could you

13:27:45 2   repeat that second one for me?  It doesn't seem to me in

13:27:51 3   reading your complaint, I'm not sure that you currently have

13:27:54 4   an action for a fraudulent conveyance, I need you to make

13:27:58 5   that second point.

13:27:59 6        MR. EVANS:  Sure.

13:28:00 7        So the complaint was initially filed in

13:28:05 8   California long before the bankruptcy was ever initiated.

13:28:09 9   And we're examining whether other causes of action are

13:28:13 10  necessary including Mr. Alexander and the fraudulent

13:28:15 11  conveyance of action would be one of the primary causes of

13:28:18 12  action if we were to file an amended complaint.

13:28:23 13       THE COURT:  Okay.  All right.  Anything else

13:28:28 14  anybody wants to add?

13:28:31 15       MR. GRIVNER:  I'll just add -- I'm sorry,

13:28:35 16  Mr. Evans.

13:28:36 17       THE COURT:  Go ahead, just make sure you say

13:28:39 18  your name when you start talking so my court reporter knows

13:28:42 19  who is speaking.  Go ahead.

13:28:46 20       MR. EVANS:  This is Mr. Evans.  There are a

13:28:50 21  couple of pockets that we identified in our letter.  One is

13:28:52 22  a transaction that Mr. Alexander just said were unknown,

13:28:56 23  there were eight of those transactions.  So we would want

13:28:59 24  the adverse inference finding on those transactions.  But

13:29:02 25  there were also fifteen transactions that the Trust

13:29:08 1    identified in their letter that were not addressed all in

13:29:10 2    the declaration and they were supposed to be addressed so we

13:29:12 3    would ask for the same treatment of those --

13:29:15 4              THE COURT:  Let me just -- I think, Mr. Evans,

13:29:19 5    ultimately I'm going to ask you to draft a proposed order

13:29:22 6    for me once you hear what I rule, but I certainly understand

13:29:29 7    in Section 1 of your letter today, in the different sections

13:29:39 8    where you go through, the one that you just mentioned which

13:29:43 9    were transactions that weren't mentioned at all in the

13:29:47 10   declaration, is that in a particular section of your letter?

13:29:52 11             MR. EVANS:  That is Section 6, Your Honor.  It

13:29:55 12   starts on page 6.

13:29:55 13             THE COURT:  Okay.  Hold on.

13:30:04 14             Got it.  So you have already identified those

13:30:10 15   transactions that you just mentioned, the ones that you have

13:30:18 16   essentially no information for?

13:30:20 17             MR. EVANS:  That's correct.

13:30:21 18             THE COURT:  I interrupted you there.  Go ahead

13:30:23 19   if you want to continue.

13:30:25 20             MR. EVANS:  No problem.

13:30:26 21             And then we have a series of transactions, five

13:30:30 22   of them, which were apparently they were cash withdraws.  He

13:30:33 23   said they were in anticipation of making a payment to a

13:30:42 24   consultant, but the payment was never made.

13:30:45 25             THE COURT:  I saw those.

13:30:45 1         **MR. EVANS:  To us those are in the same category**

13:30:49 2  **as not getting a response.  The cash wasn't returned to the**

13:30:51 3  **Trust, so if he withdrew cash but intended to pay someone**

13:30:56 4  **but didn't, then it begs the question where is the cash and**

13:30:59 5  **what did you do, the same question that we've had with the**

13:31:02 6  **other transactions, so we would ask to treat those the same**

13:31:06 7  **way as the rest are treated.**

13:31:08 8         **And the other category, large category of**

13:31:13 9  **expenses are their cryptocurrency transactions.  These are**

13:31:19 10  **in Section 7 where Mr. Alexander defines or describes these**

13:31:24 11  **transactions as the return of principal and interest from**

13:31:27 12  **short-term interest bearing placements of Cred assets, but**

13:31:31 13  **he doesn't say returned from whom.  Throughout these**

13:31:37 14  **depositions, throughout the discovery process there was a**

13:31:39 15  **constant reference to D5 or D specialized financing,**

13:31:44 16  **companies that offer banking products in cryptocurrency, but**

13:31:48 17  **he's not saying this was returned from this D5 platform,**

13:31:53 18  **this was provided by this D5 platform, he says this was**

13:31:57 19  **principal and interest, so we would ask for the same**

13:32:00 20  **treatment of those, too.**

13:32:01 21         **THE COURT:  So what you're asking me for in the**

13:32:04 22  **letter is with respect to the four issues that you just**

13:32:12 23  **raised, and those are in Sections 1, 2, 6 and 7 of your**

13:32:17 24  **letter, you want me to find that those transactions are**

13:32:22 25  **fraudulent as a sanction for contempt of Judge Dorsey's**

13:32:29 1    order.  And then you have in Section 3 and Section 4, you

13:32:42 2    want an order that additional information needs to be

13:32:44 3    provided; is that right?

13:32:46 4              MR. EVANS:  That's right.

13:32:47 5              THE COURT:  And then what are we doing about

13:32:51 6    Sections 5 and 8 of your letter, are those ones where you

13:32:56 7    are continuing to investigate?

13:33:00 8              MR. EVANS:  That's right.  So Section 5 really

13:33:03 9    just addressed the issue raised in Mr. Alexander's letter

13:33:07 10   about the work done in the Coinbase accounts, but we are

13:33:11 11   investigating that.  We don't have any further action from

13:33:14 12   Section 5.  And Section 8 is just responding to

13:33:17 13   Mr. Alexander's statement that he has returned the

13:33:21 14   cryptocurrency to the Trust.  It's not accurate and I wanted

13:33:24 15   to call that out.  But we're not asking for an action item

13:33:28 16   on either 5 or 8.

13:33:31 17            THE COURT:  Okay.  Mr. Grivner, what is your

13:33:45 18   response to Mr. Evans' request that I find that the

13:33:55 19   transactions in those sections of his report to be

13:34:01 20   fraudulent, and he points to a possible paid for fraudulent

13:34:06 21   conveyance?

13:34:09 22            MR. GRIVNER:  Your Honor, I think that that is a

13:34:14 23   bridge too far or a step too far with respect to the dispute

13:34:18 24   that is currently before Your Honor.  We have been ordered

13:34:22 25   to produce all relevant information regarding these

13:34:26 1    transactions.  That is what Mr. Alexander and we have

13:34:31 2    endeavored to do.  To find that they are somehow fraudulent

13:34:37 3    seems to miss the point or miss the conceptual framework of

13:34:42 4    what we are dealing with here today.  The question as to

13:34:46 5    whether if the information simply does not exist, it does

13:34:51 6    not exist.  Mr. Evans can make the claim for fraudulent

13:34:56 7    conveyance, make those allegations, if there is -- depending

13:35:02 8    on where the burden of proof might lie with respect to those

13:35:06 9    claims, Mr. Alexander might have difficulty defending those

13:35:10 10   charges.  But those documents and materials in support of --

13:35:18 11   to verify what exactly happened with those specific

13:35:22 12   transactions do not exist to the best of my client's and my

13:35:29 13   knowledge regarding those.  But to say they're fraudulent

13:35:34 14   seems to go too far.  To say that they are making a finding

13:35:38 15   that they are presently unaccounted for payments and

13:35:41 16   transactions that Mr. Alexander undertook when he believed

13:35:49 17   himself to be the sole director and officer of Cred Capital,

13:35:54 18   that's certainly something that we would agree to and they

13:35:58 19   cannot be accounted for and Mr. Alexander will have to face

13:36:01 20   the consequences of that reality, if it was poor accounting

13:36:06 21   and poor recordkeeping, that's certainly something that

13:36:09 22   would be on him.  But to say it was fraudulent doesn't

13:36:12 23   really seem to connect the dots from our perspective.

13:36:17 24          On a couple of specifics, Your Honor, with

13:36:19 25   respect to the Turkish bank accounts, we have those account

13:36:24 1    statements and we have requested them.  We would be happy to

13:36:27 2    provide them to Mr. Evans today.  That's certainly not a

13:36:32 3    problem.

13:36:33 4              Regarding some of these Coinbased transactions,

13:36:36 5    our understanding was in providing the Committee with full

13:36:40 6    and complete access to all of the Coinbased accounts

13:36:43 7    regarding the ins and outs of those accounts and the fact

13:36:47 8    that they were placed in these D5 platforms for a period of

13:36:52 9    time and interest was collected, that's all accounted for in

13:36:56 10   the documents that we have pending in the online accounts

13:37:00 11   that we have fully and completely handed over.

13:37:03 12             And then with respect to some of the unaccounted

13:37:06 13   for -- the transactions, the sixteen transactions that were

13:37:11 14   not listed, some them are Coinbased transactions, others are

13:37:19 15   payments to consultants that are referenced at least

13:37:23 16   generally in the declaration saying that they were monthly

13:37:28 17   payments and that's what was reflected in the entry within

13:37:31 18   that account.

13:37:32 19             So we believe that we have fully complied with

13:37:36 20   all of the information that is presently available.  If

13:37:41 21   Mr. Alexander has made representations previously under oath

13:37:44 22   that have proven to not be accurate, Mr. Evans certainly has

13:37:50 23   legal recourse to deal with that, but I don't believe that

13:37:54 24   for the purposes of today's motion anything further should

13:37:58 25   be done with respect to that -- to those allegations.

13:38:04  1          THE COURT:  And what about in the letter today,

13:38:09  2   the Trust asked for -- you mentioned the Turkish bank

13:38:16  3   account and said that you would be prepared to produce the

13:38:21  4   statements and transactions there.  What about what they

13:38:26  5   asked for that Mr. Alexander provide the current location of

13:38:32  6   the cash for the transactions in Section 3 by Wednesday?

13:38:45  7          MR. GRIVNER:  And that cash is unaccounted for,

13:38:48  8   Your Honor.  Those were payments that were drawn out of cash

13:38:51  9   and the payments were never made.  That's all the

13:38:53 10   information we have with respect to that.  And we do not

13:38:55 11   have any further information regarding the location of that

13:39:02 12   cash nor how it was specifically spent.

13:39:05 13          THE COURT:  So essentially you're saying however

13:39:08 14   I treat the unknown issues in the other sections, 1, 2, 6

13:39:15 15   and 7, Section 3 should fall within that group?

13:39:21 16          MR. GRIVNER:  That's correct, Your Honor.  Yes.

13:39:24 17          THE COURT:  All right.  Mr. Evans, is that a

13:39:28 18   sufficient way to deal with Section 3, that we treat it as

13:39:37 19   we are treating -- however we treat 1, 2, 6 and 7?

13:39:41 20          MR. EVANS:  Yes, Your Honor.

13:39:42 21          THE COURT:  Okay.

13:39:48 22          MR. EVANS:  And I will add, Your Honor, Joe

13:39:52 23   Evans for the Trust.  That the Coinbased records we have and

13:39:55 24   they show transactions, but they don't show where the

13:39:55 25   transactions are going to or what they are for, so just

13:40:02 1    providing a Coinbased statement is not sufficient.  I

13:40:07 2    thought that was pretty clear through our conversations.

13:40:11 3            THE COURT:  Right.  I'm just trying to figure

13:40:14 4    out because you had asked me to order him to do something.

13:40:18 5    It seems like we have a representation that nothing more is

13:40:22 6    coming, and so I wanted to make sure we dealt with that.

13:40:30 7            MR. EVANS:  And I would add that a finding that

13:40:34 8    these fund are unaccounted for, it doesn't do the Trust much

13:40:38 9    good.  We already know they're unaccounted for.  The person

13:40:42 10   who spent them says he doesn't know where they are and

13:40:46 11   doesn't know what they were for.  And he was required to

13:40:47 12   produce this information.  All of these accounts are funded

13:40:48 13   by Cred assets.  We have limited the transaction, we have

13:40:53 14   identified transactions, I believe every one of the nexus of

13:40:57 15   $4,000, much higher than that, we're not talking about a

13:41:02 16   $150 lunch that he can't remember who was there with him,

13:41:06 17   these are major transactions without any explanation.

13:41:12 18           THE COURT:  Okay.  So thank you for all of that.

13:41:28 19   That was helpful to me today.

13:41:33 20           On February 5th, 2021, the Bankruptcy Court for

13:41:37 21   the District of Delaware issued an order requiring

13:41:40 22   Mr. Alexander to write out exactly what assets he has, when

13:41:42 23   he got them, how he got them, where they were transferred,

13:41:46 24   how they were liquidated, and where the liquidation took

13:41:50 25   place.  He was ordered to address the differences between

bitcoin that the Trust was able to trace and his assertions as to what bitcoin he took possession of.  He was ordered to provide an explanation for each of the transfers subsequent to the initial transfer of all the bitcoin as well as an explanation for why he liquidated the bitcoin and where that money was located.  And he was ordered to describe who the bitcoin or who the funds were transferred to and where they're residing.  More than four months have past since the Bankruptcy Court order and not all of the information required by the order has been produced.  As a result, I have before me the Trust's motion to find Mr. Alexander in contempt of the Bankruptcy Court's order and to issue a bench warrant.

I am going to grant the Trust's motion in part and deny it in part.  To establish civil contempt in the Third Circuit movants must establish that one, a valid court order existed; two, the contemnor had knowledge of the order; and three, the contemnor disobeyed the order.  And that is from *Roe v. Operation Rescue*, 919 F.2d 857, 971.  Civil contention must be established by clear and convincing evidence.  However, the contemnor has the burden to introduce evidence demonstrating why the contemnor was unable to comply with the order.  And that is *Harris v. City of Philadelphia*, 47 F.3d 1311, 1324 from 1995.

The evidence must be beyond a mere assertion of

inability and the contemnor must show that he has made in
good faith all reasonable efforts to comply.

        Here there is no question that the Bankruptcy
Court order is valid and Mr. Alexander knew of the order.
The question is whether he complied with it.  I find that he
did not fully comply with the order.  Mr. Alexander has had
multiple opportunities to comply with the order but has
repeatedly provide inadequate responses.  Indeed, it appears
that every time he is given another chance, new accounts or
new transactions are uncovered, accounts and/or transactions
that should have long ago been disclosed.  Mr. Alexander has
also been uncooperative during depositions failing to answer
questions that he did not wish to answer and even
unilaterally terminating the proceedings.  He has also given
answers such as those about what bank accounts he has at
deposition that appear to be false.  Moreover, I find that
his assertions that he has no real memory of many of the
transactions listed are not particularly credible given the
relatively recent transactions and the substantial amounts
of many of those transactions.  Thus I find that
Mr. Alexander has not complied with the Bankruptcy order and
the question then is what sanction is appropriate.

        I think that issuing a bench warrant is not
appropriate here and I'm unsure of its effectiveness given
the representation that Mr. Alexander is currently in Turkey

and that being incarcerated would not lend any ability for

him to investigate the issues further.  But I do think his

conduct requires a sanction, therefore, as a sanction I am

going to determine that Mr. Alexander is precluded from

challenging that the transactions in Sections 1, 2, 3, 6 and

7 in the Trust's June 14th letter, he is precluded from

challenging that those transactions were made for an

improper purpose.  He is precluded from challenging that he

did not have the right to make the transfers listed in those

sections.

        As for the issues in Section 4 of the Trust's

letter, I will order Mr. Alexander to produce the

information requested by June 16th.  And I understand there

is a representation from counsel that that information may

be provided later today.

        To the extent that the Trust investigation is

continuing, to the extent that the Trust uncovers additional

accounts or transactions, the Trust may come back and seek

an order as to those accounts or transactions that would

similarly preclude Mr. Alexander from asserting and

challenging, it would preclude him from challenging that

those were improper transactions.

        So with that said, I am going to ask that the

parties go back and draft an order, and not simply an order

that says what I said on the record is the order, I want a

13:46:57 1   specific order that outlines what we are doing with the

13:47:01 2   various transfers that are listed in the June 14th letter.

13:47:08 3                 So that's my ruling on the motion that is

13:47:12 4   pending.  Are there any questions?

13:47:18 5                 MR. EVANS:  Your Honor, this is Joe Evans from

13:47:20 6   the Trust.  With respect to the Turkish bank accounts, after

13:47:23 7   Mr. Alexander provides the account statements either today

13:47:27 8   or on the 16th, we were intending to go through that same

13:47:32 9   process where we would identify transactions and

13:47:35 10  Mr. Alexander would respond.  And what I'm asking for is on

13:47:41 11  the 16th when he provides these account statements that the

13:47:47 12  Trust identifies a transaction file on Monday and then give

13:47:51 13  Mr. Alexander three days to explain those transactions and

13:47:57 14  only if we had any issues with those responses that we

13:48:00 15  submit a letter to Your Honor and ask for a status

13:48:04 16  conference on his compliance on that.

13:48:07 17                THE COURT:  All right.  Mr. Grivner, that sounds

13:48:09 18  reasonable.  What do you say?

13:48:10 19                MR. GRIVNER:  That sounds reasonable to me, Your

13:48:12 20  Honor, so long as Mr. Evans has some basis to believe that

13:48:17 21  the transactions in that Turkish bank account involve assets

13:48:27 22  that were at any time Cred assets.  My understanding is that

13:48:32 23  account was set up for something completely different.  I

13:48:34 24  can go back and look at that.  But I don't want to put

13:48:38 25  Mr. Alexander in a position where there is some sort of

13:48:41 1   fishing expedition without any basis to believe that the

13:48:44 2   assets in question were ever --

13:48:47 3            THE COURT:  Well, Mr. Grivner, I am going to

13:48:50 4   order that the information be produced at a minimum because

13:48:55 5   Mr. Alexander was apparently asked about bank accounts in

13:49:00 6   Turkey and he did not answer truthfully about them.  And it

13:49:04 7   appears that there is still a substantial amount of money

13:49:10 8   missing, so I think it's fair that the Trust be able to

13:49:14 9   explore those.

13:49:16 10           As for an appropriate sanction, I guess we'll

13:49:19 11  take that up when and if there is a status conference as

13:49:26 12  Mr. Evans requested.

13:49:30 13           MR. EVANS:  Thank you, Your Honor.  This is

13:49:34 14  Mr. Evans for the Trust.  I would ask that like the last

13:49:36 15  submission that they be submitted both to the Trust and the

13:49:40 16  Court under seal.

13:49:43 17           THE COURT:  That's fine.  I think that worked

13:49:45 18  before.  Mr. Evans, any issue with that?

13:49:47 19           MR. EVANS:  Not at all, Your Honor.  Thank you.

13:49:49 20           THE COURT:  Then I'm going to ask you,

13:49:52 21  Mr. Evans, to go back and draft the order with the specifics

13:49:56 22  that I asked, discuss it with Mr. Grivner and submit it to

13:50:00 23  me.  Hopefully you can do that before the end of the week.

13:50:07 24  If you can't, then send us a letter telling us when you

13:50:10 25  think that you'll be able to submit it.

13:50:13 1                    MR. EVANS:  Will do.  Thank you, Your Honor.

13:50:15 2                    THE COURT:  Anything else we need to discuss

13:50:17 3    while we're on the phone?

13:50:21 4                    MR. GRIVNER:  No, Your Honor.  Thank you.

13:50:23 5                    MR. EVANS:  Thank you.

13:50:23 6                    THE COURT:  All right, everyone.  Thanks again

13:50:25 7    for helping us to understand the issues here.  And we'll

13:50:30 8    look forward to getting some submissions from the parties

13:50:33 9    later in the week.

          10                    (Teleconference concluded at 1:50.)

          11

          12              I hereby certify the foregoing is a true and
                accurate transcript from my stenographic notes in the proceeding.
          13

          14                              /s/ Dale C. Hawkins
                                         Official Court Reporter
          15                               U.S. District Court

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25